# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE** | * | **CASE NO. 20-32679** |
| | * | |
| **HORNBECK OFFSHORE SERVICES, INC.,** *et al.*[1] | * | **CHAPTER 11** |
| | * | |
| **Debtors,** | * | **JOINTLY ADMINISTERED** |
| | * | |

## JOINT MOTION FOR RELIEF FROM THE AUTOMATIC STAY

**This is a motion for relief from the automatic stay. If it is granted, the movant may act outside of the bankruptcy process. If you do not want the stay lifted, immediately contact the moving party to settle. If you cannot settle, you must file a response and send a copy to the moving party at least 7 days before the hearing. If you cannot settle, you must attend the hearing. Evidence may be offered at the hearing and the court may rule. Represented parties should act through their attorney. There will be a hearing on this matter on July 6, 2020 at 2:00 p.m. in courtroom 400, 515 Rusk, Houston, TX 77002.**

      **NOW INTO COURT,** through undersigned counsel, comes Gulf Island Shipyards, LLC ("**Gulf Island**") and Zurich American Insurance Company and Fidelity & Deposit Company of Maryland (collectively, the "**Sureties**"), who respectfully request that this Honorable Court enter an Order herein granting Gulf Island and the Sureties relief from the automatic stay of § 362(a) of the United States Bankruptcy Code, 11 U.S.C. § 362(a), to allow Gulf Island and the Sureties to continue to pursue an action currently pending in the Twenty-Second Judicial District Court (Suit No. 2018-14866), Parish of St. Tammany, State of Louisiana (the "**State Court Action**") involving the debtor, Hornbeck Offshore Services, LLC ("**HOS**" or "**Hornbeck**"), which action was stayed by the commencement of the above-captioned bankruptcy proceedings, and to otherwise preserve

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/hornbeck.  The location of the Debtors' service address is: 8 Greenway Plaza, Suite 1525, Houston, Texas 77046.

2726329.12

and allow Gulf Island and the Sureties to pursue their respective rights of setoff and recoupment.[2] In support thereof, Gulf Island and the Sureties respectfully state as follows:

## THE DEBTORS

1.      HOS and its affiliates (collectively, the "**Debtors**"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), on May 19, 2020 (the "**Petition Date**").  The Debtors have continued to operate their businesses and manage their property as debtors-in-possession.

## JURISDICTION AND VENUE

2.      This Honorable Court is vested with subject matter jurisdiction to grant the relief sought herein pursuant to 28 U.S.C. § 1334(b) and 11 U.S.C. § 362.

3.      Venue is proper in this district under 28 U.S.C. § 1409.

## CORE PROCEEDING

4.      This matter is a "core proceeding," and this Honorable Court may enter an appropriate final order or judgment herein, in accordance with 28 U.S.C. § 157 and General Order 2012-6 of the United States District Court for the Southern District of Texas.

## PROCEDURE

5.      Procedurally, this matter is governed by 28 U.S.C. §§ 157 and 1334, Rules 4001 and 9013 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and BLR 4001-1 and 9013-1.

## RELIEF REQUESTED

6.      Gulf Island and the Sureties request that, pursuant to Bankruptcy Code § 362(d)(1), this Honorable Court terminate the automatic stay of § 362(a) to permit the pending State Court

---

[2] See Notice of Plan Supplement for the Debtors' First Amended Joint Prepackaged Chapter 11 Plan of Reorganization [Doc. No. 129], at p. 22 of 35.

2726329.12

Action to continue to conclusion to resolve all claims, counterclaims (known in Louisiana as reconventional demands), and issues therein, including those relative to the right to possession of the Vessels, Gulf Island's right to complete construction of the Vessels, Hornbeck's defaults under the Agreements, Hornbeck's purported termination of the Agreements prepetition and/or their continued viability and the liquidation of all claims and counterclaims, and to make the termination of the automatic stay effective immediately upon entry of the Court's Order.

## FACTS

### A.   Introduction

7.      Gulf Island and Hornbeck are parties to two Vessel Construction Agreements (the "**Agreements**"), originally executed in May 2013 and since amended from time to time, for the construction of two vessels (the "**Vessels**").  The combined contract price for the two Agreements exceeds $176 million.  Certain obligations of Gulf Island under the Agreements are secured by performance and payment bonds issued by the Sureties.[3]  The Agreements were prepared from a form provided in April 2013 by Hornbeck's Executive Vice President, General Counsel and Chief Compliance Officer, Samuel A Giberga.[4]

### (i)    The Agreements

8.      The Agreements provide that, "[f]or the Contract Price," Gulf Island will design and build the vessels "designed, constructed, outfitted and tested in accordance with the Contract Documents."[5]  The term "Contract Documents" is defined in the Agreements. This dispute arose when Hornbeck began to demand work outside the scope of the Contract Documents.

---

[3] The total contract price is currently $176,446,849.00.  *See* **Gulf Island exhibit "1"** (affidavit of Kirk Meche).  While the two Agreements originally specified a contract price of $62,600,000 each, the "Second Amendment" to each contract changed the contract prices to $89,831,769 and $86,615,080.  *See* Docs. 134-2, 134-3(original Agreements); *see also* Doc. 134-6, 134-7 (Second Amendments to Agreements).
[4] **Gulf Island exhibit "2"** (affidavit of Christian Vaccari).
[5] Original Agreements (Docs. 134-2, 134-3) at Article 2.2.

9.     The Agreements establish Delivery Dates by which vessel construction was projected to be completed.[6]  The Delivery Dates may be extended because of, among other things, "Change Orders" contemplated in Article 9 of the Agreements.[7]  Pursuant to Article 6 of the Agreements, Gulf Island provided detailed project schedules to Hornbeck and also provided Hornbeck with timely updates to those project schedules.[8]

10.     The Agreements give Hornbeck the right to "make any deductions from or additions to the Work on giving due notice in writing to [Gulf Island], the cost of any such changes to be agreed upon in advance by [Hornbeck] and [Gulf Island], and added to or deducted from the total Contract Price."[9]  However, Article 9.1 expressly provides that "[i]f any such change shall affect the Delivery Date of the Vessel, the Delivery Date shall be adjusted so as to allow [Gulf Island] a reasonable additional time sufficient to cover such delay…."[10]  In other words, Hornbeck had the right to add to the scope of work to be performed by Gulf Island and if it did so, the Vessels' contract prices would be updated and the delivery dates shall be extended.  The Agreements impose no deadline by which any change order concerning the delivery dates or contract prices must be sought or issued.

11.     The Agreements also specifically address how and under what circumstances they may be terminated.  Hornbeck may not terminate the Agreements for its convenience.  Instead, the Agreements provide that Hornbeck may terminate the Agreements if and only if:  (a) an "event of default" has in fact occurred; (b) Hornbeck has provided notice of the default pursuant to Article 14.1 of the Agreements, and (c) Gulf Island had failed to cure the default as specified in Article

---

[6] Original Agreements (Docs. 134-2, 134-3) at Article 1.
[7] Original Agreements (Docs. 134-2, 134-3) at Articles 7, 9.
[8] Original Agreements (Docs. 134-2, 134-3) at Article 6; *see also*, **Gulf Island exhibit "3"** (affidavit of Todd Ladd). *See also*, **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche) with attachments).
[9] Original Agreements (Docs. 134-2, 134-3) at Article 9.1.
[10] Original Agreements (Docs. 134-2, 134-3) at Article  9.1 (emphasis added).

14.1.[11]  Unless and until all of those conditions have been satisfied, Gulf Island has the absolute

right to retain possession of the Vessels and to complete their construction in its shipyards, in

accordance with the terms and conditions of the Agreements and without interference by

Hornbeck.

12.     Furthermore, Article 14.1, whose key provisions are directly derived from the form

that Hornbeck supplied in connection with the negotiation of the Agreements,[12] provides that even

if an event of default has in fact occurred and a valid termination by Hornbeck follows, Hornbeck

must pay Gulf Island for "those parts of the Work incorporated into, supplied or delivered to the

Vessel by [Gulf Island] less the amount of the Contract Price previously paid by [Hornbeck] and

less any other amounts due to [Hornbeck] due to [Gulf Island's] default."[13]

13.     Notably then, regardless of who has title to the Vessels, the Agreements do not

grant Hornbeck any right to possess and remove them from Gulf Island's facilities unless two

things occur: (a) Gulf Island defaults on the Agreements; and (b) Hornbeck validly terminates the

Agreements.[14]  If and only if Hornbeck proves that (a) Gulf Island has defaulted under the

Agreements, and (b) Hornbeck validly terminated those Agreements, do the Agreements allow

Hornbeck (after it fulfills certain obligations to Gulf Island) to, "at its sole discretion and cost,

transfer to an alternative shipyard, the Work in progress, the related materials, equipment and

[Hornbeck] Furnished Items pertaining to the Vessel."[15]

> *(ii)*     ***The Underlying Dispute***

14.     During the course of Gulf Island's construction of the Vessels, Hornbeck began to

---

[11] Original Agreements (Docs. 134-2, 134-3) at Article 14.1.
[12] **Gulf Island exhibit "2"** (affidavit of Christian Vaccari).
[13] Original Agreements (Docs. 134-2, 134-3) at Article 14.1.
[14] Original Agreements (Docs. 134-2, 134-3) at Article 14.1.
[15] Original Agreements (Docs. 134-2, 134-3) at Article 14.1.

2726329.12

demand additional Work that was not required under the Agreements.[16]  Specifically, beginning at least in early 2017, Hornbeck demanded from Gulf Island a level of engineering and detailed construction documentation that the Contract Documents do not require with regard to the Vessels' electrical systems, including, but not limited to, work that exceeds requirements of the Regulatory Authorities, and detailed engineering and detailed construction documentation not specified in the Contract Documents.[17]

15.     Eventually Hornbeck issued a unilateral May 25, 2017, directive that no additional cable was to be pulled into the Vessels until Gulf Island satisfied Hornbeck's demands for additional engineering, drawing, and design.[18]  That directive delayed construction of the Vessels as a whole, because the installation of cable is a critical path item for the completion of the Vessels.[19]  Hornbeck's unilateral directive has never been changed or rescinded.[20]

16.     Until Hornbeck directed Gulf Island to stop pulling any additional cable into the Vessels, Gulf Island consistently provided Hornbeck with timely, updated Project Schedules that projected Vessel delivery dates that were always within the time periods prescribed by the Agreements.[21]  Thereafter, the parties engaged in months of discussions related to the scope of Hornbeck's demand for the extra-contractual work from Gulf Island.[22]  Gulf Island and Hornbeck engaged in multiple executive meetings, including meetings between Gulf Island's executive staff

---

[16] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche); *see also,* **Gulf Island exhibit "4"** (affidavit of Allen Nierenberg).
[17] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche); *see also,* **Gulf Island exhibit "14"** (affidavit of Allen Nierenberg).
[18] **Gulf Island exhibit "3"** (affidavit of Todd Ladd); *see also,* **Gulf Island exhibit "5"** (affidavit of Cliff Long); *see also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche); *see also,* **Gulf Island exhibit "6"** (affidavit of Gary Suer).
[19] **Gulf Island exhibit "3"** (affidavit of Todd Ladd); *see also,* **Gulf Island exhibit "6"** (affidavit of Gary Suer).
[20] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk Meche); *see also,* Gulf Island **exhibit "6"** (affidavit of Gary Suer).
[21] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche); *see also,* **Gulf Island exhibit "6"** (affidavit of Gary Suer).
[22] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche); *see also,* Gulf Island **exhibit "6"** (affidavit of Gary Suer).

and Hornbeck's Chief Operating Officer, Carl Annessa, and Hornbeck's Chief Executive Officer, Todd Hornbeck.[23]  Hornbeck even implemented a "pause" in the work, presumably to permit those discussions to continue.[24]  Indeed, those discussions were continuing even after Hornbeck issued a notice of alleged defaults on December 27, 2017.[25]  However, Hornbeck never agreed to the scope of the extra-contractual work or lifted its directive to Gulf Island to stop pulling cable in the Vessels.[26]  Instead, even while those discussions were continuing, on March 19, 2018, Hornbeck abruptly issued its purported notice of termination of the Agreements and asserted its claims under the bonds that were issued in connection with the Agreements.[27]  Hornbeck cites as the basis for its termination the very delays that Hornbeck itself caused when it directed Gulf Island to stop pulling cable in the Vessels, interfered with Gulf Island's means and methods for performing the Work, and demanded additional Work not required in the Agreements.  Hornbeck cannot benefit from its own actions and certainly cannot use these actions to either terminate the Agreements or interfere with Gulf Island's possessory privileges.

### (iii)    *Hornbeck's Bond Claim Is Denied*

17.    On March 19, 2018, the same day that it issued its purported notice of termination to Gulf Island, Hornbeck made a demand on the Sureties, which had issued the performance bonds in connection with the Agreements. After due investigation, the Sureties denied Hornbeck's claim

---

[23] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche).
[24] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche); *see also,* Gulf Island **exhibit "6"** (affidavit of Gary Suer).
[25] **Gulf Island exhibit "3"** (affidavit of Todd Ladd); *see also,* **Gulf Island exhibit "7"** (affidavit of Christian G. Vaccari).
[26] **Gulf Island exhibit "3"** (affidavit of Todd Ladd); *see also,* **Gulf Island exhibit "7"** (affidavit of Christian G. Vaccari).
[27] **Gulf Island exhibit "3"** (affidavit of Todd Ladd).  *See also,* **Gulf Island exhibit "1"** (affidavit of Kirk J. Meche) with attachments).

on August 16, 2018, because they concluded that Hornbeck had not established that Gulf Island was in default under the Agreements or that Hornbeck had a right to terminate them.[28]

**B.**      **Status of the State Court Action**

18.      On October 2, 2018, Gulf Island filed the State Court Action against Hornbeck for, among other things, damages as a result of Hornbeck's breaches of and defaults under the Agreements, recognition of Gulf Island's right to complete the Vessels pursuant to the Agreements, recognition of Hornbeck's obligation to pay amounts owed under the Agreements, a declaration that Hornbeck's termination of the Agreements is ineffective, and otherwise asserting Gulf Island's rights under the Agreements.[29]   Hornbeck filed a reconventional demand (the Louisiana law equivalent of a counterclaim), which subsequently was amended that, among other things, joined the Sureties as defendants-in-reconvention.[30]   The Sureties answered and denied Hornbeck's amended reconventional demand.[31]

19.      The State Court Action has not been set for trial.   No scheduling order has been issued.  No depositions have been scheduled or taken.  Gulf Island and Hornbeck have propounded written discovery to each other and, pursuant to an agreement between counsel, Gulf Island and Hornbeck are in the process of producing discoverable documents on a "rolling basis."[32]

20.      The central issues in Gulf Island's case are whether Hornbeck breached and defaulted under and is liable to Gulf Island for damages under the Agreements, whether Gulf Island has the right to complete the Vessels pursuant to the Agreements, whether Gulf Island defaulted under the Agreements, whether Hornbeck validly terminated the Agreements, and the validity and

---

[28] **Gulf Island exhibit "8"** (affidavits of sureties' representative and attachments); *see also,* **Gulf Island exhibit "9"** (sureties' answer to Hornbeck's amended reconventional demand).
[29] **Gulf Island exhibit "10"** (petition).
[30] **Gulf Island exhibit "11"** (Hornbeck's original and amended reconventional demand).
[31] **Gulf Island exhibit "9"** (sureties' answer to Hornbeck's reconventional demand).
[32] **Gulf Island exhibit "12"** (affidavit of Adam McNeil).

application of Gulf Island's security interest and Louisiana statutory liens and privileges, including a right to retention, of the Vessels.[33]

21.     At this stage in the litigation, there exist genuinely disputed issues of material fact both as to whether Hornbeck breached and defaulted under the Agreements and, if so, the damages and other amounts owed by Hornbeck to Gulf Island as a result, a determination of Gulf Island's right to complete the Vessels under the Agreements, whether Gulf Island defaulted under the Agreements, and whether Hornbeck validly terminated, the Agreements.  <u>Indeed, the State Court has already twice denied Hornbeck's motions for partial summary judgment to allow it to take possession of the Vessels and all Material and equipment</u>.  In its first motion for partial summary judgment, filed in February 2019, Hornbeck asserted that it was "entitled to the immediate possession of Hull 369 and Hull 370 and all Materials and Equipment."[34]  On July 1, 2019, the State Court entered judgment denying that request.[35]  In its second motion for partial summary judgment, filed in September 2019, Hornbeck again asserted that it was "entitled to the immediate release of the Vessels and all Material and equipment."[36]  On November 21, 2019, the State Court entered judgment denying that request.[37]

22.     In response to both of Hornbeck's motions for partial summary judgment on the issue of possession, Gulf Island presented evidence, including all of the evidence referenced above, demonstrating that genuine issues of fact existed regarding, among other things, whether Hornbeck breached and defaulted under the Agreements, the amount owed by Horneck to Gulf Island under the Agreements, including damages owed as a result of Hornbeck's defaults, whether Gulf Island

---

[33] **Gulf Island exhibit "10"** (petition).
[34] **Gulf Island exhibit "13"** (Hornbeck's first motion for partial summary judgment).
[35] **Gulf Island exhibit "14"** (State Court judgment, July 1, 2019).
[36] **Gulf Island exhibit "15"** (Hornbeck's second motion for partial summary judgment).
[37] **Gulf Island exhibit "16"** (State Court judgment, November 21, 2019).

had a right to complete the Vessels under the Agreements, whether Gulf Island had defaulted under the Agreements, and whether Hornbeck's purported terminations were therefore effective. Such evidence demonstrates that—by directing Gulf Island to stop pulling cable in the Vessels, interfering with Gulf Island's means and methods for performing the Work, and demanding additional Work not required in the Agreements—<u>Hornbeck itself caused the very delays that it cited as the "event of default" entitling it to terminate the Agreements</u>. The Agreements expressly provide, however, that although Hornbeck has "the right to make any deductions from or additions to the Work. . .[,] [i]f any such change shall affect the Delivery Date of the Vessel, the Delivery Date <u>shall be adjusted so as to allow the Builder a reasonable additional time sufficient to cover such delay or to shorten the period for delivery.</u>"[38]  Accordingly, no "event of default" occurred: Hornbeck's actions entitled Gulf Island to change orders extending the Vessels' delivery dates and updating the contract prices.

23.     Accordingly, Hornbeck's purported termination of the Agreements was premature, invalid, and ineffectual, and, therefore, Hornbeck has no right to take possession of the Vessels from Gulf Island.

24.     Indeed, <u>Hornbeck conceded that whether Gulf Island defaulted remains a genuinely disputed issue</u>. In its reconventional demand, for example, Hornbeck asserts that "[t]here is a present, actual, justifiable, and substantial controversy between the parties as to whether [Hornbeck] properly terminated the Agreements."[39]  Hornbeck's second summary judgment motion referenced Gulf Island's "disputed claim for . . . wrongful termination of the Agreements," noted that Hornbeck "disputes" Gulf Island's "contention that [Hornbeck] caused Gulf Island's delay," and argued that "[i]f [Hornbeck] did not properly terminate the Agreements, then Gulf

---

[38] Original Agreements (Docs. 134-2, 134-3) at Article 9.1.
[39] **Gulf Island exhibit "11"** (original and amended reconventional demand).

Island has a claim for breach of contract . . . until such time that this Court adjudicates whether or not termination was or was not proper." [40]

25.    Additionally, in response to Hornbeck's motions for partial summary judgment, Gulf Island argued that even if Hornbeck's purported termination of the Agreements was not premature, invalid and ineffectual, Hornbeck still had no right to take possession of the Vessels. Article 14.1 of the Agreements provides that even in the event of a valid termination, Hornbeck must pay Gulf Island for "those parts of the Work incorporated into, supplied or delivered to the Vessel by the Builder less the amount of the Contract Price previously paid by the Owner and less any other amounts due to the Owner due to Builder's default."[41]   Gulf Island maintains, and its lawsuit against Hornbeck alleges, that even if Hornbeck's purported termination was valid and effectual, Hornbeck still owes Gulf Island $38 million pursuant to Article 14.1, a fact that Hornbeck again <u>conceded</u> remains a genuinely disputed issue:  "There is a *bona fide* dispute over how much, if any of the $38 million HOS will ultimately be liable to pay."[42]

26.    Furthermore, to the extent that a debt is due by Hornbeck to Gulf Island, that debt is inarguably secured by statutory privileges.  Louisiana law grants every builder of vessels, such as Gulf Island, two separate privileges, one under La. Civ. Code art. 3217 and one under La. Rev. Stat. § 9:4502.  La. Civ. Code art. 3217 specifically provides a "special privilege" to one who builds and work on movables "for the price of his labor, on the movable which he has repaired or made, if the thing continues in his possession." La. Civ. Code art. 3217 (West 2019).  The privilege under article 3217 carries with it a right of detention; the builder with possession may keep

---

[40] **Gulf Island exhibit "17"** (Hornbeck's memorandum in support of second motion for partial summary judgment) at pp. 11, 14, 18-19.
[41] Original Agreements (Docs. 134-2, 134-3) at Article 14.1.
[42] **Gulf Island exhibit "17"** (Hornbeck's memorandum in support of second motion for partial summary judgment) at p. 14.

possession as against the owner until the builder is paid.  Daggett, *Louisiana Privileges and Chattel Mortgages* § 86, p. 376-77 (Louisiana State University Press 1942).  The privilege under La. Rev. Stat. § 9:4502, a companion to §9:4501, likewise gives a builder a right to retain possession against the owner until paid.  Unlike the privilege under Civil Code article 3217, the privilege under § 9:4502 (and § 9:4501) is not immediately lost either when the owner regains possession of the object or when a third party gets possession.  Section 9:4502 gives the builder a 120-day right of pursuit.  During this 120-day pursuit period, the privilege remains, and in that instance, the builder can sequester the item.  *Id.*  Thus, even if Gulf Island is in default and Hornbeck's purported termination of the contracts was valid, Gulf Island is entitled under Louisiana law to retain possession of the Vessels pursuant to its Louisiana law privileges for the value of the materials and labor that has been incorporated into the Vessels for which Gulf Island has not been paid.

27.     Gulf Island, Hornbeck, and the Sureties have also engaged in contentious motion practice before the State Court over discovery issues—and particularly regarding the interpretation and application of Louisiana law on the issues of attorney-client privilege, work product, and joint defense and common interest privilege as it concerns communications with consulting and testifying experts and communications between the Sureties' counsel and Gulf Island's counsel.[43] Similar issues will likely continue to arise and require resolution, as all parties anticipate that this matter will require (and has already required) extensive amounts of fact and expert discovery.

28.     Finally, the State Court Action includes two supervisory writ applications that are currently pending before the Louisiana Court of Appeal for the First Circuit, which have been briefed and are awaiting decision.  Hornbeck has filed an application seeking appellate court

---

[43] For example, in January 2020, Hornbeck filed a motion to compel against Gulf Island, which Gulf Island opposed and the State Court has largely denied.  Also in January 2020, the Sureties filed a motion to quash a subpoena duces tecum that Hornbeck issued to one of the Sureties experts; the State Court has denied that motion.

review of the State Court's denial of Hornbeck's motion for partial summary judgment for possession of the Vessels, which includes a request for review of the State Court's findings regarding Gulf Island's statutory privileges and liens under Louisiana law.[44]  The Sureties have filed an application seeking appellate court review of the State Court's denial of the Sureties' motion to quash and for a protective order regarding a subpoena issued by Hornbeck to one of the Sureties' consulting experts, claiming the subpoena requested information and communications that were privileged or otherwise protected under Louisiana law.[45]

## SUMMARY OF ARGUMENT

29.     "Cause" exists to lift the automatic stay to allow the State Court Action to continue. Judicial economy, lack of prejudice to HOS, its estate and its creditors, the balance of hardships, the unique nature of Louisiana law applicable to the dispute, the probability of success on the merits, and other factors all mitigate in favor of stay relief in this matter.

30.     Because this Court may abstain, the automatic stay should be lifted to allow the previously commenced State Court Action to resume.

## LAW AND ARGUMENT

31.     In cases that have considered whether to allow a creditor to pursue litigation against the debtor in another forum, the courts have balanced the hardship on the debtor, the estate and other creditors against the hardship on the movant, while also considering the goals of the Bankruptcy Code.  *Peters v. McAlpin*, 2006 WL 763083 (S.D. Miss., Mar. 24, 2006); *Mooney v. Gill*, 310 B.R. 543 (N.D. Tex. 2002).  Factors to be considered in the balancing of hardships include:

(1)     judicial economy;

---

[44] Louisiana First Circuit Court of Appeal, No. 2020-CW-0053.
[45] Louisiana First Circuit Court of Appeals, No. 2020-CW-0308.

(2)      trial readiness;

(3)      the resolution of preliminary bankruptcy issues;

(4)      the creditor's chance of success; and

(5)      the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors.

*In re Henderson*, 352 B.R. 439, 441 (Bankr. N.D. Tex. 2006) (citing *In re Louden*, 284 B.R. 106, 108 (8th Cir. BAP 2002) (and collecting cases)); *see also In re Samshi Homes, LLC,* 2014 WL 948475, at *2 (Bankr. S.D. Tex. Mar. 11, 2014); *Matter of R.J. Groover Const., L.L.C.,* 411 B.R. 460 (Bankr. S.D. Ga. 2008) (listing a twelve factor balancing test) (collecting cases); *In re U.S. Brass Corp.,* 176 B.R. 11, 13 (Bankr. E.D. Tex. 1994).

32.      These factors need not be assigned equal weight, and only those factors relevant to the particular case need to be considered.  *U.S. Brass, supra,* 176 B.R. at 13 (*citing In re Keene Corp.,* 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994)).  Courts have recognized that a decision to lift stay may be upheld on the ground of judicial economy alone.  *See In re Kao,* 2015 Bankr. LEXIS 4293 at *6 (Bankr. S. D. Tex., Dec. 21, 2015) (*citing U.S. Brass, supra,* 176 B.R. at 13 and *In re Kemble,* 776 F.2d 802, 807 (9th Cir. 1985)).

33.      "When balancing the hardships in lifting the stay, the most important factor is the effect of such litigation on the administration of the estate."  *In re U.S. Brass Corp.*, 173 B.R. 1000, 1006 (Bankr. E.D. Tex. 1994).  While the process of determining the allowance and amount of claims is a basic and essential administrative duty of the bankruptcy courts, *Gardner v. New Jersey*, 329 U.S. 565, 573-74 (1947), where a claim could be liquidated "more expeditiously or economically in [a] state court action," it is appropriate to allow the matter to proceed in state court.  *In re Curtis*, 40 B.R. 795, 807 (Bankr. D. Utah 1984); *see also Matter of Fernstrom Storage and Van Co.*, 938 F.2d 731, 735-37 (7th Cir. 1991) (adopting the three factor test for determining

whether "cause" exists to lift the stay established in *In re Pro Football Weekly,* 60 B.R. 824, 826 (N.D. Ill. 1986)).

34.     The facts of this case strongly favor this Honorable Court permitting Gulf Island to proceed with its claims against Debtors in the State Court Action.

35.     Here, several of the factors used by the courts previously weigh strongly in favor of lifting the stay, and none weigh against.  Specifically, lifting the stay will foster judicial economy by allowing a complete resolution of the disputes between HOS, Gulf Island and the Sureties over construction of the Vessels; will not prejudice other creditors or interfere with the bankruptcy cases, in part because Debtors themselves have proposed a plan that contemplates leaving Gulf Island's claims unimpaired and retains Hornbeck's claims against Gulf Island and the Sureties to be resolved in the ordinary course outside of bankruptcy; would favor judicial efficiency and would protect the rights of third parties; and the balance of harms weighs in favor of lifting the stay.  Several other factors also weigh in favor as set forth below.

36.     <u>Judicial Economy through Complete Resolution in One Forum</u>.  Lifting the stay would permit the complete determination of the claims and counterclaims of Hornbeck, Gulf Island and the Sureties in the State Court Action because it would resolve the liability issues and the amount of any damages, the secured or unsecured status of the claims, whether the Agreements are executory or were terminated prepetition or whether they continue as executory contracts, and all other issues.  *See, e.g., In re Mildred Deli Grocery, Inc.,* 2018 WL 1136017, at *4 (Bankr. S.D.N.Y. Feb. 28, 2018) ("Relief from the stay would result in the District Court determining whether the Debtor is liable and the amount of the claim would be liquidated, thus resolving the Movants' FLSA claims completely.").

37.     The State Court is already familiar with the parties and the facts of the case and has

heard and ruled on HOS's motions for summary judgment before the Debtors filed bankruptcy. The State Court, therefore, is intimately familiar with the complex facts of, and the unique Louisiana law issues relative to, this hotly contested matter.  It would be extraordinarily inefficient to require this Court to duplicate all of this work in order to try the case as a post-confirmation adversary proceeding in these bankruptcy cases.

38.    No Interference with Bankruptcy Case and No Prejudice to Other Creditors.  For several reasons, lifting the stay would not cause any interference with Debtors' bankruptcy cases, and would not prejudice other creditors.

39.    *First,* Debtors seek to confirm a plan of reorganization that leaves trade and other non-funded debt to be resolved outside of the case:

> **Importantly, the Plan provides for the satisfaction of all trade, customer, employee, and other non-funded debt claims in full, in the ordinary course of business.**[46]

Other Secured Claims and General Unsecured Claims explicitly are made unimpaired.[47]  The Plan further provides for the resolution of disputes about such claims in the ordinary course of business, outside of the bankruptcy process, as if the bankruptcy cases had not been commenced:

> Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, **if the Debtors or the Reorganized Debtors dispute any Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced**….For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Court for allowance) to be an Allowed Claims or Allowed Interest, as applicable, under the Plan.[48]

---

[46] Hornbeck Offshore Announcement of Restructuring Support Agreement, Summary of Plan of Reorganization, Information Regarding Key Dates on Certain Other Matters [Doc. No. 12 at p. 7] (the "**Announcement**") (emphasis in original).

[47] Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization [Doc. No. 7] III(B)(1) and art. III(B)(7).

[48] Plan art. VII(A)

2726329.12

40.     The Debtor's Plan provides that the Debtor's intent is to liquidate the claims and counterclaims in the State Court Action in the ordinary course through a non-bankruptcy forum and that the result of such state court litigation will not affect the viability or confirmability of the Plan.[49]  From before the commencement of these cases, Debtors have emphasized their intent to reorganize by altering their capital structure, not by altering the rights of other secured and general unsecured claims such as Gulf Island and the Sureties.[50]  Creditors thus are not in competition with each other for estate resources.  In sum, Gulf Island is not "jumping the line" by seeking to lift the stay.

41.     *Second,* the Debtors' own counterclaims in the State Court Action are not stayed. The Debtors have made clear that they retain and intend to pursue those claims against Gulf Island and the Sureties.[51]  Thus, HOS remains a litigant with active claims of its own which it intends to pursue.  HOS should not be able to litigate its own claims in the State Court Action while using the automatic stay as a shield from proceeding as a defendant in the very same action.

42.     Moreover, whether or not the State Court Action against Gulf Island and the Sureties remains stayed, discovery requests to Debtors may continue because they will be necessary to develop the factual record for the non-stayed claims in the case.  Such discovery requests are not covered by the automatic stay.  *See In re Breitburn Energy Partners LP,* 571 B.R. 59, 69 (Bankr. S.D.N.Y. 2017) (citing *In re Residential Capital, LLC,* 480 B.R. 529, 537 (Bankr. S.D.N.Y. 2012)): *see also In re Miller,* 262 B.R. 499 (B.A.P. 9th Cir. 2001) (third-party discovery of debtor, a defendant in a multi-defendant action, does not violate the automatic stay, even if

---

[49] Gulf Island anticipates that it will file objections to Hornbeck's Disclosure Statement and Plan to clarify certain aspects thereof.
[50] See footnote 39.
[51] Notice of Plan Supplement for the Debtors' First Amended Joint Prepackaged Chapter 11 Plan of Reorganization [Doc. No. 29 at Exhibit E, pp. 22 and 24].

2726329.12

17

factual development could damage debtor's defense to the claims against it that are stayed); *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC,* No. 13 Civ. 4650 (JFK), 2014 WL 4783008, at *5 (S.D.N.Y. Sept. 25, 2014) (similar, and citing *Miller*); *Signature Bank v. Ahava Food Corp.,* No. 08 Civ. 3893 (NRB) (MHD), 2008 WL 4126248, at *1 (S.D.N.Y. Aug. 26, 2008) (same).  Debtors therefore likely would face discovery burdens whether or not the stay is lifted.[52]

43.     *Third,* in any event, while the claims and counterclaims in the State Court Action are significant (in the tens of millions of dollars), their magnitude is small compared to the Debtors' assets (more than $120 million of liquidity, and a book value asset base exceeding $2.4 billion).[53] Nor does the substance of the litigation – contract disputes over construction of two vessels – have any connection to the financial issues at play in this bankruptcy.

44.     <u>Involvement of Third Parties, Judicial Economy and Expeditious, Efficient Resolution</u>.  The State Court Action involves the Sureties who may or may not have some legal responsibility for the claims asserted by the Debtors.  The State Court Action is not stayed with respect to Debtors' claims against the Sureties.

45.     It would be far more efficient for all parties to the State Court Action to have a single discovery schedule and single trial rather than to piecemeal resolution of these interconnected disputes between this Court and the State Court.  As Collier notes, "[a]ctions that are only remotely related to the case under title 11 or which involve the rights of third parties" – both of which are true here – "often will be permitted to proceed in another forum." *3 Collier on Bankruptcy* § 362.07 (16th ed. 2020).  "Congress intended that one of the factors to consider when

---

[52] *In Residential Capital,* the Court concluded that section 105(a) gives a bankruptcy court the authority to enjoin such third-party discovery. 480 B.R. at 537-45 (discussing authority and factors to consider in exercising it).  Here, Debtors have not moved to enjoin third-party discovery of any kind.  In any event, Debtors could not meet the standard set forth in *Residential Capital*.
[53] Debtors' Disclosure Statement for the Joint Prepackaged Plan of Reorganization, Exhibit K-Liquidation Analysis, "Total Current Assets", "Total Distributable Value" and "Other Current Assets" [Doc. No. 6 at pp. 558-59].

determining whether to modify the stay is whether doing so would permit pending litigation involving the debtor to continue to their place of origin, where no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum to relieve the bankruptcy court from duties that may be handled elsewhere." *In re Project Orange Assoc., LLC,* 432 B.R. 89, 109 (Bankr. S.D.N.Y. 2010) (citing legislative history). The Agreements contain a forum selection clause for the State Court, so allowing that proceeding to continue would be consistent with the parties' intent.[54] These concerns are heightened where, as here, the various claims and counterclaims of the parties are so factually intertwined.

46.     <u>Tribunal with Expertise</u>. While the State Court is not a specialized tribunal, it does have specific expertise in the intricacies of Louisiana's unique Civil Law – both statutory and jurisprudential – which govern the State Court Action. Moreover, where the resolution of the claim requires consideration of "uniquely state law questions" cause exists to lift the stay to allow the state court to resolve those issues. *In re Adebo*, 2007 WL 3235122, at *2 (Bankr. S.D. Tex. Nov. 1, 2007); *see also In re Mildred Deli Grocery,* 2018 WL 1136017, at *4 (Bankr. S.D.N.Y. Feb. 28, 2018)(noting that "[w]hile the District Court is not a specialized tribunal, it is highly experienced" in the types of claims, and "is familiar with the particular issues involved"); *In re Ice Cream Liquidation, Inc.,* 281 B.R. 154, 167 (Bankr. D. Conn. 2002) (judicial economy favored allowing litigation to proceed in another court that was "presumed to be considerably more advanced on the 'learning curve' with respect to the merits" of the dispute than the bankruptcy court).

47.     The resolution of the dispute between Gulf Island and Hornbeck necessarily requires the resolution of questions regarding unique Louisiana state law rights, and specifically,

---

[54] Original Agreements (Docs. 134-2, 134-3) at Article 25.7.

2726329.12

the interpretation and application of Louisiana statutory liens and privileges under La. Civ. Code art. 3217 and La. Rev. Stat. §9:4502. The State Court has already heard arguments from both sides on just that issue as part of Hornbeck's motions for partial summary judgment seeking possession of the Vessels, both which were denied. The State Court is more experienced, generally, with the unique Louisiana laws at issue—both specifically regarding the liens and privileges that govern Gulf Island's right to possession of the Vessels, but also generally, in light of the fact that the Agreements include a Louisiana choice-of-law provision. Moreover, Hornbeck, Gulf Island, and the Sureties have already engaged in contentious motion practice before the State Court on discovery issues regarding interpretation and application of Louisiana-specific law on attorney-client privilege, joint defense and common interest privilege, and protected work product and those issues will likely continue to arise as discovery continues. The Louisiana lien and privilege issues and discovery issues have also resulted in supervisory writ applications that have been briefed and are currently awaiting consideration by the Louisiana Court of Appeals for the First Circuit, which will further weigh-in on these Louisiana-specific issues. If the bankruptcy court were to take up the claims at issue in the State Court Action, the parties would likely be forced to re-litigate this same set of motion practice on these same issues before the bankruptcy court (and likely the district and appellate courts)—which would be inefficient from both a court and party perspective. The State Court (and the Louisiana appellate courts) therefore is best equipped to continue to litigation, which will continue to necessarily turn primarily only the resolution of questions of law that are unique to Louisiana.

48.  <u>Impact of the Stay on the Parties and the Balance of Harms</u>. The State Court Action will continue, whether or not the stay is lifted, at least as to the HOS affirmative counterclaims. Facts about HOS' role – including documents and testimony in HOS' possession and control – are

critical to determining those counterclaims and third party claims. For these reasons, Gulf Island and the Sureties will need discovery from HOS – including documents or testimony – to determine HOS' counterclaims, even if the claims of Gulf Island against HOS remain stayed. Such discovery is not within the scope of the automatic stay, "even where that information could eventually adversely affect the Debtor" in its later defense of stayed claims. *In re Miller,* 262 B.R. 499, 505 (B.A.P. 9th Cir. 2001). In sum, HOS will face some discovery burden whether or not the stay is lifted.

49.     Moreover, Debtors' own proposed Plan contemplates that claims such as Gulf Island's will proceed in the ordinary course, which is exactly what this motion proposes. Thus, the burden of litigating the State Court Action will be borne either now, or – if Debtors' Plan is confirmed and becomes effective, as Debtors hope – when the stay terminates as a matter of law. *See* 11 U.S.C. § 362(c)(2)(C).

50.     <u>Probability of Success on the Merits.</u>  HOS has lost two summary judgment motions, seeking, *inter alia,* possession of the Vessels, it brought in the State Court Action. This is indicative that Gulf Island has a good chance of success on the merits. Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay. *In re Fernstrom Storage & Van Co., Inc.,* 938 F.2d 731, 737 (7th Cir. 1991); *In re The SCO Group, Inc.,* 395 B.R. 852, 859 (Bankr. D. Del. 2007).

51.     <u>Other Factors.</u>  It is unavoidable that Gulf Island's claims against HOS will be litigated, either by the State Court or by this Court or by both. As such, it also is unavoidable that HOS will incur the costs to defend against such claims. Regardless of the forum, the resolution of the disputes between Gulf Island, HOS, and the Sureties will require (and has already required) extensive fact and expert discovery and the State Court has already started oversight of that

discovery process and the State Court is in the best position to continue to oversee discovery.  HOS is located in Louisiana, as are Gulf Island and the Vessels under construction.  Accordingly, both HOS and Gulf Island will save travel and related litigation costs if this case is tried exclusively in Louisiana.  In addition, because the parties would need to prepare and file new pleadings and have additional pre-trial hearings to try this matter (or any portion thereof) in this Court, failure to lift the stay will increase the litigation costs thereby eroding the savings that would be realized by trying the case in Louisiana.

52.     Lifting the stay will allow the State Court Action to continue to its natural conclusion, thereby resolving all issues in that case, including (a) the liquidation of all claims and counterclaims and third party claims, including the claims of Gulf Island for purposes of distribution, (b) the purported termination of the Agreements prepetition[55] and (c) which of the parties is entitled to possession of the Vessels.  Proceeding in the State Court will not interfere with this fast-track bankruptcy case, whereas denial will result in substantial harm to Gulf Island.  Proceeding in State Court will not prejudice other creditors as it merely allows Gulf Island to litigate and liquidate claims that already exists against the estate.  *See In re Fowler,* 259 B.R. 856, 861 (Bankr. E.D. Tex. 2001); *In re Bock Laundry Mach. Co.*, 37 B.R. 564, 567 *(Bankr. N.D. Ohio 1984).*  Again, judicial economy favors lifting the stay as the State Court has presided over the case since its inception and the events giving rise to the litigation all occurred in Louisiana.  The most efficient use of judicial resources calls for the continuation of the State Court lawsuit in its original forum.

53.     Because the parties have already begun the process of litigating the claims in the

---

[55] "Bankruptcy courts have permitted state court litigation to proceed that would determine whether a lease has been terminated prepetition and is therefore incapable of being assumed or assigned under section 365 of the Bankruptcy Code." *In re Project Orange Assocs., LLC,* 432 B.R. 89, 104 (Bankr. S.D.N.Y. 2010).

State Court and, further, because the State Court is the more appropriate forum to decide the specialized areas of Louisiana law that have arisen (and that will likely continue to arise) as part of the State Court Action, this Court should conclude that the best place for the claims and counterclaims and third party claims of Gulf Island, Hornbeck and the Sureties to be adjudicated is in a single-forum – the State Court in Louisiana. This would lead to the most efficient administration of Debtors' bankruptcy estates.

**B.**     **Because this Court May Abstain to Permit Gulf Island and the Sureties to Resume the Previously Commenced State Court Proceeding, Stay Relief is Appropriate**

54.     Cause for abstention also is cause for lifting of the automatic stay.

55.     As the Court is aware, bankruptcy courts are courts of limited jurisdiction. *Matter of Majestic Energy Corp.*, 835 F.2d 87, 89 (5th Cir. 1988); *see also In re Continental Airlines,* 203 F.3d 203, 214 n.12 (3rd Cir. 2000) ("We must remain mindful that bankruptcy jurisdiction is limited, as is the explicit grant of authority to bankruptcy courts"). Proceedings over which bankruptcy courts have jurisdiction include both "core" and "non-core" proceedings. *See* 28 U.S.C. § 1334(b) ("…the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or relating to cases under title 11."); 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11…"); 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11."). "Core" proceedings are those which involve rights or claims created by bankruptcy law, which arise only in a bankruptcy case, or are otherwise defined as core proceedings under section 28 U.S.C. § 157(b)(2).

56.     "Non-core" proceedings are those that otherwise are "related to" a case under title 11 but which do not invoke substantive rights created by bankruptcy law, can arise independently

of a bankruptcy case, and are not defined as core proceedings under 28 U.S.C. § 157(b)(2).  *In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 304-305 (5th Cir. 2013); *see also Meyers v. Hefferman,* 2012 WL 251979 at *1 (D. Del. 2012) (noting that the Bankruptcy Court has jurisdiction to determine whether a matter is a core or non-core proceeding).  The bankruptcy court's non-core jurisdiction hinges upon whether the outcome of the proceeding could conceivably have an effect on the bankruptcy estate.  *In re Spillman Dev. Grp., Ltd.*, 710 F.3d at 304-305; *see also In re U.S. Brass Corp.,* 301 F.3d 296, 304 (5th Cir. 2002)(citing *Pacor, Inc. v. Higgins*, 743 F.3d 984, 994 (3rd Cir. 1984)); *In re Resorts Intern., Inc.,* 372 F.3d 154, 164 (3rd Cir. 2004) (describing *Pacor* as "seminal test" for determining boundaries of "related to" jurisdiction).

57.     The Retention of Jurisdiction provisions of the Plan explicitly contemplate that this Court will abstain from hearing various matters even though they may be within "core" bankruptcy jurisdiction.[56]

58.     None of the matters at issue in the State Court Action invoke a statutory right arising under the Bankruptcy Code but the claims therein fall within the Court's "related to" jurisdiction, inasmuch as they might be characterized as a cause of action that affects property of the bankruptcy estate.

59.     However, despite "related to" jurisdiction, because cause exists to allow the Court to abstain, under either mandatory or permissive abstention, from deciding any claim or cause of action asserted in the State Court Action, cause exists to lift the stay to allow all such issues should be handled through disposition of the State Court Action.  *See e.g., In re U.S. Brass Corp.,* 173 B.R. 1000, 1004 (Bankr. E.D. Tex.)*, modified,* 176 B.R. 11 (Bankr. E.D. Tex. 1994)*; see also In re Burger Boys, Inc. v. South Street Seaport LP,* 183 B.R. 682, 688-89 (S.D.N.Y. 1994)("The

---

[56] Plan at art. XII, p. 64.

2726329.12

decision to grant relief from the automatic stay is logical within the context of the Bankruptcy Court's determination that it must abstain from Burger Boys' Adversary Proceeding"); *see also, In re Holiday RV Superstores, Inc.,* 362 B.R. 126 (D. Del. 2007)(concluding that an action is a non-core proceeding and that the Bankruptcy Court did not err in abstaining and remanding the action to state court under the factors for either mandatory or permissive abstention); *In re Hernandez,* 2010 WL 5155011 (Bankr. D.N.M. 2010)(abstaining from adjudicating issues raised by an adversary proceeding because the issues of whether a secured lender was the holder of a note and the subject of a valid assignment of mortgage on debtors residential property were properly before the state court through a foreclosure action).

60.    <u>Mandatory Abstention</u>.    Mandatory abstention is governed by 28 U.S.C. § 1334(c)(2), which provides:

> Upon timely motion of a party in a proceeding upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).    Fifth Circuit courts determining whether mandatory abstention is appropriate have parsed this statute into a four part test: (1) the claims have no independent basis for federal jurisdiction other than § 1334(b); (2) the claims are non-core; (3) an action has been commenced in state court; and (4) the action can be timely adjudicated in state court." *In re Rupp & Bowman Co.,* 109 F.3d 237, 239 (5th Cir. 1997); *see also In re Gober,* 100 F.3d 1195, 1206 (5th Cir. 1996); *In re Houston Reg'l Sports Network, L.P.,* 514 B.R. 211, 214 (Bankr. S.D. Tex. 2014); *In re Mugica,* 362 B.R. 782 (Bankr. S.D. Tex. 2007);  *LaRoche Indus. v. Orica Nitrogen LLC (In re LaRoche Indus.),* 312 B.R. 249, 252-53 (Bankr. D. Del. 2004).

61.     The State Court Action has no independent basis for federal jurisdiction other than § 1334(b).  There is no federal question jurisdiction and there is no diversity between HOS and Gulf Island, which are both LLCs with members that are corporations either incorporated or with their principal places of business in Louisiana.

62.     The dispute between Gulf Island, the Sureties, and Hornbeck is a non-core action because the matters at issue in the State Court Action relate to the enforceability and validity of the contracts for the construction of the Vessels and the parties respective rights in relation to the Agreements and the bonds.  As such, they involve exclusively state law issues that do not arise under title 11 and do not involve matters that arise only in bankruptcy cases.

63.     The State Court Action was commenced in state court when Gulf Island filed its petition in October 2018.  The State Court Action was pending for nearly two years prior to the initiation of the bankruptcy case and the parties have already spent considerable amounts of time and energy litigating the matter in State Court through rounds of petitions, amended petitions, answers and reconventional demands, and motion practice on substantive issues and discovery issues.

64.     Furthermore, there will be little to no delay if the automatic stay is lifted, and if this Court abstains, so that all issues are addressed in the previously commenced State Court Action. Prior to the Debtors' bankruptcies, the State Court addressed numerous issues regarding those contracts, including motion practice regarding interpretation and application of Louisiana's lien and privilege statutes and Louisiana's law regarding attorney-client privilege, joint defense and common interest privilege, and protections related to consulting experts and attorney work product.  The State Court Action was highly contested prior to being stayed by the Debtors' bankruptcies.

65.     Wherever the disputes between Hornbeck, Gulf Island, and the Sureties is litigated, the dispute will not be resolved prior to the consideration of Hornbeck's proposed plan— particularly in light of the aggressive confirmation schedule contemplated by Hornbeck's initial filings.  As discussed above, Hornbeck's proposed plan contemplates the resolution of the Gulf Island/Hornbeck dispute in state court sometime after confirmation as a means to facilitate the Hornbeck's goal of a fast-tracked bankruptcy case.[57]

66.     Accordingly, the principles of mandatory abstention support a decision to abstain upon resolution of the State Court Action.

67.     <u>Permissive Abstention</u>.  Bankruptcy Courts also may abstain permissively from addressing the issues, claims and counterclaims raised in the State Court Action.   Permissive abstention is governed by 28 U.S.C. § 1334(c)(1), which provides, in relevant part:

> [N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1).  Judge Isgur summarized the factors relevant to permissive abstention:

> Although the Court is not required to abstain under § 1334(c)(2), it may discretionarily decline to hear the proceedings under § 1334(b)(1).  Similarly, this court may choose to remand a cause of action on any equitable ground.  *See In re Gober*, 100 F.3d 1995 (5th Cir. 1996); *In re Wood*, 825 F.2d 90 (5th Cir. 1987).  Courts consider a number of factors in deciding whether to abstain or remand. *Special Value Continuation Partners, L.P. v. Jones*, 2011 Bankr. LEXIS 4475, 2011 WL 5593058 at *7-8 (Bankr. S.D. Tex. 2011). These include:
>
> (1) Effect or lack thereof on the efficient administration of the estate if the court recommends [remand or] abstention;
>
> (2) Extent to which state law issues predominate over bankruptcy issues;

---

[57] Plan art. II(A).

(3) Difficult or unsettled nature of applicable law;

(4) Presence of related proceeding commenced in state court or other non-bankruptcy proceeding;

(5) Jurisdictional basis, if any, other than § 1334;

(6) Degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7) The substance rather than the form of an asserted core proceeding;

(8) The feasibility of severing state law claims from core bankruptcy matters to allow judgment to be entered in state court with enforcement left to the bankruptcy court;

(9) The burden of the bankruptcy court's docket;

(10) The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11) The existence of a right to a jury trial;

(12) The presence in the proceeding of non-debtor parties;

(13) Comity; and

(14) Possibility of prejudice to other parties in the action.

*In re Houston Reg'l Sports Network, L.P.,* 514 B.R. 211, 215 (Bankr. S.D. Tex. 2014).

68.     Clearly, there are only Louisiana law issues in the State Court Action. Determination of such issues are governed wholly by Louisiana state law that have been or should be decided by the State Court and/or the Louisiana appellate courts.  Moreover, considering that the State Court Action has already generated two supervisory writ applications to the Louisiana Court of Appeal for the First Circuit regarding the State Court's interpretation of Louisiana law, the State Court Action does involve difficult and/or unsettled questions of Louisiana law, particularly regarding statutory liens and privileges and discovery issues, that are best considered and resolved by Louisiana state courts.

2726329.12

69.     As discussed *supra* in the section regarding mandatory abstention, the State Court Action had been actively litigated for nearly two years prior to the bankruptcy case and there is no independent federal jurisdiction over the State Court Action other than "related-to" bankruptcy jurisdiction.  Moreover, Hornbeck has requested that the State Court Action be tried before a jury, which is unavailable in the bankruptcy court.

70.     There is nothing before the Court to suggest that stay relief and abstention would interfere with the efficient administration of the bankruptcy estate or of the Debtors or the Reorganized Debtors.  Indeed, no provisions of the Bankruptcy Code are implicated by State Court Action.  Rather, judicial economy would be served best by adjudication of all of the interconnected claims and causes of action as part of the ongoing State Court Action, rather than through these bankruptcy cases.

71.     Furthermore, HOS's recently filed adversary complaint seeking possession of the Vessels (after the State Court twice denied HOS's previous motions on that very issue) evidences the fact that HOS is likely motivated by forum shopping to the extent it does ask this Court to take on the claims at issue in the State Court Action.  HOS has filed two motions and a writ application in the State Court Action seeking to invalidate or otherwise attack Gulf Island's security interest and Louisiana statutory liens and privileges.  HOS has thus far been unsuccessful in the State Court and is likely looking for a different forum to take a fourth bite at this apple, while at the same time trying to railroad the rest of its bankruptcy case through the Court on an expedited basis. The fact that HOS's own Plan contemplates that the resolution of the State Court Action is not necessary to the completion of HOS's bankruptcy case indicates that any attempt by HOS to litigate the State Court Action issues in bankruptcy court is driven by motivations that are un-related to the policy goals of the Bankruptcy Code.

72.     The bankruptcy courts have broad discretion on whether to abstain.   Section 1334(c)(1) is a broadly-worded statute allowing federal courts to decline to exercise jurisdiction "in the interest of justice, or in the interest of comity with State Courts or respect for State law." 28 U.S.C. § 1334.   In *Wood*, the Fifth Circuit noted that the discretionary abstention provision of § 1334(c)(1) helps prevent the broad language of § 1334(b) from bringing into federal court matters which should be left to state courts to decide.   *See Matter of Wood,* 825 F.2d 90, 93 (5th Cir. 1998).

73.     This Court, therefore, should exercise its discretion to grant stay relief herein because cause exists to abstain from hearing the factual and legal disputes raised or to be raised by the Parties in the State Court Action.

## CONCLUSION

74.     For all of the foregoing reasons, Gulf Island and the Sureties respectfully request that this Honorable Court terminate the automatic stay pursuant to the provisions of 11 U.S.C. § 362(d)(1) to allow the State Court Action to resume and to conclude "as if the Chapter 11 Cases had not been commenced" and to otherwise preserve and allow Gulf Island and the Sureties to pursue their respective rights of setoff and recoupment as part of the State Court Action.

**WHEREFORE**, Gulf Island and the Sureties respectfully request that this Honorable Court grant it the relief requested herein, and grant to Gulf Island such other and further legal and equitable relief as is appropriate in the premises.

## CERTIFICATE OF CONFERENCE

I hereby certify, as counsel for Gulf Island, my firm has conferred with counsel for the Debtor, and as of the filing of this Motion, Debtor has not agreed to the relief requested herein.

*/s/ Richard A. Aguilar*
Richard A. Aguilar (La. Bar No. 17439)

2726329.12

30

Respectfully submitted this 10th day of June, 2020.

/s/ Richard A. Aguilar

Richard A. Aguilar (La. Bar No. 17439)
Rudy J. Cerone (La. Bar No. 14137)
Stephen P. Strohschein (La. Bar No. 12541)
Mark J. Chaney, III (La. Bar No. 35704)
McGLINCHEY STAFFORD, PLLC
601 Poydras Street, 12th Floor
New Orleans, Louisiana 70130
Telephone: (504) 586-1200
Facsimile: (504) 596-2800
raguilar@mcglinchey.com
rcerone@mcglinchey.com
sstrohschein@mcglinchey.com
mchaney@mcglinchey.com

ATTORNEYS FOR
GULF ISLAND SHIPYARDS

-and-

/s/ David J. Krebs

David J. Krebs (TX Bar No. 438281)
Matt Farley (*pro hac vice*)
Elliot Scharfenberg (*pro hac vice*)
Jonathan Ord (*pro hac vice*)
Krebs Farley & Dry, PLLC
400 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3570
Facsimile: (504) 299-2582
dkrebs@krebsfarley.com
mfarley@krebsfarley.com
escharfenberg@krebsfarley.com
jord@krebsfarley.com

ATTORNEYS FOR ZURICH AMERICAN
INSURANCE COMPANY AND FIDELITY &
DEPOSIT COMPANY OF MARYLAND

2726329.12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of June, 2020, a true and correct copy of the forgoing *Motion for Relief from the Automatic Stay* was sent via ECF Noticing to all parties registered to receive CM/ECF Notices in these chapter 11 cases and the following parties via first class mail:

Hornbeck Offshore Services, Inc.
103 Northpark Blvd.
Suite 300
Covington, LA 70433

Matthew D. Cavenaugh
Kristhy M. Peguero
Jackson Walker LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010

Charles R. Gibbs
Katten Muchin Rosenman LLP
1717 Main Street, Suite 3750
Dallas, TX 75201

Hector Duran, Jr.
Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave., Suite 3516
Houston, TX 77002

*/s/ Richard A. Aguilar*
Richard A. Aguilar

2726329.12