**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HORNBECK OFFSHORE SERVICES, INC., *et al.*, [1] | ) | Case No. 20-32679 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF**
**FIRST AMENDED PLAN SUPPLEMENT**
**FOR THE DEBTORS' JOINT PREPACKAGED**
**CHAPTER 11 PLAN OF REORGANIZATION**

**PLEASE TAKE NOTICE** that on May 29, 2020, Hornbeck Offshore Services, Inc. and certain of its affiliates (collectively, the "Debtors") filed the *Notice of Plan Supplement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* at Docket No. 7 (the "Original Plan Supplement") to the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* [Docket No. 129].[2]

The Original Plan Supplement contained documents relating to:

| **Exhibit** | **Description** |
|---|---|
| A | New Corporate Governance Documents |
| B | Restructuring Steps Memorandum |
| C | Members of the Reorganized Hornbeck Board and the Officers of Reorganized Hornbeck |
| D | Executory Contract and Unexpired Lease Documents |
| E | Retained Causes of Action Schedules |
| F | Management Agreements |

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/hornbeck. The location of the Debtors' service address is: 8 Greenway Plaza, Suite 1525, Houston, Texas 77046.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

G       Exit Facilities

H       New Warrants


**PLEASE TAKE FURTHER NOTICE** that, as contemplated by the Plan, the Debtors hereby file an amended Plan Supplement (the "First Amended Plan Supplement", and together with the Original Plan Supplement, the "Plan Supplement").

The First Amended Plan Supplement contains the following documents as set forth below:

| Exhibit | Description |
|---------|-------------|
| A | New Corporate Governance Documents |
| B | Members of the Reorganized Hornbeck Board and the Officers of Reorganized Hornbeck |
| C | New Warrants |
| D | Management Agreements |

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in this First Amended Plan Supplement remain subject to continuing negotiations among the Debtors, the Consenting Creditors and other interested parties with respect thereto. All parties reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date, or any such other date in accordance with the Plan, the Confirmation Order, or any other order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement, this First Amended Plan Supplement, or any subsequent amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases are available free of charge by visiting the website of Stretto at http://cases.stretto.com/hornbeck. You may also obtain copies of any pleadings via PACER on the Court's website at https://ecf.txsb.uscourts.gov for a fee.

[*Remainder of page left intentionally blank*]

Houston, Texas
June 18, 2020

/s/ *Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |

Matthew D. Cavenaugh (TX Bar No. 24062656)  
Kristhy M. Peguero (TX Bar No. 24102776)  
Jennifer F. Wertz (TX Bar No. 24072822)  
Veronica A. Polnick (TX Bar No. 24079148)  
1401 McKinney Street, Suite 1900  
Houston, Texas 77010  
Telephone:   (713) 752-4200  
Facsimile:    (713) 752-4221  
Email:         mcavenaugh@jw.com  
                    kpeguero@jw.com  
                    jwertz@jw.com  
                    vpolnick@jw.com  

*Proposed Co-Counsel to the Debtors*  
*and Debtors in Possession*

Edward O. Sassower, P.C. (*pro hac vice* pending)  
Ameneh M. Bordi (*pro hac vice* pending)  
601 Lexington Avenue  
New York, New York 10022  
Telephone:   (212) 446-4800  
Facsimile:    (212) 446-4900  
Email:  edward.sassower@kirkland.com  
                    ameneh.bordi@kirkland.com  

-and-

Ryan Blaine Bennett, P.C. (*pro hac vice* pending)  
Benjamin M. Rhode (*pro hac vice* pending)  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:   (312) 862-2000  
Facsimile:    (312) 862-2200  
Email:         ryan.bennett@kirkland.com  
                    benjamin.rhode@kirkland.com  

*Proposed Co-Counsel to the Debtors*  
*and Debtors in Possession*

## Exhibit A

### New Corporate Governance Documents

This Exhibit A contains the following organizational documents for Reorganized Hornbeck:

- Exhibit A(i):      Third Amended and Restated Certificate of Incorporation

- Exhibit A(ii):     Fifth Amended and Restated Bylaws

- Exhibit A(iii):    Securityholders Agreement

**Exhibit A(i)**

**Third Amended and Restated Certificate of Incorporation**

*Exhibit A(i)*

**THIRD AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**HORNBECK OFFSHORE SERVICES, INC.**

Hornbeck Offshore Services, Inc., (the "**Corporation**") a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (as the same exists or may hereafter be amended, "**Delaware Law**"),

DOES HEREBY CERTIFY:

FIRST:    The current name of the Corporation is Hornbeck Offshore Services, Inc.

SECOND:    The name under which the Corporation was originally incorporated is HV Marine Services, Inc. The date of filing of its original certificate of incorporation with the Secretary of State of the State of Delaware was June 2, 1997 (as amended, the "**Original Certificate**").

THIRD:    The Original Certificate was amended and restated in its entirety pursuant to the Restated Certificate of Incorporation on December 30, 1997 filed with the Secretary of State of the State of Delaware on, which was further amended and restated in its entirety pursuant to Second Restated Certificate of Incorporation (as amended, the "**Existing Certificate**") filed with the Secretary of State of the State of Delaware on dated March 5, 2004.

FOURTH:    This Third Amended and Restated Certificate of Incorporation (this "**Certificate**"), effective as of [●], 2020 (the "**Effective Date**"), amends and restates in their entirety the provisions of the Existing Certificate. Certain capitalized terms used in this Certificate are defined where appropriate herein.

FIFTH:    This Certificate, which restates and amends the Existing Certificate, was duly adopted, without the need for approval by the board of directors (the "**Board**") or the stockholders of the Corporation, in accordance with Sections 242, 245 and 303 of Delaware Law and in accordance with that certain Joint Prepackaged Chapter 11 Plan of Hornbeck Offshore Services, Inc. and certain of its subsidiaries, approved by order of the United States Bankruptcy Court for the Southern District of Texas in [●], under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101- 1330), as amended.

SIXTH:    The text of the Existing Certificate as heretofore amended, supplemented or restated is hereby amended and restated to read as herein set forth in full:

**ARTICLE I**
**NAME**

The name of the Corporation is Hornbeck Offshore Services, Inc.

**ARTICLE II**
**TERM**

The Corporation shall have perpetual existence.

4827-6348-7165.6
#93254604v9

### ARTICLE III
### PURPOSE

The purpose for which the Corporation is organized is to engage in any lawful act or activity for which corporations may be organized under Delaware Law.

### ARTICLE IV
### CAPITALIZATION

4.1     Capitalization. The Corporation has authority to issue up to [●] shares of capital stock, consisting of up to [●] shares of common stock, par value $0.00001 per share (the "**Common Stock**").

4.2     Common Stock.

(a)     Voting. Subject to Article XV, and subject to Delaware Law, each holder of Common Stock shall be entitled to one vote for each outstanding share of Common Stock held by such holder at all meetings of stockholders (and written actions in lieu of meetings); *provided* that any share of capital stock of the Corporation held by the Corporation shall have no voting rights.

(b)     Dividends. Subject to the Securityholders Agreement (as defined below) and the provisions of Delaware Law, the holders of Common Stock will be entitled to receive dividends when, as and if declared by the Board.

(c)     Exchange for Jones Act Warrants. Any holder of Common Stock may, at its election, exercisable by written notice to the Corporation (including in connection with a transfer of such shares), exchange any shares of Common Stock for Jones Act Warrants exercisable for the same number of shares of Common Stock except to the extent such exchange would result in Non-U.S. Citizens beneficially owning, in the aggregate, more than the Permitted Percentage of each class or series of the capital stock of the Corporation. Any holder of Common Stock may exercise such right at any time and from time to time, with respect to all or any portion of its shares of Common Stock, and may similarly elect to receive Jones Act Warrants in lieu of shares of Common Stock upon any exercise of any warrants or other securities exercisable or exchangeable for or convertible into shares of Common Stock. Upon receipt of notice of any such election from a holder of Common Stock, the Corporation shall issue or cause to be issued the applicable Jones Act Warrants promptly and in any event within two Business Days after receipt of such notice (or on such later date as such holder would have been entitled to receive shares of Common Stock upon the exercise of the applicable warrants or other securities exercisable or exchangeable for or convertible into shares of Common Stock).

4.1     Withholding.  All actual or constructive payments, dividends and distributions on, or in redemption of, the Common Stock, Jones Act Warrants, Anti-Dilution Warrants (as defined in the Securityholders Agreement) or Demand Notes (as defined in the Securityholders Agreement), shall be subject to withholding and backup withholding of tax to the extent required by law, and amounts withheld, if any, shall be treated as received by the holders of such Common Stock, Jones Act Warrants, Anti-Dilution Warrants or Demand Notes, as the case may be, in

2

4827-6348-7165.6
#93254604v9

respect of which such amounts were withheld. The Corporation shall have the right to take measures necessary to obtain cash to satisfy the Corporation's withholding requirements with respect to any non-cash, deemed or constructive payment, dividend or distribution to the holders, including by retaining, selling or liquidating property of the applicable holders held by the Corporation in its custody or over which it has control. Each holder shall indemnify the Corporation and its Affiliates (as defined in the Securityholders Agreement) for, and hold harmless the Corporation and its Affiliates from and against, any and all withholding tax, including penalties and interest, payable by or assessed against the Corporation or any of its Affiliates in respect of the Common Stock, Jones Act Warrants, Anti-Dilution Warrants or Demand Notes held by such holder.

4.2     Non-Voting Securities.  To the extent prohibited by Section 1123 of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), the Corporation shall not issue any class or series of nonvoting equity securities as in effect on the date of filing of this Certificate with the Secretary of State of the State of Delaware; provided, however, that the foregoing (a) will have such force and effect only for so long as such prohibition under Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation; (b) will have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code; and (c) may be amended or eliminated in accordance with applicable law from time to time in effect.

**ARTICLE V**
**REGISTERED AGENT**

The street address of the registered office of the Corporation in the State of Delaware is 251 Little Falls Drive, Wilmington, New Castle County, Delaware 19808. The name of its registered agent at that address is Corporation Service Company.

**ARTICLE VI**
**MANAGEMENT**

The business and affairs of the Corporation shall be managed by or under the direction of a board of directors consisting of the number of directors specified in the Securityholders Agreement.  Notwithstanding anything to the contrary in the foregoing, (i) all of the officers of the Company, including the Chief Executive Officer, shall be U.S. Citizens (as defined in Article XV), and (ii) the Chairman of the Board shall in all events be a U.S. Citizen. Any vacancy on the Board that results from an increase in the number of directors shall be filled in accordance with the terms of the Securityholders Agreement, by and among the Corporation and the holders listed therein, dated as of even date herewith (as may be amended from time to time, the "**Securityholders Agreement**"). Subject, in all respects, to the consent rights and any other limitations set forth in the Securityholders Agreement, the Board is expressly authorized to adopt, amend and repeal the bylaws of the Corporation, dated as of even date herewith (as may be amended from time to time, the "**Bylaws**").

3

## ARTICLE VII
## DIRECTORS

7.1     No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of Delaware Law, or (iv) for any transaction from which the director derived an improper personal benefit. If Delaware Law is subsequently amended to authorize corporate action further limiting or eliminating the personal liability of directors, then the liability of directors of the Corporation shall be limited or eliminated to the fullest extent permitted by Delaware Law, as so amended. Neither the amendment nor repeal of this Article VII, nor the adoption of any provision of this Certificate inconsistent with this Article VII, shall adversely affect any right or protection of a director of the Corporation existing at the time of such amendment, repeal or adoption of an inconsistent provision.

7.2     Notwithstanding anything to the contrary in this Certificate or the Securityholders Agreement, no more than  a minority of the number of directors necessary to constitute a quorum of the Board (in order for the Corporation to continue as a U.S. Citizen (as defined in Article XV)) (or any committee thereof) shall be Non-U.S. Citizens (as defined in Article XV).

## ARTICLE VIII
## INDEMNIFICATION

8.1     <u>Indemnification</u>. The Corporation (and any successor or surviving corporation to the Corporation by merger or otherwise) shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any Person (an "**Indemnitee**") who was or is made or is threatened to be made a party or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**") (whether such Proceeding is an action by or in the right of the Corporation, is initiated by a third party or otherwise), by reason of the fact that he or she is or was a director, advisory director, board observer or officer of the Corporation or, while a director, advisory director, board observer or officer of the Corporation, is or was serving at the request of the Corporation as a director, advisory director, board observer, officer, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity, including service with respect to an employee benefit plan, against all liability, expense and loss (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such Indemnitee, but only if such Indemnitee acted in good faith and in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful. Notwithstanding the preceding sentence, except for a suit or action brought as described in <u>Section 8.3</u>, the Corporation shall be required to indemnify an Indemnitee in connection with a Proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such Proceeding (or part thereof) by the Indemnitee was authorized by the Board.

4

4827-6348-7165.6
#93254604v9

8.2     Prepayment of Expenses. The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnitee in defending any Proceeding in advance of its final disposition; *provided*, *however*, that the Corporation may require (e.g., if required by law) that such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnitee to repay all amounts advanced if it should be ultimately determined that the Indemnitee is not entitled to be indemnified under this Article VIII or otherwise.

8.3     Claims. If a claim for indemnification or payment of expenses under this Article VIII is not paid in full within 60 days after a written claim therefor by the Indemnitee has been received by the Corporation, the Indemnitee may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnitee is not entitled to the requested indemnification or payment of expenses under applicable law.

8.4     Authorization. Any indemnification under Section 8.1 (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the Indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in Section 8.1. Such determination shall be made (a) by a majority vote of the directors who are not parties to such Proceeding, even though less than a quorum, (b) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, (c) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion or (d) by the stockholders.

8.5     Indemnification of Employees and Agents. The Corporation may indemnify and advance expenses to any Person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such Person is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, advisory director, board observer, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability, expense and loss (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such employee or agent, but only if such employee or agent acted in good faith and in a manner such employee or agent reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal proceeding, had no reasonable cause to believe such employee's or agent's conduct was unlawful. The ultimate determination of entitlement to indemnification of Persons who are not a director, advisory director, board observer or officer employee or agent shall be made in such manner as is determined by the Board in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a Person pursuant to this Section 8.5 in connection with a Proceeding initiated by such Person if the Proceeding was not authorized in advance by the Board.

8.6     Advancement of Expenses of Employees and Agents. The Corporation may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board.

5

4827-6348-7165.6
#93254604v9

8.7     Nonexclusivity of Rights. The rights conferred on any Indemnitee by this Article VIII shall not be exclusive of any other rights which such Indemnitee may have or hereafter acquire under any statute, provision of the Bylaws, this Certificate, the Securityholders Agreement, vote of stockholders or disinterested directors or otherwise.

8.8     First Resort of Indemnification. The Corporation acknowledges that any Indemnitee may have certain rights to indemnification, advancement of expenses and/or insurance provided by another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise ("**Other Indemnitors**"). The Corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to an Indemnitee are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by an Indemnitee are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by such and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Certificate or the Bylaws of the Corporation (or any other agreement between the Corporation and an Indemnitee), without regard to any rights an Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Corporation further agrees that no advancement or payment by the Other Indemnitors on behalf of an Indemnitee with respect to any claim for which an Indemnitee has sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of an Indemnitee against the Corporation.  The Corporation agrees that the Other Indemnitors are express third party beneficiaries of the terms of this Section 8.8.  Notwithstanding the foregoing, the Corporation's obligation, if any, to indemnify any Indemnitee  shall be reduced by any amount such Indemnitee may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

8.9     Amendment or Repeal. Any repeal or modification of the provisions of this Article VIII shall not adversely affect any right or protection hereunder of any Indemnitee in respect of any act or omission occurring prior to the time of such repeal or modification.  The adoption of this Certificate and the Bylaws and the Securityholders Agreement shall not adversely affect any right or protection of any Person entitled to indemnification under the Existing Certificate, the Fourth Restated Bylaws of the Corporation (the "**Existing Bylaws**") or by law.

8.10    Survival of Indemnification Rights. The rights to indemnification and advance payment of expenses provided by this Article VIII shall continue as to a Person who has ceased to be a director, advisory director, board observer, officer, employee, or agent of the Corporation and shall inure to the benefit of the personal representatives, heirs, executors and administrators of such Person.  The rights to indemnification and advance payment of expenses provided under the Existing Certificate, the Existing Bylaws or by law shall continue as to any Person entitled to indemnification thereto who has ceased to serve in any such applicable capacity.

8.11    Insurance. The Corporation shall have power to purchase and maintain insurance on behalf of any Person who is or was a director, officer, employee, advisory director or board observer of the Corporation, or is or was serving at the request of the Corporation as a director,

6

4827-6348-7165.6
#93254604v9

officer, advisory director, board observer, employee, fiduciary, partner (limited or general), manager, trustee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, or that served in any such capacity under the Existing Certificate and the Existing Bylaws against any liability asserted against such Person or incurred by such Person in any such capacity, or arising out of such Person's status as such, and related expenses, whether or not the Corporation would have the power to indemnify such Person against such liability under the provisions of applicable law.

**ARTICLE IX**
**CORPORATE OPPORTUNITIES**

9.1     <u>Corporate Opportunities</u>. Notwithstanding any duty otherwise existing at law or in equity, to the fullest extent permitted by Applicable Law, the Corporation and the Securityholders (as defined in the Securityholders Agreement) agree that:

(a)     Any of the Securityholders who are not employed by, or do not serve as a director of, the Corporation or any of its subsidiaries, each director who is employed by an Appointing Person or any of its Affiliates (each, as defined in the Securityholders Agreement), any of the foregoing Persons' respective Affiliates, and any one or more of the respective managers, directors, principals, officers, employees and other representatives of such Persons or their respective Affiliates (as defined in the Securityholders Agreement) (the foregoing Persons being referred to, collectively, as "**Identified Persons**") may now engage, may continue to engage, or may, in the future, engage in the same or similar activities or lines of business as those in which the Corporation or any of its Affiliates, directly or indirectly, now engage or may engage or other business activities that overlap with, are complementary to, or compete with those in which the Corporation or any of its Affiliates, directly or indirectly, now engage or may engage (any such activity or line of business, an "**Opportunity**"). No Identified Person shall, as a result of its capacity as such, have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity or (ii) otherwise competing with the Corporation or any of its Affiliates. No Identified Person shall, as a result of its capacity as such, have any duty or obligation to refer or offer to the Corporation or any of its Affiliates any Opportunity except for  any Identified Person who is a Director, who shall have the duty to refer or offer to the Corporation any Opportunity that is expressly first presented in writing to such Director in his or her capacity as a Director or if knowledge of such Opportunity is first acquired by such Director solely as a result of such Director's position as a Director, and the Corporation hereby renounces any interest or expectancy of the Corporation in, or in being offered, an opportunity to participate in any other Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation or any of its Affiliates.

(b)     In the event that any Identified Person acquires knowledge of a potential transaction or other corporate (or analogous) or business opportunity which may be an Opportunity for the Corporation or any of its Affiliates, such Identified Person shall have no duty to communicate or offer such Opportunity to the Corporation or any of its Affiliates and shall not be liable to the Corporation or the Securityholders for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself (or any of its Affiliates), or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person); provided that each Identified Person who is a Director shall have the duty to communicate

7

or offer to the Corporation any Opportunity that is expressly first presented in writing to such Director in his or her capacity as a Director or if knowledge of such Opportunity is first acquired by such Director solely as a result of such Director's position as a Director, and the Corporation does not waive any claims in respect of breaches of fiduciary duty arising therefrom. For the avoidance of doubt, none of the waivers of the corporate opportunities doctrine or related duties set forth in this Section 9.1 shall apply to any officer, employee or consultant of the Corporation or any of its subsidiaries.

(c)     Except as provided in the Securityholders Agreement, the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other Persons (such Persons, collectively, "**Related Companies**") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any Securityholders or any of their respective Affiliates (including Disqualified Persons (as defined in the Securityholders Agreement)), and (i) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate or the Bylaws shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Certificate or the Bylaws shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (A) the ownership by an Identified Person of any interest in any Related Company, (B) the affiliation of any Related Company with an Identified Person or (C) any action taken or omitted by an Identified Person in respect of any Related Company, (ii) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Securityholders or any of their respective Affiliates, (iii) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of its Securityholders or any of their respective Affiliates and (iv) except as set forth in Section 9.1(a) and Section 9.1(b), the Identified Persons are not and shall not be obligated to disclose to (A) the Corporation or any of its subsidiaries or (B) any of the Securityholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, and shall not be obligated to refrain from or in any respect to be restricted in competing against the Corporation, any of the Securityholders or any of their respective Affiliates in any such business or as to any such opportunities.

(d)     In addition to and notwithstanding the foregoing provisions of this Article IX, a corporate (or analogous) or business opportunity shall not be deemed to be an Opportunity for the Corporation or any of its Affiliates if it is an opportunity (i) that the Corporation is not legally able or contractually permitted to undertake or (ii) which the Board has affirmatively elected to refrain from continued evaluation or pursuing.

Any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Article IX.

8

## ARTICLE X
## MEETINGS OF STOCKHOLDERS

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws and Securityholders Agreement may provide; *provided* that notwithstanding anything herein to the contrary, special meetings of the stockholders may be called only by (i) Board acting pursuant to a resolution adopted by a majority of the Board and (ii) stockholders pursuant to a resolution adopted by Securityholders holding at least 20% of the Fully Diluted Securities (as defined in the Securityholders Agreement). The books of the Corporation may be kept (subject to any provisions contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board, or as the business of the Corporation may require. Elections of directors at an annual or special meeting of stockholders shall be by written ballot unless the Bylaws shall otherwise provide. Any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote only to the extent permitted by and in the manner provided in the Securityholders Agreement and in accordance with Delaware Law.

## ARTICLE XI
## BUSINESS COMBINATIONS

The Corporation shall not be governed by or subject to the provisions of Section 203 of the Delaware General Corporate Law as now in effect or hereafter amended, or any successor statute thereto.

## ARTICLE XII
## AMENDMENT

Subject, in all respects, to the consent rights and any other limitations set forth in the Securityholders Agreement, the Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

## ARTICLE XIII
## INCORPORATOR

The provision of the Existing Certificate naming the incorporator is omitted pursuant to Section 245(c) of Delaware Law.

## ARTICLE XIV
## SUBMISSION TO JURISDICTION

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, advisory director, board observer, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, advisory directors, board observers, officers or employees arising

9

pursuant to any provision of Delaware Law, this Certificate or the Bylaws or (iv) any action asserting a claim against the Corporation, its directors, advisory directors, board observers, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article XIV shall be held to be invalid, illegal or unenforceable as applied to any Person or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article XIV (including, without limitation, each portion of any sentence of this Article XIV containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other Persons and circumstances shall not in any way be affected or impaired thereby.

## ARTICLE XV
## JONES ACT COMPLIANCE

15.1   Certain Definitions. The following terms shall have the meanings specified below:

(a) "**Excess Share Date**" shall have the meaning ascribed to such term in Section 15.5.

(b) "**Excess Shares**" shall have the meaning ascribed to such term in Section 15.5.

(c) "**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended or supplemented from time to time.

(d) "**Fair Market Value**" shall mean, with respect to a share of Common Stock, (i) at any time the Common Stock is listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the arithmetic average of the daily VWAP of a share of Common Stock for the ten (10) consecutive trading days on which shares of Common Stock traded immediately preceding the date of measurement; or (ii) otherwise, the value of a share of Common Stock as reasonably determined in good faith by the Board assuming such asset was sold in an arm's-length transaction between a willing buyer and a willing seller occurring on the date of valuation, taking into account all relevant factors determinative of value (and giving effect to any transfer taxes payable in connection with such sale). For all purposes hereunder, the determination of the Fair Market Value by the Board (or compensation committee or similar committee of the Board) shall be deemed conclusive, final and binding (and shall not be subject to collateral attack for any reason).

(e) "**Jones Act**" shall mean, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder

10

by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering and interpreting such laws, statutes, rules and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. Coastwise Trade.

(f) "**Jones Act Warrant Agreement**" means the warrant agreement, dated [●], 2020, between the Corporation and Computershare, Inc. and Computershare Trust Company, N.A., collectively as warrant agent.

(g) "**Jones Act Warrants**" means warrants to purchase a number of shares of Common Stock, which warrants shall have the terms set forth in and as governed by the Jones Act Warrant Agreement. In accordance with the terms of the Jones Act Warrant Agreement, a holder of Jones Act Warrants (or its proposed or purported transferee) who cannot establish to the satisfaction of the Corporation that it is a U.S. Citizen shall not be permitted to exercise its Jones Act Warrants to the extent the receipt of the Common Stock upon exercise thereof would cause such shares of Common Stock to constitute Excess Shares if they were issued. Holders of Jones Act Warrants, as such, shall not have any rights or privileges of stockholders of the Corporation, including, without limitation, any rights to vote, to receive dividends or distributions, to exercise any preemptive rights, or to receive notices, in each case, as stockholders of the Corporation, until they exercise their Jones Act Warrants and receive shares of Common Stock.

(h) "**Non-U.S. Citizen**" shall mean any Person other than a U.S. Citizen.

(i) "**Permitted Percentage**" shall mean, with respect to any class or series of capital stock of the Corporation, with respect to all Non-U.S. Citizens in the aggregate, 24% of the shares of such class or series of capital stock of the Corporation from time to time issued and outstanding.

(j) "**Person**" means any individual, firm, partnership, limited liability or other company, corporation, joint venture or other entity, and shall include any successor (by merger, business combination or otherwise) of such entity.

(k) "**Redemption Date**" shall have the meaning ascribed to such term in Section 15.6(c)(iv).

(l) "**Redemption Notes**" shall mean interest-bearing promissory notes of the Corporation with a maturity of not more than 10 years from the date of issue and bearing interest at a fixed rate equal to the yield on the U.S. Treasury Note having a maturity comparable to the term of such Redemption Notes as published in The Wall Street Journal or comparable publication at the time of the issuance of the Redemption Notes. Such Redemption Notes shall be governed by the terms of an indenture to be entered into by and between the Corporation and a trustee, as may be amended from time to time. Redemption Notes shall be redeemable at par plus accrued but unpaid interest.

(m) "**Redemption Notice**" shall have the meaning ascribed to such term in Section 15.6(c)(iii).

(n) "**Redemption Price**" shall have the meaning ascribed to such term in Section 15.6(c)(i).

11

(o) "**transfer**" shall mean any transfer of beneficial ownership of shares of the capital stock of the Corporation, including (i) original issuance of shares, (ii) issuance of shares upon the exercise, conversion or exchange of any securities of the Corporation, including Jones Act Warrants, and (iii) transfer by merger, transfer by testamentary disposition, transfer pursuant to a court order or arbitration award, or other transfer by operation of law.

(p) "**transferee**" shall mean any Person receiving beneficial ownership of shares of the capital stock of the Corporation, including any recipient of shares resulting from (i) the original issuance of shares, (ii) the issuance of shares upon the exercise, conversion or exchange of any securities of the Corporation, including Jones Act Warrants, or (iii) transfer by merger, transfer by testamentary disposition, transfer pursuant to a court order or arbitration award, or other transfer by operation of law; all references to "transferees" shall also include, and the provisions of this Article XV (including, without limitation, requirements to provide citizenship certifications, affidavits and other information) shall apply to, any beneficial owner on whose behalf a transferee is acting as custodian, nominee, fiduciary, purchaser representative or in any other capacity.

(q) "**U.S. Citizen**" shall mean a citizen of the United States within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. Coastwise Trade.

(r) "**U.S. Coastwise Trade**" shall mean the carriage or transport of merchandise or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 and any successor statutes thereto, as amended or supplemented from time to time.

(s) "**VWAP**" means, for any trading day, the price for shares of  Common Stock determined by the daily volume weighted average price per share of Common Stock for such trading day on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, or the NASDAQ Capital Market, as the case may be, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session), or if shares of Common Stock are not listed or quoted on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, or the NASDAQ Capital Market, as reported by the principal U.S. national or regional securities exchange on which shares of Common Stock are then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such trading day.

15.2     Restrictions on Ownership of Shares by Non-U.S. Citizens. Non-U.S. Citizens shall not be permitted to beneficially own, individually or in the aggregate, more than the applicable Permitted Percentage of each class or series of the capital stock of the Corporation. To help ensure that at no time Non-U.S. Citizens, individually or in the aggregate, become the beneficial owners of more than the applicable Permitted Percentage of the issued and outstanding shares of any class or series of capital stock of the Corporation, and to enable the Corporation to comply with any requirement that it be, and submit any documents and other information as reasonable to demonstrate that it is, a U.S. Citizen under any applicable law or under any contract with the United States government (or any agency thereof), the Corporation shall have the power to take the actions prescribed in Section 15.3 through Section 15.8. The provisions of this Article XV are intended to ensure that the Corporation continues to qualify as a U.S. Citizen under the Jones Act so that the

4827-6348-7165.6
#93254604v9

Corporation does not cease to be qualified: (a) under the Jones Act to own and operate vessels in the U.S. Coastwise Trade; (b) to operate vessels under an agreement with the United States government (or any agency thereof); (c) to be a party to a maritime security program agreement with the United States government (or any agency thereof), under 46 U.S.C. Chapter 531 or any successor statute thereto, with respect to vessels owned, chartered or operated by the Corporation; (d) to maintain a construction reserve fund under 46 U.S.C. Chapter 533 or any successor statute thereto; (e) to maintain a capital construction fund under 46 U.S.C. Chapter 535 or any successor statute thereto; or (f) to own, charter, or operate any vessel where the costs of construction, modification, or reconstruction have been financed, in whole or in part, by obligations guaranteed by the United States government (or any agency thereof) under 46 U.S.C. Chapter 537 or any successor statute thereto. The Board (or any duly authorized committee thereof, or any officer of the Corporation who shall have been duly authorized by the Board or any such committee thereof) is specifically authorized to make all determinations and to adopt and effect all policies and measures necessary or desirable, in accordance with applicable law and this Certificate, to fulfill the purposes or implement the provisions of this Article XV; *provided*, *however*, that determinations with respect to redemptions of any Excess Shares shall be made only by the Board (or any duly authorized committee thereof).

15.3    Dual Share System.

(a)  To implement the requirements set forth in Section 15.2, the Corporation may, but is not required to, institute a dual share system such that: (i) each certificate and/or book entry (in the case of uncertificated shares) representing shares of each class or series of capital stock of the Corporation that are beneficially owned by a U.S. Citizen shall be marked "U.S. Citizen" and each certificate and/or book entry (in the case of uncertificated shares) representing shares of each class or series of capital stock of the Corporation that are beneficially owned by a Non-U.S. Citizen shall be marked "Non-U.S. Citizen", but with all such certificates and/or book entries (in the case of uncertificated shares) to be identical in all other respects and to comply with all provisions of the laws of the State of Delaware; (ii) an application to transfer shares shall be set forth on the back of each certificate or made available by the Corporation (in the case of book entry shares) in which a proposed transferee of title to shares shall apply to the Corporation to transfer the number of shares indicated therein and shall certify as to the citizenship of such proposed transferee; (iii) a certification shall be submitted by such proposed transferee (which may include as part thereof a form of affidavit), upon which the Corporation and its transfer agent (if any) shall be entitled (but not obligated) to rely conclusively, stating whether such proposed transferee is a U.S. Citizen; and (iv) the stock transfer records of the Corporation may be maintained in such manner as to enable the percentages of the shares of each class or series of the Corporation's capital stock that are beneficially owned by U.S. Citizens and by Non-U.S. Citizens to be confirmed. The Board (or any duly authorized committee thereof, or any officer of the Corporation who shall have been duly authorized by the Board or any such committee thereof) is authorized to take such other ministerial actions or make such interpretations of this Certificate as it may deem necessary or advisable in order to implement a dual share system consistent with the requirements set forth in Section 15.2 and to ensure compliance with such system and such requirements.

(b) A conspicuous statement shall be set forth on the face or back of each certificate and/or on each book entry (in the case of uncertificated shares) representing shares of each class or series of capital stock of the Corporation to the effect that: (i) such shares and the beneficial

4827-6348-7165.6
#93254604v9

ownership thereof are subject to restrictions on transfer set forth in this Certificate; and (ii) the Corporation will furnish, without charge, to each stockholder of the Corporation who so requests a copy of this Certificate.

      15.4    <u>Restrictions on Transfers</u>.

      (a) No shares of any class or series of the capital stock of the Corporation may be transferred to a Non-U.S. Citizen or a holder of record that will hold such shares for or on behalf of a Non-U.S. Citizen if, upon completion of such transfer, the number of shares of such class or series beneficially owned by Non-U.S. Citizens individually or in the aggregate would exceed the applicable Permitted Percentage for such class or series. Any transfer or purported transfer of beneficial ownership of any shares of any class or series of capital stock of the Corporation, the effect of which would be to cause Non-U.S. Citizens individually or in the aggregate to beneficially own shares of any class or series of capital stock of the Corporation in excess of the applicable Permitted Percentage for such class or series, shall, to the fullest extent permitted by law, be void *ab initio* and ineffective, and, to the extent that the Corporation or its transfer agent (if any) knows that such transfer or purported transfer would, if completed, be in violation of the restrictions on transfers to Non-U.S. Citizens set forth in this <u>Article XV</u>, neither the Corporation nor its transfer agent (if any) shall register such transfer or purported transfer on the stock transfer records of the Corporation and neither the Corporation nor its transfer agent (if any) shall recognize the transferee or purported transferee thereof as a stockholder of the Corporation with respect to such shares for any purpose whatsoever (including for purposes of voting, dividends and other distributions) except to the extent necessary to effect any remedy available to the Corporation under this <u>Article XV</u>. In no event shall any such registration or recognition make such transfer or purported transfer effective unless the Board (or any duly authorized committee thereof, or any officer of the Corporation who shall have been duly authorized by the Board or any such committee thereof) shall have expressly and specifically authorized the same.

      (b) In connection with any proposed or purported transfer of shares of any class or series of the capital stock of the Corporation, any transferee or proposed or purported transferee of shares may be required by the Corporation or its transfer agent (if any) to deliver (i) a certification by such transferee or proposed or purported transferee (which may include as part thereof a form of affidavit) upon which the Corporation and its transfer agent (if any) shall be entitled (but not obligated) to rely conclusively, stating whether such transferee or proposed or purported transferee is a U.S. Citizen, and (ii) such other documentation and information concerning the citizenship of such transferee or proposed or purported transferee (as applicable) under Section 15.8 as the Corporation may request in its sole discretion. Registration and recognition of any transfer of shares may be denied by the Corporation upon refusal to furnish, or failure to adequately so evidence as requested, any of the foregoing citizenship certifications, documentation or information requested by the Corporation. Each proposed or purported transferor of such shares shall reasonably cooperate with any requests from the Corporation to facilitate the transmission of requests for such citizenship certifications and such other documentation and information to the proposed or purported transferee and such proposed or purported transferee's responses thereto.

      (c) Notwithstanding any of the provisions of this <u>Article XV</u>, the Corporation shall be entitled (but not obligated) to rely, without limitation, on the stock transfer and other stockholder records of the Corporation (and its transfer agent, if any) for the purposes of preparing lists of

stockholders entitled to vote at meetings, determining the validity and authority of proxies, and otherwise conducting votes of stockholders.

(d) Notwithstanding anything to the contrary in this Certificate, any transfer of any shares of any class or series of the capital stock of the Corporation must be in accordance with the provisions of the Securityholders Agreement. Any transfer or purported transfer of beneficial ownership of any shares of any class or series of capital stock of the Corporation, other than in accordance with the provisions of the Securityholders Agreement shall, to the fullest extent permitted by law, be void *ab initio* and ineffective, and, to the extent that the Corporation or its transfer agent (if any) knows that such transfer or purported transfer would, if completed, be in violation of the terms of the Securityholders Agreement, neither the Corporation nor its transfer agent (if any) shall register such transfer or purported transfer on the stock transfer records of the Corporation and neither the Corporation nor its transfer agent (if any) shall recognize the transferee or purported transferee thereof as a stockholder of the Corporation with respect to such shares for any purpose whatsoever (including for purposes of voting, dividends and other distributions) except to the extent necessary to effect any remedy available to the Corporation under this Certificate.

15.5     Excess Shares. If on any date, including, without limitation, any record date (each, an "**Excess Share Date**"), the number of shares of any class or series of capital stock of the Corporation beneficially owned by Non-U.S. Citizens individually or in the aggregate should exceed the applicable Permitted Percentage with respect to such class or series of capital stock, irrespective of the date on which such event becomes known to the Corporation (such shares in excess of the applicable Permitted Percentage of such applicable class or series of capital stock, the applicable "**Excess Shares**"), then the shares of such class or series of capital stock of the Corporation that constitute Excess Shares for purposes of this Article XV shall be (x) those shares that have been purported to be acquired by or purported to become beneficially owned by Non-U.S. Citizens, starting with the most recent purported acquisition of beneficial ownership of such shares by a Non-U.S. Citizen and including, in reverse chronological order of purported acquisition, all other purported acquisitions of beneficial ownership of such shares by Non-U.S. Citizens from and after the purported acquisition of beneficial ownership of such shares by a Non-U.S. Citizen that first caused such applicable Permitted Percentage to be exceeded, or (y) those shares purported to be beneficially owned by Non-U.S. Citizens that exceed the applicable Permitted Percentage as the result of any repurchase or redemption by the Corporation of shares of its capital stock, starting with the most recent purported acquisition of beneficial ownership of such shares by a Non-U.S. Citizen and going in reverse chronological order of purported acquisition; *provided*, *however*, that: (a) the Corporation shall have the sole power to determine, in the exercise of its reasonable judgment, those shares of such class or series that constitute Excess Shares in accordance with the provisions of this Article XV; (b) the Corporation may, in its reasonable discretion, rely on any documentation provided by Non-U.S. Citizens with respect to the date and time of their purported acquisition of beneficial ownership of Excess Shares; (c) if the purported acquisition of beneficial ownership of more than one Excess Share occurs on the same date and the time of purported acquisition is not definitively established, then the order in which such purported acquisitions shall be deemed to have occurred on such date shall be determined by lot or by such other method as the Corporation may, in its reasonable discretion, deem appropriate; (d) Excess Shares that result from a determination that a beneficial owner has ceased to be a U.S. Citizen shall be deemed to have been acquired, for purposes of this Article XV, as of the date that

15

such beneficial owner ceased to be a U.S. Citizen; and (e) the Corporation may adjust upward to the nearest whole share the number of shares of such class or series deemed to be Excess Shares. Any determination made by the Corporation pursuant to this Section 15.5 as to which shares of any class or series of the Corporation's capital stock constitute Excess Shares of such class or series shall be conclusive and shall be deemed effective as of the applicable Excess Share Date for such class or series.

      15.6    <u>Redemption</u>.

(a) In the event that (i) Section 15.4(a) would not be effective for any reason to prevent the transfer of beneficial ownership of any Excess Share of any class or series of the capital stock of the Corporation to a Non-U.S. Citizen (including by reason of the applicability of Section 15.10), (ii) a change in the status of a Person from a U.S. Citizen to a Non-U.S. Citizen causes a share of any class or series of capital stock of the Corporation of which such Person is the beneficial owner to constitute an Excess Share, (iii) any repurchase or redemption by the Corporation of shares of its capital stock causes any share of any class or series of capital stock of the Corporation beneficially owned by Non-U.S. Citizens individually or in the aggregate to exceed the applicable Permitted Percentage and thereby constitute an Excess Share, or (iv) a beneficial owner of a share of any class or series of capital stock of the Corporation has been determined to be or is to be treated as a Non-U.S. Citizen pursuant to Section 15.7 or Section 15.8, respectively, and the beneficial ownership of such share by such Non-U.S. Citizen results in such share constituting an Excess Share, then, the Corporation, by action of the Board (or any duly authorized committee thereof), in its sole discretion, shall have the power to redeem such Excess Share in accordance with this Section 15.6, unless the Corporation does not have sufficient lawfully available funds to permit such redemption or such redemption is not otherwise permitted under Delaware Law or other provisions of applicable law; *provided*, *however*, that the Corporation shall not have any obligation under this Section 15.6 to redeem any one or more Excess Shares.

(b) Until such time as any Excess Shares subject to redemption by the Corporation pursuant to this Section 15.6 are so redeemed by the Corporation at its option and beginning on the first Excess Share Date for the classes or series of the Corporation's capital stock of which such Excess Shares are a part, to the fullest extent permitted by applicable law:

(i) the holders of such Excess Shares subject to redemption shall (so long as such Excess Shares exist) not be entitled to any voting rights with respect to such Excess Shares; and

(ii) the Corporation shall (so long as such Excess Shares exist) pay into a segregated account dividends and any other distributions (upon liquidation or otherwise) in respect of such Excess Shares.

Full voting rights shall be restored to any shares of a class or series of capital stock of the Corporation that were previously deemed to be Excess Shares, and any dividends or distributions with respect thereto that have been previously paid into a segregated account shall be due and paid solely to the holders of record of such shares, promptly after such time as, and to the extent that, such shares have ceased to be Excess Shares (including as a result of the sale of such shares to a U.S. Citizen prior to the issuance of a Redemption Notice pursuant to Section 15.6(c)(iii)),

4827-6348-7165.6
#93254604v9

*provided*, *however*, that such shares have not been already redeemed by the Corporation at its option pursuant to this Section 15.6.

(c) The terms and conditions of redemptions by the Corporation of Excess Shares of any class or series of the Corporation's capital stock under this Section 15.6 shall be as follows:

(i) the per share redemption price (the "**Redemption Price**") for each Excess Share shall be paid by the issuance of one Jones Act Warrant (or such higher number of Jones Act Warrants or a fraction of an Jones Act Warrant, as the case may be, then exercisable for one share of such applicable class or series of Excess Shares) for each Excess Share; *provided*, *however*, that if the Corporation determines that such Jones Act Warrant would be treated as capital stock under the Jones Act or that the Corporation may not issue such Jones Act Warrant for any reason, then the Redemption Price shall be paid, as determined by the Board (or any duly authorized committee thereof) in its sole discretion, (A) in cash (by wire transfer or bank or cashier's check), (B) by the issuance of Redemption Notes or (C) by any combination of cash and Redemption Notes (it being understood that all Excess Shares of the same class or series of capital stock of the Corporation being redeemed in the same transaction or any series of related transactions shall be redeemed for the same amount per Excess Share and in the same form of consideration);

(ii) with respect to the portion of the Redemption Price being paid in whole or in part by cash and/or by the issuance of Redemption Notes, such portion of the Redemption Price shall be an amount equal to, in the case of cash, or a principal amount equal to, in the case of Redemption Notes, the sum of (A) the Fair Market Value of such Excess Share as of the date of redemption of such Excess Share plus (B) an amount equal to the amount of any dividend or any other distribution (upon liquidation or otherwise) declared in respect of record of such Excess Share prior to the date on which such Excess Share is called for redemption and which amount has been paid into a segregated account by the Corporation pursuant to Section 15.6(b) (which shall be in full satisfaction of any right of the holder to any amount(s) in such segregated account to the extent relating to such Excess Share);

(iii) written notice of the redemption of the Excess Shares containing the information set forth in Section 15.6(c)(v), together with a letter of transmittal to accompany certificates, if any, representing the Excess Shares that have been called for redemption, shall be given either by hand delivery or by overnight courier service or by first-class mail, postage prepaid, to each holder of record of the Excess Shares to be redeemed, at such holder's last known address as the same appears on the stock register of the Corporation (the "**Redemption Notice**"), unless such notice is waived in writing by any such holder(s);

(iv) the date on which the Excess Shares shall be redeemed (the "**Redemption Date**") shall be the later of (A) the date specified in the Redemption Notice sent to the record holder of the Excess Shares (which shall not be earlier than the date of such notice), and (B) the date on which the Corporation has irrevocably deposited in trust with a paying agent or set aside for the benefit of such record holder consideration sufficient to pay the

17

4827-6348-7165.6
#93254604v9

Redemption Price to such record holders of such Excess Shares in Jones Act Warrants, cash and/or Redemption Notes;

(v) each Redemption Notice to each holder of record of the Excess Shares to be redeemed shall specify (A) the Redemption Date (as determined pursuant to Section 15.6(c)(iv)), (B) the number and the class or series of shares of capital stock to be redeemed from such holder as Excess Shares (and, to the extent such Excess Shares are certificated, the certificate number(s) representing such Excess Shares), (C) the Redemption Price and the manner of payment thereof, (D) the place where certificates for such Excess Shares (if such Excess Shares are certificated) are to be surrendered for cancellation, (E) any instructions as to the endorsement or assignment for transfer of such certificates (if any) and the completion of the accompanying letter of transmittal, and (F) the fact that all right, title and interest in respect of the Excess Shares to be redeemed (including, without limitation, voting, dividend and distribution rights) shall cease and terminate on the Redemption Date, except for the right to receive the Redemption Price, without interest;

(vi) on and after the Redemption Date, all right, title and interest in respect of the Excess Shares selected for redemption (including, without limitation, voting and dividend and distribution rights) shall forthwith cease and terminate, such Excess Shares shall no longer be deemed to be outstanding shares for any purpose, including, without limitation, for purposes of voting or determining the total number of shares entitled to vote on any matter properly brought before the stockholders for a vote thereon or receiving any dividends or distributions (and may be either cancelled or held by the Corporation as treasury stock), and the holders of record of such Excess Shares shall thereafter be entitled only to receive the Redemption Price, without interest; and

(vii) upon surrender of the certificates (if any) for any Excess Shares so redeemed in accordance with the requirements of the Redemption Notice and the accompanying letter of transmittal (and otherwise in proper form for transfer as specified in the Redemption Notice), the holder of record of such Excess Shares shall be entitled to payment of the Redemption Price. In case fewer than all the shares represented by any such certificate are redeemed, a new certificate (or certificates), to the extent such shares were certificated, shall be issued representing the shares not redeemed, without cost to the holder of record. On the Redemption Date, to the extent that dividends or other distributions (upon liquidation or otherwise) with respect to the Excess Shares selected for redemption were paid into a segregated account in accordance with Section 15.6(b)(ii), then, to the fullest extent permitted by applicable law, such amounts shall be released to the Corporation upon the completion of such redemption.

(d) Nothing in this Section 15.6 shall prevent the recipient of a Redemption Notice from transferring its Common Stock before the Redemption Date if such transfer is otherwise permitted under this Certificate and applicable law and the recipient provides notice of such proposed or purported transfer to the Corporation along with the documentation and information required under Section 15.4(b) and Section 15.8 establishing that the proposed or purported transferee is a U.S. Citizen to the satisfaction of the Corporation in its reasonable discretion before the Redemption Date. If such conditions are met, the Board (or any duly authorized committee thereof) shall

4827-6348-7165.6
#93254604v9

withdraw the Redemption Notice related to such shares, but otherwise the redemption thereof shall proceed on the Redemption Date in accordance with this Section and the Redemption Notice.

15.7    Citizenship Determinations. The Corporation shall have the power to determine, in the exercise of its reasonable judgment including, at its option, with the advice of counsel, the citizenship of the beneficial owners and the transferees or proposed or purported transferees of any class or series of the Corporation's capital stock for the purposes of this Article XV. In determining the citizenship of any beneficial owners or their transferees or proposed or purported transferees of any class or series of the Corporation's capital stock, the Corporation may, absent other available information to the contrary, rely on the stock transfer records of the Corporation and the citizenship certifications required under Section 15.4(b) and the written statements and affidavits required under Section 15.8 given by the beneficial owners or their transferees or proposed or purported transferees, in each case whether such certifications, written statements or affidavits have been given on their own behalf or on behalf of others, to prove the citizenship of such beneficial owners, transferees or proposed or purported transferees (or any beneficial owners for whom such transferees or proposed or purported transferees are acting as fiduciaries or nominees). The determination of the citizenship of such beneficial owners, transferees or proposed or purported transferees (and any beneficial owners for whom such transferees or proposed or purported transferees are acting as fiduciaries or nominees)  may also be subject to documents and other information as the Corporation may deem reasonable pursuant to Section 15.8(b). The determination of the Corporation at any time as to the citizenship of such beneficial owners, transferees or proposed or purported transferees in accordance with the provisions of Article XV shall be conclusive.

15.8    Requirement to Provide Citizenship Information.

(a) In furtherance of the requirements of Section 15.2, and without limiting any other provision of this Article XV, the Corporation may require the beneficial owners of shares of any class or series of the Corporation's capital stock to confirm their citizenship status from time to time in accordance with the provisions of this Section 15.8, and, as a condition to acquiring and having beneficial ownership of shares of any class or series of capital stock of the Corporation, every beneficial owner of any such shares must comply with the following provisions:

(i)  promptly upon a beneficial owner's acquisition of beneficial ownership of five (5%) percent or more of the outstanding shares of any class or series of capital stock of the Corporation (other than, as of the Effective Date, the acquisition pursuant to the Corporation's prepackaged plan of reorganization under the Bankruptcy Code), and at such other times as the Corporation may determine by written notice to such beneficial owner, such beneficial owner must provide to the Corporation a written statement or an affidavit, as specified by the Corporation, duly signed, stating the name and address of such beneficial owner, the number of shares of each class or series of capital stock of the Corporation beneficially owned by such beneficial owner as of a recent date, the legal structure of such beneficial owner, a statement as to whether such beneficial owner is a U.S. Citizen, and such other information and documents required by the U.S. Coast Guard or the U.S. Maritime Administration under the Jones Act, including 46 C.F.R. part 355;

19

4827-6348-7165.6
#93254604v9

(ii) promptly upon request by the Corporation, any beneficial owner must provide to the Corporation a written statement or an affidavit, as specified by the Corporation, duly signed, stating the name and address of such beneficial owner, the number of shares of each class or series of capital stock of the Corporation beneficially owned by such beneficial owner as of a recent date, the legal structure of such beneficial owner, a statement as to whether such beneficial owner is a U.S. Citizen, and such other information and documents required by the U.S. Coast Guard or the U.S. Maritime Administration under the Jones Act, including 46 C.F.R. part 355;

(iii) promptly upon request by the Corporation, any beneficial owner must provide to the Corporation a written statement or an affidavit, as specified by the Corporation, duly signed, stating the name and address of such beneficial owner, together with reasonable documentation of the date and time of such beneficial owner's acquisition of beneficial ownership of the shares of any class or series of capital stock of the Corporation specified by the Corporation in its request;

(iv) promptly after becoming a beneficial owner, every beneficial owner must provide, or authorize such beneficial owner's broker, dealer, custodian, depositary, nominee or similar agent with respect to the shares of each class or series of the Corporation's capital stock beneficially owned by such beneficial owner to provide, to the Corporation such beneficial owner's address and other contact information as may be requested by the Corporation; and

(v) every beneficial owner must provide to the Corporation, at any time such beneficial owner ceases to be a U.S. Citizen, as promptly as practicable but in no event less than five Business Days after the date such beneficial owner becomes aware that it has ceased to be a U.S. Citizen, a written statement, duly signed, stating the name and address of the beneficial owner, the number of shares of each class or series of capital stock of the Corporation beneficially owned by such beneficial owner as of a recent date, the legal structure of such beneficial owner, and a statement as to such change in status of such beneficial owner to a Non-U.S. Citizen.

(b) The Corporation may at any time require documents and other information as it may request as reasonable, in addition to the citizenship certifications required under Section 15.4(b) and the written statements and affidavits required under Section 15.8(a), of the citizenship of the beneficial owner or the transferee or proposed or purported transferee of shares of any class or series of the Corporation's capital stock.

(c) In the event that (i) the Corporation requests in writing (in which express reference is made to this Section 15.8) from a beneficial owner of shares of any class or series of the Corporation's capital stock a citizenship certification required under Section 15.4(b), a written statement, an affidavit and/or reasonable documentation required under Section 15.8(a) as reasonable to confirm citizenship required under Section 15.8(b), and (ii) such beneficial owner fails to provide the Corporation with the requested documentation by the date set forth in such written request, then, to the fullest extent permitted by applicable law: (A)(x) the voting rights of such beneficial owner's shares of the Corporation's capital stock shall be suspended, and (y) any dividends or other distributions (upon liquidation or otherwise) with respect to such shares shall

4827-6348-7165.6
#93254604v9

be paid into a segregated account, until such requested documentation is submitted in form and substance reasonably satisfactory to the Corporation, subject to the other provisions of this Article XV; provided, however, that the Corporation shall have the power, in its sole discretion, to extend the date by which such requested documentation must be provided and/or to waive the application of sub-clauses (x) and/or (y) of this clause (ii)(A) to any of the shares of such beneficial owner in any particular instance; and (B) the Corporation, upon approval by the Board (or any duly authorized committee thereof) in its sole discretion, shall have the power to treat such beneficial owner as a Non-U.S. Citizen unless and until the Corporation receives the requested documentation confirming that such beneficial owner is a U.S. Citizen.

(d) In the event that (i) the Corporation requests in writing (in which express reference is made to this Section 15.8) from the transferee or proposed or purported transferee) of, shares of any class or series of the Corporation's capital stock a citizenship certification required under Section 15.4(b), a written statement, an affidavit and/or reasonable documentation required under Section 15.8(a) or under Section 15.8(b), and (ii) such Person fails to submit the requested documentation in form and substance reasonably satisfactory to the Corporation, subject to the other provisions of this Article XV, by the date set forth in such written request, the Corporation, acting through its Board (or any duly authorized committee thereof, or any officer of the Corporation who shall have been duly authorized by the Board or any such committee thereof), shall have the power, in its sole discretion, to refuse to accept any application to transfer ownership of such shares (if any) or to register such shares on the stock transfer records of the Corporation and may prohibit and/or void such transfer, including by placing a stop order with the Corporation's transfer agent (if any), until such requested documentation is so submitted and the Corporation is satisfied that the proposed or purported transfer of shares will not result in Excess Shares.

15.9    Restrictions on Voting Power.  The voting power of Non-U.S. Citizens shall be limited in accordance with Sections 2.1(a)(iii) and 2.1(b) of the Securityholders Agreement for purposes of compliance with the Jones Act.

15.10   Severability. Each provision of this Article XV is intended to be severable from every other provision. If any one or more of the provisions contained in this Article XV is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of any other provision of this Article XV shall not be affected, and this Article XV shall be construed as if the provisions held to be invalid, illegal or unenforceable had never been contained herein.

21

**IN WITNESS WHEREOF**, Hornbeck Offshore Services, Inc. has caused this Certificate to be executed in its corporate name by duly authorized officer on this _____ day of _____, 2020.

HORNBECK OFFSHORE SERVICES, INC.


By:_____
      Name:
      Title:

4827-6348-7165.6

#93254604v9

**Exhibit A(ii)**

**Fifth Amended and Restated Bylaws**

*Exhibit A(ii)*

**FIFTH AMENDED AND RESTATED BYLAWS**

**OF**

**HORNBECK OFFSHORE SERVICES, INC.**

Adopted [●], 2020

## ARTICLE 1
## DEFINITIONS

As used in these Fifth Amended and Restated Bylaws of Hornbeck Offshore Services, Inc. (these "**Bylaws**"), unless the context otherwise requires, the terms "Person", "Non-U.S. Citizen", "U.S. Citizen", "U.S. Coastwise Trade", "Jones Act" and "Permitted Percentage" shall have the same meanings as ascribed to those terms in the Corporation's Third Amended and Restated Certificate of Incorporation (as it may be amended from time to time, the "**Certificate of Incorporation**"). Capitalized terms used but not otherwise defined herein shall have the meanings as ascribed to those terms in the Certificate of Incorporation.

## ARTICLE 2
## OFFICES

Section 2.01. *Registered Office.* The registered office of Hornbeck Offshore Services, Inc. (the "**Corporation**") is 1209 Orange Street, Corporation Trust Center, in the City of Wilmington, County of New Castle, State of Delaware 19801.

Section 2.02. *Other Offices.* The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors of the Corporation (the "**Board**") may from time to time determine or the business of the Corporation may require.

Section 2.03. *Books.* The books of the Corporation may be kept (subject to any provisions contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board, or as the business of the Corporation may require.

## ARTICLE 3
## MEETINGS OF STOCKHOLDERS

Section 3.01. *Time and Place of Meetings.* All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board (or the Chairman of the Board in the absence of a designation by the Board). The Board may, in its sole discretion, determine that a meeting of stockholders of the Corporation shall not be held at any place, but may instead be held solely by means of remote communication in the manner authorized by the General Corporation Law of the State of Delaware (as the same exists or may hereafter be amended, "**Delaware Law**").

Section 3.02. *Annual Meetings.*  Commencing in 2021, an annual meeting of stockholders shall be held for the election of directors to succeed those whose terms expire and to transact such other business as may properly be brought before the meeting.

Section 3.03. *Special Meetings.*  Except as otherwise provided in the Securityholders Agreement of the Corporation, dated as of even date herewith (as may be amended from time to time, the "**Securityholders Agreement**"), special meetings of the stockholders may be called only (i) by the Board acting pursuant to a resolution adopted by a majority of the Board, and (ii) by the stockholders acting pursuant to a resolution adopted by Securityholders (as defined in the Securityholders Agreement) holding at least 20% of the Fully Diluted Securities (as defined by in the Securityholders Agreement).

Section 3.04. *Notice of Meetings and Adjourned Meetings; Waivers of Notice.*

(a)      Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise required by Delaware Law, such notice shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder of record entitled to vote at such meeting.  The Board or the chairman of the meeting may adjourn the meeting to another time or place (whether or not a quorum is present), and notice need not be given of the adjourned meeting if the time, place, if any, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, are announced at the meeting at which such adjournment is made.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b)      A written waiver of any such notice signed by the Person entitled thereto, or a waiver by electronic transmission by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a Person at a meeting shall constitute a waiver of notice of such meeting, except when the Person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 3.05. *Quorum.*  Unless otherwise provided in the Securityholders Agreement, Certificate of Incorporation or these Bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the total voting power of all outstanding securities of the Corporation generally entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the chairman of the meeting or a majority in voting interest of the stockholders present in person or represented by proxy may adjourn the meeting, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such

2

adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally notified.

Section 3.06. *Voting.*

(a)      Unless otherwise provided in the Securityholders Agreement, Certificate of Incorporation or these Bylaws and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of Common Stock of the Corporation held by such stockholder. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights. Except as otherwise required by Delaware Law, the Securityholders Agreement, the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of the holders of a majority of the votes cast at the meeting on the subject matter shall be the act of the stockholders.  Abstentions shall not be counted as votes cast.  Subject to the rights of the holders of any class or series of preferred stock, including to elect additional directors under specific circumstances, pursuant to the terms of the Securityholders Agreement, the Certificate of Incorporation or these Bylaws, directors shall be elected by a majority of the votes cast by holders of the shares of Common Stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

(b)      Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another Person or Persons to act for such stockholder by proxy, appointed by an instrument in writing, subscribed by such stockholder or by his attorney thereunto authorized, or by proxy sent by electronic mail in "portable document format" (".pdf") form or any other means of electronic communication permitted by Delaware Law, which results in a writing from such stockholder or by his attorney, and delivered to the secretary of the meeting.  No proxy shall be voted after three (3) years from its date, unless said proxy provides for a longer period.

(c)      Should a proxy designate two (2) or more Persons to act as proxies, unless such instrument shall provide the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, each proxy so attending shall be entitled to exercise such powers in respect of the same portion of the shares as he or she is of the proxies representing such shares.

Section 3.07.  *Inspectors at Meetings of Stockholders.* Any vote of stockholders may be conducted in any manner approved by the person presiding at the meeting of the stockholders at the time when the vote is held and need not be by written ballot. At any meeting of stockholders at which a vote is taken by ballots, the chairman of the meeting may appoint one or more inspectors, each of whom shall subscribe an oath or affirmation to execute faithfully the duties of inspector at such meeting with strict impartiality and according to the best of his or her ability. Such inspector shall ascertain the number of shares of capital stock of the Corporation outstanding and the voting power of each such share, determine the shares of capital stock of the Corporation represented at the meeting and the validity of proxies and ballots, count all votes and ballots, determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and certify their determination of the number of shares of

4833-0310-5213.6
#93254601v8

capital stock of the Corporation represented at the meeting and such inspectors' count of all votes and ballots.  Such certification and report shall specify such other information as may be required by Delaware Law.  In determining the validity and counting of proxies and ballots cast at any meeting of stockholders of the Corporation, the inspectors may consider such information as is permitted by Delaware Law.  The chairman of the meeting may appoint any person to serve as inspector, except no candidate for the office of director shall be appointed as an inspector.  The chairman of the meeting shall be a U.S. Citizen.

Section 3.08.  *Stockholder Action by Written Consent.* Unless otherwise provided in the Securityholders Agreement, any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.

Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered to the Corporation, a written consent or consents signed by a sufficient number of holders to take action are delivered to the Corporation in the manner prescribed in the first paragraph of this Section.  An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a Person or Persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this Section to the extent permitted by Delaware Law.  Any such consent shall be delivered in accordance with Section 228(d)(1) of the Delaware General Corporation Law.

Any copy, .pdf transmission, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, .pdf transmission, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Section 3.09.  *Organization.*  At each meeting of stockholders, the Chairman of the Board, if one shall have been elected, or in the Chairman of the Board's absence or if one shall not have been elected, the director designated by the vote of the majority of the directors present at such meeting, or if one director shall not have been so designated, then the Chief Executive Officer, shall act as chairman of the meeting. The Secretary (or in the Secretary's absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.   Each of the Chairman of the Board, the President, and the Chief Executive Officer of the Corporation shall be a U.S. Citizen.

4

4833-0310-5213.6
#93254601v8

Section 3.10. *Order of Business.* The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

Section 3.11. *Nomination of Directors and Proposal of Other Business.*

(a) *Annual Meetings of Stockholders.* Except as otherwise provided in the Securityholders Agreement, nominations of persons for election to the Board or the proposal of other business to be transacted by the stockholders at an annual meeting of stockholders may be made only (A) pursuant to the Corporation's notice of meeting (or any supplement thereto), (B) by or at the direction of the Board or any nominating committee thereof, or (C) as may be provided in the Certificate of Incorporation.

(b) *Special Meetings of Stockholders.* Except as otherwise provided in the Securityholders Agreement, if the election of directors is included as business to be brought before a special meeting in the Corporation's notice of meeting, then nominations of persons for election to the Board at a special meeting of stockholders may be made (x) by or at the direction of the Board or any committee thereof and (y) by any stockholder who is a stockholder of record at the time of giving of notice provided for in this Section 3.11(b) and at the time of the special meeting, who shall be entitled to nominate one or more persons for election to the Board pursuant to the Securityholders Agreement at such time.

**ARTICLE 4**
**DIRECTORS**

Section 4.01. *General Powers.* Except as otherwise provided in Delaware Law or the Certificate of Incorporation and subject to the terms of the Securityholders Agreement, the business and affairs of the Corporation shall be managed by or under the direction of the Board.

Section 4.02. *Number, Election and Term of Office.* Subject to the terms of the Certificate of Incorporation and the Securityholders Agreement, the Board shall consist of a number of directors to be determined from time to time solely by resolution adopted by the affirmative vote of a majority of the Board; *provided*, that, as of the date of adoption of these Bylaws, the Board shall consist of seven (7) directors, who shall be appointed as set forth in the Securityholders Agreement. Except as may otherwise be provided in the Certificate of Incorporation and subject to the terms of the Securityholders Agreement, each director shall serve for a term ending on the date of the first (1st) annual meeting of stockholders next following the annual meeting at which such director was elected. Notwithstanding the foregoing, each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal. Directors need not be stockholders.

Section 4.03. *Citizenship Requirement for Directors.* No more than a minority of the number of directors necessary to constitute a quorum of the Board (in order for the Corporation to continue as a U.S. Citizen) (or any committee thereof) shall be Non-U.S. Citizens.

Section 4.04. *Chairman.* Except as otherwise provided in the Certificate of Incorporation and the Securityholders Agreement, the Chairman of the Board shall be     elected by a majority vote of the Board. Any director elected as Chairman of the Board in accordance with this Section

4833-0310-5213.6
#93254601v8

4.04 shall hold such office until such time as a replacement Chairman of the Board has been elected by a majority vote of the Board. The Chairman of the Board shall preside at all meetings of the stockholders of the Corporation and shall have such other powers and perform such other duties (including, without limitation, as applicable, as an officer of the Corporation) as may be prescribed by the Board or provided in these Bylaws. The Chairman of the Board, any Vice Chairman of the Board and any other person who chairs a meeting of the Board or the stockholders shall be a U.S. Citizen.

Section 4.05.  *Quorum and Manner of Acting.*  Unless the Certificate of Incorporation or these Bylaws require a greater number and subject to the terms of the Securityholders Agreement, five (5) directors of the Board (without regard to vacancies; provided that if there are fewer than 5 directors then in office, a quorum shall be all then serving directors) shall constitute a quorum for the transaction of business at any meeting of the Board and, except as otherwise expressly required by Delaware Law or by the Certificate of Incorporation or Securityholders Agreement, the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.  When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Board may transact any business which might have been transacted at the original meeting.  If a quorum shall not be present at any meeting of the Board, the directors present thereat shall adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 4.06. *Time and Place of Meetings.*  The Board shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board (or the Chairman of the Board in the absence of a determination by the Board, or the Chief Executive Officer in the Chairman's absence).

Section 4.07.  *Annual Meeting.*  The Board shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held; provided, that, subject to the remaining provisions of this Section 4.07, the failure to hold such meeting of the Board at such time and place shall not be a breach of these Bylaws.  Notice of such meeting need not be given.  In the event such annual meeting is not so held, the annual meeting of the Board may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 4.10 herein or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 4.08.  *Regular Meetings.* After the place and time of regular meetings of the Board shall have been determined and notice thereof shall have been once given to each member of the Board, regular meetings may be held without further notice being given.

Section 4.09.  *Special Meetings.*  Special meetings of the Board may be called by the Chairman of the Board, the Chief Executive Officer, the President, or at least two members of the Board.  Notice of special meetings of the Board shall be given to each director at least three (3) days before the date of the meeting in such manner as is determined by the Board.

4833-0310-5213.6
#93254601v8

Section 4.10. *Notice of Meetings and Business to be Discussed*. Written notice of each meeting of the Board shall be given to each director which shall state the date, time, place of the meeting and the purpose or purposes for which the meeting is called. Only business within the purposes described in the notice may be conducted at any special meeting. The written notice of any meeting shall be given at least three (3) days prior to such meeting, which notice may be waived in writing or by a director attending such meeting.

Section 4.11. *Committees.* Subject to the terms of the Securityholders Agreement, the Board may designate one or more committees, each committee to consist of two or more of the directors of the Corporation, and may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board establishing such committee and subject to the terms of the Securityholders Agreement, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter expressly required by Delaware Law to be submitted to the stockholders for approval (other than nominations for persons for election as directors) or (b) adopting, amending or repealing any bylaw of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board when required. No more than a minority of the number of directors necessary to constitute a quorum of any committee of the Board shall be Non-U.S. Citizens. The chairman of any committee of the Board, any vice chairman of any committee of the Board and any other person who chairs a meeting of any committee of the Board shall be a U.S. Citizen.

Section 4.12. *Action by Consent.* Unless otherwise restricted by the Securityholders Agreement, Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions, are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper or electronic form.

Section 4.13. *Telephonic Meetings.* Unless otherwise restricted by the Securityholders Agreement, the Certificate of Incorporation or these Bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 4.14. *Resignation.* Any director may resign from the Board at any time by giving notice to the Board or to the Secretary of the Corporation. Any such notice must be in writing or by electronic transmission to the Board or to the Secretary of the Corporation. The resignation of

4833-0310-5213.6
#93254601v8

any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4.15. *Vacancies.* Except as otherwise set forth in the Securityholders Agreement, in the event that a vacancy is created on the Board at any time due to the death, disability, retirement, resignation or removal of a director, then:

(a)    with respect to any directors that have been designated to serve on the Board in accordance with the Securityholders Agreement (such directors, "**Board Designees**"), the Appointing Person (as defined in the Securityholders Agreement, including any successor thereto in accordance the terms of the Securityholders Agreement) who designated for election such director (such Appointing Person, a "**Designating Holder**") shall have the exclusive right to designate for election an individual to fill such vacancy and the Corporation shall take such actions as may be necessary or desirable to ensure the election and appointment of such designee to fill such vacancy on the Board in a manner consistent with Section 2.1(c)(iv)(A) of the Securityholders Agreement; *provided*, *however*, in the event that the applicable Designating Holder shall fail to designate in writing a replacement Board Designee to fill the vacant director position on the Board, and such failure shall continue for more than sixty (60) days after notice from the Corporation to such Designating Holder with respect to such failure, then the vacant position shall be filled by an individual designated by the remaining directors then in office; *provided* that such individual shall be removed from such position if such Designating Holder so directs and simultaneously designates a new Board Designee to serve in such position on the Board;

(b)    with respect to any Other Director (as defined in the Securityholders Agreement) vacancy, such vacancy shall be filled in accordance with Section 2.1(c)(iv)(B) of the Securityholders Agreement; and

(c)    if the person serving as Chief Executive Officer of the Corporation is removed or resigns or is otherwise replaced in such capacity, then such person shall automatically, and without any action by the Board or stockholders of the Corporation, cease to be a director, and the director position on the Board reserved for the Chief Executive Officer of the Corporation shall remain vacant until a successor Chief Executive Officer is duly appointed by the Board in accordance with these Bylaws, the Securityholders Agreement and the Certificate of Incorporation, in which case such person shall automatically, and without any further action by the Board or stockholders of the Corporation, fill such vacancy and become a director.

Section 4.16. *Removal.* Subject to the provisions of the Securityholders Agreement, no director may be removed from office by the stockholders except with the affirmative vote of the holders of not less than a majority of the total voting power of all outstanding securities of the Corporation generally entitled to vote in the election of directors, voting together as a single class.

Section 4.17.    *Compensation.* Unless otherwise restricted by the Certificate of Incorporation, these Bylaws or the Securityholders Agreement, the Board shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

8

Section 4.18. *Corporate Opportunities.* Notwithstanding any duty otherwise existing at law or in equity, to the fullest extent permitted by Delaware Law, the Corporation and the Securityholders (as defined in the Securityholders Agreement) agree that:

(a)     Any of the Securityholders who are not employed by, or do not serve as a director of, the Corporation or any of its subsidiaries, each director who is employed by an Appointing Person or any of its Affiliates (each, as defined in the Securityholders Agreement), any of the foregoing Persons' respective Affiliates, and any one or more of the respective managers, directors, principals, officers, employees and other representatives of such Persons or their respective Affiliates (as defined in the Securityholders Agreement) (the foregoing Persons being referred to, collectively, as "Identified Persons") may now engage, may continue to engage, or may, in the future, engage in the same or similar activities or lines of business as those in which the Corporation or any of its Affiliates, directly or indirectly, now engage or may engage or other business activities that overlap with, are complementary to, or compete with those in which the Corporation or any of its Affiliates, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity"). No Identified Person shall, as a result of its capacity as such, have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity or (ii) otherwise competing with the Corporation or any of its Affiliates.  No Identified Person shall, as a result of its capacity as such, have any duty or obligation to refer or offer to the Corporation or any of its Affiliates any Opportunity except for any Identified Person who is a Director, who shall have the duty to refer or offer to the Corporation any Opportunity that is expressly first presented in writing to such Director in his or her capacity as a Director or if knowledge of such Opportunity is first acquired by such Director solely as a result of such Director's position as a Director, and the Corporation hereby renounces any interest or expectancy of the Corporation in, or in being offered, an opportunity to participate in any other Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation or any of its Affiliates.

(b)     In the event that any Identified Person acquires knowledge of a potential transaction or other corporate (or analogous) or business opportunity which may be an Opportunity for the Corporation or any of its Affiliates, such Identified Person shall have no duty to communicate or offer such Opportunity to the Corporation or any of its Affiliates and shall not be liable to the Corporation or the Securityholders for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself (or any of its Affiliates), or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person); provided that each Identified Person who is a Director shall have the duty to communicate or offer to the Corporation any Opportunity that is expressly first presented in writing to such Director in his or her capacity as a Director or if knowledge of such Opportunity is first acquired by such Director solely as a result of such Director's position as a Director, and the Corporation does not waive any claims in respect of breaches of fiduciary duty arising therefrom. For the avoidance of doubt, none of the waivers of the corporate opportunities doctrine or related duties set forth in this Section 4.18 shall apply to any officer, employee or consultant of the Corporation or any of its subsidiaries.

(c)     Except as provided in the Securityholders Agreement, the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other Persons (such Persons, collectively, "**Related Companies**") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the

9

Corporation, any Securityholders or any of their respective Affiliates (including Disqualified Persons (as defined in the Securityholders Agreement)), and (i) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under the Certificate of Incorporation or these Bylaws shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under the Certificate of Incorporation or these Bylaws shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (A) the ownership by an Identified Person of any interest in any Related Company, (B) the affiliation of any Related Company with an Identified Person or (C) any action taken or omitted by an Identified Person in respect of any Related Company, (ii) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Securityholders or any of their respective Affiliates, (iii) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of its Securityholders or any of their respective Affiliates and (iv) except as set forth in Section 4.18(a) and Section 4.18(b), the Identified Persons are not and shall not be obligated to disclose to (A) the Corporation or any of its subsidiaries or (B) any of the Securityholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, and shall not be obligated to refrain from or in any respect to be restricted in competing against the Corporation, any of the Securityholders or any of their respective Affiliates in any such business or as to any such opportunities.

(d)     In addition to and notwithstanding the foregoing provisions of this Section 4.18, a corporate (or analogous) or business opportunity shall not be deemed to be an Opportunity for the Corporation or any of its Affiliates if it is an opportunity (i) that the Corporation is not legally able or contractually permitted to undertake or (ii) which the Board has affirmatively elected to refrain from continued evaluation or pursuing.

Any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Section 4.18.

## ARTICLE 5
## OFFICERS

Section 5.01.  *Officers; Limitations*.

(a)     The executive officers of the Corporation shall be a Chief Executive Officer, Chief Financial Officer, General Counsel, one or more Executive or Senior Vice Presidents and a Corporate Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose.  The Corporation may also have such other executive officers, including one or more Controllers, as the Board may in its discretion appoint.  One person may hold the offices and perform the duties of any two (2) or more of said offices, except that no one person shall hold the offices and perform the duties of President and Corporate Secretary.

4833-0310-5213.6
#93254601v8

(b)      Each of the executive officers of the Corporation shall be U.S. Citizens.

Section 5.02.  *Appointment, Term of Office and Remuneration.*   The officers of the Corporation shall be appointed by the Board in the manner determined by the Board.  Each such officer shall hold office until his or her successor is appointed, or until his or her earlier death, resignation or removal.  Subject to any delegation made pursuant to Section 5.03, the remuneration of all officers of the Corporation shall be fixed by the Board.  Any vacancy in any office shall be filled in such manner as the Board shall determine.

Section 5.03.  *Subordinate Officers.*  In addition to the executive officers enumerated in Section 5.01 herein, the Corporation may have a Treasurer, one or more Vice Presidents, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board may deem necessary, each of whom shall hold office for such period as the Board may from time to time determine; *provided, however*, that a Non-U.S. Citizen may not exercise or be delegated any authority or duties that in any way relate to the exercise of authority or performance of duties associated with the functions of the Chairman or the President nor may such person be granted or delegated any authority to bind the Corporation.  The Board may delegate to any executive officer the power to appoint, remove and remunerate any such subordinate officers, agents or employees.

Section 5.04.  *Removal.*  Any officer may be removed, with or without cause, at any time, by resolution adopted by a majority of the Board, except that subordinate officers may be removed in such manner and by such persons as the Board shall otherwise permit.

Section 5.05.  *Resignations.*  Any officer may resign at any time by giving notice to the Board (or to the Chief Executive Officer).  Any such notice must be requested to be in writing. The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice, unless the Corporation provides such officer with written notice that such resignation shall be effective as of a date after such notice is delivered, but prior to the date set forth in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.06.  *Powers and Duties.*  The officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board.

## ARTICLE 6
## CAPITAL STOCK

Section 6.01.  *Certificates for Stock; Uncertificated Shares.*  The shares of the Corporation need not be represented by certificates, and the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares or a combination of certificated and uncertificated shares.  Any such resolution that shares of a class or series will only be uncertificated shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation; provided that all shares shall be uncertificated as of the date of adoption of these Bylaws.  Except as otherwise required by Delaware Law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders

11

of shares represented by certificates of the same class and series shall be identical.  Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of the Corporation by two authorized officers representing the number of shares registered in certificate form.  Any or all of the signatures on the certificate may be a .pdf or facsimile.  In case any officer, transfer agent or registrar who has signed or whose .pdf or facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.  The Corporation shall not have power to issue a certificate in bearer form.

Section 6.02.  *U.S. Citizenship Requirement*.  At no time shall Non-U.S. Citizens be permitted to beneficially own, individually or in the aggregate, more than the Permitted Percentage of each class or series of the capital stock of the Corporation.

Section 6.03.  *Dual Share System*.

(a)    If the Board has determined pursuant to the Certificate of Incorporation to use a dual share system, the Corporation shall instruct its transfer agent to maintain two separate stock records for each class or series of its capital stock: (i) a record of shares owned by U.S. Citizens and (ii) a record of shares owned by Non-U.S. Citizens.

(b)    Certificates and/or book entries (in the case of uncertificated shares) representing shares of each class or series of the capital stock of the Corporation shall be marked either "U.S. Citizen" or "Non-U.S. Citizen," but shall be identical in all other respects. Shares owned by U.S. Citizens shall be represented by U.S. Citizen certificates and/or book entries, and shares owned by Non-U.S. Citizens shall be represented by Non-U.S. Citizen certificates and/or book entries. Whether shares are owned by U.S. Citizens or by Non-U.S. Citizens shall be determined in accordance with the Certificate of Incorporation.

Section 6.04.  *Transfer of Shares*.

(a)    Shares of the stock of the Corporation may be transferred on the record of stockholders of the Corporation by the holder thereof or by such holder's duly authorized attorney upon surrender of a certificate therefor properly endorsed or upon receipt of proper transfer instructions from the registered holder of uncertificated shares or by such holder's duly authorized attorney and upon compliance with appropriate procedures for transferring shares in uncertificated form, unless waived by the Corporation; *provided* however that such transfer must comply with the Securityholders Agreement, the Certificate of Incorporation and applicable law, including the Jones Act.

(b)    Without limiting the applicable provisions of the Certificate of Incorporation, shares of any class or series of capital stock represented by a U.S. Citizen certificate and/or book entry, or represented by a Non-U.S. Citizen certificate and/or book entry determined by the Corporation to be held by or on behalf of a U.S. Citizen, may not be transferred, and shares of any class or series of the capital stock of the Corporation may not be issued (upon original issuance), to a Non-U.S. Citizen or a holder of record that will hold such shares for or on behalf of a Non-U.S. Citizen if, upon completion of such transfer or issuance, Non-U.S. Citizens, individually or in the

12

4833-0310-5213.6
#93254601v8

aggregate, will own shares of such class or series of the capital stock represented by Non-U.S. Citizen certificates and/or book entries and represented by U.S. Citizen certificates and/or book entries determined by the Corporation to be held by or on behalf of Non-U.S. Citizens in excess of the Permitted Percentage of such class or series.

Section 6.05. *Authority for Additional Rules Regarding Transfer.* The Board shall have the power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificated or uncertificated shares of the stock of the Corporation (in each case, solely to the extent consistent with the Securityholders Agreement), as well as for the issuance of new certificates in lieu of those which may be lost or destroyed, and may require of any stockholder requesting replacement of lost or destroyed certificates, bond in such amount and in such form as they may deem expedient to indemnify the Corporation, and/or the transfer agents, and/or the registrars of its stock against any claims arising in connection therewith.

## ARTICLE 7
## INDEMNIFICATION

Section 7.01. *Indemnification.* The Corporation (and any successor or surviving corporation to the Corporation by merger or otherwise) shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any Person (an "**Indemnitee**") who was or is made or is threatened to be made a party or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**") (whether such Proceeding is an action by or in the right of the Corporation, is initiated by a third party or otherwise), by reason of the fact that he or she is or was a director, advisory director, board observer or officer of the Corporation or, while a director, advisory director, board observer or officer of the Corporation, is or was serving at the request of the Corporation as a director, advisory director, board observer, officer, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity, including service with respect to an employee benefit plan, against all liability, expense and loss (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such Indemnitee, but only if such Indemnitee acted in good faith and in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful. Notwithstanding the preceding sentence, except for a suit or action brought as described in Section 7.03, the Corporation shall be required to indemnify an Indemnitee in connection with a Proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such Proceeding (or part thereof) by the Indemnitee was authorized by the Board.

Section 7.02. *Prepayment of Expenses.* The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnitee in defending any Proceeding in advance of its final disposition; *provided*, *however*, that the Corporation may require (e.g., if required by law) that such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnitee to repay all amounts advanced if it should be

4833-0310-5213.6
#93254601v8

ultimately determined that the Indemnitee is not entitled to be indemnified under this Article 7 or otherwise.

Section 7.03.  *Claims*.  If a claim for indemnification or payment of expenses under this Article 7 is not paid in full within 60 days after a written claim therefor by the Indemnitee has been received by the Corporation, the Indemnitee may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Corporation shall have the burden of proving that the Indemnitee is not entitled to the requested indemnification or payment of expenses under applicable law.

Section 7.04.  *Authorization*.  Any indemnification under Section 7.01 (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the Indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in Section 7.01.  Such determination shall be made (a) by a majority vote of the directors who are not parties to such Proceeding, even though less than a quorum, (b) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, (c) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion or (d) by the stockholders.

Section 7.05.  *Indemnification of Employees and Agents*. The Corporation may indemnify and advance expenses to any Person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such Person is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, advisory director, board observer, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability, expense and loss (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such employee or agent, but only if such employee or agent acted in good faith and in a manner such employee or agent reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal proceeding, had no reasonable cause to believe such employee's or agent's conduct was unlawful. The ultimate determination of entitlement to indemnification of Persons who are not a director, advisory director, board observer or officer employee or agent shall be made in such manner as is determined by the Board in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a Person pursuant to this Section 7.05 in connection with a Proceeding initiated by such Person if the Proceeding was not authorized in advance by the Board.

Section 7.06.  *Advancement of Expenses of Employees and Agents*.  The Corporation may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board.

Section 7.07.  *Nonexclusivity of Rights*.  The rights conferred on any Indemnitee by this Article 7 shall not be exclusive of any other rights which such Indemnitee may have or hereafter

4833-0310-5213.6
#93254601v8

acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, Securityholders Agreement, vote of stockholders or disinterested directors or otherwise.

Section 7.08. *First Resort of Indemnification*. The Corporation acknowledges that any Indemnitee may have certain rights to indemnification, advancement of expenses and/or insurance provided by another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise ("**Other Indemnitors**"). The Corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to an Indemnitee are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by an Indemnitee are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by such and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the Certificate of Incorporation or these Bylaws (or any other agreement between the Corporation and an Indemnitee), without regard to any rights an Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Corporation further agrees that no advancement or payment by the Other Indemnitors on behalf of an Indemnitee with respect to any claim for which an Indemnitee has sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of an Indemnitee against the Corporation.  The Corporation agrees that the Other Indemnitors are express third party beneficiaries of the terms of this Section 7.08.  Notwithstanding the foregoing, the Corporation's obligation, if any, to indemnify any Indemnitee shall be reduced by any amount such Indemnitee may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

Section 7.09. *Amendment or Repeal*.  Any repeal or modification of the provisions of this Article 7 shall not adversely affect any right or protection hereunder of any Indemnitee in respect of any act or omission occurring prior to the time of such repeal or modification. The adoption of these Bylaws, the Certificate of Incorporation and the Securityholders Agreement shall not adversely affect any right or protection of any Person entitled to indemnification under the Fourth Restated Bylaws of the Corporation (the "**Existing Bylaws**"), the Second Amended and Restated Certificate of Incorporation (as amended, the "**Existing Certificate**") or by law.

Section 7.10. *Survival of Indemnification Rights*.  The rights to indemnification and advance payment of expenses provided by Section 7.01, Section 7.02, Section 7.05 and Section 7.06 shall continue as to a Person who has ceased to be a director, advisory director, board observer, officer, employee, or agent of the Corporation and shall inure to the benefit of the personal representatives, heirs, executors and administrators of such Person.  The rights to indemnification and advance payment of expenses provided under the Existing Certificate, the Existing Bylaws or by law shall continue as to any Person entitled to indemnification thereto who has ceased to serve in any such applicable capacity.

Section 7.11. *Insurance*.  The Corporation shall have power to purchase and maintain insurance on behalf of any Person who is or was a director, officer, employee, advisory director, board observer of the Corporation, or is or was serving at the request of the Corporation as a

15

director, officer, advisory director, board observer, employee, fiduciary, partner (limited or general), manager, trustee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, or that served in any such capacity under the Existing Certificate and the Existing Bylaws against any liability asserted against such Person or incurred by such Person in any such capacity, or arising out of such Person's status as such, and related expenses, whether or not the Corporation would have the power to indemnify such Person against such liability under the provisions of applicable law.

## ARTICLE 8
## GENERAL PROVISIONS

Section 8.01.  *Fixing the Record Date.*  (a) In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board for stockholders entitled to vote at such meeting, the record date for determining stockholders entitled to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided* that the Board may in its discretion or as required by law fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall fix the same date or an earlier date as the record date for stockholders entitled to notice of such adjourned meeting.

(a)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Section 8.02.  *Dividends.*  Subject to limitations contained in Delaware Law, the Certificate of Incorporation and the Securityholders Agreement, the Board may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid either in cash, in property or in shares of the capital stock of the Corporation.

Section 8.03.  *Year.*  The fiscal year of the Corporation shall commence on January 1 and end on December 31 of each year.

16

Section 8.04. *Corporate Seal.* The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware". The seal may be used by causing it or a .pdf or facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 8.05. *Actions with Respect to Securities Owned by the Corporation.* The Board may authorize any Person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting, and to take comparable actions in respect of actions by written consent in lieu of a meeting, of holders of any stock and other securities of other entities (except the Corporation) owned or held by the Corporation for itself. The Person so designated shall be a U.S. Citizen. If the Board has not so authorized anyone, the Chief Executive Officer or the Chief Executive Officer's delegate shall have authority to perform such function.

Section 8.06. *Amendments.* Subject to the terms of the Securityholders Agreement, these Bylaws or any of them may be altered, amended or repealed, or new Bylaws may be made, by a majority of the Board. Unless a higher percentage is required by the Certificate of Incorporation or the Securityholders Agreement as to any matter that is the subject of these Bylaws, all such amendments must be approved by the affirmative vote of a majority of the total voting power of all outstanding securities of the Corporation, generally entitled to vote in the election of directors, voting together as a single class, or by a majority of the Board.

17

**Exhibit A(iii)**

**Securityholders Agreement**

*Exhibit A(iii)*

**SECURITYHOLDERS AGREEMENT**

**by and among**

**HORNBECK OFFSHORE SERVICES, INC.**

**and**

**THE OTHER PARTIES TO THIS AGREEMENT**

**Dated as of [●], 2020**

4810-8317-5862

#93253667v16

## TABLE OF CONTENTS

**Page**

**Article I Definitions** .................................................................................................................**1**
    Section 1.1    Definitions ...........................................................................................1
    Section 1.2    Other Definitional and Interpretive Matters ....................................15

**Article II Management of the Company and Certain Activities** ............................................**16**
    Section 2.1    Board ..................................................................................................16
    Section 2.2    Actions Requiring Consent ...............................................................20
    Section 2.3    Observer Rights .................................................................................22
    Section 2.4    Budget ...............................................................................................22
    Section 2.5    Jones Act Compliance .......................................................................22

**Article III Information and Access** ........................................................................................**22**
    Section 3.1    Information and Access Rights ..........................................................22

**Article IV Transfers** ...............................................................................................................**26**
    Section 4.1    Rights and Obligations of Transferees ..............................................26
    Section 4.2    Transferability ...................................................................................26
    Section 4.3    Restrictions on Transfer ....................................................................26
    Section 4.4    Transfers Not in Compliance ............................................................27
    Section 4.5    IPO Demand Rights ..........................................................................27
    Section 4.6    Tag-Along Right ................................................................................28
    Section 4.7    Drag-Along Right ..............................................................................32

**Article V Preemptive Rights** ..................................................................................................**35**
    Section 5.1    Preemptive Rights .............................................................................35

**Article VI Registration Rights** ...............................................................................................**38**
    Section 6.1    Demand Registration ........................................................................38
    Section 6.2    Piggyback Registration .....................................................................41
    Section 6.3    Certain Information ...........................................................................42
    Section 6.4    Expenses ............................................................................................42
    Section 6.5    Registration and Qualification ..........................................................43
    Section 6.6    Underwriting; Due Diligence ............................................................45
    Section 6.7    Indemnification and Contribution .....................................................46
    Section 6.8    Rule 144 Information .........................................................................48
    Section 6.9    Transfer of Registration Rights .........................................................49
    Section 6.10   Grant of Additional Registration Rights ...........................................49
    Section 6.11   Termination .......................................................................................49

**Article VII Corporate Opportunities** .....................................................................................**49**
    Section 7.1    Corporate Opportunities ....................................................................49

**Article VIII Miscellaneous** .....................................................................................................**51**

i

#93253667v11
#93253667v16

Section 8.1     Notices ................................................................................................51
Section 8.2     Survival; Termination .........................................................................52
Section 8.3     Governing Law ...................................................................................52
Section 8.4     Submission to Jurisdiction .................................................................52
Section 8.5     Waiver of Jury Trial............................................................................52
Section 8.6     Successors and Assigns.......................................................................52
Section 8.7     Counterparts .......................................................................................53
Section 8.8     Severability .........................................................................................53
Section 8.9     Specific Performance ..........................................................................53
Section 8.10    No Waivers; Amendments; Termination ............................................53
Section 8.11    Non-Recourse .....................................................................................54
Section 8.12    Action by Appointing Persons ............................................................55
Section 8.13    Further Assurances..............................................................................55
Section 8.14    Entire Agreement ................................................................................55
Section 8.15    Independent Agreement by the Securityholders .................................55
Section 8.16    No Third-Party Beneficiaries ..............................................................55
Section 8.17    Construction........................................................................................55

**Schedules**

Schedule I – Competitors

**Exhibits**

Exhibit A – Joinder Agreement

Exhibit B-1 – Major Actions

Exhibit B-2 – Majority Appointing Person Actions

Exhibit B-3 – Unanimous Appointing Person Actions

Exhibit B-4 – Officer Delegation of Authority

Exhibit C – Form of Confidentiality Agreement

ii

#93253667v11
#93253667v16

## SECURITYHOLDERS AGREEMENT

THIS SECURITYHOLDERS AGREEMENT (this "**Agreement**"), dated effective as of [●], 2020 (the "**Effective Date**"), is entered into by and among Hornbeck Offshore Services, Inc., a Delaware corporation (the "**Company**"), and each of the Securityholders (as defined below).

## RECITALS

WHEREAS, in connection with a recapitalization of the Company and its Subsidiaries (as defined below) under chapter 11 title 11 of the U.S. Bankruptcy Code (the "**Restructuring**"), the Securityholders have received Company Securities (as defined below) pursuant to and in accordance with the Plan (as defined below);

WHEREAS, pursuant to the Restructuring, the Company has adopted each of (i) the Certificate of Incorporation (as defined below) and (ii) the Bylaws (as defined below);

WHEREAS, the Plan provides that any party that is to receive Equity Interests and Warrants (each as hereinafter defined) shall be a party to this Agreement and deemed to be bound to the terms of this Agreement from and after the Effective Date, even if not a signatory hereto;

WHEREAS, the Company and the Securityholders party hereto wish to provide for certain matters relating to the management and administration of the affairs of the Company on the terms and conditions set forth herein; and

NOW THEREFORE, pursuant to, and in consideration of the obligations of the Company and the Securityholders under the Plan, the premises, mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows effective as of the Effective Date:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.

(a)    As used herein, the following terms have the following meanings:

"**2% Securityholder**" at any time of determination means each Securityholder that has a Securityholder Ownership Percentage at such time of greater than or equal to 2%.

"**7.5% Securityholder**" at any time of determination means each Securityholder that has a Securityholder Ownership Percentage at such time of greater than or equal to 7.5%.

"**10% Securityholder**" at any time of determination means each Securityholder that has a Securityholder Ownership Percentage at such time of greater than or equal to 10%.

"**Accredited Investor**" means an "Accredited Investor" as such term is defined in Regulation D of the Securities Act, or any successor rule then in effect.

"**Additional Appointing Person Director**" has the meaning ascribed to such term in Section 2.1(a)(iii) of this Agreement.

"**Affiliate**" of any specified Person means (i) each other Person who, directly or indirectly, controls, is controlled by or is under common control with such specified Person and (ii) each Affiliated Fund of such specified Person, and the term "control" (including the terms "controlled", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract (including proxy) or otherwise; *provided*, *however*, that no Securityholder shall be deemed an Affiliate of any other Securityholder and no Securityholder shall be deemed an Affiliate of the Company (or vice versa), in each case solely on account of ownership of Company Securities or being party to this Agreement.

"**Affiliated Fund**" means, with respect to any Person, a fund, pooled investment vehicle, managed account (including separately managed accounts) or other entity now or hereafter existing that is directly or indirectly controlled, managed, advised or sub-advised by such Person, an Affiliate thereof or the same investment manager, advisor or subadvisor as such Person or any Affiliates of such entity or an Affiliate of such investment manager, advisor or subadvisor (excluding, except for the purpose of calculating Security Ownership Percentage, any portfolio company of such Person).

"**Agreement**" has the meaning ascribed to such term in the preamble hereof.

"**Anti-Dilution Warrant**" means a warrant to purchase a Demand Note issued pursuant to and in accordance with the Jones Act Warrant Agreement to the holders of Jones Act Warrants, which warrant shall have the terms set forth in and as governed by the Anti-Dilution Warrant Agreement.

"**Anti-Dilution Warrant Agreement**" means the Jones Act Anti-Dilution Warrant Agreement entered into as of the date hereof between the Company and Computershare, Inc. and Computershare Trust Company, N.A., collectively as warrant agent.

"**Applicable Law**" means all applicable provisions of (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (ii) any consents or approvals of any Governmental Authority; and (iii) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Appointing Person**" means each of (a) Ares, (b) Whitebox, (c) Highbridge and (d) each Person designated as an Appointing Person pursuant to Section 2.1(h), in each case until the earlier of (x) the date on which such Person ceases to be a 10% Securityholder and (y) the date on which such Appointing Person no longer retains Director Designation Rights as a result of designating a Transferee as an Appointing Person pursuant to Section 2.1(h); provided, that, except in the case of a Non-U.S. Appointing Person, the Director Designation Rights exercisable by an Appointing Person shall only be exercisable by Persons comprising such Appointing Person that are U.S. Citizens; and provided, further, that for purposes of Sections 2.2 and 8.10, "Appointing Person"

2

shall mean (i) Ares, taken together as a group with each of its direct and indirect Transferees to which have been transferred Director Designation Rights in accordance with Section 2.1(h), acting by majority vote based on Security Ownership Percentages, (ii) Highbridge, taken together as a group with each of its direct and indirect Transferees to which have been transferred Director Designation Rights in accordance with Section 2.1(h), acting by majority vote based on Security Ownership Percentages, and (iii) Whitebox, taken together as a group with each of its direct and indirect Transferees to which have been transferred Director Designation Rights in accordance with Section 2.1(h), acting by majority vote based on Security Ownership Percentages.

"**Appointing Person Director**" has the meaning ascribed to such term in Section 2.1(a)(i) of this Agreement.

"**Approved Purpose**" has the meaning ascribed to such term in Section 3.1(c)(i) of this Agreement.

"**Ares**" means, collectively, (i) ASSF IV HOS AIV 1, L.P., (ii) ASOF HOS AIV 1, L.P., (iii) ASSF IV HOS AIV 2, L.P, (iv) ASOF HOS AIV 2, L.P., (v) ASSF IV AIV B, L.P., (vi) ASOF Holdings I, L.P., (vii) SA Real Assets 19 Limited, (viii) SALI Multi-Series Fund, L.P. and (ix) each of their Affiliates that is or becomes a Securityholder in accordance with this Agreement. For purposes of the definition of "Disqualified Person," (i) SA Real Assets 19 Limited and its portfolio companies and (ii) SALI Multi-Series Fund, L.P. and its portfolio companies shall be excluded from the definition of "Ares", in each case for so long as such accounts are not exclusively managed by the Private Equity Group of Ares Management LLC.

"**Audit Committee**" has the meaning ascribed to such term in Section 2.1(d)(ii) of this Agreement.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Board**" means the board of directors of the Company.

"**Board Committee**" and "**Board Committees**" have the meanings ascribed to such term in Section 2.1(d) of this Agreement.

"**Board Designees**" has the meaning ascribed to such term in Section 2.1(a)(v) of this Agreement.

"**Budget**" has the meaning ascribed to such term in Section 2.4.

"**Business Day**" means any day other than a Saturday, Sunday or a day on which state or federally chartered banking institutions in New York City, New York are not required to be opened.

3

#93253667v11
#93253667v16

"**Bylaws**" means those certain Fifth Amended and Restated Bylaws of the Company dated as of the date hereof, as the same may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms.

"**Certificate**" has the meaning ascribed to such term in <u>Section 4.3(b)</u> of this Agreement.

"**Certificate of Incorporation**" means that certain Third Amended and Restated Certificate of Incorporation of the Company, as filed with the Secretary of State of the State of Delaware as of the Effective Date, as the same may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms.

"**Chairman**" has the meaning ascribed to such term in <u>Section 2.1(a)(vi)</u> of this Agreement.

"**Change of Control**" shall be deemed to have occurred, with respect to any Person, at any time after the date hereof if any of the following occurs:

(i) the consummation of any transaction (other than any transaction described in <u>clause (ii)</u> below, whether or not the proviso therein applies) the result of which is that a "person" or "group" (within the meaning of Section 13(d) of the Exchange Act), has become the direct or indirect beneficial owner of more than fifty percent (50.0%) of the Voting Stock (it being understood and agreed that in no event shall the Securityholders be deemed to be a "group" within the meaning of Section 13(d) of the Exchange Act solely by reason of ownership of Equity Securities of the Company or the entry by the Securityholders into this Agreement and the other certificates, documents and other instruments to be entered into at the Effective Time in accordance with the Plan); or

(ii) the consummation of (A) any recapitalization, reclassification or change of any capital stock of such Person (other than a change in par value, or from par value to no par value, or from no par value to par value, or changes resulting from a subdivision or combination), as a result of which the capital stock of such Person would be converted into, or exchanged for, stock, other securities or other property or assets (including cash or any combination thereof); (B) any consolidation, merger or other combination of such Person or binding share exchange pursuant to which the capital stock of such Person would be converted into, or exchanged for, stock, other securities or other property or assets (including cash or any combination thereof); or (C) any sale, lease or other transfer or disposition in one transaction or a series of transactions of all or substantially all of the consolidated assets of such Person and its Subsidiaries, taken as a whole, to any other Person other than one or more of such Person's wholly-owned Subsidiaries; <u>provided</u>, <u>however</u>, that (x) none of the transactions described in clauses (A) or (B) shall constitute a "Change of Control" if the holders of the Voting Stock of such Person immediately prior to such transaction continue to own at least, directly or indirectly, more than fifty percent (50.0%) of the voting power of the equity of the surviving corporation or transferee, or the parent thereof, immediately after such event and (y) none of the transactions described in clauses (A), (B) or (C) shall constitute a "Change of Control" if such transaction is effected solely to change such Person's jurisdiction of formation or to form a holding company for such Person and that results in a share exchange or

4

reclassification or similar exchange of the outstanding Voting Stock of such Person solely into voting equity of the surviving entity.

"**Chief Executive Officer**" has the meaning ascribed to such term in Section 2.1(a)(ii) of this Agreement.

"**Commission**" means the United States Securities and Exchange Commission.

"**Common Stock**" means the common stock, par value $0.00001 per share, of the Company, and any shares or capital stock for or into which such common stock hereafter is exchanged, converted, reclassified or recapitalized by the Company.

"**Common Stock Equivalents**" means, without duplication, Common Stock and any warrants (including the Creditor Warrants and Jones Act Warrants), options, securities or other rights exercisable for or convertible or exchangeable into, directly or indirectly, Common Stock, whether exercisable, convertible or exchangeable at the time of issuance or upon the passage of time or the occurrence of some future event, including, for greater clarity, restricted stock units, performance stock units or any substantially similar award, whether or not settled in Common Stock or a Common Stock Equivalent, if the value of such award is derived from or measured in part or in full from the value of the Common Stock or a Common Stock Equivalent.

"**Company**" has the meaning ascribed to such term in the preamble of this Agreement.

"**Company Sale Notice**" has the meaning ascribed to such term in Section 5.1(c) of this Agreement.

"**Company Securities**" means (i) the Common Stock, (ii) the Warrants, (iii) all other Common Stock Equivalents and Equity Securities of the Company and (iv) all securities, bonds, notes, guarantees, indebtedness, options or other rights or instruments exercisable or exchangeable for or convertible into any of the foregoing. As of the date hereof, the Company Securities consist solely of (A) the Common Stock and Warrants and (B) awards under the MIP.

"**Compensation Committee**" has the meaning ascribed to such term in Section 2.1(d)(i) of this Agreement.

"**Competitor**" means any Person set forth on Schedule I (as may be modified from time to time in accordance with the terms of this Agreement) and each Subsidiary of such Person.

"**Confidential Information**" means all information of the Company, any Securityholder or any of their respective Affiliates received from the Company, any Securityholder or any of their respective Affiliates hereunder (including information provided to an Appointing Person by any of its appointed Directors or Observers), other than any information which (A) is available on a non-confidential basis, from a source other than the Company or its Affiliates, or any of their respective representatives, employees, agents or other service providers, and in each case not in violation of a confidentiality obligation, (B) is disclosed in a prospectus, in other documents or in

5

#93253667v11
#93253667v16

any other manner for dissemination to the public, or (C) is independently developed by the disclosing Person without violating any requirement hereunder.

"**Consulting Right**" has the meaning ascribed to such term in Section 2.1(a)(iii) of this Agreement.

"**Contracting Parties**" has the meaning ascribed to such term in Section 8.11 of this Agreement.

"**Creditor Warrant Agreement**" means the Creditor Warrant Agreement, dated as of the date hereof, between the Company and Computershare, Inc. and Computershare Trust Company, N.A., collectively as warrant agent, with respect to the Creditor Warrants.

"**Creditor Warrants**" means warrants to purchase a number of shares of Common Stock, which warrants shall have the terms set forth in and as governed by the Creditor Warrant Agreement.

"**Demand Note**" means a non-interest-bearing demand note issuable in connection with the exercise of an Anti-Dilution Warrant pursuant to the terms of the Anti-Dilution Warrant Agreement.

"**Demand Registration Notice**" has the meaning ascribed to such term in Section 6.1(a) of this Agreement.

"**Dilutive Instruments**" has the meaning ascribed to such term in Section 5.1(b) of this Agreement.

"**Director**" means a duly nominated and elected or appointed member of the Board.

"**Director Designation Right**" means the right of an Appointing Person to designate a Director for election to the Board pursuant Section 2.1(a) of this Agreement.

"**Disqualified Person**" at any time of determination means a Person if at such time such Person or any of its Affiliates (other than any such Affiliate that is separated from such Person by an effective information wall) either (i) is a Competitor or (ii) owns a Disqualifying Interest. For purposes of this definition, (A) neither an Affiliated Fund of Ares, Whitebox or Highbridge nor any of the portfolio companies in which it is invested shall be deemed to be an Affiliate of Ares, Whitebox or Highbridge, respectively, if (x) such Affiliated Fund does not directly or indirectly beneficially own any Company Securities and (y) the dedicated senior investment professionals (excluding those persons whose role is limited to membership on an investment committee) of Ares, Whitebox or Highbridge, as applicable, substantially involved in the management of the fund or pooled investment vehicle that beneficially owns such Company Securities are not substantially involved in the management of such Affiliated Fund (excluding any role limited to membership on an investment committee), (B) no Person shall be deemed to be an Affiliate of Highbridge other than (1) Highbridge Capital Management LLC, (2) any fund, pooled investment vehicle, managed account (including any separately managed account) or other entity now or hereafter existing that

6

is directly or indirectly controlled, managed, advised or sub-advised by Highbridge Capital Management LLC or (3) any of their respective controlled Affiliates and (C) neither SA Real Assets 19 Limited, SALI Multi-Series Fund , L.P. nor any of their respective portfolio companies shall be deemed to be an Affiliate of Ares, in each case for so long as such accounts are not exclusively managed by the Private Equity Group of Ares Management LLC.

"**Disqualifying Interest**" means the beneficial ownership of more than 25% of the Equity Interests in a Competitor (after giving effect to a hypothetical conversion, or exercise, as applicable, of any issued and outstanding Equity Securities of such Competitor which are convertible or exercisable (directly or indirectly) into such Equity Security, without regard to whether such other Equity Securities are then convertible or exercisable in accordance with their terms or the terms of the organizational documents of such Competitor).

"**Drag-Along Notice**" has the meaning ascribed to such term in Section 4.7(f) of this Agreement.

"**Drag Transaction**" has the meaning ascribed to such term in Section 4.7(a) of this Agreement.

"**Effective Date**" has the meaning ascribed to such term in the preamble of this Agreement.

"**Equity Interest**" in any Person means all of the units, membership interests, partnership interests, trusts interests or shares of capital stock of, or other ownership or profit interests in, such Person.

"**Equity Security**" means with respect to any Person, (i) any of the Equity Interests of such Person, (ii) any of the options, warrants or other rights for the purchase or acquisition from such Person of Equity Interests of such Person, and (iii) any security, bond, note, guarantee, indebtedness, option or other right or instrument exercisable or exchangeable for or convertible into any of the foregoing.

"**Excess Shares**" has the meaning specified in the Certificate of Incorporation.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Commission thereunder.

"**Exercise Cap**" has the meaning ascribed to such term in Section 2.5 of this Agreement.

"**Full Preemptive Rights Securityholder**" has the meaning ascribed to such term in Section 5.1(e) of this Agreement.

"**Full Tagging Person**" has the meaning ascribed to such term in Section 4.6(b) of this Agreement.

"**Fully Diluted Securities**" means the aggregate number of issued and outstanding shares of Common Stock after giving effect to a hypothetical exercise of all of the issued and outstanding

7

Jones Act Warrants (and not, for the avoidance of doubt, the Creditor Warrants) into shares of Common Stock, without regard to whether such Jones Act Warrants are then exercisable in accordance with their respective terms or the terms of the Organizational Documents (but disregarding and without giving effect to the issuance, conversion or exercise, as applicable, of any Common Stock, Common Stock Equivalent or other Equity Security of the Company issued or issuable pursuant to the MIP). References to the Fully Diluted Securities beneficially owned by any Securityholder shall be to the aggregate number of issued and outstanding shares of Common Stock beneficially owned by such Securityholder after giving effect to such hypothetical exercise.

"**Government Contracts**" has the meaning ascribed to such term in Exhibit B-4 of this Agreement.

"**GAAP**" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants, statements and pronouncements of the Financial Accounting Standards Board and, when applicable, rules of the Commission or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, applied on a consistent basis for the periods involved.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, including the U.S. Coast Guard, and the U.S. Maritime Administration, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Highbridge**" means, collectively, (i) **[HIGHBRIDGE ENTITY]**, and (ii) each of its Affiliates that is or becomes a Securityholder in accordance with this Agreement.

"**Identified Persons**" has the meaning ascribed to such term in Section 7.1(a) of this Agreement.

"**Information Right Securityholder**" has the meaning ascribed to such term in Section 3.1(b) of this Agreement.

"**Information Rights**" has the meaning ascribed to such term in Section 3.1(b) of this Agreement.

"**Initiating Drag Securityholder**" has the meaning ascribed to such term in Section 4.7(a) of this Agreement.

"**Initiating IPO Securityholder**" has the meaning ascribed to such term in Section 4.5(a).

"**Initiating Tag Securityholder**" has the meaning ascribed to such term in Section 4.6(a).

8

"**IPO**" means the initial public offering and sale of Common Stock after the Effective Date pursuant to an effective registration statement filed by the Company with the Commission, other than a registration statement on Form S-4 or Form S-8 or their equivalent, under the Securities Act.

"**Joinder Agreement**" means an agreement in the form of Exhibit A entered into from time to time between the Company and any Person who acquires any Company Security after the date hereof who is not already a party to this Agreement.

"**Jones Act**" means, collectively, the United States citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels (each, a "**U.S. Vessel**") for the purposes of the carriage or transport of merchandise or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 and any successor thereto as amended from time to time ("**U.S. Coastwise Trade**").

"**Jones Act Compliance**" means compliance by the Company with the U.S. citizenship requirements of the Jones Act to be eligible to own and operate U.S. Vessels in U.S. Coastwise Trade or to obtain a coastwise endorsement.

"**Jones Act Restriction**" means in no event shall Non-U.S. Citizens hold, in the aggregate, more than 24% of the total number of issued and outstanding shares of any class or series of the Equity Interests of the Company.

"**Jones Act Warrant Agreement**" means the Jones Act Warrant Agreement, dated as of the date hereof, between the Company and Computershare, Inc. and Computershare Trust Company, N.A., with respect to the Jones Act Warrants.

"**Jones Act Warrants**" means warrants to purchase a number of shares of Common Stock, which warrants shall have the terms set forth in and as governed by the Jones Act Warrant Agreement.

"**Losses**" has the meaning ascribed to such term in Section 6.7(a) of this Agreement.

"**Major Action**" has the meaning ascribed to such term in Section 2.2(a)(i) of this Agreement.

"**Majority Appointing Person Action**" has the meaning ascribed to such term in Section 2.2(a)(ii) of this Agreement.

"**Management Securityholders**" means any current employee or director of, or independent contractor or consultant to, the Company or any Subsidiary of the Company who owns any Company Securities.

#93253667v11
#93253667v16

"**MIP**" means the Hornbeck Offshore Services, Inc. Management Equity Incentive Plan adopted as of the date hereof, as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms, and any other equity incentive plan approved by the Board pursuant to which Common Stock, Common Stock Equivalents, or any other Company Security may be issued to employees, consultants, Officers and/or Directors of the Company and its Subsidiaries as incentive compensation.

"**National Securities Exchange**" means The NASDAQ Global Market, The NASDAQ Global Select Market or The New York Stock Exchange.

"**Necessary Action**" means, with respect to a specified result, all actions within the applicable Person's control that are permitted by Applicable Law and reasonably necessary or desirable to cause such result, including (i) including each Director to be nominated pursuant to Section 2.1 in the Company's slate of nominees to the holders of Common Stock for each election of Directors, (ii) attending meetings in person or, for stockholder meetings, by proxy for purposes of obtaining a quorum, (iii) voting or providing a written consent or proxy with respect to Voting Stock of the Company, (iv) causing the adoption of stockholders' resolutions, (v) executing agreements and instruments, (vi) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result, and (vii) causing the election or removal of Directors and the exercise of Director Designation Rights; *provided*, *however*, that Necessary Action shall not include, with respect to any Securityholder any obligation to make any payments or to assume or incur any expenses or liabilities (except as required under this Agreement).

"**NISPOM**" has the meaning ascribed to such term in Section 2.1(e) of this Agreement.

"**Non-Party Affiliates**" has the meaning ascribed to such term in Section 8.11 of this Agreement.

"**Non-U.S. Appointing Person**" means any Appointing Person if all of such Appointing Person's Affiliates that are Securityholders are Non-U.S. Citizens.

"**Non-U.S. Citizen**" means any Person who is not a U.S. Citizen.

"**Observer**" has the meaning ascribed to such term in Section 2.3(a)(i) of this Agreement.

"**Officer**" means an officer of the Company.

"**Officer Delegation of Authority**" has the meaning ascribed to such term in Section 2.2(b) of this Agreement.

"**Opportunity**" has the meaning ascribed to such term in Section 7.1(a) of this Agreement.

"**Organizational Documents**" means, collectively, each of this Agreement, the Bylaws, and the Certificate of Incorporation.

10

"**Other Director**" has the meaning ascribed to such term in Section 2.1(a)(iv) of this Agreement.

"**Permitted Offering**" means any sale or issuance by the Company or any of its Subsidiaries of any (i) Company Securities or (ii) Subsidiary Securities (A) pursuant to any stock split, subdivision of such Company Securities or Subsidiary Securities, stock dividend or similar transaction; (B) as consideration for the acquisition by the Company or any of its Subsidiaries of another business or entity from one or more sellers; (C) in any IPO; (D) upon the exercise of any Company Securities issued in accordance with the terms of the this Agreement; (E) issuances of Common Stock upon the conversion or exercise of any Warrants in accordance with the terms of this Agreement, the other Organizational Documents and the applicable Warrant Agreements; (F) issuances of Warrants in accordance with the terms of this Agreement, the other Organizational Documents and the Warrant Agreements; (G) issuances of Anti-Dilution Warrants and Demand Notes in accordance with the terms of this Agreement, the other Organizational Documents and the Warrant Agreements; (H) issuances or sales of Equity Securities of the Company to any existing or prospective employees, Officers, Directors, managers or consultants of the Company or any of its Subsidiaries pursuant to any stock option, employee stock purchase, employee benefits or similar equity incentive plan or other compensation agreement that is approved by the Board, including the MIP; or (I) issuances by a wholly-owned Subsidiary of the Company to the Company or another wholly-owned Subsidiary of the Company; *provided*, that in no event may any of the exceptions set forth in this definition be used with the intent to circumvent the rights of the Securityholders under Section 5.1.

"**Permitted Transferee**" means, with respect to any Securityholder, any Affiliate of such Securityholder and, in the case of a Securityholder that is an individual, any member of such Securityholder's immediate family (as defined in Item 404 of Regulation S-K) and any descendant of any such Securityholder, or any trust or like vehicle solely for the benefit of one or more of the foregoing.

"**Person**" means any individual, firm, partnership, limited liability or other company, corporation, joint venture or other entity, and shall include any successor (by merger, business combination or otherwise) of such entity.

"**Piggyback Registration**" means any proposed filing of a Registration Statement with respect to Company Securities with respect to which the Company is required to provide 2% Securityholders with a Piggyback Registration Notice.

"**Piggyback Registration Notice**" has the meaning ascribed to such term in Section 6.2(a) of this Agreement.

"**Piggyback Registration Request**" has the meaning ascribed to such term in Section 6.2(a) of this Agreement.

"**Plan**" means the Joint Prepackaged Chapter 11 Plan of Reorganization of the Company and certain of its subsidiaries under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*, as amended from time to time and as approved by the Bankruptcy Court.

11

"**Preemptive Rights Excess Instruments**" has the meaning ascribed to such term in Section 5.1(e) of this Agreement.

"**Preemptive Rights Offer**" has the meaning ascribed to such term in Section 5.1(c) of this Agreement.

"**Preemptive Rights Securityholder**" means (i) in the case of a Proposed Offering of Company Securities, (A) each 2% Securityholder that is an Accredited Investor and (B) subject to and in accordance with Section 5.1(j), Todd Hornbeck and (ii) in the case of a Proposed Offering of indebtedness for borrowed money, each Appointing Person.

"**Proposed Offering**" has the meaning ascribed to such term in Section 5.1(b) of this Agreement.

"**Qualified IPO**" shall mean an IPO effected by means of an underwritten public offering in connection with which the Common Stock offered in such IPO shall be listed on a National Securities Exchange.

"**Reallotment Securities**" has the meaning ascribed to such term in Section 4.6(b) of this Agreement.

"**Registrable Securities**" means (i) all shares of Common Stock beneficially owned by any Securityholder and (ii) all shares of Common Stock issuable upon conversion or exercise of any Company Securities beneficially owned by any Securityholder; *provided,* that such Registrable Securities shall cease to be Registrable Securities (i) upon any sale pursuant to a Registration Statement or Rule 144 under the Securities Act and (ii) upon repurchase by the Company.

"**Registration Demand**" has the meaning ascribed to such term in Section 6.1(a) of this Agreement.

"**Registration Expenses**" means any and all expenses incident to the performance of or compliance with Article 6, including (i) the fees, disbursements and expenses of the Company's counsel and accountants (including the expenses of any annual audit letters and "cold comfort" letters required or incidental to the performance of such obligations), (ii) the reasonable fees and disbursements of one counsel for all of the Selling Securityholders, which counsel shall be selected by the Company and be reasonably acceptable to holders of a majority of the Registrable Securities to be registered on the Registration Statement, (iii) all expenses, including filing fees, in connection with the preparation, printing and filing of the Registration Statement, any free writing, preliminary prospectus or final prospectus, any other offering document and amendments and supplements thereto and the mailing and delivering of copies thereof to any underwriters and dealers, (iv) the cost of printing or producing any agreements among underwriters, underwriting agreements, any selling agreements and any other documents in connection with the offering, sale or delivery of the securities to be disposed of, (v) all expenses in connection with the qualification of the securities to be disposed of for offering and sale under state securities laws, (vi) the filing fees incidental to securing any required review by FINRA of the terms of the sale of the securities

12

to be disposed of, (vii) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (viii) all security engraving and security printing expenses, (ix) all fees and expenses payable in connection with the listing of the securities on any National Securities Exchange and (x) all rating agency fees, but, for the avoidance of doubt, shall not include underwriting discounts, selling commissions or stock transfer taxes applicable to Registrable Securities sold which shall be borne by the owner of such Registrable Securities sold.

"**Registration Request**" has the meaning ascribed to such term in Section 6.1(a) of this Agreement.

"**Registration Statement**" means a registration statement under the Securities Act that is filed by the Company with the Commission for a public offering and sale of Company Securities, other than a registration statement on Form S-8 or Form S-4 or any successor forms thereto.

"**Related Companies**" has the meaning ascribed to such term in Section 7.1(c) of this Agreement.

"**Requesting Securityholder**" means, with respect to any Registration Statement that is used to register Registrable Securities pursuant to Article VI, any Securityholder who timely submits a Registration Request pursuant to Section 6.1(a) or any Securityholder who timely submits a Piggyback Registration Request pursuant to Section 6.2.

"**Restructuring**" has the meaning ascribed to such term in the recitals to this Agreement.

"**Rollover Investment**" has the meaning ascribed to such term in Section 4.7(b) of this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"**Securityholder Ownership Percentage**" of any Securityholder at any time of determination means, a fraction (expressed as a percentage), (i) the numerator of which is the aggregate number of Fully Diluted Securities beneficially owned by such Securityholder and, without duplication, its Affiliates at such time and (ii) the denominator of which is the aggregate number of Fully Diluted Securities at such time beneficially owned by all Securityholders.

"**Securityholders**" means, collectively, (i) each Person (other than the Company) named on the signature pages to this Agreement, (ii) each Person deemed to be a party to this Agreement pursuant to Article IV.C.2 of the Plan, (iii) each Person who is a Transferee of Company Securities beneficially owned by another Securityholder in a Transfer that complies with the terms and conditions of this Agreement and who is required by this Agreement to agree to be bound by the terms and conditions of this Agreement and (iv) each other Person who otherwise is issued Company Securities and becomes a party to this Agreement pursuant to the terms and conditions of this Agreement.

#93253667v11
#93253667v16

"**Securityholders' Representative**" has the meaning ascribed to such term in Section 4.7(g) of this Agreement.

"**Selling Securityholder**" has the meaning ascribed to such term in Section 4.7(a) of this Agreement.

"**Stockholders Meeting**" has the meaning ascribed to such term in Section 2.1(c)(iv)(B) of this Agreement.

"**Subsidiary**" of any Person means (i) a corporation a majority of whose outstanding shares of capital stock or other Equity Securities with voting power, under ordinary circumstances, to elect directors (or similar function) is at the time, directly or indirectly, owned by such Person, by one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person, (ii) each other Person (other than a corporation) in which such Person, a Subsidiary of such Person or such Person and one or more Subsidiaries of such Person, directly or indirectly, at the date of determination thereof, (A) is the general partner of such Person or (B) has (x) at least a majority ownership interest or (y) the power to elect or direct the election of the directors or other governing body of such Person.

"**Subsidiary Security**" means, with respect to any Subsidiary of the Company, any Equity Security of such Subsidiary.

"**Tag-Along Notice**" has the meaning ascribed to such term in Section 4.6(a).

"**Tag-Along Notice Period**" has the meaning ascribed to such term in Section 4.6(b).

"**Tag-Along Rightholders**" has the meaning ascribed to such term in Section 4.6(a).

"**Tag-Along Securities**" has the meaning ascribed to such term in Section 4.6(a) of this Agreement.

"**Tag-Along Transaction**" has the meaning ascribed to such term in Section 4.6(a).

"**Tag-Along Transaction Documents**" has the meaning ascribed to such term in Section 4.6(iii).

"**Tag-Eligible Securities**" has the meaning ascribed to such term in Section 4.6(a) of this Agreement.

"**Tag Securities**" has the meaning ascribed to such term in Section 4.6(a) of this Agreement.

"**Transfer**" means, when used as a verb, to directly or indirectly sell, transfer, assign, convey or otherwise dispose of, and when used as a noun, any direct or indirect sale, transfer, assignment, conveyance or other disposition, including by merger, business combination, operation of law, bequest or pursuant to any domestic relations order, whether voluntarily or involuntarily; *provided*, that (i) with respect to any Securityholder that is a widely held "investment

14

#93253667v11
#93253667v16

company" as defined in the Investment Company Act of 1940, as amended, or any publicly traded company whose securities are registered under the Exchange Act, a sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of ownership interests in such investment company or publicly traded company shall not be deemed a Transfer; and (ii) with respect to any Securityholder that is a private equity fund, hedge fund or similar vehicle, any sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of partnership or other ownership interests in any entity which is a pooled investment vehicle holding other material investments and which is an equityholder (directly or indirectly) of a Securityholder, or any sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of partnership or other ownership interests in any general partner, manager or similar Person of such entity, shall not be deemed to be a Transfer for purposes hereof. The terms "**Transferred**" or "**Transferring**" shall have a correlative meaning.

 "**Transferee**" means any Person to whom any Securityholder or any Transferee thereof Transfers Company Securities in accordance with the terms hereof.

"**Unanimous Appointing Person Action**" has the meaning ascribed to such term in Section 2.2(a)(iii) of this Agreement.

"**Underwriting Agreement**" has the meaning ascribed to such term in Section 6.6 of this Agreement.

"**U.S. Citizen**" means any Person which is eligible and qualified to own and operate U.S. Vessels in U.S. Coastwise Trade term pursuant to the Jones Act.

"**U.S. Coastwise Trade**" has the meaning ascribed to such term in the definition of "Jones Act" in this Agreement.

"**U.S. Vessel**" has the meaning ascribed to such term in the definition of "Jones Act" in this Agreement.

"**Voting Stock**" means, with respect to any Person, each of the Equity Securities then entitled, under ordinary circumstances, to vote generally in the election of directors (or similar function).

"**Warrant Agreements**" means, collectively, the Creditor Warrant Agreement, the Jones Act Warrant Agreement and the Anti-Dilution Warrant Agreement.

"**Warrants**" means, collectively, the Jones Act Warrants and the Creditor Warrants.

"**Whitebox**" means collectively, (i) **[WHITEBOX ENTITY]** and (ii) each of its Affiliates that is or becomes a Securityholder in accordance with this Agreement.

Section 1.2    Other Definitional and Interpretive Matters. For purposes of this Agreement, the following rules shall apply:

15

(a)      *Calculation of Time Period*. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)      *Dollars*. Any reference in this Agreement to "$" shall mean U.S. dollars.

(c)      *Gender and Number*. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(d)      *Headings*. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section of this Agreement unless otherwise specified.

(e)      *Herein*. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(f)      *Including*. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(g)      *Successor Laws*. Any reference to any law or code section thereof will be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified, and any and all rules or regulations promulgated thereunder.

(h)      *Successor Agreements*.   Any definition of or reference to any agreement, instrument, or document herein shall be construed as referring to such agreement, instrument, or document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

(i)      *Heirs, Executors, etc*. References herein to any Person shall include such Person's heirs, executors, personal representatives, administrators and successors and assigns; *provided*, *however*, that nothing contained in this Section 1.2(i) is intended to authorize any assignment or other Transfer not otherwise permitted by this Agreement.

## ARTICLE II
## MANAGEMENT OF THE COMPANY AND CERTAIN ACTIVITIES

Section 2.1      Board. Each Securityholder and the Company shall take all Necessary Action to ensure that the provisions of this Article II are fully implemented and carried out. No Securityholder or any of its Affiliates shall nominate any person for election as a Director or otherwise take any action to affect or influence the election of a nominee, in each case, other than

16

as expressly provided by the terms of this Agreement (*provided*, that nothing in this Article II shall be deemed to restrict any Securityholder from having private discussions with the Board).

(a)      *Board Representation; Number of Directors*. From and after the Effective Date, the Board shall consist of seven (7) Directors or such greater number approved by the Company and the Appointing Persons in accordance with Section 2.2(a)(iii) and, subject to Section 2.1(b) and Section 2.1(h), the Board shall be constituted as follows:

(i)      (A) subject to Section 2.1(k), three (3) Directors shall be designated by Ares, for so long as Ares is an Appointing Person (or any Person designated as an Appointing Person for such purpose by Ares in accordance with Section 2.1(h)); (B) one (1) Director shall be designated by Whitebox, for so long as Whitebox is an Appointing Person (or any Person designated as an Appointing Person for such purpose by Whitebox in accordance with Section 2.1(h)) and (C) one (1) Director shall be designated by Highbridge, for so long as Highbridge is an Appointing Person (or any Person designated as an Appointing Person for such purpose by Highbridge in accordance with Section 2.1(h)) (each such Director, an "**Appointing Person Director**");  *provided*, that, as of the date hereof and subject to the last sentence of Section 2.1(b), the Directors appointed by Ares and Whitebox shall be appointed by Affiliates thereof that are U.S. Citizens; and *provided*, further, that (x) [●], [●] and [●] shall be the initial Board Designee of Ares, (y) [●] shall be the initial Board Designee of Whitebox, and (z) [●] shall be the initial Board Designee of Highbridge pursuant to this Section 2.1(a)(i);

(ii)      the duly-appointed and acting Chief Executive Officer of the Company (the "**Chief Executive Officer**"), who shall initially be Todd Hornbeck, shall be designated as a Director;

(iii)      subject to Section 2.1(k), one (1) Director shall be designated by agreement of Whitebox and Highbridge (or any Person designated as an Appointing Person for such purpose by Whitebox or Highbridge, respectively, in accordance with Section 2.1(h)) (such Director, the "**Additional Appointing Person Director**"); *provided*, that, if such Persons do not agree on an Additional Appointing Director within sixty (60) days after any vacancy in such seat, a Director shall be elected to fill such seat in accordance with Section 2.1(a)(iv); *provided further*, that for so long as Whitebox and Highbridge (or such designees thereof) have the right to designate the Additional Appointing Person Director, and either Whitebox or Highbridge (or its designee) is not a 7.5% Securityholder, the Additional Appointing Person Director shall be designated by (A) in the event Highbridge is not a 7.5% Securityholder, Whitebox (or its designee), in consultation with Highbridge, or (B) in the event Whitebox is not a 7.5% Securityholder, Highbridge (or its designee), in consultation with Whitebox (each consultation right set forth in this Section 2.1(a)(iii), a "**Consultation Right**"); *provided further*, that [●] shall be the initial Board Designee pursuant to this Section 2.1(a)(iii);

(iv)      if any seats on the Board remain unfilled after the exercise of the Director Designation Rights set forth above, candidates for such additional seats (each, an "**Other Director**") shall be nominated by the Board and shall be subject to election by the holders of Common Stock in accordance with the Certificate of Incorporation and Bylaws;

17

(v)      Directors designated pursuant to <u>Section 2.1(a)(i)</u>, <u>Section 2.1(a)(ii)</u>, <u>Section 2.1(a)(iii)</u> or appointed to fill a vacancy by an Appointing Person as provided in <u>Section 2.1(c)(iv)</u> shall be referred to as the "**Board Designees**";

(vi)      For so long as Todd Hornbeck is the Chief Executive Officer, Todd Hornbeck shall serve as chairman of the Board (the "**Chairman**").  After such time, the Board shall vote to elect the Chairman by a majority vote of the Board and shall thereafter vote to elect the Chairman annually by a majority vote of the Board.

(b)      *Director and Officer Citizenship*. Notwithstanding anything to the contrary in this Agreement, (i) all of the executive Officers of the Company, including the Chief Executive Officer, shall be U.S. Citizens, and (ii) the Company shall take all Necessary Action (including in the exercise of Director Designation Rights) to cause in all events the Board to be in Jones Act Compliance, including (A) the Chairman of the Board shall in all events be a U.S. Citizen and (B) no more than a minority of the number of Directors necessary to constitute a quorum of the Board (in order for the Company to continue as a U.S. Citizen) (or any committee thereof) shall be Non-U.S. Citizens.

(c)      *Board Meetings; Voting; Board Elections; Term; Board Vacancies; Replacements*.

(i)      *Removals*. At the request and direction of any Appointing Person (or in the case of the Additional Appointing Person Director, at the request and direction of the relevant Appointing Person(s)), the Company and each Securityholder agrees to take all Necessary Action to remove any Director that was designated for election by such Appointing Person(s). If the person serving as the Chief Executive Officer is removed, resigns or is otherwise replaced, then such person shall automatically, and without any action by the Board or stockholders of the Company, cease to be a Director.

(ii)      *Term*.  Notwithstanding anything to the contrary in this Agreement, to the extent the right of an Appointing Person to designate a Director is terminated, then any Director designated solely by such Appointing Person shall be entitled to continue serving in such capacity for the remainder such Director's term of office as determined in accordance with Section 4.02 of the Bylaws; *provided* that the Board may request that any such Director resign from the Board or may remove any such Director at any time after the right of the applicable Appointing Person to designate a Director is terminated.

(iii)      *Resignations*. A Director may resign at any time from the Board by delivering his or her written resignation to the Board or to the Corporate Secretary of the Corporation. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event, and unless otherwise specified therein, the acceptance of a resignation shall not be necessary to make it effective.

(iv)      *Vacancies*. In the event that a vacancy is created on the Board at any time due to the death, disability, retirement, resignation or removal of a Director or for any other reason, then:

18

(A)      if such Director is an Appointing Person Director or Additional Appointing Person Director, the Appointing Person or Appointing Persons with the right to appoint such Director at such time shall have the exclusive right to designate an individual to fill such vacancy and the Company and each Securityholder shall take all Necessary Action to elect or appoint such designee to fill such vacancy on the Board;

(B)      with respect to any Other Director vacancy, such vacancy shall be filled by a majority vote of the Board, and such replacement Other Director so appointed shall fill such vacancy until the next meeting of the Company's stockholders (each, a "**Stockholders Meeting**") following such Other Director's appointment pursuant to this Section 2.1(c)(iv)(B);

(C)      if the person serving as Chief Executive Officer ceases to be a Director pursuant to Section 2.1(c)(i), the Director position on the Board reserved for the Chief Executive Officer shall remain vacant until a successor Chief Executive Officer is duly appointed by the Board in accordance with this Agreement and the Company's other Organizational Documents, at which time the Company and each Securityholder shall take all Necessary Action to elect or appoint such successor Chief Executive Officer to fill such vacancy on the Board.

(d)      *Board Committees*. The Board will initially establish the following committees (each a "**Board Committee**" and, collectively, the "**Board Committees**"), each of which shall be entitled to exercise the full powers of the Board with respect to the powers expressly delegated to it and may authorize the seal of the Company to be affixed to all papers which may require it; *provided*, *however*, that (A) no more than a minority of the number of directors necessary to constitute a quorum of any Board Committee of the Board shall be Non-U.S. Citizens, (B) the chairman of any Board Committee, any vice chairman of any Board Committee and any other person who chairs a meeting of any Board Committee shall not be a Non-U.S. Citizen, and (C) no Board Committee shall be (x) formed as an executive committee with delegated authority to act on behalf of the Board or (y) authorized to exercise such powers with respect to any Major Action (as determined by the Board in its sole discretion) of the Company or its Subsidiaries, including any actions described in Section 2.2(a):

(i)      *Compensation Committee*. A compensation committee of the Board (the "**Compensation Committee**") shall be established, which committee shall be responsible for (i) establishing the compensation of the Chief Executive Officer and, subject to any delegation of authority by the Board under the last sentence of Section 5.03 of the Bylaws, the other Officers, (ii) establishing the terms and conditions of any stock option plan or management or employee incentive equity plan and (iii) such other matters as the Board may determine in accordance with the terms hereof.

(ii)      *Audit Committee.* An audit committee of the Board (the "**Audit Committee**") shall be established, which committee shall be responsible for oversight of the integrity of the Company's financial statements and monitoring of the Company's accounting practices and reporting, and such other matters as the Board may determine in accordance with the terms hereof.

19

(iii) *Chairman; Other Committees*; *Observers*. From time to time, the Board shall be entitled, in its sole discretion, to (A) appoint the chairman of each such Board Committee; *provided*, that, for so long as Todd Hornbeck remains the Chief Executive Officer, the first name nominated for consideration and vote by the Board with respect to the chairman of any Board Committee (other than the Compensation Committee) shall be proffered by Todd Hornbeck (but if not so made within 15 days after given the opportunity in writing, may be proffered by any other Director), and (B) establish other such Board Committees (and their respective responsibilities) as it deems prudent and appoint Directors to such Board Committees and in each case with the affirmative vote of a majority of the Board. The Board and each Board Committee shall be entitled to meet in executive session and exclude members of management, including the Chief Executive Officer, from such executive session. Any Director may request to be present as an observer for any meeting of a Board Committee, subject to the Board's or Board Committee's right to exclude such person from all or any portion of any meeting of such Board Committee as deemed necessary or appropriate by such Board Committee acting by majority approval; *provided*, that the attendance of such observer shall not be required to constitute a quorum or conduct business.

(e) *Subsidiaries*. Except as set forth in the last sentence of this Section 2.1(e) or when the Board determines to otherwise create or approve a board of managers or similar governing body at any of the Company's Subsidiaries, the Chief Executive Officer (or other Officer of the Company as designated in writing by the Board) shall be the sole manager of each of the Company's Subsidiaries; provided, that any determination by the Board or other Necessary Action (including, for the avoidance of doubt, by any board of managers or similar governing body of any Subsidiary of the Company) to create or approve any such board of managers or similar governing body at any of the Company's Subsidiaries holding or operating under a Facility Clearance, as defined in the in the National Industrial Security Program Operating Manual (the "**NISPOM**") shall exclude any Board Designee of Highbridge (including, for the avoidance of doubt, the Additional Appointing Person Director). If the Board so determines to otherwise create or approve a board of directors or similar governing body at any of the Company's Subsidiaries, to the extent requested by an Appointing Person, the Company and the Securityholders shall take all Necessary Action to cause the Board Designees designated by such Appointing Person to be designated as members of the board of directors or similar governing body of any of the Company's Subsidiaries with the same proportionate representation of such Appointing Person on such other board or governing body as on the Board; provided that Highbridge shall not be entitled to make, and the Company and each Securityholder shall not honor, any such request for representation on, and the Additional Appointing Person Director shall not be a member of, the board of directors or similar governing body of any Subsidiary of the Company holding or operating under a Facility Clearance (as defined in the NISPOM). The Company and each Securityholder hereby agree to take all Necessary Action to cause any Subsidiary of the Company holding or operating under a Facility Clearance (as defined in the NISPOM) to have, and be managed under the direction of, a board of managers or similar governing body.

20

(f)  *Board Meetings*. The Board shall have regular meetings, which shall occur no less frequently than quarterly.

(g)  *Stockholders Meeting*.  Holders of Jones Act Warrants shall be entitled to notice of, and have the right to attend any Stockholders Meeting to the same extent as if such holder of Jones Act Warrants was a holder of Common Stock, and, in this respect, shall be provided with all notices and documentation (including the agenda, minutes, committee reports and other documentation) for such Stockholders Meeting but shall not be entitled to vote on any matters presented at any such meeting.

(h)  *Transfer of Appointing Person Rights.* Subject to the restrictions on Transfer set forth in Article IV, if (i) any Appointing Person, taken together with its Affiliates, Transfers to any Transferee Company Securities representing a Securityholder Ownership Percentage of greater than or equal to 10%, and (ii) (A) the Transferring Appointing Person designates such Transferee as an Appointing Person with respect to all or a portion of such Transferring Appointing Person's Director Designation Rights and/or Consultation Right, as applicable (including, for the avoidance of doubt, any rights of such Person with respect to the designation of the Additional Appointing Person Director) and (B) such designation would not result in the number of directors that Non-U.S. Appointing Persons have the right to designate pursuant to the Director Designation Rights being more than a minority of the number of Directors necessary to constitute a quorum of the Board, then effective as of the date of such Transfer, (x) such Transferring Appointing Person shall cease to be an Appointing Person if the Director Designation Right(s) so transferred are the Transferring Appointing Person's last remaining Director Designation Rights and (y) such Transferee shall become an Appointing Person solely with respect to the Director Designation Rights so transferred and solely for purposes of Sections 2.1(a), 2.1(c), 2.1(e), 2.1(h), 2.1(i), 3.1(c)(iv), 7.1(a), 8.12, Exhibit B-2 and Exhibit B-4, and not for purposes of any other provision of this Agreement whatsoever (including, for the avoidance of doubt, Sections 2.2, 2.3 and 8.10).

(i)  *Fees; Costs and Expenses*. Except for Directors who are employees of the Company or any of its Subsidiaries or any Appointing Person or its respective Affiliates, Directors shall receive such cash or other compensation (if any) in respect of their service on the Board (or committees thereof) as the Board shall approve from time to time. The Company shall pay and reimburse each Director for all reasonable out-of-pocket expenses incurred by such Director in connection with his or her participation in (or attendance at) meetings of the Board (or committees thereof) and the boards of directors (or committees thereof) of the Subsidiaries of the Company.

(j)  *Directors' and Officers' Insurance*. The Company shall purchase and shall use its reasonable efforts to maintain director and officer liability insurance in such amounts and such limits as reasonably determined by the Board or, in the absence of such insurance, otherwise provide financial support for the indemnification obligations under the Company's organizational documents and by Applicable Law, for the benefit of any person who is or was a member of the Board, an advisory director, board observer or an executive Officer, of the Company, against any liability asserted against him or her or incurred by him or her in any capacity as such, whether or not the Company would have the power to indemnify him or her against that liability under the Company's Organizational Documents.

21

(k)     *Reduction; Termination of Rights*. The rights of the Appointing Persons to designate Directors under this Section 2.1 shall be reduced and terminated, as applicable, as follows:

(i)     Notwithstanding anything to the contrary in Sections 2.1(a)(i)(A) and 2.1(h), if any Appointing Person with the right to designate directors pursuant to Section 2.1(a)(i)(A) (A) has a Securityholder Ownership Percentage of less than 30% but greater than or equal to 20% and has the right to designate more than two Directors pursuant to Section 2.1(a)(i)(A), the number of Directors such Appointing Person has the right to designate pursuant to Section 2.1(a)(i)(A) shall be reduced to two Directors, and (B) has a Securityholder Ownership Percentage of less than 20% but greater than or equal to 10% and has the right to designate more than one Director pursuant to Section 2.1(a)(i)(A), the number of Directors such Appointing Person has the right to designate pursuant to Section 2.1(a)(i)(A) shall be reduced to one Director.

(ii)     For so long as the aggregate Securityholder Ownership Percentage of Whitebox and Highbridge, or any Person designated as an Appointing Person for purposes of Section 2.1(a)(iii) by Whitebox or Highbridge, respectively, in accordance with Section 2.1(h), is less than 20%, the right to designate the Additional Appointing Person Director pursuant to Section 2.1(a)(iii) shall terminate.

Section 2.2     Actions Requiring Consent.

(a)     *Board Reserved Matters; Appointing Person Consent Rights*. Notwithstanding anything to the contrary in this Agreement or any other agreement to which the Company is a party, the Company hereby covenants and agrees with each of the Securityholders that it shall not, and shall cause each of its Subsidiaries not to, directly or indirectly, take or enter into any of the actions or transactions set forth on:

(i)     Exhibit B-1 (each, a "**Major Action**"), unless such action or transaction has been expressly approved by the Board;

(ii)     at any time there is at least one Appointing Person, Exhibit B-2 (each, a "**Majority Appointing Person Action**"), unless such action or transaction has been expressly approved by the prior written consent of at least two (2) Appointing Persons (or, if there is only one (1) Appointing Person at such time, the sole Appointing Person), and any such act or transaction entered into without such written consent shall be null and void and of no force and effect; and

(iii)     at any time there is at least one Appointing Person, Exhibit B-3 (each, a "**Unanimous Appointing Person Action**"), unless such action or transaction has been expressly approved by the prior written consent of each of the Appointing Persons, and any such act or transaction entered into without such written consent shall be null and void and of no force and effect.

(b)     *Officer Delegation of Authority*. Notwithstanding Section 2.2(a)(i), the Board may expressly delegate to the Officers such authority as it determines in consultation with such Officers

22

#93253667v11
#93253667v16

to be appropriate in connection with empowering the Officers to manage the day-to-day affairs of the Company, including delegation to the Chief Executive Officer of the authority to take those actions set forth in Exhibit B-4, as modified from time to time by the Board (the "**Officer Delegation of Authority**").

(c)     *Return of Capital*. Subject to Section 2.2 and subject to compliance with the Jones Act, the Company and each of the Securityholders agree that in the event the Board determines to return capital or any other amounts to the Securityholders, the Company shall do so by offering to redeem or otherwise repurchase shares of Common Stock and Jones Act Warrants on a pro rata basis (determined by reference to the relative ownership of the then-outstanding Fully Diluted Securities as of the date of such redemption or repurchase).

Section 2.3     Observer Rights.

(a)     *Appointment*.

(i)     Each Appointing Person will be entitled to appoint, remove and replace from time to time one person (each, an "**Observer**") to act as an observer to the Board and each Board Committee exercisable by providing written notice of such appointment, removal or replacement, as the case may be, to the Company and the Chairman in advance of any meeting that such Observer will attend.

(ii)     For so long as Todd Hornbeck remains the Chief Executive Officer and a Director of the Company, Larry Hornbeck will be an Observer, unless otherwise agreed between the Board and Larry Hornbeck.

(b)     *Notice of Meetings and Actions*. The Company shall deliver notice of each proposed action of the Board and Board Committee (including any proposed action by written consent) and each meeting of the Board (including telephonic or teleconferenced meetings) to each Observer previously identified as appointed to attend such meeting concurrently with any notice given to the Directors.

(c)     *Attendance and Materials*. The Company agrees to permit each Observer to attend in person or by conference call and participate in all meetings of the Board and each Board Committee and to distribute to each Observer all materials distributed for or at any such meeting (including any meeting agenda or board or committee package) and all other information and materials distributed to Directors, in each case, concurrently with any such information or materials distributed to the Directors.

(d)     *Voting; Compensation*. No Observer shall be entitled to vote at a meeting of the Board or receive compensation from the Company for services as an Observer (other than payment of expenses pursuant to paragraph (f) below and, for the avoidance of doubt, payments made to Larry Hornbeck in connection with his Consulting Agreement with the Company, dated as of the date hereof (inclusive of any amendment, modification, restatement or replacement thereof).

23

(e)     *Conditions and Exceptions*.  The rights of each Observer and the obligations of the Company set forth in this Section 2.3 shall be subject to the following:  (i) except for an Observer that is an officer or employee of an Appointing Person or any of its respective Affiliates, prior to attending any meeting  each Observer shall have entered into a confidentiality agreement with the Company in form and substance acceptable to the Company; and (ii) with the approval of the Board, the Company may withhold any information from any Observer or exclude any Observer from any meeting or portion thereof, if access to such information or attendance at such meeting would reasonably be expected, based on advice from outside counsel, (x) to result in the loss of the Company's attorney-client privilege, or (y) solely with respect to any Observer that is not an officer or employee of an Appointing Person (or any of its Affiliates), to contain competitively sensitive information; *provided*, that any Observer may be excluded as deemed necessary or appropriate by the Board from all or any portion of any meeting of the Board relating to Government Contracts for which a security clearance would be required.

(f)     *Expenses*.  The Company shall pay and reimburse each Observer for all reasonable out-of-pocket expenses incurred by such Observer in connection with his or her participation in (or attendance at) meetings of the Board (or Board Committees).

Section 2.4     Budget. The Officers shall use reasonable efforts to present to the Board no later than February 15 of each fiscal year a draft of the proposed annual budget, including an operating budget and capital budget (collectively, the "**Budget**"), for such fiscal year, which Budget shall be subject to the consideration and approval of the Board.

Section 2.5     Jones Act Compliance. The Company shall review its books and records and third party publicly available information at least quarterly to determine Jones Act Compliance pursuant to the requirements of Applicable Law and the Organizational Documents. If, after making such review, the Company determines, in its sole discretion, that conversion of some or all of the outstanding Jones Act Warrants held by Non-U.S. Citizens that are exercisable at the time of such review will not result in (and would not reasonably be expected to result in) ownership and control by Non-U.S. Citizens in the aggregate in excess of twenty-four percent (24%)  of the aggregate outstanding Common Stock after giving effect to such conversion (the "**Exercise Cap**"), the Company shall effect in accordance with the Jones Act Warrant Agreement the automatic conversion of such amount of outstanding Jones Act Warrants covered by a Warrant Exercise Notice (as defined in the Jones Act Warrant Agreement) that has not been withdrawn into the total number of shares of Common Stock that the Company has so determined, in its sole discretion, may be issued at such time without causing the Exercise Cap to be exceeded or Excess Shares being issued.

### ARTICLE III
### INFORMATION AND ACCESS

Section 3.1     Information and Access Rights.

(a)     *Directors Access*. The Directors shall be entitled to examine the books, accounts and records of the Company and its Subsidiaries and shall have free access, at all reasonable times and with prior written notice, to any and all assets, properties and facilities of the Company and its

24

#93253667v11
#93253667v16

Subsidiaries. The Company shall provide such information relating to the business affairs and financial position of the Company or its Subsidiaries, as the Directors may require.

(b)     *Information Rights; Access.* The Company shall, and shall cause its Subsidiaries to, keep proper books, records and accounts, in which full and correct entries shall be made of all financial transactions and the assets and business of the Company and each of its Subsidiaries in accordance with GAAP. Each Securityholder hereby waives, to the fullest extent permitted by law, and agrees not to assert, any rights pursuant to Section 220 of Delaware Law (as defined in the Charter). Subject to Section 3.1(c)(i), each Securityholder that is not a Disqualified Person and any Securityholder that is a Disqualified Person whom the Board has approved for purposes of this Section 3.1(b) (provided that if the Board approves a Transfer of Company Securities to any Disqualified Person pursuant to Section 4.3(a)(iv), unless otherwise expressly provided by the Board in such approval, such Disqualified Person shall be deemed approved for purpose of this Section 3.1(b)) (each, an "**Information Right Securityholder**") shall be entitled to the following information rights (the rights described in Section 3.1(b)(i) through Section 3.1(b)(iv) below, collectively and as applicable, constituting the "**Information Rights**"):

(i)     All Information Right Securityholders shall be entitled to access a password-protected virtual data room, established and maintained periodically by the Company or its Affiliates or their respective representatives, and as a condition to gaining access to the information posted in such data room, each such Information Right Securityholder shall be required to "click through" or take other affirmative action pursuant to which each such Information Right Securityholder shall only be required to confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement and any confidentiality agreement executed by such Information Right Securityholder with the Company or any of its Subsidiaries prior to such access and acknowledge such Information Right Securityholder's confidentiality obligations in respect of such information hereunder or under any such confidentiality agreement and agree to abide by the terms of this Agreement and any such confidentiality agreement, which shall include the following (or the Company or its Affiliates or their respective representatives shall otherwise provide the following to all such Information Right Securityholders):

(A)     Annual Financial Statements. As soon as available, and in any event within one hundred twenty (120) days after the end of the first fiscal year ended after the Effective Date or ninety (90) days after the end of each subsequent fiscal year of the Company, audited consolidated balance sheets of the Company and its Subsidiaries as at the end of each such fiscal year and audited consolidated statements of income, of stockholders' equity and of cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal year, accompanied by (I) a report on such consolidated balance sheets and financial statements by the independent certified public accountants of recognized national standing selected by the Board, which report shall state that such consolidated financial statements fairly present in all material respects the consolidated financial condition of the Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows and stockholders' equity for the periods indicated in conformity with GAAP, applied on a basis consistent with prior years, and that the examination by such accountants was conducted in accordance with generally accepted auditing standards and (II) a reasonably detailed narrative discussion of the changes in the

25

Company's financial condition and results of operations compared with the prior periods presented, which will be in form and substance similar to the discussion contained in the "Management Discussion & Analysis" section of an Exchange Act report.

           (B)     <u>Quarterly Financial Statements</u>. As soon as available, and in any event within forty-five (45) days after the end of each of the first three (3) quarterly periods in each fiscal year of the Company, the consolidated balance sheet of the Company and its Subsidiaries as at the end of such quarterly period and the related consolidated statements of income, of stockholders' equity and of cash flows for such quarterly period and of the elapsed portion of the fiscal year ended with the last day of such quarterly period, and in each case prepared in accordance with GAAP, consistently applied, and setting forth comparative consolidated figures for the related periods in the prior fiscal year, subject to normal year-end audit adjustments and the absence of notes thereto, all in reasonable detail and certified by the principal financial or accounting officer of the Company, accompanied by a reasonably detailed narrative discussion of the changes in the Company's financial condition and results of operations compared with the prior periods presented, which will be in form and substance substantially similar to the discussion contained in the "Management Discussion & Analysis" section of an Exchange Act report.

           (ii)     *Quarterly MD&A Conference Call*. The Company will, no less than once per fiscal quarter and no later than ten (10) Business Days after delivery of the materials required pursuant to <u>Section 3.1(b)(i)(A)</u> or <u>Section 3.1(b)(i)(B)</u>, hold a conference call, including a questions and answers session, for which all such Information Right Securityholders will be provided reasonable advance notice in writing at least two (2) Business Days prior to such conference call, and to which all such Information Right Securityholders will be invited, where the Company will discuss or cause to be discussed the performance, financial results and future plans of the Company and its Subsidiaries.

           (iii)     *Inspection Rights*. Subject to <u>Section 3.1(c)(i)</u>, each Information Right Securityholder that is a 2% Securityholder shall be entitled, at reasonable times, for purposes reasonably related to such Information Right Securityholder interests as a holder of Company Securities, in a manner that does not interfere with the operations and daily business of the Company and its Subsidiaries, and upon reasonable prior notice to the Company, (A) to access to (1) the corporate, financial and similar records, reports and documents or other reasonably requested information of the Company and its Subsidiaries, and to permit each such qualified Information Right Securityholder to examine such documents and make copies thereof and (2) the Company's and its Subsidiaries' officers, senior employees and public accountants, and to afford each such qualified Information Right Securityholder the opportunity to discuss and advise on the affairs, finances and accounts of the Company and its Subsidiaries with their officers, senior management and public accountants (and the Company hereby authorizes said accountants to discuss with such qualified Information Right Securityholder such affairs, finances and accounts); *provided* that the rights provided for by this <u>Section 3.1(b)(iii)</u>(A) may not be exercised by any Information Right Securityholder or any of its Affiliates (taken as a group for such determination) more than once in any twelve (12)-month period and (B) to receive any information of the Company or any of its Subsidiaries that is reasonably requested by such Information Right Securityholder.

26

(iv)      *Notification of Key Events*. Each Information Right Securityholder that is a 2% Securityholder shall be entitled to prompt written notification by the Company of key events and reasonable details thereof, including (A) the planned termination or departure of any member of senior management of the Company or any Subsidiary, (B) material adverse changes to the business of the Company, (C) the existence of material litigation with respect to the Company or any Subsidiary and (D) any event of the type that would otherwise require disclosure pursuant to Form 8-K under the Exchange Act; provided that in each case, disclosure of the information described in clauses (A), (B), (C) and (D) above shall be subject to the reasonable discretion of the Board, acting in good faith, as to (x) the form of disclosure and (y) which information rises to the level of materiality such as would require disclosure under this Section 3.1(b)(iv).

(c)      *Confidentiality Obligations*.

(i)      Each Securityholder is only entitled to use Confidential Information (including any such information provided pursuant to the Information Rights and any such information provided to any Director or Observer which such Director or Observer provides to such Securityholder in accordance with the terms hereof, including Section 3.1(c)(ii)) for purposes of monitoring such Securityholder's investment in the Company (the "**Approved Purpose**") and not for any other purpose (including to disadvantage competitively the Company, any of its Affiliates or any other Securityholder). Each Securityholder further acknowledges and agrees that it shall not disclose any Confidential Information to any Person, except that such information may be disclosed:

(A)      to such Securityholder's officers, employees, directors, auditors, accountants, attorneys and other agents and representatives in the normal course of the performance of their duties;

(B)      in the case of the Management Securityholders and the Directors, in the performance of their duties for or on behalf of the Company and its Subsidiaries;

(C)      as part of its normal reporting or review procedure, or in connection with such Securityholder's or any of its Affiliates' or investors' ordinary course fundraising, marketing, informational or reporting activities;

(D)      to any prospective purchaser of Company Securities from such Securityholder that is not a Disqualified Person for purposes of enabling such prospective purchaser to evaluate a potential acquisition of such Company Securities; *provided*, that, as a condition precedent to the receipt of such information, any such prospective purchaser shall have executed and delivered to the Company a confidentiality agreement substantially in the form attached as Exhibit C, with such changes requested by such prospective purchaser and approved by the Company (such approval not to be unreasonably withheld, delayed or conditioned);

(E)      to any actual or potential sources of debt or equity financing to such Securityholder or any of its Affiliates, as long as such financing source is advised of the confidential nature of such information and is bound by a confidentiality agreement containing terms no less restrictive in any material respect than those contained in this Section 3.1(c);

27

(F) to the extent required by Applicable Law (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which a Securityholder is subject; *provided* that such Securityholder agrees to give the Company prompt notice of such request(s), to the extent practicable, so that the Company may seek an appropriate protective order or similar relief (and such Securityholder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such Applicable Law));

(G) to any regulatory authority or rating agency to which such Securityholder or any of its Affiliates is subject or with which it has regular dealings, as long as such authority or agency is advised of the confidential nature of such information;

(H) to the extent related to the tax treatment and tax structure of the transactions contemplated by this Agreement (including all materials of any kind, such as opinions or other tax analyses that the Company, its Affiliates or its representatives have provided to such Securityholder relating to such tax treatment and tax structure); *provided* that the foregoing does not constitute an authorization to disclose the identity of any existing or future party to the transactions contemplated by this Agreement or their Affiliates or representatives, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information; or

(I) if the prior approval of the Board shall have been obtained.

(ii) Each Securityholder hereby agrees to promptly notify the Company if such Securityholder is or becomes a Disqualified Person.

(iii) Upon the request of any Securityholder, the Company shall provide a prospective purchaser of Company Securities that is not a Disqualified Person with customary access to Confidential Information, which shall include the Information Rights set forth in Section 3.1(b)(i), for the purpose of enabling such prospective purchaser to evaluate a potential acquisition of such Company Securities; *provided*, that, as a condition precedent to the receipt of such information, any such prospective purchaser shall have executed and delivered to the Company a confidentiality agreement with respect to such information in form and substance reasonably acceptable to the Company.

(iv) Notwithstanding anything to the contrary in this Section 3.1(c), a Director or Observer shall be permitted to share all materials distributed by the Company or any Subsidiary of the Company to such Director or Observer and all other Confidential Information made available to such Director or Observer with its Appointing Person.

## ARTICLE IV
## TRANSFERS

Section 4.1 Rights and Obligations of Transferees. In connection with any Transfer of Company Securities (including any issuance of any Company Securities by the Company), other than in connection with a Transfer pursuant to Section 4.8, as a condition thereto, the applicable

28

#93253667v11
#93253667v16

Transferee, unless already a party to this Agreement, shall agree in writing, by executing and delivering the form of Joinder Agreement, to become a party to this Agreement and assume all of the obligations in this Agreement applicable to the Transferring Securityholder with respect to the Company Securities being Transferred.

Section 4.2    Transferability. Each Securityholder shall not be restricted by this Agreement from Transferring any of its Company Securities; *provided*, that such Transfer complies with this Article IV and the other provisions of this Agreement, the Company's other Organizational Documents and Applicable Law (including the Jones Act and the Jones Act Restriction).

Section 4.3    Restrictions on Transfer.

(a)    No Transfer of any Company Securities shall be permitted if:

(i)    such Transfer would cause the record number of Securityholders of any class of Company Securities to exceed the applicable threshold for registration under the Exchange Act, or if the Board otherwise determines that such Transfer could result in the Company's being required to file reports with the Commission under the Exchange Act or otherwise;

(ii)    such Transfer would violate the Securities Act or applicable federal and state securities or blue sky laws;

(iii)    such Transfer is made to a Person who lacks the legal right, power or capacity to own such Company Securities; or

(iv)    such Transfer is made to a Disqualified Person other than any Transfer (A) approved with the prior written consent of the Board or (B) pursuant to Section 4.7.

(b)    To the extent any Company Securities are represented by certificates (a "**Certificate**"), all such Certificates held by any Securityholder shall bear a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A SECURITYHOLDERS AGREEMENT AMONG HORNBECK OFFSHORE SERVICES, INC. AND THE HOLDERS PARTY THERETO, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF HORNBECK OFFSHORE SERVICES, INC. THE SECURITYHOLDERS AGREEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN PROVISIONS RELATING TO THE TRANSFER OF THE SECURITIES SUBJECT TO THE AGREEMENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY, DIRECTLY OR INDIRECTLY, BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE

29

OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THEY HAVE BEEN REGISTERED UNDER THAT ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE."

Notwithstanding anything to the contrary in the foregoing, only the condition set forth in Section 4.3(a)(ii) (and not any of the other conditions listed above) shall apply to any Transfer in a Drag Transaction.

Section 4.4    Transfers Not in Compliance. Notwithstanding anything to the contrary contained in this Agreement, any Transfer or attempted Transfer of any Company Securities in violation of any provision of this Agreement shall be null and void *ab initio* and of no force or effect whatsoever, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the Securityholder proposing to make any such Transfer shall continue be treated) as the owner of such Company Securities for all purposes of this Agreement. The Company may institute legal proceedings to force rescission of a Transfer prohibited by this Agreement and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such Transfer.

Section 4.5    IPO Demand Rights.

(a)    Subject to Section 4.5(d), any one or more Securityholders (collectively, the "**Initiating IPO Securityholder**") collectively holding (A) during the period of three (3) years from the Effective Date, 60% or more of the Fully Diluted Securities and (B) thereafter, 30% or more of the Fully Diluted Securities, shall have the right to effect, and to cause the Company and each other Securityholder to consent, to a Qualified IPO.

(b)    In connection with any such Qualified IPO, each Securityholder shall be required to vote, if such a vote is required by this Agreement, Applicable Law, or otherwise, its Voting Stock of the Company in favor of such Qualified IPO at any Securityholders Meeting called to vote on or approve such Qualified IPO and/or to consent in writing to such Qualified IPO, and the Securityholders and the Company shall take all other Necessary Action to cause, and shall not interfere with, the consummation of such Qualified IPO on the terms and conditions proposed or approved by the Initiating IPO Securityholder, including executing, acknowledging and delivering consents, waivers and other documents or instruments, furnishing information and copies of documents, and filing applications, reports, returns and other documents or instruments with governmental authorities; *provided* that in each case, each Securityholder shall be provided with reasonable prior notice of, and the opportunity to review (including with its external advisors), any such actions so required by Securityholders to cause the consummation of such Qualified IPO.

(c)    Each Securityholder and the Company shall cooperate in any such Qualified IPO and will take all Necessary Action in connection with the consummation of the Qualified IPO as

30

are reasonably requested by the Initiating IPO Securityholder (including the restructuring of the Company and its Subsidiaries to facilitate such Qualified IPO). Without limiting the generality of the foregoing, in connection with any such Qualified IPO, the Company shall take all necessary steps to engage an internationally recognized financial institution as the managing underwriter selected by the Board to lead such Qualified IPO, and each Securityholder, the Company and its Subsidiaries and their respective employees, officers, and advisors shall reasonably cooperate with such underwriter in connection with such Qualified IPO.

(d)      The Initiating IPO Securityholder shall, in its sole discretion, decide whether or not to pursue, consummate, postpone or abandon such proposed Qualified IPO initiated pursuant to this Section 4.5 and the terms and conditions hereof. Except as expressly provided in this Section 4.5, the Board shall make all other decisions regarding the Qualified IPO.  No Securityholder or Affiliate of a Securityholder shall have any liability to any other Securityholder or the Company arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Qualified IPO subject to this Section 4.5, except to the extent such Securityholder shall have failed to comply with the provisions of this Section 4.5.

Section 4.6      Tag-Along Right.

(a)      Each of the Securityholders hereby agrees that if any one or more Securityholders (each, an "**Initiating Tag Securityholder**") shall, in any one transaction or any series of related transactions, directly or indirectly, propose to Transfer Common Stock or Jones Act Warrants that represent greater than 50% of the Fully Diluted Securities (such Common Stock or Jones Act Warrants, the "**Tag-Along Securities**") to any Person, other than a Person that is a Permitted Transferee of an Initiating Tag Securityholder (a "**Tag-Along Transaction**"), the Initiating Tag Securityholders (or a designated representative acting on their behalf) shall deliver written notice (a "**Tag-Along Notice**") to the Company, and the Company shall deliver such Tag-Along Notice to each Securityholder other than the Initiating Tag Securityholders (the "**Tag-Along Rightholders**"), at least fifteen (15) Business Days prior to the consummation of such Tag-Along Transaction, offering the Tag-Along Rightholders the opportunity to participate in such Tag-Along Transaction on the terms and conditions set forth in the Tag-Along Notice (which terms and conditions shall be the same as those terms and conditions applicable to the Initiating Tag Securityholders, except as to the number of Company Securities proposed to be sold and except that any Tag-Along Rightholder shall be permitted to sell either Common Stock or Jones Act Warrants (such Company Securities which Tag-Along Rightholders are so entitled to sell, the "**Tag-Eligible Securities**" and, together with the Tag-Along Securities, the "**Tag Securities**"). The Tag-Along Notice shall contain a general description of the material terms and conditions of the Tag-Along Transaction, including the identity of the parties to the proposed Tag-Along Transaction, the total number of Tag-Along Securities proposed to be sold, the proposed amount and form of consideration and whether any termination fee, break-up fee or similar fee would be payable by the Initiating Tag Securityholders and the Tag-Along Rightholders if the Tag-Along Transaction is not consummated (and the amount of any such termination fee, break-up fee or similar fee), and a copy of any acquisition agreement entered into in connection with such Tag-Along Transaction.

31

(b)      Each Tag-Along Rightholder may, by written notice to the Initiating Tag Securityholders (or their designated representative) delivered within ten (10) Business Days after delivery of the Tag-Along Notice to such Tag-Along Rightholder (the "**Tag-Along Notice Period**"), elect to sell an amount up to its pro rata portion (based on the relative ownership of the then-outstanding Fully Diluted Securities as of the date of the Tag-Along Notice) of the Tag Securities to be Transferred to the proposed Transferee on the same terms and conditions as the Initiating Tag Securityholders. Failure to respond within the Tag-Along Notice Period shall constitute an irrevocable rejection of the offer made pursuant to the Tag-Along Notice and an irrevocable waiver by such Tag-Along Rightholder of its rights under this Section 4.6 only with respect to the applicable Tag-Along Transaction.  If at the end of the Tag-Along Notice Period (i) any Tag-Along Rightholder has declined to exercise its rights under this Section 4.6 or (ii) any Tag-Along Rightholder has elected to exercise its rights under this Section 4.6 with respect to less than all of such Tag-Along Rightholder's pro rata portion (the Tag-Along Securities described in clauses (i) and (ii) for which a Tag-Along Rightholder did not elect to exercise its rights under this Section 4.6, the "**Reallotment Securities**"), the Initiating Tag Holder shall give prompt written notice thereafter to each Tag-Along Rightholder that has elected to fully exercise its rights under this Section 4.6 (each such Person, a "**Full Tagging Person**"), of the right to sell in the Tag-Along Transaction a number of additional Tag-Along Securities in an amount up to its pro rata portion (based on the relative ownership of the then-outstanding Fully Diluted Securities held by all Full Tagging Persons and the Initiating Tag Securityholders as of the date of the Tag-Along Notice) of the Reallotment Securities (or such greater portion of the Reallotment Securities (up to all of the Reallotment Securities) as such Full Tagging Person may indicate in its election to exercise such right (*provided*, that if more than one Full Tagging Person elects to sell such greater portion, and the elections of all such Full Tagging Persons cannot be accommodated in full, then the right to sell more than each such Full Tagging Person's pro rata portion shall be allocated among all such Full Tagging Persons and the Initiating Tag Securityholders pro rata to such Full Tagging Persons' relative ownership of the then-outstanding Fully Diluted Securities held by all Full Tagging Persons as of the date of the Tag-Along Notice). Each such Full Tagging Person shall have three (3) Business Days to notify the Initiating Tag Holder of its election to exercise its rights to sell additional Tag-Along Securities pursuant to this Section 4.6(b).

(c)      In connection with any Tag-Along Transaction in which any Tag-Along Rightholder elects to participate pursuant to this Section 4.6, each such Tag-Along Rightholder will take all necessary or desirable actions reasonably requested by the Initiating Tag Securityholders or the Company in connection with the consummation of such Tag-Along Transaction, including executing and delivering the applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal or other agreements or documents governing or relating to such Tag-Along Transaction that the Company, the Initiating Tag Securityholders or the Transferee in such Tag-Along Transaction may reasonably request (the "**Tag-Along Transaction Documents**"), pursuant to which such Initiating Tag Securityholder and Tag-Along Rightholder shall agree to (A) provide customary representations and warranties regarding its legal status and authority, its ownership of the Tag Securities being Transferred (free and clear of liens and encumbrances), the due execution of the Tag-Along Transaction Documents and their enforceability, no conflicts with material agreements, law or judgment, order or decree of any governmental authority and customary (several but not joint) indemnities regarding the

32

same, (B) participate pro rata based on the consideration to be received by such Tag-Along Rightholder in any customary indemnities with respect to matters other than the representations and warranties described in clause (A) above, it being understood that such participation shall be limited to funding, out of consideration to be received by such Tag-Along Rightholder, on a pro rata basis based on the consideration to be received by such Tag-Along Rightholder, any escrow arrangements related thereto and being responsible for such Tag-Along Rightholder's pro rata share of any withdrawals therefrom and (C) a customary confidentiality covenant; *provided*, that in no event shall any Tag-Along Rightholder be obligated to (x) agree to any restrictive covenant, including any non-competition covenant, employee non-solicit covenant or other similar agreement restricting the business operations or investments of the Tag-Along Rightholder or any of its Affiliates as a condition of participating in such Transfer other than the customary confidentiality covenant described above (in each case except as otherwise provided in any Management Securityholder's employment or similar agreement in effect immediately prior to the consummation of the proposed Tag-Along Transaction), or (y) to agree to any indemnification obligations or contribute any amount in excess of the net cash amount received by such Tag-Along Rightholder in any such Tag-Along Transaction. In the event that the proposed Transferee in a Tag-Along Transaction does not purchase the number of Tag-Eligible Securities required to be included pursuant to this Section 4.6 on the terms and conditions of this Section 4.6, then no Initiating Tag Securityholder or Tag-Along Rightholder shall be permitted to sell any Tag-Along Securities to the proposed Transferee in such Tag-Along Transaction.

(d)     At the closing of any Tag-Along Transaction in which any Tag-Along Rightholder has exercised its rights under this Section 4.6, such Tag-Along Rightholder shall deliver, against payment of the consideration therefor in accordance with the terms of the Tag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Transferee of such Company Securities) representing its Tag-Eligible Securities to be sold, duly endorsed for Transfer or accompanied by duly endorsed stock powers, and such other documents as are deemed reasonably necessary by the Initiating Tag Securityholders, the Transferee and/or the Company for the proper Transfer of such Tag-Eligible Securities on the books of the Company, free and clear of any liens (other than liens imposed by this Agreement, the other Organizational Documents or Applicable Law or that are otherwise permitted pursuant to the Tag-Along Transaction Documents).

(e)     Each Initiating Tag Securityholder and each Tag-Along Rightholder electing to participate in a Tag-Along Transaction will bear its pro rata share (based upon the relative number of Tag Securities, on an as-converted or exercised basis, to be sold by each such Person in such Tag-Along Transaction) of the costs and expenses of any such Tag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all such Securityholders and are not otherwise paid by the Company or the Transferee. Costs and expenses incurred by any such Securityholder on its own behalf will not be considered costs of the Tag-Along Transaction and will be borne solely by such Securityholder.

(f)     The Company shall, and shall use its commercially reasonable efforts to cause its Officers, managers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Tag-Along Transaction.

33

(g)     If any Tag-Along Rightholder electing to participate in a Tag-Along Transaction breaches any of its obligations under this Section 4.6 or under any of the Tag-Along Transaction Documents, then such Tag-Along Rightholder will be provided a notice of such breach promptly (and in any event within three (3) Business Days) following the identification thereof and a reasonable opportunity to cure any such breach (if curable) and, if such breach remains uncured as of the date that is ten (10) Business Days following delivery of such notice, then such Tag-Along Rightholder will not be permitted to participate in such Tag-Along Transaction and the Initiating Tag Securityholders may proceed to close such Tag-Along Transaction excluding the sale of such Tag-Along Rightholder's Tag-Along Securities therefrom.

(h)     The consideration to be received by a Tag-Along Rightholder shall be the same form and amount of consideration per Tag Security to be received by the Initiating Tag Securityholder, and the terms and conditions of such sale shall be the same as those upon which the Initiating Tag Securityholder sells its Tag-Along Securities; *provided*, that if the Initiating Tag Securityholder shall have a *bona fide* election as to the form of consideration to be received in a Tag-Along Transaction, the Tag-Along Rightholders shall have the opportunity to make the same election with respect thereto. If any Securityholders of Tag Securities are given an option as to the form and amount of consideration to be received in the Tag-Along Transaction, all the Tag-Along Rightholders must be given the same option.

(i)     Any Tag-Along Transaction pursuant to this Section 4.6 shall occur within ninety (90) days after delivery of the Tag-Along Notice to the Tag-Along Rightholders; *provided* that, if such Tag-Along Transaction is subject to regulatory approval and such regulatory approval is required by the binding, definitive agreement entered into to give effect to such transactions, such ninety (90)-day period shall be extended until the expiration of 10 Business Days after all such approvals have been received or the relevant transaction document is terminated. If, at the end of such period, the Initiating Tag Securityholder has not completed the sale or other disposition of all of the Company Securities being held by the Company in accordance with the terms and conditions of the proposed Tag-Along Transaction, the Company shall return to each of the Tag-Along Rightholders any unsold certificates or evidences of ownership delivered in accordance with Section 4.6(d) above, together with any other documents in the possession of the Company executed by the Tag-Along Rightholders in connection with the proposed Tag-Along Transaction, and all the restrictions on Transfer contained in this Agreement with respect to the unsold Company Securities that are returned to the Tag-Along Rightholders shall again be in effect.

(j)     The provisions of this Section 4.6 shall not apply in the event that an Initiating Drag Securityholder Transfers Company Securities in a Drag Transaction in which such Initiating Drag Securityholder exercises its rights under Section 4.7.

Section 4.7     Drag-Along Right.

(a)     Subject to Section 4.7(h), and the prior approval of the Board, any one or more Securityholders (the "**Initiating Drag Securityholder**") collectively holding greater than 60% of the Fully Diluted Securities shall have the right to effect, and to cause the Company and each other Securityholder to consent to and participate in, a sale of all of the Company Securities or all or substantially all of the assets of the Company, as the case may be, to any Person, other than a

34

Person that is a Permitted Transferee of any of the Initiating Drag Securityholders, in a single transaction or series of related transactions, whether pursuant to a sale of the Company Securities or an alternate form of transaction at the election of the Initiating Drag Securityholder (whether by a merger transaction, business combination, consolidation or sale of all of the Company Securities or all or substantially all of the assets of the Company) (a "**Drag Transaction**"), and if requested by the Initiating Drag Securityholder, each other Securityholder (each, a "**Selling Securityholder**") shall be required to sell all of its Company Securities (or, if applicable, to take all Necessary Action to support and consummate such alternate form of transaction) in accordance with this Section 4.7.

(b)      In connection with a Drag Transaction, all Securityholders shall receive the same type and amount of consideration per share of each class of Company Securities as is received by other Securityholders of such class of Company Securities (and, subject to appropriate adjustments to reflect the exercise price of Warrants in accordance with the Warrant Agreements, shall receive the same type and amount of consideration per share as is received by other Securityholders for Common Stock), whether cash, securities or otherwise (and, subject to clause (y) below, if any Securityholder is given an option as to the form of consideration to be received in respect of its Company Securities, all other Securityholders shall be given the same option on the same terms), in each case in accordance with the Organizational Documents and the Warrant Agreements, and the terms and conditions of such Drag Transaction shall be the same as those applicable to the Initiating Drag Securityholder; *provided*, (w) that in no event shall a Selling Securityholder be obligated to accept any form of consideration in connection with any Drag Transaction other than cash or publicly traded Equity Interests that are not subject to restrictions on Transfer as a result of contractual provisions or Applicable Laws, (x) to the extent any Management Securityholder obtains the right to make a debt or equity investment in a purchaser or one of its Affiliates in connection with a Drag Transaction (whether directly or through a contribution of Equity Securities of the Company) (a "**Rollover Investment**"), such Rollover Investment shall not in itself constitute such Management Securityholder receiving different consideration from the other Securityholders, (y) in the event that any Selling Securityholder is not an Accredited Investor, such Selling Securityholder may, in the discretion of the Board, receive, and hereby agrees to accept, in lieu of any consideration in the form of unregistered securities, cash consideration with an equivalent value to such securities as determined by the Board, and (z) the aggregate consideration receivable by all Securityholders shall be allocated among the Securityholders in the manner specified by the Organizational Documents and Warrant Agreements.  In connection with the Drag Transaction, each Selling Securityholder shall agree (A) to provide customary representations and warranties regarding its legal status and authority, its ownership of the Company Securities being Transferred (free and clear of liens and encumbrances,), the due execution of the transaction documents and their enforceability, no conflicts with material agreements, law or judgment, order or decree of any governmental authority and customary (several but not joint) indemnities regarding the same, and (B) to participate pro rata based on the consideration to be received by such Selling Securityholder in any customary indemnities with respect to matters other than the representations and warranties described in clause (A) above, it being understood that such participation shall be limited to funding out of the consideration to be received by such Selling Securityholder, on a pro rata basis based on the consideration to be received by such Selling Securityholder, any escrow arrangements related thereto and being responsible for such

35

#93253667v11
#93253667v16

Securityholder's pro rata share, on an as-converted basis, of any withdrawals therefrom. Notwithstanding anything to the contrary contained herein, in no event shall (I) any Selling Securityholder (other than a Management Securityholder) be required to agree to any restrictive covenant, including any non-competition covenant, employee non-solicit covenant or other similar agreement restricting the Securityholder from engaging or investing in any business as a condition of participating in such Transfer, other than confidentiality, (II) any Management Securityholder be required to agree to any restrictive covenant other than reconfirming the terms of any agreement then in effect between such Management Securityholder and the Company, or (III) any Securityholder be required to agree to any indemnification obligations or contribute any amount in excess of the net cash amount received by such Selling Securityholder in any such Drag Transaction.

(c)      In connection with any Drag Transaction, each Selling Securityholder shall be required to vote, if such a vote is required by this Agreement, Applicable Law or otherwise, its Voting Stock of the Company in favor of such Drag Transaction at any Securityholders Meeting called to vote on or approve such Drag Transaction or to consent in writing to such Drag Transaction, and the Securityholders and the Company shall take all other Necessary Action to cause, and shall not interfere with, the consummation of such Drag Transaction on the terms and conditions proposed by the Initiating Drag Securityholder, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, furnishing information and copies of documents, and filing applications, reports, returns and other documents or instruments with governmental authorities; *provided* that in each case, a Selling Securityholder shall be provided with reasonable prior notice of, and the opportunity to review (including with its external advisors), any such actions so required by Selling Securityholders to cause the consummation of a Drag Transaction. Without limiting the foregoing, (A) each Securityholder shall vote or cause to be voted all Voting Stock of the Company that such Securityholder holds or with respect to which such Securityholder has the power to direct the voting and which are entitled to vote on such Drag Transaction in favor of such Drag Transaction and shall waive any dissenter's rights, appraisal rights or similar rights which such Securityholder may have in connection therewith and (B) if the proposed Drag Transaction is structured as or involves a sale or redemption of Company Securities, then each Securityholder shall agree to sell such Securityholder's Company Securities being sold in such Drag Transaction on the terms and conditions approved by the Board or proposed by the Initiating Drag Securityholder, as applicable, and such Securityholders shall execute all documents reasonably necessary or required to effectuate such Drag Transaction.

(d)      Each Selling Securityholder shall cooperate in the Drag Transaction and will take all Necessary Actions in connection with the consummation of the Drag Transaction as are reasonably requested, including, in the event of a Drag Transaction involving the Transfer of Company Securities, delivering the duly endorsed certificate or certificates if any, representing the Company Securities beneficially owned by such Selling Securityholder to be sold or, in the event the Company Securities are held in book entry, such evidence of ownership and Transfer as the transfer agent for the Company Securities may reasonably require in order to effect the Transfer thereof, and a stock power and limited power-of-attorney authorizing the Company to take all Necessary Actions to sell or otherwise dispose of such securities on the terms contemplated by this

36

Section 4.7 in the Drag Transaction.  Such power-of-attorney shall be irrevocable and coupled with an interest. In the event that a Selling Securityholder should fail to deliver such certificates and/or documentation, the Company shall cause the books and records of the Company to show that such Company Securities is bound by the provisions of this Section 4.7 and that such Company Securities may be Transferred to the purchaser in such Drag Transaction.

(e)       The fees and expenses, other than those payable to any Selling Securityholder or any of their respective Affiliates, incurred in connection with a Drag Transaction under this Section 4.7 and for the benefit of all Selling Securityholders (it being understood that costs incurred by or on behalf of a Selling Securityholder for his, her or its sole benefit, will not be considered to be for the benefit of all Selling Securityholders), to the extent not paid or reimbursed by the Company or the Transferee or acquiring Person, shall be shared by all the Selling Securityholders on a pro rata basis, in proportion to the consideration received by each Selling Securityholder; *provided*, that no Selling Securityholder shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag Transaction consummated pursuant to this Section 4.7 (excluding de minimis expenditures).

(f)       The Initiating Drag Securityholder shall provide written notice (the "**Drag-Along Notice**") to each Selling Securityholder of any proposed Drag Transaction as soon as practicable; *provided*, that such Drag-Along Notice shall be provided to each Selling Securityholder no later than twenty (20) Business Days prior to the consummation of the Drag Transaction. The Drag-Along Notice will include the material terms and conditions of the Drag Transaction, including (x) the name and address of the proposed Transferee, (y) the proposed amount and form of consideration and (z) the proposed Transfer date, if known. The Initiating Drag Securityholder will deliver or cause to be delivered to each Selling Securityholder copies of all transaction documents (including any schedules, exhibits and annexes thereto) relating to the Drag Transaction promptly as the same become available. Any Drag Transaction pursuant to this Section 4.7 shall occur within one hundred eighty (180) days after delivery of the Drag-Along Notice to the Selling Securityholder unless agreed in writing to be extended by the Board and the Selling Securityholders; *provided* that, if such Drag Transaction is subject to regulatory approval and such regulatory approval is required by the binding, definitive agreement entered into to give effect to such transactions, such one hundred eighty (180)-day period shall be extended until the expiration of ten (10) Business Days after all such approvals have been received or the relevant transaction document is terminated. If, at the end of such period, the Company has not completed the sale or other disposition of the Company Securities in accordance with the terms and conditions of the proposed Drag Transaction, the Company shall return to each of the Selling Securityholders any certificates or evidences of ownership delivered in accordance with Section 4.7(d) and any limited powers-of-attorney received by the Company, together with any other documents in the possession of the Company executed by the Selling Securityholder in connection with the proposed Drag Transaction, and all the restrictions on Transfer contained in this Agreement with respect to the Company Securities shall again be in effect.

(g)       If the Board, in connection with a Drag Transaction, appoints a Securityholders' representative (the "**Securityholders' Representative**") with respect to matters affecting the Selling Securityholders under the related transaction documentation, such Securityholders'

37

Representative shall be a third-party firm that provides such transaction services and each Selling Securityholder agrees (A) to consent to (1) the appointment of such Securityholders' Representative, (2) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations and (3) the payment of such Selling Securityholders' pro rata portion (from the applicable escrow) of any and all reasonable fees and expenses to such Securityholders' Representative in connection with such Drag Transaction and its related service as the Securityholders' Representative and (B) not to assert any claim or commence any suit against the Securityholders' Representative in connection with its services as the Securityholders' Representative, absent fraud, gross negligence or willful misconduct.

(h)     The Initiating Drag Securityholder shall, in its sole discretion, decide whether or not to pursue, consummate, postpone or abandon any proposed Transfer subject to this Section 4.7 and the terms and conditions hereof. No Securityholder or Affiliate of a Securityholder shall have any liability to any other Securityholder or the Company arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Transfer subject to this Section 4.7, except to the extent such Securityholder shall have failed to comply with the provisions of this Section 4.7.

## ARTICLE V
## PREEMPTIVE RIGHTS

Section 5.1     Preemptive Rights.

(a)     *Generally*. The Board, subject to the Company's Organizational Documents, with respect to the preemptive rights provided for in this Article V, and the consent rights provided for in Section 2.2(a), shall have the authority to issue Company Securities and/or Subsidiary Securities and issue or incur any indebtedness for borrowed money in such amounts and for such consideration per Company Security or Subsidiary Security, as applicable, as the Board shall determine.

(b)     *Procedure*. In the event that the Company or any of its Subsidiaries proposes to (i) sell or otherwise issue Company Securities and/or Subsidiary Securities or (ii) issue or incur any indebtedness for borrowed money (other than Company Securities and/or Subsidiary Securities) (any of the foregoing, "**Dilutive Instruments**") other than in a Permitted Offering (each a "**Proposed Offering**"), each Preemptive Rights Securityholder shall have the right to acquire or lend, as applicable, that number or amount of such Dilutive Instruments as is determined in accordance with Section 5.1(c) below, at the same price and upon the same terms and conditions as such Dilutive Instruments are being offered by the Company or its Subsidiary, as applicable, in the Proposed Offering.

(c)     *Notice and Offer*. As promptly as practicable prior to the consummation of any Proposed Offering to which this Section 5.1 applies, the Company shall give written notice thereof to each Preemptive Rights Securityholder (the "**Company Sale Notice**"), setting forth the number and class of the Dilutive Instruments and the consideration per Dilutive Instrument to be issued or incurred in such Proposed Offering as well as the other terms and conditions on which the Dilutive Instruments are being offered in such Proposed Offering, as applicable, and offering to sell, issue

38

or incur, as applicable, to or from, as applicable, each Preemptive Rights Securityholder its pro rata share (subject to Section 5.1(h), based on the relative ownership of the then-outstanding Fully Diluted Securities held by all applicable Preemptive Rights Securityholders as of the date of the Company Sale Notice) of such Dilutive Instruments on the same terms and conditions as are set forth in the applicable Company Sale Notice (the "**Preemptive Rights Offer**").

(d)      *Exercise of Rights*. Each Preemptive Rights Securityholder shall be entitled to accept any Preemptive Rights Offer by providing written notice to the Company not later than ten (10) Business Days after the date of the applicable Company Sale Notice. A delivery of such notice (which notice shall specify the number of Company Securities and/or Subsidiary Securities, as applicable, requested to be purchased by the Preemptive Rights Securityholder submitting such notice, up to the maximum amount determined pursuant to Section 5.1(c)) by such Preemptive Rights Securityholder shall constitute a binding agreement of such Preemptive Rights Securityholder to purchase, for the per share consideration and on the terms and conditions specified in the Company Sale Notice, the number of Preemptive Rights Shares specified in such Preemptive Rights Securityholder's notice. If, at the end of such ten (10) Business Day period, any Preemptive Rights Securityholder has not exercised its right to purchase any of its pro rata share of the Preemptive Rights Offer by delivering such notice, such Preemptive Rights Securityholder shall be deemed to have waived all of its rights under this Article V with respect to, and only with respect to, the purchase of such Dilutive Instruments specified in the applicable Company Sale Notice.

(e)      *Failure to Exercise*. If following the expiration of the period specified in Section 5.1(c) (i) any Preemptive Rights Securityholder has declined or failed to exercise its preemptive rights under this Section 5.1, or (ii) any Preemptive Rights Securityholder exercises its rights under this Section 5.1 with respect to less than all of such Preemptive Rights Securityholder's pro rata portion (the difference between (x) the total number or amount, as applicable, of Dilutive Instruments to be issued or incurred in the Proposed Offering and (y) the number or amount, as applicable, of Dilutive Instruments attributable to the Preemptive Rights Securityholders described in clauses (i) and (ii), the "**Preemptive Rights Excess Instruments**"), then the Company or its Subsidiary, as applicable, shall give prompt written notice thereafter to each Preemptive Rights Securityholder that has elected to fully exercise its rights under this Section 5.1 (each such Preemptive Rights Securityholder, a "**Full Preemptive Rights Securityholder**"), of its right to purchase such Full Preemptive Rights Securityholder's pro rata portion of any Preemptive Rights Excess Instruments (based on the relative ownership of the then-outstanding Fully Diluted Securities held by all Full Preemptive Rights Securityholders as of the date of the Company Sale Notice) (with an option for each Full Preemptive Rights Securityholder to indicate that it would purchase up to all such Preemptive Rights Excess Instruments, to the extent that other Full Preemptive Rights Securityholders do not exercise their over-subscription rights pursuant to this Section 5.1(d)) and for the same per share consideration and on the same terms as those specified in the Company Sale Notice, and such Full Preemptive Rights Securityholder shall have two (2) Business Days following the expiration of the period specified in Section 5.1(c) to exercise its rights pursuant to this Section 5.1(e) with respect to the Preemptive Rights Excess Instruments by delivering written notice thereof to the Company.

39

(f)  *Timing*. Subject to compliance with this Article V, the Company or its Subsidiary, as applicable, shall have sixty (60) days after the date of the Company Sale Notice to consummate the Proposed Offering with respect to any Dilutive Instruments that the Preemptive Right Securityholders have elected not to purchase at the same (or higher) per share consideration and upon such other terms and conditions that, taken as a whole, are not materially less favorable to the Company or its Subsidiary, as applicable, than those specified in the Company Sale Notice; *provided*, that, if such Proposed Offering is subject to regulatory approval, such 60-day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received. If the Company or its Subsidiary, as applicable, proposes to consummate a Proposed Offering (x) during such 60-day period at a lower per share consideration or on such other terms that are, taken as a whole, materially less favorable to the Company or its Subsidiary, as applicable, or (y) at any point after such 60-day period, in each case it shall again comply with the procedures set forth in this Article V prior to such Proposed Offering. Subject to Section 5.1(h), the purchase of Dilutive Instruments by the Preemptive Rights Securityholders agreeing to purchase any such Dilutive Instruments pursuant to this Section 5.1 shall be consummated simultaneously with the closing of the applicable Proposed Offering.

(g)  Notwithstanding the foregoing, the Company or its Subsidiary, as applicable, shall have the right to offer to, issue to, or incur from, the Appointing Persons (pro rata based on the relative ownership of the then outstanding Fully Diluted Securities held by the Appointing Persons as of the date of the Company Sale Notice) any Dilutive Instruments without first providing a Preemptive Rights Offer as described in Section 5.1(c) to the Preemptive Right Securityholders as long as the Company promptly thereafter (and in any event within sixty (60) days) makes a Preemptive Rights Offer to the other Preemptive Rights Securityholders on the same terms (including at the same price) as such Securityholders would have been entitled to exercise such preemptive rights if the Company had offered such Dilutive Instruments at the time of the original Proposed Offering.

(h)  *Disclaimer of Liability*. The Company shall be under no obligation to consummate any proposed issuance or incurrence of Dilutive Instruments, nor shall there be any liability on the part of the Company or the Board to any Preemptive Rights Securityholder if the Company has not consummated any proposed issuance or incurrence of Dilutive Instruments for whatever reason, except for issuances or incurrences made in breach of this Agreement, regardless of whether the Board shall have delivered a Company Sale Notice in respect of such proposed issuance.

(i)  *Jones Act Compliance*. Notwithstanding anything to the contrary set forth herein, if and to the extent required to satisfy the Jones Act Restriction, and solely to such extent, Preemptive Rights Securityholders exercising preemptive rights pursuant to this Section 5.1 that are Non-U.S. Citizens shall receive, on a proportionate basis with each other Non-U.S. Citizen (*i.e.*, each Non-U.S. Citizen shall receive the same proportion of Company Securities as each other Non-U.S. Citizen) otherwise entitled to receive any class of Company Securities pursuant to this Agreement, Jones Act Warrants in lieu of all or a portion of such Dilutive Instruments in an amount such that, in the aggregate with all other Non-U.S. Citizens (including after giving effect to this Section 5.1(i)), the Jones Act Restriction is satisfied. For the avoidance of doubt, any Preemptive

40

Rights Securityholder to which Jones Act Warrants are issued in lieu of Company Securities shall remain obligated to pay the same purchase price therefor and to make such payment at the same time and otherwise on the same terms and conditions as if such holder were purchasing Company Securities pursuant hereto.

(j)     *CEO Director Issuances*. For so long as Todd Hornbeck remains the Chief Executive Officer and a Director, for purposes of the preemptive rights set forth in this Article V, (x) the Common Stock underlying any options, restricted stock or other incentive equity beneficially owned by Todd Hornbeck (whether or not vested) shall be taken into account in determining the Fully Diluted Securities and each Preemptive Rights Securityholder's pro rata share of the Preemptive Rights Offer and (y) if the total Fully Diluted Securities beneficially owned by Todd Hornbeck and his Affiliates as calculated in accordance with clause (x) does not equal or exceed 2% of the Fully Diluted Securities (including for purposes of clause (x)), then Todd Hornbeck and his Affiliates, taken as a group, will be deemed to hold 2% of the Fully Diluted Securities.

## ARTICLE VI
## REGISTRATION RIGHTS

Section 6.1     Demand Registration.

(a)     Subject to Section 6.1(b) and the other terms of this Article VI, each 10% Securityholder shall have the right to, in each case, pursuant to Section 6.1(c) or Section 6.1(d), request the Company to effect the registration under and in accordance with the provisions of the Securities Act of the offering of all or any portion of the Registrable Securities at an aggregate proposed price to the public of not less than $10,000,000 beneficially owned by such 10% Securityholder by submitting a written request for such registration and specifying the amount of Registrable Securities proposed to be registered and the intended method (or methods) and plan of disposition thereof, including whether such requested registration is to involve an underwritten offering (a "**Registration Demand**").  The Company shall give prompt written notice thereof (a "**Demand Registration Notice**") (and in any event within five (5) Business Days from the date of receipt of such Registration Demand) to each of the 2% Securityholders, each of whom shall be entitled to elect to include, subject to the terms and conditions set forth in this Article VI, Registrable Securities beneficially owned by it in the Registration Statement to which a Demand Registration Notice relates, by submitting a written request to the Company (a "**Registration Request**") within fifteen (15) Business Days after the date of such Demand Registration Notice, specifying the number of Registrable Securities that such 2% Securityholder intends to dispose of pursuant to such Registration Statement.  Except as otherwise provided in this Agreement, the Company shall prepare and use its reasonable best efforts to file with the SEC, within ninety (90) days after the date of the applicable Registration Demand, a Registration Statement with respect to the following (in either case subject to Section 6.1(j) if the Registrable Securities will be sold in an underwritten offering):  (i) all Registrable Securities of the Requesting Securityholder included in such Registration Demand and (ii) all Registrable Securities that other Requesting Securityholders elect to include in such Registration Statement, pursuant to one or more timely submitted Registration Requests.  Thereafter, the Company shall use its reasonable best efforts, in

41

accordance with Section 6.6, to effect the registration of the offering of such Registrable Securities under the Securities Act and applicable state securities laws, for disposition in accordance with the intended method or methods of disposition stated in the underlying Registration Demand.  The Company may include in such Registration Statement such number of shares of Common Stock or other Company Securities of the Company as the Company proposes to offer and sell for its own account or the account of any other Person.

(b)      *Limitation on Demand Registration*.  Notwithstanding anything to the contrary in this Section 6.1, no 10% Securityholder may make a Registration Demand until six months following the Company's IPO.

(c)      *Form S-1 Registration*.  Subject to the terms and conditions of this Article VI, any 10% Securityholder shall have the right to submit a Registration Demand to effect the registration on Form S-1 (or if available Form S-3) or any successor form  of all or any portion of the Registrable Securities beneficially owned by such Securityholder and its Affiliates; provided that each 10% Securityholder (taken as a group with its Affiliates) shall be limited to three such Registration Demands pursuant to this Section 6.1(c). Any registration pursuant to such a Registration Demand may, if so requested in the underlying Registration Demand, be a "shelf" registration for an offering of Registrable Securities on a continuous or delayed basis pursuant to Rule 415 under the Securities Act (or any successor rule that is subsequently adopted by the SEC).

(d)      *Registration; Shelf Registration*.  Subject to the terms and conditions of this Article VI, at any time that the Company is eligible to use Form S-3 for the registration of Registrable Securities for resale, any 2% Securityholder shall have the right, subject to the terms and conditions of this Article VI, to submit a Registration Demand to effect the registration on Form S-3 (or any successor form) of the Registrable Securities beneficially owned by such 2% Securityholder.  Any registration pursuant to such a Registration Demand may, if so requested in the underlying Registration Demand, be a "shelf" registration for an offering of Registrable Securities on a continuous or delayed basis pursuant to Rule 415 under the Securities Act (or any successor rule that is subsequently adopted by the SEC).  Subject to paragraph (f), the number of Registration Demands that may be made pursuant to this paragraph is unlimited. Notwithstanding the foregoing, the Company shall not be obligated to effect any Registration Demand on Form S-3 if the Registrable Securities sought to be included in such Registration Demand have a fair market value of less than $3,000,000. Notwithstanding the foregoing, no 2% Securityholder may make a Registration Demand on Form S-3 pursuant to this Section 6.1(d) until six months following the Company's IPO.

(e)      *Delay for Disadvantageous Condition*.  If, in connection with any registration requested or ongoing pursuant to a Registration Demand, the Company provides a certificate to the Requesting Securityholders, signed by the President or Chief Executive Officer of the Company and stating that, in the good-faith judgment of the Board, it would be materially detrimental to the Company or its Securityholders for such Registration Statement either to become effective or to remain effective for as long as such Registration Statement otherwise would be required to remain effective, or if the Company is prohibited by the terms of any applicable underwriting or securities purchase agreement, then the Company shall have the right to defer

42

taking action with respect to such Registration Statement and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly; provided, however, that the aggregate number of days in all such delay periods in any period of twelve (12) consecutive months shall not exceed sixty (60) days.

(f)     *Limitation on Successive Registrations and Underwritten Offerings*.  The Company shall not be required to effect a registration of Registrable Securities pursuant to Section 6.1(c) or Section 6.1(d) for a period of ninety (90) days immediately following the effective date of any Registration Statement filed pursuant to this Section 6.1 or a Registration Statement otherwise filed by the Company as permitted by this Agreement to register Company Securities to be sold by the Company and in no event shall the Company be required to file more than three Registration Statements pursuant to Section 6.1(d) during any period of twelve (12) consecutive months.

(g)     *Demand Withdrawal*.  With respect to any registration requested pursuant to this Section 6.1, any Requesting Securityholder may withdraw its Registrable Securities from such registration, in either case by providing written notice to the Company at any time (x) in the case of an underwritten offering, prior to the filing of the preliminary prospectus pursuant to such registration, and (y) in the case of non-underwritten offering, prior to the effective date of the Registration Statement relating to such Registration Demand.  If all of the Registrable Securities to be included in the registration pursuant to any Registration Demand are so withdrawn, then such Registration Demand shall be deemed withdrawn.  In the event of any such actual or deemed withdrawal of a Registration Demand, the Company shall cease all efforts to effect the registration of the Registrable Securities requested to be included in such registration, without liability to any Requesting Securityholder.  Such registration will be deemed to have been effected (including for purposes of Section 6.1(c) and Section 6.1(d), with respect to a Registration Demand made thereunder) unless each Requesting Securityholder who has withdrawn its Registration Demand or has withdrawn all of its Registrable Securities from such registration has paid (or reimbursed the Company for), pursuant to and if required by Section 6.4, its pro rata share (based on a fraction, the numerator of which is the number of Registrable Securities that such Requesting Securityholder asked to be included in such withdrawn registration and the denominator of which is the aggregate number of Registrable Securities that all Requesting Securityholders, collectively, requested to be included in such withdrawn registration) of the Registration Expenses incurred by the Company in connection with such withdrawn registration.

(h)     *Effective Registration*.  Notwithstanding anything to the contrary in this Agreement, except to the extent expressly set forth in Section 6.1(g), a Registration Statement filed pursuant to this Section 6.1 shall not be deemed to have been requested or effected (including for purposes of Section 6.1(c) and Section 6.1(d), with respect to a Registration Demand made thereunder) unless it has been declared effective by the SEC and shall have remained effective for one hundred eighty (180) days (excluding any periods of time during which such Registration Statement is tolled or suspended pursuant to Section 6.1(e) [or Section 6.5(c))] or such shorter period as may be required to sell all Registrable Securities included in such Registration Statement; provided that in the case of any registration of Registrable Securities that are intended to be offered on a continuous or delayed basis, such one hundred eighty (180) day period shall be extended, if necessary, to keep the Registration Statement effective until all such Registrable Securities are

43

#93253667v11
#93253667v16

sold. In no event shall a registration be deemed to have been effected if (i) after the Registration Statement has been declared effective by the SEC, such registration is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, for any reason other than a misrepresentation or an omission by any Requesting Securityholder and, as a result thereof, the Registrable Securities requested to be registered therein cannot be completely distributed in accordance with the plan of distribution set forth in such Registration Statement or (ii) the conditions to closing the sale of Registrable Securities specified in any purchase agreement or Underwriting Agreement, which agreement was entered into in connection with such registration for the purpose of distributing Registrable Securities in accordance with the plan of distribution set forth in the applicable Registration Statement, are not satisfied or waived other than solely by reason of some act or omission by any Requesting Securityholder.

(i)  *Selection of Underwriters*. Subject to Section 6.1(f), any registration of Registrable Securities pursuant to this Section 6.1 may, if so requested in the underlying Registration Demand, be effected as an underwritten offering, and in such event the Company shall have the right to select the managing underwriter or underwriters for the offering; provided that such underwriter or underwriters shall be reasonably acceptable to the Requesting Securityholder(s).

(j)  *Priority*. Notwithstanding any other provision of this Section 6.1, if the underwriters advise the Requesting Securityholder(s) in writing that marketing factors require a limitation on the number of shares to be underwritten in a registration pursuant to this Section 6.1,(other than Section 6.1(k)) the number of Registrable Securities that may be so included shall be allocated as follows: (i) (A) in the case of a registration pursuant to Section 6.1(c), (I) first, among all 10% Securityholders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities beneficially owned by such 10% Securityholders and (II) second, among all 2% Securityholders (other than 10% Securityholders participating in (I)) requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities beneficially owned by such 2% Securityholders, and (B) in the case of a registration pursuant to Section 6.1(d), first, among all 2% Securityholders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities beneficially owned by such 2% Securityholders; and (ii) thereafter, to the Company, which the Company may allocate, at its discretion, for its own account, or for the account of other Securityholders.

(k)  *Company Registration*. Notwithstanding the provisions of this Section 6.1 to the contrary, the Company shall not be obligated to effect a registration requested pursuant to Section 6.1 if within thirty (30) days after the date of the applicable Registration Demand under Section 6.1, the Company notifies all 2% Securityholders of its intention to file a registration statement for a firm commitment underwritten public offering of Common Stock and within ninety (90) days after the date of the applicable Registration Demand, files a Registration Statement for such offering and provided that 2% Securityholders shall have rights to include Registrable Securities in such Registration Statement in accordance with Section 6.2. In such case, the Securityholders shall have all the rights provided herein as if no such Registration Demand had been submitted. If at any time the Company fails diligently to pursue its Registration Statement or the offering, the provisions of the preceding sentence shall not apply, and the Company shall be obligated to satisfy

#93253667v11
#93253667v16

its obligations otherwise due under Section 6.1.  With respect to such registration, the Company shall have sole authority to select or terminate the employment of underwriters, and to make all decisions in connection with the filing, effectiveness and consummation of the proposed offering, subject to the express provisions hereof.

Section 6.2    Piggyback Registration.

(a)    *Notice of Registrations*.  In the event that the Company proposes to file a Registration Statement with respect to Company Securities (other than a Registration Statement (i) filed in connection with the Company's IPO, (ii) filed pursuant to Section 6.1, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers, directors, consultants or advisors of the Company or its Affiliates), whether or not for sale for its own account, the Company shall provide each 2% Securityholder with written notice of its intention to do so (a "**Piggyback Registration Notice**") at least thirty (30) days prior to filing such Registration Statement.  Any 2% Securityholder may elect to include Registrable Securities beneficially owned by it in the Registration Statement to which a Piggyback Registration Notice relates, by submitting a written request (a "**Piggyback Registration Request**") to the Company within fifteen (15) Business Days after the date of such Piggyback Registration Notice, specifying the number of Registrable Securities that such 2% Securityholder intends to dispose of pursuant to such Registration Statement, and the intended method of disposition thereof.  The Company shall use its reasonable best efforts to effect the registration under the Securities Act of all Registrable Securities that 2% Securityholder have requested, pursuant to timely submitted Registration Requests, to be included in the Registration Statement to which the underlying Piggyback Registration Notice relates. Notwithstanding the foregoing, no 2% Securityholder may make a Piggyback Registration Request pursuant to this Section 6.2(a) until six months following the Company's IPO.

(b)    *Withdrawal of Registration*.  If, at any time after the Company provides a Piggyback Registration Notice and prior to the effective date of any Registration Statement filed in connection therewith, the Company shall determine for any reason not to register the Company Securities to which such Piggyback Registration Notice relates, the Company may, in its sole discretion, give the Requesting Securityholders written notice of such determination and thereupon shall be relieved of its obligation to register any Registrable Securities that the Requesting Securityholders requested to be registered pursuant to a Piggyback Registration Request delivered in response to such Piggyback Registration Notice.  Each Securityholder shall be permitted to withdraw all or any portion of the Registrable Securities of such Securityholder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

(c)    *Priority.* Notwithstanding any other provision of this Section 6.2, if the underwriters advise the Requesting Securityholder(s) in writing that marketing factors require a limitation on the number of shares to be underwritten, the number of Registrable Securities that may be so included shall be allocated as follows: (i) first, to the Company with respect to the Company Securities that the Company proposes to offer and sell for its own account in such registration; (ii) second, among all 2% Securityholders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities

45

#93253667v11
#93253667v16

beneficially owned by such 2% Securityholders; and (iii) third, to the Company, which the Company may allocate, at its discretion, for the account of other Securityholders.

(d)      *Not a Demand Registration*.  No registration of Registrable Securities effected under this Section 6.2 shall relieve the Company of its obligation to effect any registration of Registrable Securities pursuant to Section 6.1.

Section 6.3      Certain Information.  In connection with any request for registration pursuant to Section 6.1 or Section 6.2, each Selling Securityholder shall furnish to the Company such information regarding itself, the Registrable Securities beneficially owned by it, and the intended method of disposition of such Registrable Securities as the Company shall reasonably request, to the extent required to complete the filing of such Registration Statement in accordance with applicable law (including the Securities Act and any state securities or "blue sky" laws).

Section 6.4      Expenses.  Except as expressly provided otherwise in this Agreement, if the Company is required to effect the registration of any Registrable Securities pursuant to Section 6.1 or Section 6.2, the Company shall pay all Registration Expenses with respect to such registration; *provided* that each Selling Securityholder shall bear its pro rata share, on the basis of the number of Registrable Securities or shares of Common Stock, as applicable, sold in such registration, of all underwriting discounts, selling commissions and stock transfer taxes, and each such Selling Securityholder shall be responsible for any fees and expenses of any persons retained by such Selling Securityholder.  Notwithstanding the foregoing, in the event that any registration of Registrable Securities or shares of Common Stock, as applicable, requested pursuant to Section 6.1 is withdrawn or deemed withdrawn pursuant to Section 6.1(g) and the Requesting Securityholder(s) elects not to have such withdrawn registration counted as a registration under Section 6.1, the Requesting Securityholder(s) and each Requesting Securityholder withdrawing all of its Registrable Securities or shares of Common Stock, as applicable, shall pay (or reimburse the Company for) its pro rata share (in proportion to the number of Registrable Securities or shares of Common Stock, as applicable, that it asked to be included in such withdrawn registration) of the Registration Expenses incurred by the Company with respect to such withdrawn registration.  The immediately preceding sentence shall not apply if such registration is withdrawn (i) as a result of information concerning the occurrence of a material adverse change in the business or financial condition of the Company that is made known to the Requesting Securityholders after the date on which such registration was requested, (ii) if the revocation of such Selling Securityholder's request for registration is based on the Company's failure to comply in any material respect with its obligations hereunder or (iii) if the registration is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court for any reason other than a misrepresentation or omission by any Requesting Securityholder.

Section 6.5      Registration and Qualification.

(a)      In the event that the Company is required to effect the registration of any Registrable Securities or shares of Common Stock, as applicable, pursuant to this Article VI, the Company shall:

46

#93253667v11
#93253667v16

(i)     use its reasonable best efforts to, as promptly as practicable, prepare, file and cause to become effective and remain effective a Registration Statement relating to such Registrable Securities or shares of Common Stock, as applicable;

(ii)     prepare and file with the SEC such amendments (including post-effective amendments) and supplements to the Registration Statement for such Registrable Securities or shares of Common Stock, as applicable, and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all such Registrable Securities or shares of Common Stock, as applicable, until such time as all of such Registrable Securities or shares of Common Stock, as applicable, have been disposed of; provided that the Company shall, as far in advance as practicable but at least five (5) Business Days prior to filing a Registration Statement or prospectus (or any amendment or supplement thereto), furnish to each Selling Securityholder, for their review, copies of such Registration Statement or prospectus (or amendment or supplement) as proposed to be filed (including, upon the request of such Selling Securityholder, documents to be incorporated by reference therein); provided further that each Selling Securityholder may request reasonable changes to such Registration Statement, prospectus, amendment or supplement (as the case may be) and the Company shall be required to comply therewith to the extent necessary to lawfully complete such filing or maintain the effectiveness of such Registration Statement;

(iii)     furnish to each Selling Securityholder and each underwriter of such Registrable Securities or shares of Common Stock, as applicable, such number of conformed copies of such Registration Statement and each amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus included in such Registration Statement (including each preliminary prospectus and any summary prospectus), in conformity with the requirements of the Securities Act, such documents as are incorporated by reference in such Registration Statement or prospectus (including any amendments or supplements thereto), and such other documents as such Selling Securityholder or underwriter may reasonably request;

(iv)     promptly notify each Selling Securityholder in writing of the effectiveness of the Registration Statement and of any stop order issued or threatened by the SEC with respect thereto, use its reasonable best efforts to prevent the entry of any such stop order that is threatened and promptly remove any such stop order that has been entered, and promptly notify each Selling Securityholder of such lifting or withdrawal of any such stop order;

(v)     use its reasonable best efforts to (x) register or qualify all Registrable Securities or shares of Common Stock, as applicable, covered by such Registration Statement under the securities or blue sky laws of such jurisdictions as may be requested by any Selling Securityholder or underwriter of such Registrable Securities or shares of Common Stock, as applicable, and promptly notify the Selling Securityholders of the receipt of any notification with respect to the suspension of the qualification of Registrable Securities or shares of Common Stock, as applicable, for sale or offer in any such jurisdiction and (y) obtain all appropriate registrations, permits and consents in connection with such registrations and qualifications, and do any and all other acts and things (including using reasonable best efforts to promptly remove any such

47

suspension) necessary or advisable to enable the Selling Securityholders and underwriters to consummate the disposition of such Registrable Securities or shares of Common Stock, as applicable, in such jurisdictions; *provided* that the Company shall not be required to qualify to do business as a foreign corporation in any such jurisdiction where it is not so qualified, to consent to general service of process in any such jurisdiction or to amend its Organizational Documents;

(vi)    in an underwritten offering, use its reasonable best efforts to furnish to each underwriter of such Registrable Securities or shares of Common Stock, as applicable, (x) an opinion of counsel to the Company addressed to each such underwriter and dated the date of the closing under the Underwriting Agreement  and (y) "cold comfort" letters dated the effective date of the Registration Statement (and brought down to the date of closing under the Underwriting Agreement) addressed to each underwriter and signed by the independent public accountants who have certified the Company's financial statements included in such Registration Statement, in each such case covering substantially the same matters as are customarily covered in such opinions and cold comfort letters in connection with underwritten public offerings of securities;

(vii)    if requested by the managing underwriter, use its reasonable best efforts to list all such Registrable Securities or shares of Common Stock, as applicable, covered by such registration on each National Securities Exchange on which shares of Common Stock are then listed;

(viii)    furnish for delivery in connection with the closing of the registered offering of such Registrable Securities or shares of Common Stock, as applicable, unlegended certificates representing ownership of such Registrable Securities or shares of Common Stock, as applicable, in such denominations as shall be requested by the Selling Securityholders or the underwriters (if any) for such Registrable Securities or shares of Common Stock, as applicable;

(ix)    not later than the effective date of the applicable Registration Statement, (x) retain a transfer agent and registrar (if the Company does not already have one), (y) obtain a CUSIP number for all Registrable Securities or shares of Common Stock, as applicable, included in such Registration Statement and (z) provide the applicable transfer agent with printed certificates for the Registrable Securities or shares of Common Stock, as applicable, which are in a form eligible for deposit with The Depository Trust Company or other applicable clearing agency;

(x)    in the case of an underwritten offering of such Registrable Securities or shares of Common Stock, as applicable, cause its senior executive officers to participate in such customary "road show" presentations as may be reasonably requested by the managing underwriter, and to otherwise facilitate, cooperate with, and participate in each proposed offering of Registrable Securities or shares of Common Stock, as applicable, pursuant to this Article VI and customary selling efforts related thereto; and

(xi)    otherwise use its reasonable best efforts to comply with all applicable securities laws, including the Securities Act, the Exchange Act, and state securities and "blue sky" laws.

#93253667v11
#93253667v16

(b)      In the event that the Company delivers a prospectus covering Registrable Securities or shares of Common Stock, as applicable, to the Selling Securityholders and such prospectus is subsequently amended to comply with the requirements of the Securities Act, the Company shall promptly notify each Selling Securityholder and may, in its discretion, request that the Selling Securityholders cease making offers of Registrable Securities or shares of Common Stock, as applicable, and return to the Company all prospectuses in their possession.  In the event that the Company makes such a request each Selling Securityholder shall immediately cease making such offers and shall promptly return all such prospectuses.  The Company shall promptly provide the Selling Securityholders with revised prospectuses and each Selling Securityholder shall be free, following its receipt of such revised prospectuses, to resume making offers of the Registrable Securities or shares of Common Stock, as applicable.

(c)      In the event that the Company determines, in its reasonable discretion, that it is advisable to suspend use of a prospectus included in a Registration Statement due to pending material developments or other events that have not yet been publicly disclosed and as to which the Company believes public disclosure would be materially detrimental to the Company, the Company shall direct the Selling Securityholders to discontinue sales of Registrable Securities or shares of Common Stock, as applicable, pursuant to such prospectus, and each Selling Securityholder shall immediately so discontinue, until such Selling Securityholder has received copies of a supplemented or amended prospectus or until such Selling Securityholder is advised in writing by the Company that the then-current prospectus may be used and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such prospectus.  The Company shall promptly furnish to each Selling Securityholder copies of any such supplemented or amended prospectuses or additional or supplemental filings, as the case may be.  Notwithstanding anything to the contrary in this Agreement, the Company shall not exercise its rights under this Section 6.5(c) to suspend sales of Registrable Securities or shares of Common Stock, as applicable, for a period when taken together with all delay periods under Section 6.1(e) in excess of sixty (60) days during any period of three hundred sixty-five (365) consecutive days.

Section 6.6      Underwriting; Due Diligence.  In the event of an underwritten offering of Registrable Securities pursuant to a registration requested under this Article VI, the Company shall, if requested by the underwriters for such offering, enter into an underwriting agreement with such underwriters (an "**Underwriting Agreement**").  Any such Underwriting Agreement shall contain such representations, warranties and covenants by the Company and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions, and shall include indemnification and contribution provisions substantially to the effect and extent of those set forth in Section 6.7, and agreements as to the provision of opinions of counsel and accountants' letters substantially to the effect and extent of those set forth in Section 6.5(a)(vi).  The Selling Securityholders on whose behalf such Registrable Securities are to be distributed by the underwriters shall enter into such Underwriting Agreement, which shall also contain such representations, warranties and indemnities by the Selling Securityholders as are customarily provided by selling Securityholders in underwriting agreements with respect to secondary distributions.  With respect to any Underwriting Agreement:  (i) all of the conditions precedent to the obligations of the underwriters thereunder shall be conditions precedent to the

49

obligations of the Selling Securityholders and (ii) no Selling Securityholder shall be required to make any representations or warranties to, or agreements with, the Company or the underwriters, other than customary representations, warranties or agreements generally made by selling Securityholders in similar offerings.

Section 6.7    Indemnification and Contribution.

(a)    *The Company's Indemnification Obligations*.  To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless each Selling Securityholder, its Affiliates, and their respective directors, officers, members, managers, partners, employees, Securityholders, agents, advisors, investment managers and any Person who "controls" such Selling Securityholder (within the meaning of Section 15 of the Securities Act), from and against any and all losses, claims, damages and liabilities, including any legal or other costs, fees and expenses reasonably incurred in connection with defending or investigating any such action or claim (collectively, "**Losses**") insofar as such Losses are caused by (i) any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or amendment thereto, any free writing prospectus, any preliminary prospectus or prospectus (as amended or supplemented) relating to the Registrable Securities, (ii)  any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation by the Company of any federal, state or common law rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with such registration, except insofar as such Losses (x) relate to a transaction or sale made by a Selling Securityholder in violation of Section 6.5(c) or (y) are caused by any such untrue statement or omission or alleged untrue statement or omission that is based upon and in conformity with information relating to a Selling Securityholder which is furnished to the Company in writing by such Selling Securityholder expressly for use therein; provided that clause (y) shall not apply to the extent that the Selling Securityholder has furnished in writing to the Company prior to the filing of such Registration Statement, free writing prospectus, preliminary prospectus, prospectus, amendment or supplement information expressly for use in such document which information corrected or made not misleading the information previously furnished to the Company by such Selling Securityholder, and the Company failed to include such information therein.

(b)    *The Selling Securityholders' Indemnification Obligations*. To the fullest extent permitted by law, each Selling Securityholder agrees to indemnify and hold harmless the Company, all Affiliates of the Company, each of their respective directors, officers, members, managers, partners, employees, Securityholders, agents and advisors and each Person, if any, who "controls" (within the meaning of Section 15 of the Securities Act) the Company, from and against any and all Losses insofar as such Losses are caused by any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or amendment thereto, any free writing prospectus, preliminary prospectus or prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) relating to the Registrable Securities, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, but only with reference to information relating to such Selling Securityholder furnished in writing by or on

50

behalf of such Selling Securityholder expressly for use in such Registration Statement, free writing prospectus, preliminary prospectus, prospectus, amendments or supplement; *provided* that such Selling Securityholder shall not be liable in any such case to the extent that it has furnished in writing to the Company prior to the filing of any such Registration Statement, free writing prospectus, preliminary prospectus, prospectus, amendment or supplement information expressly for use in such document which information corrected or made not misleading the information previously furnished to the Company by such Selling Securityholder, and the Company failed to include such information therein.  Notwithstanding anything to the contrary in this Section 6.7, each Selling Securityholder's indemnification obligations under this paragraph are several, and not joint and several, and shall not exceed, with respect to any given registration of Registrable Securities pursuant to this Article VI, the amount of net proceeds received by such Selling Securityholder in connection with the offering of its Registrable Securities under such registration.

(c)      Each party that is entitled to indemnification under paragraph (a) or (b) of this Section 6.7 shall, promptly after receipt of notice of a claim or action against such indemnified party in respect of which indemnity may be sought hereunder, notify the indemnifying party in writing of the claim or action and the indemnifying party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such indemnified party, and shall assume the payment of all fees and expenses; provided that the failure of any indemnified party to so notify the indemnifying party shall not relieve the indemnifying party of its obligations hereunder except to the extent that the indemnifying party is materially prejudiced by such failure to notify.  In any such action, any indemnified party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the sole expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) in the reasonable judgment of such indemnified party, representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them, in which case the fees and expenses of such counsel shall be at the sole expense of the indemnifying party; *provided* that in the event that the Company, as indemnifying party, is required to pay expenses of separate legal counsel for any one or more Selling Securityholders as indemnified party, the Company shall only be required to pay expenses for a single counsel, which shall be designated in writing to the Company by the Selling Securityholder with the largest number of Registrable Securities included in such registration.  All such fees and expenses shall be reimbursed as they are incurred.  The indemnifying party shall not be liable for any settlement of any claim or action effected without its written consent, which consent shall not be unreasonably withheld or delayed, but if settled with such consent, or if there be a final judgment for the plaintiff, the indemnifying party shall indemnify and hold harmless such indemnified parties from and against any loss or liability (to the extent stated above) by reason of such settlement or judgment.  No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened claim or action in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability arising out of such proceeding and imposes no obligations on such indemnified party other than the payment of monetary damages (which damages will be paid by the indemnifying party hereunder).

51

(d)     If the indemnification provided for in this Section 6.7 shall for any reason be unavailable (other than in accordance with its terms) to an indemnified party in respect of any Loss referred to therein, then the indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by the indemnified party as a result of such Loss in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and the indemnified party on the other.  The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. Notwithstanding anything to the contrary in this paragraph, no indemnifying party (other than the Company) shall be required to contribute any amount in excess of the amount by which the net proceeds received by such indemnifying party from the sale of Registrable Securities in the offering to which the Loss relates exceeds the amount of any damages which such indemnifying party has otherwise been required to pay by reason of such untrue statement or omission.  The parties to this Agreement agree that it would not be just and equitable if contribution pursuant to this paragraph were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in Section 6.7(c).  No Person who is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) that results in a Loss shall be entitled to contribution with respect to such Loss from any Person who is not guilty of such fraudulent misrepresentation.

(e)     Indemnification and contribution similar to that specified in the preceding paragraphs of this Section 6.7 (with appropriate modifications) shall be given by the Company, the Selling Securityholders and the underwriters with respect to any required registration or other qualification of Registrable Securities under any state law or regulation or governmental authority.

(f)     The obligations of the parties under this Section 6.7 shall be in addition to any liability which any party may otherwise have to any other party. If indemnification is available under this Section 6.7, the indemnifying parties shall indemnify each indemnified party to the fullest extent permitted by Applicable Law and as provided in paragraphs (a) and (b) hereof without regard to the relative fault of said indemnifying parties or indemnified party.

(g)     The rights and obligations of the Company and the Selling Securityholders under this Section 6.7 shall survive the termination of this Agreement.

Section 6.8     Rule 144 Information.  The Company hereby covenants and agrees that as soon as practicable after the IPO, it shall (a) file such periodic reports as it is required to file under the Exchange Act or if the Company is not required to file such reports, it shall, upon the reasonable request of any Securityholder, use commercially reasonable efforts to make publicly available such information as is necessary to permit such Securityholder to sell Registrable Securities pursuant to Rule 144 under the Securities Act and (b) use commercially reasonable efforts to take such further action as any Securityholder may reasonably request, to the extent such action is necessary to permit such Securityholder to sell Registrable Securities pursuant to Rule 144 under the Securities Act.

52

Section 6.9     Transfer of Registration Rights.  A Securityholder may Transfer all or any portion of its registration rights under this Article VI with respect to any of its Registrable Securities in connection with any Transfer of such Registrable Securities that fully complies with the terms and conditions of this Agreement; provided that any such recipient will be subject to the limitations with respect to such registration rights that are set forth in this Agreement, including with respect to the threshold ownership levels required to have certain rights.  Any other purported direct or indirect Transfer of such registration rights by any Securityholders shall be null and void and of no force or effect.

Section 6.10    Grant of Additional Registration Rights.  Except for the registration rights granted pursuant to this Article VI, the Company shall not grant any registration rights with respect to shares of Common Stock to any other Person without the prior written consent of Securityholders holding a majority of the Fully Diluted Securities at such time unless such registration rights so granted do not materially affect the rights of the Securityholders under this Agreement with respect to their priority following the IPO.

Section 6.11    Termination.  All of the Company's obligations to register Registrable Securities under Sections 6.1 and 6.2 shall terminate on the date on which the Securityholder cease to beneficially own any Registrable Securities.

## ARTICLE VII
## CORPORATE OPPORTUNITIES

Section 7.1     Corporate Opportunities. Notwithstanding any duty otherwise existing at law or in equity, to the fullest extent permitted by Applicable Law, the Company and the Securityholders agree that:

(a)      Any of the Securityholders who are not employed by the Company or any of its Subsidiaries, each Director who is employed by an Appointing Person or any of its Affiliates, any of the foregoing Persons' respective Affiliates, and any one or more of the respective managers, directors, principals, officers, employees and other representatives of such Persons or their respective Affiliates (the foregoing Persons being referred to, collectively, as "**Identified Persons**") may now engage, may continue to engage, or may, in the future, engage in the same or similar activities or lines of business as those in which the Company or any of its Affiliates, directly or indirectly, now engage or may engage or other business activities that overlap with, are complementary to, or compete with those in which the Company or any of its Affiliates, directly or indirectly, now engage or may engage (any such activity or line of business, an "**Opportunity**"). No Identified Person shall, as a result of its capacity as such, have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity or (ii) otherwise competing with the Company or any of its Affiliates. No Identified Person shall, as a result of its capacity as such, have any duty or obligation to refer or offer to the Company or any of its Affiliates any Opportunity except for any Identified Person who is a Director, who shall have the duty to refer or offer to the Company any Opportunity that is expressly first presented in writing to such Director in his or her capacity as a Director or if knowledge of such Opportunity is first acquired by such Director solely as a result of such Director's position as a Director, and the Company hereby renounces any interest or expectancy of the Company in, or in being offered, an opportunity to participate in any other

53

Opportunity which may be a corporate (or analogous) or business opportunity for the Company or any of its Affiliates.

(b)     In the event that any Identified Person acquires knowledge of a potential transaction or other corporate (or analogous) or business opportunity which may be an Opportunity for the Company or any of its Affiliates, such Identified Person shall have no duty to communicate or offer such Opportunity to the Company or any of its Affiliates and shall not be liable to the Company or the Securityholders for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself (or any of its Affiliates), or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person); provided that each Identified Person who is a Director shall have the duty to communicate or offer to the Company any Opportunity that is expressly first presented in writing to such Director in his or her capacity as a Director or if knowledge of such Opportunity is first acquired by such Director solely as a result of such Director's position as a Director, and the Company does not waive any claims in respect of breaches of fiduciary duty arising therefrom. For the avoidance of doubt, none of the waivers of the corporate opportunities doctrine or related duties set forth in this Section 7.1 shall apply to any Officer, employee or consultant of the Company or any of its Subsidiaries.

(c)     Except as provided herein with respect to any Securityholder that becomes a Disqualified Person (and without limiting such provisions of this Agreement), the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more Persons (such Persons, collectively, "**Related Companies**") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Company , any Securityholders or any of their respective Affiliates (including Disqualified Persons), and (i) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement, the Certificate or the Bylaws shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement, the Certificate or the Bylaws shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (A) the ownership by an Identified Person of any interest in any Related Company, (B) the affiliation of any Related Company with an Identified Person or (C) any action taken or omitted by an Identified Person in respect of any Related Company, (ii) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Company , any of the Securityholders or any of their respective Affiliates, (iii) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Company , any of its Securityholders or any of their respective Affiliates and (iv) except as set forth in Section 7.1(a) and Section 7.1(b), the Identified Persons are not and shall not be obligated to disclose to (A) the Company or any of its Subsidiaries or (B) any of the Securityholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, and shall not be obligated to refrain from or in any respect to be restricted in competing against the Company , any of the Securityholders or any of their respective Affiliates in any such business or as to any such opportunities.

54

(d)     In addition to and notwithstanding the foregoing provisions of this <u>Article VII</u>, a corporate (or analogous) or business opportunity shall not be deemed to be an Opportunity for the Company or any of its Affiliates if it is an opportunity (i) that the Company is not legally able or contractually permitted to undertake or (ii) which the Board has affirmatively elected to refrain from continued evaluation or pursuing.

Any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the Company shall be deemed to have notice of and to have consented to the provisions of this <u>Article VII</u>.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1     <u>Notices</u>. All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (a) when delivered by hand, facsimile or electronic transmission to the party to be notified, (b) one (1) Business Day after deposit with a national overnight delivery service with next-business-day delivery guaranteed, (c) three (3) Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested, in each case addressed to the party to be notified at the addresses set forth below such party's respective signature to this Agreement, or (d) when posted to the virtual data room described in <u>Section 3.1(b)(i)</u>, so long as the Company has taken such action as is necessary on its part to push email notifications to the Securityholders of uploads to such data room (or, if the Company is not able to push such notifications to the Securityholders, then all action necessary on its part to permit the Securityholders to opt into notifications of such uploads); <u>provided</u>, <u>however</u>, this clause (d) shall not apply to notices, requests, waivers and other communications to any Appointing Person other than pursuant to Information Rights. Any party to this Agreement may change its address for purposes of notice hereunder by giving ten (10) days' written notice of such change to the Company, in the manner provided in this <u>Section 8.1</u>. Failure to mail a notice or communication to a Securityholder or any defect in it shall not affect its sufficiency with respect to other Securityholders.

Any notices, requests, waivers and other communications required or permitted hereunder shall be addressed as follows (or at such other address as may be substituted by notice given as herein provided):

If to the Company:

> Hornbeck Offshore Services, Inc.
> 103 Northpark Blvd., Suite 300
> Covington, LA 70433
> Attention:     James O. Harp, Jr., Executive Vice President and Chief Financial Officer
> Email:     james.harp@hornbeckoffshore.com

with a copy to:

> Hornbeck Offshore Services, Inc.

55

> 103 Northpark Blvd., Suite 300
> Covington, LA 70433
> Attention: Samuel A. Giberga, Executive Vice President, General Counsel and
>      Chief Compliance Officer
> Email:  Samuel.giberga@hornbeckoffshore.com

If to any Securityholder, at its address, if any, provided in a written notice to the Company from such Securityholder.

Section 8.2    Survival; Termination. This Agreement, and the Company's and the Securityholders' respective rights and obligations hereunder shall remain in effect until terminated (a) by agreement of the Company and Securityholders representing at least ninety percent (90%) of the Fully Diluted Securities at such time or (b) upon the consummation of a Qualified IPO; provided that (i) the provisions of this Agreement shall survive any such termination to the extent necessary for any Person to enforce any right of such Person that accrued hereunder prior to or on account of such termination, (ii) each of the provisions of Article VI shall survive the termination of this Agreement upon the consummation of a Qualified IPO, (iii) the right to appoint or nominate directors to the Board pursuant to Section 2.1 shall survive the termination upon the consummation of a Qualified IPO as may be modified to the extent necessary to meet applicable listing requirements of any securities exchange or quotation system on which the Company's Common Stock is expected to be listed or quoted.  This Agreement shall terminate automatically with respect to any Securityholder when such Securityholder ceases to beneficially own any Company Securities; provided that (A) the provisions of this Agreement shall survive any such termination to the extent necessary for any Person to enforce any right of such Person that accrued hereunder prior to or on account of such termination, and (B) Section 3.1(c) and this Article VIII shall survive any such termination and shall terminate as set forth therein.

Section 8.3    Governing Law. This Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

Section 8.4    Submission to Jurisdiction. Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought in Delaware Chancery Court; provided that if such court does not have jurisdiction then such action, suit or proceeding must be brought in the United States District Court for the District of Delaware. Each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 8.5    Waiver of Jury Trial. Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising

56

out of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.5 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

Section 8.6    Successors and Assigns. Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any party hereto pursuant to any Transfer of Company Securities or otherwise, except that each Securityholder may assign all or a portion of its rights hereunder to any Transferee in connection with a Transfer of Company Securities by such Securityholder to such Transferee in compliance with the terms of this Agreement. Subject to the rights and restrictions on Transfers set forth in this Agreement, this Agreement shall be binding upon the Company, each Securityholder, and their respective successors and permitted assigns.

Section 8.7    Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile, by electronic mail in "portable document format" (".pdf") form, or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 8.8    Severability. Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction (including any provision hereof that would violate the Jones Act) is, as to such jurisdiction, ineffective to the extent of any such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof, or affecting the validity, enforceability or legality of such provision in any other jurisdiction, unless the ineffectiveness of such provision would result in such a material change as to cause completion of the transactions contemplated hereby to be unreasonable. Upon a determination that any provision of this Agreement is prohibited, unenforceable or not authorized (including any determination that any provision hereof that would violate the Jones Act), the parties hereto agree to negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

#93253667v11
#93253667v16

Section 8.9    Specific Performance. Each party hereto agrees that irreparable harm would occur to the other parties hereto, for which monetary damages would not be an adequate remedy, in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, including if any party hereto fails to take any action required of them hereunder, or threatened to be breached. It is accordingly agreed that, in addition to any and all other rights and remedies that may be available to them at law or equity, the parties hereto shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each party hereto agrees that it will not oppose the granting of an injunction or a temporary restraining order, specific performance or other equitable relief from a court of competent jurisdiction (without any requirement to post bond) on the basis that (i) the other party has an adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or in equity. Each of the parties hereto hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate and (ii) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.10    No Waivers; Amendments; Termination.

(a)    No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the Company or any Securityholder at law or in equity or otherwise.

(b)    Subject to Section 2.2(a), and without limiting the rights of any Securityholders under the other Organizational Documents, this Agreement and the other Organizational Documents may only be amended, waived or otherwise modified (including restated or supplemented) (whether by merger, consolidation or otherwise) or terminated by an instrument in writing executed by the Securityholder(s) beneficially owning at least 75% of the Fully Diluted Securities, which must include each Appointing Person; *provided*, that no provision of this Agreement or the other Organizational Documents shall be amended, waived or otherwise modified (including restated or supplemented) (whether by merger, consolidation or otherwise) or terminated (i) (A) in a manner that is disproportionately and materially adverse to any Securityholder (as compared to other Securityholders holding the same class of Company Securities), (B) in a manner that would materially and adversely affect the rights of any Securityholder provided in Article III, Sections 4.6, 4.7, or Article V, or (C) in a manner that would materially increase the transfer restrictions applicable to any Securityholder, in each case without the prior written consent of such Securityholder so affected or (ii) in a manner that would reduce the threshold for termination set forth in Section 8.2 without the prior written consent of the Securityholders beneficially owning at least ninety percent (90%) of the Fully Diluted Securities

58

#93253667v11
#93253667v16

at such time. Notwithstanding the foregoing, Exhibit B-4 may be amended by resolution of the Board, and Schedule 1 may be amended by resolution of the Board with the requisite consent of the Appointing Persons. The Company shall give prompt written notice to the Securityholders of any amendments, waivers or modifications of the provisions of this Agreement.

Section 8.11    Non-Recourse. All claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties in the preamble to this Agreement ("**Contracting Parties**"). No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach; and, to the maximum extent permitted by law, each Contracting Party hereby waives and releases all such liabilities, claims, causes of action, and obligations against any such Non-Party Affiliates.

Section 8.12    Action by Appointing Persons.

(a)    Any action to be taken or consent or approval to be given by an Appointing Person pursuant to this Agreement shall be deemed taken, consented to or approved upon the affirmative consent or approval by Securityholders comprising such Appointing Person that beneficially owns a majority of the Fully Diluted Securities beneficially owned by such Appointing Person.

(b)    Any Appointing Person may exercise the rights, and grant any approval or consent, under this Agreement of the other Securityholders comprising such Appointing Person.

Section 8.13    Further Assurances. Each party shall cooperate and shall take such further action and shall execute and deliver such further documents, certificates, instruments, conveyances, and assurances and to take such further actions as may be reasonably requested by any other party hereto in order to carry out the provisions and purposes of this Agreement.

Section 8.14    Entire Agreement. This Agreement contains the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, among the parties hereto with respect to such matters. In the event of any inconsistency or conflict between this Agreement and any other Organizational Document, the Securityholders and the Company shall, to the extent permitted by Applicable Law, amend such other Organizational Document to comply with the terms of this Agreement.

#93253667v11
#93253667v16

Section 8.15    Independent Agreement by the Securityholders. The obligations of each Securityholder hereunder are several and not joint with the obligations of any other Securityholder, and no provision of this Agreement is intended to confer any obligations on any Securityholder vis-à-vis any other Securityholder. Nothing contained herein, and no action taken by any Securityholder pursuant hereto, shall be deemed to constitute the Securityholders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Securityholders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

Section 8.16    No Third-Party Beneficiaries. Except for Section 7.1 and Section 8.10, this Agreement is for the sole benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.17    Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

[<em>Signature Pages Follow</em>]

60

#93253667v11
#93253667v16

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the date first written above.

**COMPANY:**

Hornbeck Offshore Services, Inc.

By: _____
Name: [●]
Title:  [●]

*[Signature Page to Securityholders Agreement]*

#93253667v11
#93253667v16

**SECURITYHOLDERS:**

[SECURITYHOLDER]

By: _____
Name:
Title:

ADDRESS:

[ADDRESS]
[ADDRESS]
Attention: [●]
Email: [●]

With a copy to:

[ADDRESS]
[ADDRESS]
Attention: [●]
Email: [●]

[*Signature Page to Securityholders Agreement*]

#93253667v11
#93253667v16

## Schedule I

### Competitors

1.  Offshore Service Vessels, L.L.C.
2.  Harvey Gulf International Marine, LLC
3.  SEACOR, Inc.
4.  SEACOR Marine Holdings Inc.
5.  Otto Candies, L.L.C.
6.  Tidewater, Inc.
7.  Crowley Maritime Corporation
8.  Tote, Inc.
9.  GulfMark Offshore Inc.
10. Jackson Offshore Operators L.L.C.
11. A.P. Møller - Mærsk A/S
12. Oceaneering International, Inc.
13. DOF ASA
14. Mantenimiento Express Maritimo S.A.P.I. de C.V.
15. Helix Energy Solutions Group, Inc.
16. Bordelon Marine Inc.
17. Bollinger Shipyards, L.L.C.
18. Adriatic Marine, L.L.C.
19. Guice Offshore, LLC
20. Laborde Marine LLC
21. Odyssea Marine Inc.
22. Sea Mar Offshore LLC
23. C&G Boats, Inc.
24. Candy Fleet, LLC
25. Foss Maritime Company, LLC
26. Saltchuk Resources, Inc.
27. Sause Bros. Inc.
28. Funds, accounts and other entities owned or managed by Black Diamond Capital Management or any of its Affiliates

**Exhibit A**

**FORM OF JOINDER AGREEMENT**

This Joinder Agreement (this "Joinder Agreement") is made as of [_____ ___, 20__] by the undersigned (the "Transferee") in accordance with the Securityholders Agreement of Hornbeck Offshore Services, Inc. (the "Company") dated as of [●], 2020 (as the same may be amended from time to time in accordance with its terms, the "Securityholders Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Securityholders Agreement.

The Transferee hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, it shall become a party to the Securityholders Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the Securityholders Agreement as though an original party thereto and shall be deemed and is hereby admitted as, a Securityholder for all purposes thereof and entitled to all the rights incidental thereto, as of the date first written above.

The Transferee hereby represents and warrants that (i) the Transferee has all requisite power and authority to execute this Joinder Agreement and to perform its obligations under the Securityholders Agreement and (ii) the execution and delivery of this Joinder Agreement and the performance of Transferee's obligations under the Securityholders Agreement will not conflict with or constitute a default under any material contract to which the Transferee is a party, constitute a default under the Transferee's governing documents or conflict with or constitute a violation of any Applicable Law.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the Securityholders Agreement.

[TRANSFEREE]

By: _____

    Name:
    Title:

#93253667v11
#93253667v16

**Exhibit B-1**

Each of the following will constitute "**Major Actions**", which may be approved by the Board individually, through consent to delegate authority in the Officer Delegation of Authority, or otherwise:

(a)     **<u>Financial Matters</u>**

(1)     <u>Annual Budget</u>.  Establishment, approval, adoption or modification of the Budget and business plan for any fiscal year (as adopted, the "**Approved Budget**");

(2)     <u>Exceeding the Budget</u>.  Making, or committing to make, any expenditures (other than contractually reimbursable expenditures that would not reasonably be expected to result in available cash falling below certain minimum thresholds approved by the Board in the Company's cash management plan, or otherwise) (i) not provided for in the Approved Budget then in effect in excess of $10,000,000 in the aggregate during any corresponding fiscal year, or (ii) covered by the then effective Approved Budget that, in any individual budgeted event or item, exceeds, (A) with respect to any operating expenditure, the lesser of (x) 5% of the budgeted expense line item amount approved or (y) $10,000,000 in the aggregate, and (B) with respect to any capital expenditure, $10,000,000, in each case, during any corresponding fiscal year;

(3)     <u>Issuances</u>.  Issuance of (i) any Company Securities or (ii) any Subsidiary Securities, in each case in this <u>clause (ii)</u> other than  any issuance by a Subsidiary to the Company or any other Subsidiary of the Company;

(4)     <u>Redemptions</u>.  Redeem, repurchase, retire, combine, split or reclassify any Company Securities or Subsidiary Securities or redeem or repurchase any indebtedness of the Company or any of its Subsidiaries not required by the terms of such indebtedness;

(5)     <u>Dividends and Distributions</u>.  Authorization or payment of any dividend or distribution (other than dividends or distributions from any wholly owned subsidiary of the Company to the Company or any other wholly owned subsidiary thereof);

(6)     <u>Indebtedness</u>.  Any guarantee, assumption or incurrence of, or grant of any security interests to secure, indebtedness of the Company or any Subsidiary in excess of $10,000,000 in the aggregate, other than (i) unsecured trade indebtedness incurred in the ordinary course of business and in amounts consistent with the Approved Budget then in effect, (ii) such other indebtedness that is authorized pursuant to the Approved Budget then in effect, and (iii) the indebtedness already existing on the date of this Agreement;

(7)     <u>Encumbrances</u>.  Creation of any mortgage or charge or permitting the creation of or suffering to exist any mortgage or fixed or floating charge, lien (other than a lien arising by operation of law) or other encumbrance over the whole or any part of the undertaking, property or assets of the Company or any Subsidiary other than any mortgage, charge, lien or other encumbrance securing obligations not in excess of $10,000,000 in the aggregate, other than (x) trade credit obligations incurred in the ordinary course of business and in amounts consistent

with the Approved Budget then in effect and (y) such other obligations that are authorized pursuant to the Approved Budget then in effect; and

(8)     <u>Loans and Investments</u>.  Making investments in or loaning any funds or money, extending credit, or otherwise providing financial accommodations to any entity or person other than a subsidiary in excess of $10,000,000 in the aggregate outside the ordinary course of business.

(b)     **Exit and Acquisitions**

(1)     <u>Entity Organization</u>.  Amendment to or waiver of any of the provisions of the Organizational Documents, entering into or approving any merger, consolidation, amalgamation, recapitalization or other form of business combination or Change of Control involving the Company or any of its Subsidiaries (whether by sale of Equity Securities, assets or otherwise) or effecting any change in corporate structure that would result in the Company not being taxable as a corporation;

(2)     <u>Liquidation, Dissolution, or Bankruptcy</u>.  Commencement of any liquidation, dissolution or voluntary bankruptcy, administration, insolvency proceeding, recapitalization or reorganization of the Company or any of its Subsidiaries in any form of transaction, any arrangement with creditors, or the consent to entry of an order for relief in an involuntary case, or the conversion of an involuntary case to a voluntary case, or the consent to any plan of reorganization in any involuntary or voluntary case, or the consent to the appointment or taking possession by a receiver, trustee or other custodian for all or any portion of its property, or otherwise seek the protection of any applicable bankruptcy or insolvency law;

(3)     <u>Establishment of Subsidiaries</u>.  To the extent not otherwise expressly approved as part of an approved annual business plan, the establishment of any Subsidiaries and the terms, provisions and conditions of its governing agreements and any amendments or modifications thereof and the designation of any persons to serve on its board of directors or other governing body;

(4)     <u>Transfers of Assets</u>.  Any Transfer of assets of the Company or any of its Subsidiaries (including equity interests in any entity and any intellectual property of the Company or any of its Subsidiaries) in any transaction or series of related transactions, except for Transfers of immaterial assets in a single transaction or series of related transactions with an aggregate fair market value of less than $10,000,000;

(5)     <u>Acquisitions</u>. To the extent not otherwise expressly approved as part of an Approved Budget and business plan for the applicable fiscal year, the making of, or committing to make, any capital expenditure or purchase, lease (including the assumption of any existing lease) or other acquisition of assets (including Equity Securities of any entity) by the Company or any of its Subsidiaries for consideration (including assumed indebtedness) in excess of $10,000,000; and

(6)     Catch-All.  Entering into any corporate transaction, including any joint venture, investment, recapitalization, reorganization or contract with any other Person or acquisition of any securities or assets of another entity or person, whether in a single transaction or series of related transactions, in excess of $10,000,000.

(c)     **Board and Employee Matters**

(1)     Hiring and Compensation.  With respect to any Officer of the Company or any of its Subsidiaries:  (i) appointment, retention or removal of, or entering into any employment agreement or other compensation arrangement with, such person or (ii) the amendment or other modification of any employment agreement or other compensation arrangement entered into with such person, except where such agreement, arrangement, amendment or modification would not result in the payment of compensation to such person in excess of $100,000;

(2)     Incentive Plans.   (i) Establishment, adoption, entry into, amendment or modification to or termination of any equity incentive plan or bonus incentive plan, and (ii) granting any awards, canceling any awards or re-allocating any awards under an equity incentive plan or a bonus incentive plan, or the payment of cash bonuses to any manager, Officer, Director or employee;

(3)     Severance Payments.  Granting any severance or termination payment to any present or former manager, officer, director or employee of the Company or any of its Subsidiaries other than pursuant to a management incentive plan expressly permitted by this Agreement;

(4)     Benefit Plans.  Establishment, adoption, entering into, amendment or modification to or termination of any employee benefit plan; and

(5)     Delegation of Authority.  Establishment, adoption, entering into, amendment or modification to or termination of the Officer Delegation of Authority.

(d)     **Other Non-Ordinary Course Transactions**

(1)     Transactions with Securityholders.  Other than transactions expressly permitted by this Agreement, entering into any agreement or other transaction between the Company or any Subsidiary, on the one hand, and any Securityholders, executive officers, or directors or Affiliates of any of the foregoing or any family members thereof, on the other (including, without limitation, any purchase, sale, lease or exchange of any property, or rendering of any service or modification, waiver or amendment of or failure to enforce any existing agreement or arrangement (including, for the avoidance of doubt, the Warrant Agreements), or any loans or advances to or guarantees for the benefit of any Securityholder, officers or directors of the Company or any Subsidiary, other than in the ordinary course of business as part of travel advances, relocation advances or salary);

(2)     Change in Name; Restriction on Business.  Making (i) any change to the name of the Company or any of its Subsidiaries, (ii) any material change in the business of the Company

or (iii) any of its Subsidiaries or entering into any contract containing a material restriction on the business activities of the Company or any of its Subsidiaries;

(3)     Material Contracts. Execution, termination or material amendment of any material contract of the Company or any of its Subsidiaries not entered into in the ordinary course of business and the consequences of which could reasonably be expected, in the event that the benefits hoped to be obtained thereunder are not realized, to have a material adverse impact on the profits and losses or net cash flows of the Company, other than any material contract that is authorized pursuant to an Approved Budget and which does not involve payments to or from the Company, individually or in the aggregate, in excess of $10,000,000;

(4)     Litigation. Initiation of material litigation or similar proceedings or the compromise or settlement of any lawsuit or administrative matter (including with respect to the Gulf Island Shipyards, LLC litigation) where the amount that the Company or any of its Subsidiaries could be required to pay individually or in the aggregate pursuant to such compromise or settlement is in excess of $10,000,000, or that could have a material effect on the Company or any of its Subsidiaries;

(5)     Government Communications.   Making any filing, notice or other material communication with any governmental, regulatory or accreditation authority, or taking any action that would require the Company or any of its Subsidiaries to make any filing, notice or other material communication with any governmental, regulatory or accreditation authority; and

(6)     Definition of "Competitor." Any change to Schedule I of this Agreement.

**Exhibit B-2**

Each of the following will constitute "**Majority Appointing Person Actions**":

(1)      Issuances. Issuance of any Company Securities or Subsidiary Securities (x) at a common equity valuation of the Company and its Subsidiaries of less than $143,000,000 but greater than or equal to $114,400,000 (the "**Valuation Range**") if the aggregate value of such issuance, taken together with all other issuances of Company Securities or Subsidiary Securities at a common equity valuation of the Company and its Subsidiaries in the Valuation Range made after the Effective Date, would be in excess of $10,000,000 in the aggregate or (y) at a common equity valuation of the Company and its Subsidiaries of less than $114,400,000, in each case, without restricting or taking into account issuances (i) by reason of stock dividends, split, combinations or the like, (ii) to officers, employees or directors of, or consultants to, the Company or any of its Subsidiaries pursuant to any purchase plan or arrangement, option plan, or other incentive plan or agreement approved by the Board, or (iii) to any party that is not affiliated with the Company or any of its Affiliates or any Appointing Person or any of its Affiliates as purchase consideration in connection with acquisitions approved by the Board;

(2)      Redemptions. Redeem, repurchase, retire, combine, split or reclassify any Company Securities or Subsidiary Securities;

(3)      Organizational Documents.  Amendment to or waiver of any of the provisions of the Organizational Documents of the Company other than in connection with (i) the issuance of Company Securities by the Company made in compliance with the terms of this Agreement, (ii) entering into or approving any IPO, merger, consolidation, amalgamation, recapitalization or other form of business combination or Change of Control involving the Company or any of its Subsidiaries (whether by sale of Equity Securities, assets or otherwise) otherwise made in compliance with the terms of this Agreement;

(4)      Entity Organization. Converting the Company to another type of business entity;

(5)      Change in Business.  Making any material change in the business of the Company or any of its Subsidiaries;

(6)      Transactions with Appointing Persons. Entering into any agreement or other transaction between the Company or any Subsidiary, on the one hand, and any Appointing Person, any Affiliate of an Appointing Person or any of their respective executive officers or directors, on the other (such Appointing Person, an "**Interested Appointing Person**") (including, without limitation, any purchase, sale, lease or exchange of any property, or rendering of any service or modification, waiver or amendment of or failure to enforce any existing agreement or arrangement (including, for the avoidance of doubt, the Warrant Agreements), or any loans or advances to or guarantees for the benefit of any Appointing Person, its Affiliates or their respective officers or directors, other than in the ordinary course of business as part of travel advances, relocation advances or salary to employees), but specifically excluding issuances of Company Securities and

the issuance of debt securities and borrowing under loan agreements, in each case, in compliance with the terms of this Agreement (including Section 5.1 hereof) (it being understood and agreed that any Appointing Person that is an Interested Appointing Person with respect to any matter contemplated by this item (6) shall be deemed not to be an Appointing Person for purposes of determining whether such matter has been approved under Section 2.2(a)(ii) of this Agreement); and

(7)     Definition of "Competitor." Any change to Schedule I of this Agreement.

**Exhibit B-3**

Each of the following will constitute "<u>Unanimous Appointing Person Actions</u>":

      (1)      <u>Dividends and Distributions</u>.   Authorization or payment of any dividend or distribution by the Company.

      (2)      <u>Board Size</u>.  Increases to the size of the Board.

**Exhibit B-4**

The Board will delegate authority to the Chief Executive Officer to take or authorize taking any of the following actions without further consent or approval by the Board:

(1)    <u>Government Contracts</u>.

    (a)    To enter into, extend, continue, and amend contracts with the United States of America or any agency or division thereof, or with any branch of the military of the United States of America, or any agency or division thereof if either (i) such contract may not be shared with persons without certain levels of government security clearance or (ii) involves payments to or from the Company in any 12-month period, individually or in the aggregate, of $10,000,000 or less (the "**Government Contracts**");

    (b)    To seek and maintain personnel and facility security clearances necessary for the performance of Government Contracts;

    (c)    To make expenditures necessary and appropriate for the performance of Government Contracts as (i) provided in the Approved Budget, (ii) which are permitted without prior Board approval under <u>paragraph (a)(ii)</u> or (iii) which will be reimbursed within one hundred eighty (180) days of such expenditure, excluding expenditures that would reasonably be expected to result in available cash falling below certain minimum thresholds approved by the Board in the Company's cash management plan, or otherwise;

    (d)    To maintain the confidentiality or secrecy required to perform such contracts including restricting who sensitive information can be shared with (including, but not limited to, the Board, Observers and/or Appointing Persons); <u>provided</u> that such Government Contract does not result in a material change to the business of the Company or its Subsidiaries, as applicable; and

(2)    <u>Jones Act</u>.  Take action by way of advocacy, lobbying, litigation or otherwise necessary in support of the Jones Act provided such financial support shall not exceed $250,000 annually without prior approval of the Board.

**Exhibit C**

**FORM OF CONFIDENTIALITY AGREEMENT**

#93253667v11
#93253667v16

## Exhibit B

- This Exhibit B contains the following documents:

  - Exhibit B(i):   Members of the Reorganized Hornbeck Board and the Officers of Reorganized Hornbeck

  - Exhibit B(ii):   Redline to Original Plan Supplement *Exhibit C*

**Exhibit B(i)**

**Members of the Reorganized Hornbeck Board and the Officers of Reorganized Hornbeck**

*Exhibit B(i)*

**Members of the Reorganized Hornbeck Board and the Officers of Reorganized Hornbeck**

As of the Effective Date and subject to the Restructuring Support Agreement and the New Securityholders Agreement and the New Corporate Governance Term Sheet, the terms of the current members of the board of directors or managers (as applicable) of each Debtor shall expire, and, without further order of the Bankruptcy Court, the Reorganized Hornbeck Board shall be appointed.

The Reorganized Hornbeck Board will initially consist of directors who will be designated in accordance with the terms of the Restructuring Support Agreement and the New Securityholders Agreement and Corporate Governance Term Sheet, including, more specifically, Todd M. Hornbeck and directors designated by Appointing Persons (as defined in the New Securityholders Agreement and New Corporate Governance Term Sheet).

The officers of Reorganized Hornbeck will initially consist of Todd M. Hornbeck as President and Chief Executive Officer, James O. Harp, Jr. as Executive Vice President & Chief Financial Officer, Carl G. Annessa as Executive Vice President and Chief Operating Officer, John S. Cook as Executive Vice President, Chief Commercial Officer and Chief Information Officer, Samuel A. Giberga as Executive Vice President, General Counsel and Chief Compliance Officer and any other officers appointed in accordance with the New Corporate Governance Documents. On the Effective Date, board of managers, board of directors or other governing body in existence prior to the Effective Date, along with its respective members, if any, and the officers, at each Debtor other than Reorganized Hornbeck, shall be constituted in accordance with the New Securityholders Agreement.

**Exhibit B(ii)**

**Redline to Original Plan Supplement** *Exhibit C*

*Exhibit ~~C~~B(i)*

**Members of the Reorganized Hornbeck Board <u>and the Officers of Reorganized Hornbeck</u>**

As of the Effective Date and subject to the Restructuring Support Agreement and the New Securityholder<u>s</u> Agreement and <u>the New</u> Corporate Governance Term Sheet, the terms of the current members of the board of directors or managers (as applicable) of each Debtor shall expire, and, without further order of the Bankruptcy Court, the Reorganized Hornbeck Board shall be appointed.

The Reorganized Hornbeck Board will initially consist of directors who will be designated in accordance with the terms of the Restructuring Support Agreement and the New Securityholder<u>s</u> Agreement and Corporate Governance Term Sheet, including, more specifically, Todd M. Hornbeck and directors designated by Appointing Persons (as defined in the New Securityholder<u>s</u> Agreement and <u>New</u> Corporate Governance Term Sheet).

<u>The officers of Reorganized Hornbeck will initially consist of Todd M. Hornbeck as President and Chief Executive Officer, James O. Harp, Jr. as Executive Vice President & Chief Financial Officer, Carl G. Annessa as Executive Vice President and Chief Operating Officer, John S. Cook as Executive Vice President, Chief Commercial Officer and Chief Information Officer, Samuel A. Giberga as Executive Vice President, General Counsel and Chief Compliance Officer and any other officers appointed in accordance with the New Corporate Governance Documents. On the Effective Date, board of managers, board of directors or other governing body in existence prior to the Effective Date, along with its respective members, if any, and the officers, at each Debtor other than Reorganized Hornbeck, shall be constituted in accordance with the New Securityholders Agreement.</u>~~To the extent known, the identity of the other members of the initial Reorganized Hornbeck Board and the officers of Reorganized Hornbeck will be disclosed in a Plan Supplement, as amended, revised or supplemented prior to the commencement of the Confirmation Hearing.~~

**Exhibit C**

**New Warrants**

This <u>Exhibit C</u> contains the following documents:

- <u>Exhibit C(i)</u>:      New Creditor Warrants.

- <u>Exhibit C(ii)</u>:     Jones Act Warrants.

- <u>Exhibit C(iii)</u>:    Jones Act Anti-Dilution Warrants.

**Exhibit C(i)**

**New Creditor Warrants**

*Exhibit C*(i)

CREDITOR WARRANT AGREEMENT

Between

Hornbeck Offshore Services, Inc.,

AS ISSUER,

And

Computershare, Inc. and

Computershare Trust Company, N.A.,

collectively, AS WARRANT AGENT

[●], 2020

4811-0606-4572.8
#93247308v10

## TABLE OF CONTENTS

Section 1.    Certain Defined Terms ...........................................................................1

Section 2.    Appointment of Warrant Agent ...............................................................6

Section 3.    Issuance of Warrants; Form, Execution and Delivery ............................6

Section 4.    Transfer or Exchange .............................................................................8

Section 5.    Duration and Exercise of Warrants .......................................................12

Section 6.    Adjustment of Number of Shares Purchasable or Number of Warrants ................18

Section 7.    Cancellation of Warrants ......................................................................26

Section 8.    Mutilated or Missing Warrant Certificates ...........................................26

Section 9.    Reservation of Shares ............................................................................26

Section 10.   Legends .................................................................................................27

Section 11.   Notification of Certain Events; Corporate Action ................................27

Section 12.   Warrant Agent ......................................................................................29

Section 13.   Severability ..........................................................................................34

Section 14.   Holder Not Deemed a Stockholder .......................................................34

Section 15.   Notices to Company and Warrant Agent ..............................................34

Section 16.   Supplements and Amendments ..............................................................35

Section 17.   Termination ...........................................................................................36

Section 18.   Governing Law and Consent to Forum ..................................................36

Section 19.   Waiver of Jury Trial ...............................................................................36

Section 20.   Benefits of this Agreement .....................................................................37

Section 21.   Counterparts ...........................................................................................37

Section 22.   Headings ................................................................................................37

Section 23.   Confidentiality .......................................................................................37

Section 24.   Representations .......................................................................................37

i

4811-0606-4572.8
#93247308v10

Section 25.   No Suspension ...............................................................................................38

Section 26.   Withholding; Adjustments Relating to Withholding ...........................................38

| | |
|---|---|
| Exhibit A | Warrant Allocation Schedule |
| Exhibit B-1 | Form of Face of Global Creditor Warrant Certificate |
| Exhibit B-2 | Form of Face of Individual Warrant Certificate |
| Exhibit B-3 | Form of Election to Exercise Warrant for Holders of Direct Registration Warrants |
| Exhibit C | Form of Assignment |
| Exhibit D | Warrant Summary |

4811-0606-4572.8
#93247308v10

This CREDITOR WARRANT AGREEMENT (this "Agreement") is dated as of [●], 2020, between Hornbeck Offshore Services, Inc., a Delaware corporation, as issuer (the "Company"), and Computershare, Inc., a Delaware corporation, and its wholly owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company (collectively, including any successors thereto, the "Warrant Agent").

W I T N E S S E T H

WHEREAS, in connection with the financial restructuring of the Company and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Plan") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*, the Company has agreed to issue to certain creditors of the Company as of immediately prior to the consummation of the restructuring contemplated by the Plan warrants which are exercisable or convertible to purchase (i) shares of the Company's common stock, par value $0.00001 per share ("Common Stock"), or (ii) Warrants (as defined in the Jones Act Warrant Agreement), as determined herein, subject to adjustment as provided herein (the "Warrants");

WHEREAS, the Company desires to engage the Warrant Agent to act on behalf of the Company in connection with the issuance, registration, transfer, exchange, replacement, exercise, conversion and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, transfer, exchange, replacement, exercise and conversion of the Warrants as provided herein; and

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the Holders thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.   Certain Defined Terms. Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section 1. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Securityholders Agreement (as defined below).

"Act of Bankruptcy" means, with respect to any Person, the occurrence of any of the following events, conditions or circumstances: (a) such Person files a voluntary petition in bankruptcy or files any petition or consent seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under the Bankruptcy Code or any present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, or seeks or consents to, or acquiesces in, the appointment of any trustee, receiver, conservator or liquidator of such Person or of all or any substantial part of its properties (the term "acquiesce," as used in this definition, includes the failure to file a petition or motion to vacate or discharge any order, judgment or decree within twenty (20) days, after entry

1

of such order, judgment or decree); or (b) such Person makes a general assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Affected Holder" has the meaning specified in Section 16 hereof.

"Affiliate" means, with respect to any Person, any Person who, directly or indirectly, Controls, is Controlled by or is under common Control with that Person; *provided*, *however*, that for the avoidance of doubt no Holder shall be deemed an affiliate of any other Holder solely on account of ownership of Equity Securities of the Company or being party to the Securityholders Agreement, and no Holder shall be deemed an affiliate of the Company solely on account of being party to the Securityholders Agreement.

"Agreement" has the meaning specified in the preamble hereof.

"Applicable Law" means all applicable provisions of (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority, including the Jones Act; (ii) any consents or approvals of any Governmental Authority; and (iii) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Appropriate Officer" has the meaning specified in Section 3(c) hereof.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ § 101 et seq.

"Board" means the board of directors (or other applicable governing body) of the Company.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which state or federally chartered banking institutions in New York City, New York are not required to be opened.

"Cash Closing" has the meaning specified in Section 6(g) hereof.

"Cash Sale" means any merger, consolidation or other similar transaction to which the Company is a party and in which holders of Common Stock as of immediately prior to the consummation of such transaction (other than with respect to treasury shares and any shares of Common Stock held by the purchasing party(ies) in such transaction) are entitled to receive consideration consisting solely of cash upon cancellation of such Common Stock in such transaction.

"Cashless Conversion" has the meaning specified in Section 5(c)(ii) hereof.

"Charter" means, with respect to any Person, such Person's certificate or articles of incorporation, certificate of formation, articles of association or similar organizational document, in each case as may be amended from time to time.

"Commission" means the United States Securities and Exchange Commission.

2

4811-0606-4572.8
#93247308v10

"Common Stock" has the meaning specified in the recitals hereof.

"Company Liquidation Event" means any liquidation, dissolution or winding-up of the affairs of the Company, the termination of the legal existence of the Company or any Act of Bankruptcy or any other similar event or proceeding with respect to the Company, whether voluntary or involuntary, pursuant to which the holders of Common Stock are (subject to the liquidation preferences set forth in the Company's Charter) entitled to receive consideration consisting solely of cash.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract (including proxy) or otherwise. The terms "Controlled", "Controlled by" or "under common Control with" shall have correlative meanings.

"Convertible Securities" means any securities (directly or indirectly) convertible into or exchangeable or exercisable for Common Stock, but excluding Options.

"Definitive Warrants" has the meaning specified in Section 4(h)(i) hereof.

"Depository" has the meaning specified in Section 3(b) hereof.

"Direct Registration Warrant" has the meaning specified in Section 3(a) hereof.

"Effective Date" means [●], 2020.

"Excess Shares" has the meaning specified in the Company's Charter.

"Exchange Act" has the meaning specified in Section 4(h)(i) hereof.

"Exercise Price" means the initial exercise price for the Warrants as set forth in Section 5(b) hereof, as it may be adjusted from time to time as provided herein.

"Expiration Date" has the meaning specified in Section 5(a) hereof.

"Fair Market Value" shall mean (i) with respect to Common Stock, at any time the Common Stock is listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the arithmetic average of the daily VWAP of a share of Common Stock for the ten (10) consecutive trading days on which shares of Common Stock traded immediately preceding the date of measurement; or (ii) otherwise, the value of an asset as reasonably determined in good faith by the Board assuming such asset was sold in an arm's-length transaction between a willing buyer and a willing seller occurring on the date of valuation, taking into account all relevant factors determinative of value (and giving effect to any transfer taxes payable in connection with such sale). For all purposes hereunder, the determination of the Fair Market Value by the Board (or compensation committee or similar committee of the Board) shall be deemed conclusive, final and binding (and shall not be subject to collateral attack for any reason).

3

4811-0606-4572.8
#93247308v10

"Fully Diluted Basis" means the aggregate number of issued and outstanding shares of Common Stock after giving effect to a hypothetical conversion, or exercise, as applicable, of all of the issued and outstanding Warrants (as defined in the Jones Act Warrant Agreement) (and not, for the avoidance of doubt, the Warrants) into shares of Common Stock, without regard to whether such Warrants (as defined in the Jones Act Warrant Agreement) are then convertible or exercisable in accordance with their terms or the terms of the Company's Charter (but disregarding and without giving effect to the issuance, conversion or exercise, as applicable, of any Common Stock, Common Stock Equivalent or other Equity Security of the Company issued or issuable pursuant to the MIP).

"Funds" has the meaning specified in Section 12(q) hereof.

"Global Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, including the U.S. Coast Guard, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Holder" means the beneficial or registered holder or holders of Warrants, unless the context otherwise requires.

"Individual Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Jones Act" shall mean, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d), and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering and interpreting such laws, statutes, rules and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. Coastwise Trade.

"Jones Act Warrant Agreement" means that certain Jones Act Warrant Agreement, dated as of [●], 2020, by and between the Company and the Warrant Agent, as may be amended from time to time.

"MIP" has the meaning specified in the Securityholders Agreement.

"Non-U.S. Citizen" means any Person who is not a U.S. Citizen.

"Options" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"Person" means any individual, corporation, general partnership, limited partnership, limited liability partnership, joint venture, association, joint-stock company, trust, limited liability

4

company, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" has the meaning specified in the recitals hereof.

"Reference Date" has the meaning specified in Section 6(f) hereof.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"Securityholders Agreement" means that certain Securityholders Agreement, dated as of [●], 2020, by and between the Company and the holders of Common Stock, Warrants and/or Warrants (as defined in the Jones Act Warrant Agreement) party thereto from time to time, as may be amended from time to time.

"Settlement Date" means the date that is the third Business Day after a Warrant Exercise Notice is delivered.

"Signature Guarantee" has the meaning specified in Section 4(c)(ii).

"U.S. Citizen" shall mean a citizen of the United States within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. Coastwise Trade.

"U.S. Coastwise Trade" shall mean the carriage or transport of merchandise or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 and any successor statutes thereto, as amended or supplemented from time to time.

"U.S. Maritime Laws" has the meaning specified in the Company's Charter.

"VWAP" means, for any trading day, the price for shares of Common Stock determined by the daily volume weighted average price per share of Common Stock for such trading day on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market or the NASDAQ Capital Market, as the case may be, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session), or if shares of Common Stock are not listed or quoted on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market or the NASDAQ Capital Market, as reported by the principal U.S. national or regional securities exchange on which shares of Common Stock are then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such trading day.

"Warrant Agent" has the meaning specified in the preamble hereof.

"Warrant Agent Office" has the meaning specified in Section 4(g)(iv) hereof.

"Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Warrant Exercise Notice" has the meaning specified in Section 5(c)(i) hereof.

5

4811-0606-4572.8
#93247308v10

"Warrant Register" has the meaning specified in Section 3(d) hereof.

"Warrant Shares" has the meaning specified in Section 3(a) hereof.

"Warrant Spread" has the meaning specified in Section 6(g) hereof.

"Warrant Statement" has the meaning specified in Section 3(b) hereof.

"Warrant Summary" has the meaning specified in Section 3(b) hereof.

"Warrants" has the meaning specified in the recitals hereof.

SECTION 2.   Appointment of Warrant Agent. The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the express terms and conditions set forth in this Agreement (and no implied terms and conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

SECTION 3.   Issuance of Warrants; Form, Execution and Delivery.

(a)      Issuance of Warrants. On the Effective Date, the Warrants shall be issued by the Company in the amounts and to the recipients specified in the Warrant Allocation Schedule attached hereto as Exhibit A. In accordance with Section 4 hereof and the Plan, the Company shall initially cause the Warrants to be issued in the form of Individual Warrant Certificates or by book-entry registration on the books and records of the Warrant Agent ("Direct Registration Warrants"). Thereafter, at the Company's option, the Company may, in its sole discretion, cause to be issued to the Depository one or more Global Warrant Certificates evidencing the Warrants and, in such event, the Company shall cause to be issued to the applicable registered Holders Warrants in the form of Global Warrant Certificates through the facilities of the Depository. Each Direct Registration Warrant and each Warrant evidenced by a Global Warrant Certificate or Individual Warrant Certificate shall entitle the Holder, upon proper exercise and payment or conversion of such Warrant, to receive from the Company, as adjusted as provided herein and subject to the Jones Act limitations on ownership of shares of Common Stock by Non-U.S. Citizens set forth in Section 5(m) hereof, if applicable, (i) one share of Common Stock or (ii) a number of Warrants (as defined in the Jones Act Warrant Agreement) exercisable or convertible into one share of Common Stock, as determined herein. The shares of Common Stock or Warrants (as defined in the Jones Act Warrant Agreement), as determined herein (as adjusted pursuant to Section 6 hereof), deliverable upon proper exercise or conversion of the Warrants are referred to herein as "Warrant Shares".

(b)      Form of Warrant. Subject to Section 4 of this Agreement, each of the Warrants shall be issued (i) in certificated form in the form of one or more individual certificates (the "Individual Warrant Certificates") in substantially the form of Exhibit B-2 attached hereto, with the form of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibit C attached hereto, and/or (ii) in the form of Direct Registration Warrants reflected on statements issued by the Warrant Agent from time to time to the Holders thereof reflecting such book-entry position (the "Warrant Statements"); *provided*, that following the Effective Date, the Company

6

may, in its sole discretion, issue, and allow the Warrants to be exchanged for, beneficial interests in one or more global certificates (the "Global Warrant Certificates") in substantially the form of Exhibit B-1 attached hereto, with the form of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibit C attached hereto.  Upon the issuance of the Global Warrant Certificates, any Individual Warrant Certificates or Direct Registration Warrants that are not subject to any transfer restrictions under applicable securities laws may be exchanged at any time for Global Warrant Certificates representing a corresponding number of Warrants, in accordance with Section 4(d) and the applicable procedures of the Depository and the Warrant Agent. The Warrant Statements representing Warrants shall include as an attachment thereto the "Warrant Summary" as set forth in Exhibit D attached hereto. The Global Warrant Certificates and Individual Warrant Certificates (collectively, the "Warrant Certificates") and Warrant Statements may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the rules and regulations of The Depository Trust Company or any successor thereof (the "Depository") in the case of the Global Warrant Certificates, with any law or with any rules made pursuant thereto or with any rules of any securities exchange or as may be determined, consistently herewith and reasonably acceptable to the Warrant Agent and provided, in each case, that they do not affect the rights, duties, obligations, responsibilities, liabilities or indemnities of the Warrant Agent, by (i) in the case of Warrant Certificates, the Appropriate Officers executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates and (ii) in the case of Warrant Statements, any Appropriate Officer. The Global Warrant Certificates shall be deposited as and when appropriate with the Warrant Agent and registered in the name of Cede & Co. or any successor thereof, as the Depository's nominee. Each Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(c)     Execution of Warrants. Warrant Certificates shall be signed on behalf of the Company by its Chief Executive Officer, its President, its Chief Financial Officer, its General Counsel, its Treasurer or any Executive or Senior Vice President of the Company (each, an "Appropriate Officer"), and by the Corporate Secretary or any Assistant Corporate Secretary of the Company. Each such signature upon the Warrant Certificates may be in the form of an electronic signature of any such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the electronic signature of any Appropriate Officer, the Corporate Secretary or any Assistant Corporate Secretary who shall have been serving as an Appropriate Officer, the Corporate Secretary, or an Assistant Corporate Secretary at the time of entering into this Agreement or issuing such Warrant Certificate. If any Appropriate Officer, the Corporate Secretary or any Assistant Corporate Secretary who shall have signed any of the Warrant Certificates shall cease to be such Appropriate Officer, the Corporate Secretary or an Assistant Corporate Secretary before the Warrant Certificates so signed shall have been countersigned by the Warrant Agent or disposed of by the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of as though such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary had not ceased to be such Appropriate Officer,

7

Corporate Secretary or Assistant Corporate Secretary, and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary, although at the date of the execution of this Agreement any such person was not such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary. Warrant Certificates shall be dated the date of countersignature by the Warrant Agent and shall represent one or more whole Warrants.

(d)     Countersignature. Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to countersign and accompanied by Warrant Certificates duly executed on behalf of the Company, the Warrant Agent shall countersign (in manual, facsimile or electronic form) one or more Warrant Certificates evidencing the Warrants and shall deliver such Warrant Certificates to or upon such written order of the Company. Such written order of the Company shall specifically state the number of Warrants that are to be represented by such Warrant Certificate and the Warrant Agent may rely conclusively on such order. Each Warrant shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or converted or shall have expired or been canceled in accordance with the terms hereof. Each Holder shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Corporate Secretary of the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same. No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable or convertible, until such Warrant Certificate has been countersigned by the manual, facsimile or electronic signature of the Warrant Agent. Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder. The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register any Warrant Certificates or Direct Registration Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent. The Company or the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made. Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, the Warrant Agent and the Company may deem and treat the Person in whose name any Warrant is registered as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing made in a Warrant Certificate by anyone), for the purpose of any exercise or conversion thereof, any distribution to the Holder thereof and for all other purposes.

SECTION 4.   Transfer or Exchange.

(a)     Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein. The transfer and exchange of Global Warrant Certificates or beneficial interests therein shall be effected through the Depository, in accordance with the terms of this Agreement and the Warrant Certificates and the procedures of the Depository.

8

(b)      <u>Exchange of a Beneficial Interest in a Global Warrant Certificate for an Individual Warrant Certificate or Direct Registration Warrant</u>.

(i)      Any Holder of a beneficial interest represented by a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Direct Registration Warrant or a Warrant represented by an Individual Warrant Certificate. A transferor of a beneficial interest represented by a Global Warrant Certificate (or the Depository or its nominee on behalf of such transferor) shall, but only to the extent required by the procedures of the Depository and the Warrant Agent in connection with such transfer or exchange, deliver to the Warrant Agent (I) written instructions or such other form of instructions as is customary for the Depository on behalf of any Person having a beneficial interest in a Global Warrant Certificate, and all other reasonably necessary information, and (II) an instruction of transfer in form reasonably satisfactory to the Warrant Agent which, with respect to a transfer of a Global Warrant Certificate only, shall be properly completed, duly authorized in writing and duly executed by the Holder thereof or by such Holder's attorney. Upon satisfaction of the conditions in this <u>Section 4(b)(i)</u>, the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be reduced by the number of Warrants to be represented by an Individual Warrant Certificate or Direct Registration Warrant, as the case may be, to be issued in exchange for the beneficial interest of such Person in the Global Warrant Certificate and, following such reduction, (A) in the case of an exchange for an Individual Warrant Certificate (x) the Company shall issue and the Warrant Agent shall either manually, facsimile or electronically countersign an Individual Warrant Certificate representing the appropriate number of Warrants and (y) the Warrant Agent shall deliver such Individual Warrant Certificate to the registered Holder thereof, or (B) in the case of an exchange for a Direct Registration Warrant, the Warrant Agent shall register such Direct Registration Warrants in accordance with such written instructions from the Depository and deliver to such Holder a Warrant Statement.

(ii)      Warrants represented by an Individual Warrant Certificate issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this <u>Section 4(b)</u> shall be issued in such names as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver Individual Warrant Certificates evidencing such issuance to the Persons in whose names such Individual Warrant Certificates are so issued. Direct Registration Warrants issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this <u>Section 4(b)</u> shall be registered in such names as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.

(c)      <u>Transfer and Exchange of Individual Warrant Certificates or Direct Registration Warrants</u>. When the registered Holder of an Individual Warrant Certificate or Direct Registration Warrant has presented to the Warrant Agent a written request:

(i)      to register the transfer of any Individual Warrant Certificate or Direct Registration Warrant; or

9

4811-0606-4572.8
#93247308v10

(ii)    to exchange any Individual Warrant Certificate or Direct Registration Warrant for a Direct Registration Warrant or an Individual Warrant Certificate, respectively, representing an equal number of Warrants of authorized denominations,

the Warrant Agent shall register the transfer or make the exchange as requested if (x) its customary requirements for such transactions are met and (y) such transfer or exchange otherwise satisfies the provisions of this Agreement; *provided*, *however*, that the Warrant Agent has received a written instruction of transfer or exchange, as applicable, in form reasonably satisfactory to the Warrant Agent, properly completed and duly executed by the Holder thereof or by his attorney, accompanied by a signature guarantee ("Signature Guarantee") from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, duly authorized in writing and a written order of the Company signed by an Appropriate Officer authorizing such exchange. A party requesting transfer of Warrants must provide any evidence of authority that may be reasonably required by the Warrant Agent.

(d)    Restrictions on Transfer and Exchange of Individual Warrant Certificates or Direct Registration Warrants for a Beneficial Interest in a Global Warrant Certificate. Neither an Individual Warrant Certificate nor a Direct Registration Warrant may be exchanged for a beneficial interest in a Global Warrant Certificate pursuant to this Agreement except, following the issuance of a Global Warrant Certificate by the Company, upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of the Company's written approval and appropriate instruments of transfer, accompanied by a Signature Guarantee, with respect to an Individual Warrant Certificate or Direct Registration Warrant that is not subject to transfer restrictions under applicable securities laws, in form reasonably satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depository to make, an endorsement on the applicable Global Warrant Certificate to reflect an increase in the number of Warrants represented by such Global Warrant Certificate equal to the number of Warrants represented by such Individual Warrant Certificate or Direct Registration Warrant, and all other necessary information, then the Warrant Agent shall cancel such Individual Warrant Certificate or Direct Registration Warrant on the Warrant Register and cause, or direct the Depository to cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by such Global Warrant Certificate to be increased accordingly. Any such transfer shall be subject to the Company's prior written approval.

(e)    Restrictions on Transfer and Exchange of Global Warrant Certificates. Notwithstanding any other provisions of this Agreement (other than the provision set forth in Section 4(f)), a Global Warrant Certificate may not be transferred as a whole except by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

(f)    Cancellation of Warrant Certificate.

(i)    At such time as all beneficial interests in Warrant Certificates and Direct Registration Warrants have been exchanged for Warrant Shares in accordance herewith, redeemed, repurchased or cancelled, all Warrant Certificates shall be returned to, or cancelled and retained

10

4811-0606-4572.8
#93247308v10

pursuant to Applicable Law by, the Warrant Agent, upon written instructions from the Company reasonably satisfactory to the Warrant Agent.

(ii)     If at any time the Depository for the Global Warrant Certificates notifies the Company that the Depository is unwilling or unable to continue as Depository for the Global Warrant Certificates and a successor Depository for the Global Warrant Certificates is not appointed by the Company within ninety (90) days after delivery of such notice, then the Warrant Agent, upon written instructions signed by an Appropriate Officer of the Company, shall register Individual Warrants Certificates and Direct Registration Warrants, in an aggregate number equal to the number of Warrants represented by the Global Warrant Certificates, in exchange for such Global Warrant Certificates.

(g)     Obligations with Respect to Transfers and Exchanges of Warrants.

(i)     To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent is hereby authorized to countersign, either by manual, facsimile or electronic signature, in accordance with the provisions of this Section 4, Warrant Certificates, as required pursuant to the provisions of this Section 4.

(ii)     All Warrant Certificates or Direct Registration Warrants issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Warrant Certificates or Direct Registration Warrants surrendered upon such registration of transfer or exchange.

(iii)     So long as the Depository, or its nominee, is the registered owner of a Global Warrant Certificate, the Depository or such nominee, as the case may be, will be considered the sole owner or Holder represented by such Global Warrant Certificate for all purposes under this Agreement, including, without limitation, for the purposes of (a) giving notices with respect to such Warrants and (b) registering transfers with respect to such Warrants. Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(iv)     The Warrant Agent shall register the transfer of any outstanding Warrants in the Warrant Register at the Warrant Agent office designated for such purpose (the "Warrant Agent Office") upon (a) receipt of all information required to be delivered hereunder, (b) if applicable, surrender of duly endorsed Warrant Certificates representing such Warrants, and (c) receipt of a completed form of assignment duly authorized in writing substantially in the form attached as Exhibit C hereto, as the case may be, duly signed by the Holder thereof or by the duly appointed legal representative thereof or by such Holder's attorney, accompanied by a Signature Guarantee. Upon any such registration of transfer, a new Warrant Certificate or Warrant Statement, as the case may be, shall be issued to the transferee.

(v)     The Warrant Agent shall not undertake the duties and obligations of a stock transfer agent under this Agreement, or otherwise, including, without limitation, the duty to receive, issue or transfer Warrant Shares.

11

4811-0606-4572.8
#93247308v10

(h)     Definitive Warrants.

(i)     Beneficial interests represented by a Global Warrant Certificate deposited with the Depository or with the Warrant Agent pursuant to Section 3(b) shall be transferred to each beneficial owner thereof in the form of Warrant Certificates in a definitive form that is not deposited with the Depository or with the Warrant Agent as custodian for the Depository ("Definitive Warrants") evidencing a number of Warrants equivalent to such owner's beneficial interest in such Global Warrant Certificate, in exchange for such Global Warrant Certificate, only if such transfer complies with Section 4(a) and (i) the Depository notifies the Company in writing that it is unwilling or unable to continue as Depository for such beneficial interests represented by such Global Warrant Certificate or if at any time the Depository ceases to be a "clearing agency" registered under the Securities and Exchange Act of 1934, as amended, or the rules promulgated thereunder (the "Exchange Act"), and, in each such case, a successor Depository is not appointed by the Company within ninety (90) days of such notice or (ii) upon the request of any Holder or beneficial owner, if the Company shall be adjudged bankrupt or insolvent or makes an assignment for the benefit of its creditors or institutes proceedings to be adjudicated bankrupt or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization under federal bankruptcy laws or any other similar applicable federal or state law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or custodian of all or any substantial part of its property, or shall admit in writing its inability to pay or meet its debts as they mature, or if a receiver or custodian of it or all or any substantial part of its property shall be appointed, or if a public officer shall have taken charge or control of the Company or of its property or affairs, for the purpose of rehabilitation, conservation or liquidation.

(ii)     Any beneficial interests represented by a Global Warrant Certificate that are transferable to the beneficial owners thereof in the form of Definitive Warrants pursuant to this Section 4(h) shall be surrendered by the Depository to the Warrant Agent, to be so transferred, in whole or from time to time in part, without charge, and the Warrant Agent shall if directed by an Appropriate Officer of the Company countersign, by either manual, facsimile or electronic signature, and deliver to each beneficial owner in the name of such beneficial owner, upon such transfer of each portion of such beneficial interests represented by a Global Warrant Certificate, Definitive Warrants evidencing a number of Warrants equivalent to such beneficial owner's beneficial interest in the Global Warrant Certificate. The Warrant Agent shall register such transfer in the Warrant Register, and upon such transfer the surrendered Global Warrant Certificate shall be cancelled by the Warrant Agent.

(iii)     All Definitive Warrants issued upon registration of transfer pursuant to this Section 4(h) shall be valid obligations of the Company, evidencing the same obligations of the Company and entitled to the same benefits under this Agreement and the Global Warrant Certificate surrendered for registration of such transfer.

(iv)     Subject to the provisions of Section 4(h)(ii), the registered Holder of a Global Warrant Certificate may grant proxies and otherwise authorize any Person to take any action that such Holder is entitled to take under this Agreement or the Warrants.

4811-0606-4572.8
#93247308v10

(v)     In the event of the occurrence of any of the events specified in Section 4(h)(i), the Company will promptly make available to the Warrant Agent a reasonable supply of Definitive Warrants necessary to comply with this Agreement in definitive, fully registered form.

(vi)     Neither the Company nor the Warrant Agent shall be liable or responsible for any registration or transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

(i)     Securityholders Agreement.  Notwithstanding anything herein to the contrary, no Person may Transfer any Warrant except in compliance with the provisions of the Securityholders Agreement, if the Securityholders Agreement is then in effect.

SECTION 5.   Duration and Exercise of Warrants.

(a)     Expiration Date. The Warrants may be exercised only during the period commencing on the Effective Date and expiring on the date that is the seventh (7th) anniversary of the Effective Date (the "Expiration Date"). After 5:00 p.m. New York City time on the Expiration Date, the Warrants will become void and without further legal effect, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

(b)     Exercise Price. The Exercise Price for the Warrants shall be $[●][1] per Warrant Share (subject to adjustment as provided herein).

(c)     Manner of Exercise.

(i)     Cash Payment. Subject to the provisions of this Agreement, including the Jones Act limitations on ownership and control of capital stock of the Company by Non-U.S. Citizens, including those set forth in Section 5(m) hereof and the adjustments contained in Section 6 hereof, each Warrant shall entitle the Holder thereof to purchase from the Company one fully paid and nonassessable (if applicable) Warrant Share at the Exercise Price. All or any of the Warrants represented by a Warrant Certificate or in the form of Direct Registration Warrants may be exercised by the registered Holder thereof during normal business hours on any Business Day, by delivering (A) written notice of such election (a "Warrant Exercise Notice") to exercise Warrants to the Company (at the address set forth in Section 15 hereof) and the Warrant Agent at the Warrant Agent Office, no later than 5:00 p.m., New York City time, on the Expiration Date, which Warrant Exercise Notice shall be (i) substantially in the "Form of Election" set forth in Exhibit B-1, in the case of Warrants represented by a Global Warrant Certificate or otherwise in accordance with applicable procedures of the Depository, (ii) substantially in the "Form of Election" set forth in Exhibit B-2, in the case of Warrants represented by Individual Warrant Certificates and (iii) substantially in the form set forth in Exhibit B-3, in the case of Direct Registration Warrants; and (B) by no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date, such Warrants to the Warrant Agent (by book-entry

---

[1] Note to draft: The New Warrant exercise price will be based on the equity value of the Company as of the Effective Date that would be implied by an enterprise value equal to $621,200,000.

4811-0606-4572.8
#93247308v10

transfer through the facilities of the Depository, if such Warrants are represented by a Global Warrant Certificate), accompanied by a Signature Guarantee and payment in full in respect of each Warrant that is exercised (which shall be made by delivery of a certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer to an account specified in writing by the Company or the Warrant Agent in immediately available funds or, in respect of any Global Warrant Certificate, otherwise in accordance with applicable procedures of the Depository). Such payment shall be in an amount equal to the product of the number of Warrant Shares designated in such Warrant Exercise Notice multiplied by the Exercise Price for the Warrants being exercised, in each case as adjusted herein. Upon such surrender and payment, such Holder shall thereupon be entitled to receive the number of duly authorized, validly issued, and (if applicable) fully paid and nonassessable, Warrant Shares as set forth in Section 5(d), Section 5(h) and Section 5(i).

(ii) Cashless Conversion. Subject to the provisions of this Agreement, the Holder shall have the right, in lieu of paying the Exercise Price of Warrants in cash, to instruct the Company in writing to reduce the number of Warrant Shares issuable pursuant to the conversion of such Warrants (the "Cashless Conversion") in accordance with the following formula:

$$X = (Y \times (A - B)) \div A$$

Where:

$X =$ the number of Warrant Shares to be issued to the Holder upon conversion of the Warrants

$Y =$ the total number of Warrant Shares for which the Holder has elected to exercise the applicable Warrants as of the day the Warrant Exercise Notice is delivered to the Warrant Agent

$A =$ the Fair Market Value of one Warrant Share determined as of the day the Warrant Exercise Notice is delivered to the Warrant Agent

$B =$ the exercise price which would otherwise be payable in cash for one Warrant Share determined as of the day the Warrant Exercise Notice is delivered to the Warrant Agent

If the Exercise Price of the aggregate number of Warrants being converted exceeds the Fair Market Value at the time of such conversion of the aggregate number of Warrant Shares issuable upon such conversion, then no Warrant Shares will be issuable pursuant to the Cashless Conversion. The Holder shall effect a Cashless Conversion by indicating on a duly executed Warrant Exercise Notice that the Holder wishes to effect a Cashless Conversion. Upon receipt of such election to effect a Cashless Conversion, the Warrant Agent will promptly request the Company to confirm the number of Warrant Shares issuable in connection with the Cashless Conversion. The Company shall calculate and transmit to the Warrant Agent in a written notice the number of Warrant Shares issuable in connection with any Cashless Conversion.

14

(d)     The number of Warrant Shares to be issued on such exercise or conversion will be determined by the Company (with written notice thereof to the Warrant Agent) in accordance with Section 5(c). The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the number of Warrant Shares to be issued on such exercise or conversion is accurate or correct, nor shall the Warrant Agent have any duty or obligation to take any action with regard to such Warrant exercise or conversion prior to being notified by the Company of the relevant number of Warrant Shares to be issued.

(e)     Except as otherwise provided herein, any exercise or conversion of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(f)     Upon receipt of a Warrant Exercise Notice pursuant to Section 5(c), the Warrant Agent shall:

(i)     examine such Warrant Exercise Notice and all other documents delivered to it by or on behalf of the Holder as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notice and any such other documents have been executed and completed in accordance with their terms;

(ii)     endeavor to inform the Company of and cooperate with and assist the Company in resolving any inconsistencies between the Warrant Exercise Notice received and delivery of Warrants to the Warrant Agent's account;

(iii)     advise the Company, no later than the Business Day after receipt of such Warrant Exercise Notice, of (a) the receipt of such Warrant Exercise Notice and, subject to Company's approval, the number of Warrants to be exercised or converted in accordance with the terms of this Agreement, (b) the instructions with respect to delivery of the Warrant Shares deliverable upon such exercise or conversion, subject to the timely receipt from the Depository of the necessary information, and (c) such other information as the Company shall reasonably require;

(iv)     in the case of Warrants represented by a Global Warrant Certificate, liaise with the Depository and effect such delivery to the relevant accounts at the Depository in accordance with its requirements, if requested by the Company with the delivery of the Warrant Shares and all other necessary information by or on behalf of the Company for delivery to the Depository; and

(v)     notify the Company each month of the amount of any funds received by the Warrant Agent for payment of the aggregate Exercise Price in a given month and forward all such funds by the fifth (5th) Business Day of the following month by wire transfer to an account designated by the Company, provided that the Company shall pay wire transfer fees to the Warrant Agent for each such wire pursuant to the mutually agreed upon fee schedule referenced in Section 12(g).

(g)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise or conversion shall be determined by the Company in its sole discretion in good faith, which determination shall be final and binding. The Company reserves the right to reject any

15

and all Warrant Exercise Notices that it determines are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful or in violation of the Jones Act Restriction as determined in good faith. Such determination by the Company shall be final and binding on the Holders absent manifest error. Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise or conversion of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise or conversion of Warrants. Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise or conversion of Warrants, nor shall they incur any liability for the failure to give such notice.

(h)     As soon as reasonably practicable after the exercise or conversion of any Warrant (and in any event not later than five (5) Business Days thereafter), the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the Holder, either: (A) if such Holder holds the Warrants being exercised or converted through the Depository's book-entry transfer facilities, by same-day or next-day credit to the Depository for the account of such Holder or for the account of a participant in the Depository the number of Warrant Shares to which such Holder is entitled, in each case registered in such name and delivered to such account as directed in the Warrant Exercise Notice by such Holder or by the direct participant in the Depository through which such Holder is acting (or, if the Common Stock may not then be held in book-entry form through the facilities of the Depository, as set forth in clause (B)); (B) if such Holder holds the Warrants being exercised or converted in the form of Individual Warrant Certificates, a book-entry interest in the number of Warrant Shares to which such Holder is entitled on the books of the Company's transfer agent or, at the Company's option, by delivery to the address designated by such Holder in its Warrant Exercise Notice of a physical certificate or certificates representing the number of Warrant Shares to which such Holder is entitled, in fully registered form, registered in such name or names as may be directed by such Holder (or, if Common Stock at the time of such exercise is held through the facilities of the Depository, as set forth in the foregoing clause (A)); or (C) if such Holder holds the Warrants being exercised or converted in the form of Direct Registration Warrants, a book-entry interest in the number of Warrant Shares to which such Holder is entitled on the books and records of the Company's transfer agent (or, if Common Stock at the time of such exercise is held through the facilities of the Depository, as set forth in the foregoing clause (A)).

If fewer than all of the Warrants evidenced by a Global Warrant Certificate surrendered upon the exercise or conversion of Warrants are exercised or converted at any time prior to the Expiration Date, the Warrant Agent shall cause a notation to be made to the records maintained by the Depository. Subject to Section 5(g), the Person in whose name any certificate or certificates, or any Warrant Exercise Notice, for the Warrant Shares are to be issued (or such Warrant Shares are to be registered, in the case of a book-entry transfer) upon exercise or conversion of a Warrant shall be deemed to have become the Holder of record of such Warrant Shares on the date such Warrant Exercise Notice is delivered.

(i)     No fractional Warrant Shares or scrip representing fractional Warrant Shares shall be issued upon any exercise or conversion of Warrants. In lieu of any fractional Warrant Share to which a Holder would otherwise be entitled upon an exercise of Warrants, such Holder shall be entitled to receive a cash payment equal to the value of such fractional Warrant Share based on the Fair Market Value of the Common Stock as of the applicable date of delivery of a Warrant Exercise

16

4811-0606-4572.8
#93247308v10

Notice. The number of full Warrant Shares that shall be issuable upon an exercise of Warrants by a Holder at any time shall be computed on the basis of the aggregate number of Warrant Shares which may be issuable pursuant to the Warrants being exercised by that Holder at that time. The beneficial owners of the Warrants and the Holders, by their acceptance hereof, expressly agree to receive cash in lieu of any fractional Warrant Share in accordance with this Section 5(i) and hereby waive their right to receive a physical certificate representing such fractional Warrant Share upon exercise of any Warrant. Whenever a payment for fractional Warrant Shares is to be made by the Warrant Agent under any section of this Agreement, the Company shall (1) provide to the Warrant Agent in reasonable detail the facts related to such payments and the prices and/or formulas utilized in calculating such payments, and (2) provide sufficient monies to the Warrant Agent in the form of fully collected funds to make such payments. The Warrant Agent shall be fully protected in relying upon such a certificate and shall have no duty with respect to, and shall not be deemed to have knowledge of, any payment for fractional Warrant Shares or fractional shares under any section of this Agreement relating to the payment of fractional Warrant Shares or fractional shares unless and until the Warrant Agent shall have received such a certificate and sufficient monies.

(j)      If all of the Warrants evidenced by a Warrant Certificate have been exercised or converted, such Warrant Certificate shall be cancelled by the Warrant Agent. Such cancelled Warrant Certificate shall then be disposed of by or at the direction of the Company in accordance with Applicable Law. The Warrant Agent shall confirm such information to the Company in writing as promptly as practicable.

(k)      The Company shall pay all expenses in connection with, and all transfer taxes and similar governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise or conversion of Warrants. The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

(l)      The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period beginning on the date of this Agreement and ending no earlier than the first (1st) anniversary of the Expiration Date.

(m)      Jones Act Limitations on Issuance of Common Stock. Notwithstanding any of the other provisions of this Agreement, in order to facilitate the Company's compliance with the Jones Act and the Jones Act Restriction concerning the ownership and control of the capital stock of the Company by Non-U.S. Citizens with regard to its continuing ability to operate its vessels in the coastwise trade of the United States and to comply with obligations of the Company under contracts that it may enter into from time to time with United States Governmental Authorities, the following provisions shall apply to any proposed exercise or conversion of any Warrant:

(i)      At the time of exercise or conversion of any Warrant, its Holder shall advise the Company whether or not it (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of such Warrant) is a U.S. Citizen. The Company may require a Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of such Warrant) to provide it with such documents and other information as it may request as reasonable to confirm

17

that the Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of such Warrant) is a U.S. Citizen.

(ii)     Any Holder that cannot establish to the Company's reasonable satisfaction that it (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of any Warrant) is a U.S. Citizen may exercise or convert any Warrant; *provided*, that to the extent all or any portion of the Warrant Shares deliverable upon exercise or conversion of such Warrant would constitute Excess Shares if they were issued, which shall be determined by the Company in its sole discretion at the time of any proposed exercise or conversion of such Warrant, the Company will instead issue to such Holder Warrants (as defined in the Jones Act Warrant Agreement) pursuant to the Jones Act Warrant Agreement in respect of such Excess Shares.

(iii)    Notwithstanding anything herein to the contrary, in the event that either (A) the Jones Act and other applicable laws are repealed or amended so that the ownership and control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way or (B) the Company's Charter is amended so that the ownership and control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way, the provisions of this Section 5(m) shall no longer apply to any Holder or Warrant.

(n)     Cost Basis Information.

(i)      In the event of a cash exercise of Warrants, the Company hereby instructs the Warrant Agent to record cost basis for newly issued Warrant Shares as reasonably determined by the Company prior to processing.

(ii)     In the event of a Cashless Conversion of Warrants, the Company shall provide the cost basis for Warrant Shares issued pursuant to such Cashless Conversion at the time the Company confirms the number of Warrant Shares issuable in connection with such Cashless Conversion to the Warrant Agent pursuant to Section 5 hereof.

(o)     Securityholders Agreement. Each (i) Holder and (ii) Person that acquires any Warrants after the date hereof in accordance with the terms of this Agreement and the Securityholders Agreement, in each case, that is not already a party to the Securityholders Agreement, shall become a party to the Securityholders Agreement, if the Securityholders Agreement is then in effect. Notwithstanding anything herein to the contrary, no Person shall receive any Warrant Shares upon exercise or conversion of any Warrant unless such Person is or becomes a party to the Securityholders Agreement by executing a joinder thereto, if the Securityholders Agreement is then in effect.

SECTION 6.   Adjustment of Number of Shares Purchasable or Number of Warrants.

(a)     Below Market Issuances.

(i)      If the Company at any time or from time to time after the date hereof shall grant, issue or sell (whether directly or by assumption in a merger or otherwise) any additional shares of Common Stock, Options or Convertible Securities or shall fix a record date for the

18

determination of holders of any Equity Securities to receive any additional shares of Common Stock, Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon such event, including upon the exercise of such Options or, in the case of Convertible Securities, the conversion or exchange of such Convertible Securities, shall be deemed to be additional Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of 5:00 PM (New York City time) on such record date; provided, that additional Common Stock shall not be deemed to have been issued unless the consideration per share of such additional Common Stock would be less than the Fair Market Value of each such share of Common Stock as of such date and immediately prior to such issuance, or such record date, as the case may be; provided, further, that, in any such case in which additional Common Stock is deemed to be issued, no further adjustments shall be made upon the subsequent issue of Convertible Securities or Common Stock upon the exercise of Options or the conversion or exchange of Convertible Securities.

(ii)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment pursuant to the terms of this Section 6(a), are revised (either automatically, pursuant to the provisions contained therein, or as a result of an amendment to such terms) to provide for either (i) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (ii) any increase or decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then, effective upon such increase or decrease becoming effective, the number of Warrant Shares issuable upon exercise or conversion of any Warrant computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such number of Warrant Shares issuable upon exercise or conversion of any Warrant as would have been obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security.

(iii)     If the terms of any Option or Convertible Security, the issuance of which did not result in an adjustment to the number of Warrant Shares issuable upon exercise or conversion of any Warrant pursuant to the terms of this Section 6(a) (either because the consideration per additional Common Stock subject thereto was equal to or greater than the-then Fair Market Value of each such share of Common Stock), are revised after the date hereof (either automatically, pursuant to the provisions contained therein, or as a result of an amendment to such terms) to provide for either (i) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (ii) any increase or decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended, and the additional Common Stock subject thereto shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(iv)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the number of Warrant Shares issuable upon exercise or conversion of any Warrant pursuant to the terms of this Section 6(a), the number of Warrant Shares issuable upon exercise or conversion of any Warrant shall be readjusted to such

19

4811-0606-4572.8
#93247308v10

number of Warrant Shares issuable upon exercise or conversion of any Warrant as would have been obtained had such Option or Convertible Security never been issued.

(v)      Except as provided in Section 6(a)(vii) and except in the case of any event described in Section 6(b), Section 6(c), Section 6(d) or Section 6(e), in the event the Company shall at any time after the date hereof grant, sell or issue additional Common Stock (including additional Common Stock deemed to be issued pursuant to Section 6(a)(i)) without consideration or for consideration per share of Common Stock less than the Fair Market Value of each such share of Common Stock, then the number of Warrant Shares issuable upon exercise or conversion of any Warrant shall be increased pursuant to the formula below:

$$Ua = Ub \times \frac{Oa}{Ob + Y}$$

Where:

Ub = The number of Warrant Shares issuable for each Warrant before the adjustment

Ua = The number of Warrant Shares issuable for each Warrant after the adjustment

Oa = Number of shares of Common Stock outstanding immediately after the transaction in question on a Fully Diluted Basis

Ob = Number of shares of Common Stock outstanding immediately before the transaction in question on a Fully Diluted Basis

Y = Number of shares of Common Stock equal to the aggregate offering price of the shares of Common Stock being issued, *divided by* the Fair Market Value of one share of Common Stock as of the earlier of (a) the announcement date of the issuance of such Common Stock and (b) the date of issuance of such Common Stock

(vi)      In the event of an adjustment to the number of Warrant Shares pursuant to Section 6(a)(v), the Exercise Price shall be adjusted, effective as of the same time as such adjustment to the number of Warrant Shares, so that the Exercise Price immediately after such adjustment shall be equal to (A) the Exercise Price immediately prior to such adjustment, multiplied by (B) a fraction, (1) the numerator of which is the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment, and (2) the denominator of which is the number of Warrant Shares issuable upon exercise of the Warrants immediately after such adjustment.

(vii)      Notwithstanding anything in this Section 6 to the contrary, none of the grant, sale or issuance of (A) any Common Stock, Common Stock Equivalent or other Equity Security of the Company (including the grant, sale or issuance of any Common Stock, other Equity Security of the Company or Common Stock Equivalent upon conversion, exchange or exercise

20

4811-0606-4572.8
#93247308v10

thereof) pursuant to the MIP, (B) the Warrants issued pursuant to this Agreement (including the grant, sale or issuance of any Warrant Shares, other Equity Security of the Company or Common Stock Equivalent upon the exercise thereof), (C) the Warrants (as defined in and issued pursuant to the Jones Act Warrant Agreement) (including the grant, sale or issuance of any Common Stock, other Equity Security of the Company or Common Stock Equivalent upon the exercise thereof), (D) shares of Common Stock or Convertible Securities actually issued upon the exercise of Options or shares of Common Stock actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security and such issuance has already resulted in an adjustment in accordance with this Section 6, or (E) shares of Common Stock in an offering for cash for the account of the Company that is underwritten on a firm commitment basis and is registered under the Securities Act,  shall be deemed to be a grant, sale or issuance of additional Common Stock for purposes of this Section 6.

(b)      Stock Dividends, Subdivisions and Combinations of Shares. If after the date hereof the number of outstanding shares of Common Stock is increased by a share dividend or share distribution to all holders of Common Stock, in each case payable in shares of Common Stock, or a split, subdivision or combination of shares of Common Stock occurs, then, in any such event, the number of Warrant Shares issuable for each Warrant will be adjusted as follows: the number of Warrant Shares issuable pursuant to a valid exercise or conversion of Warrants immediately prior to such event shall be adjusted so that each Holder shall be entitled to receive upon the exercise or conversion of its Warrant the number of Warrant Shares that such Holder would have owned or would have been entitled to receive upon or by reason of such event had such Warrant been exercised or converted immediately prior to the occurrence of such event (without taking into account any limitations or restrictions on the exercisability of the Warrants). In the event of an adjustment to the number of Warrant Shares pursuant to this Section 6(b), the Exercise Price shall be adjusted so that the Exercise Price immediately after such adjustment shall be equal to (A) the Exercise Price immediately prior to such adjustment, multiplied by (B) a fraction, (1) the numerator of which is the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment, and (2) the denominator of which is the number of Warrant Shares issuable upon exercise of the Warrants immediately after such adjustment. Any adjustment made pursuant to this Section 6(b) shall become effective (i) in the case of any such dividend or distribution, at the close of business on the record date for the determination of holders of shares of Common Stock entitled to receive such dividend or distribution or (ii) in the case of any such split, subdivision or combination, at the open of business on the date on which such corporate action becomes effective.

(c)      Distributions of Certain Rights, Options and Warrants. If after the date hereof the Company distributes to holders of the Common Stock any Options or Convertible Securities entitling them to subscribe for or purchase shares of Common Stock at a price per share that is less than the Fair Market Value of one share of Common Stock as of the announcement date of such issuance, the number of Warrant Shares issuable for each Warrant will be increased pursuant to the formula below. In the event of an adjustment to the number of Warrant Shares pursuant to this Section 6(c), the Exercise Price shall be adjusted so that the Exercise Price immediately after such adjustment shall be equal to (A) the Exercise Price immediately prior to such adjustment, multiplied by (B) a fraction, (1) the numerator of which is the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment, and (2) the denominator of

21

which is the number of Warrant Shares issuable upon exercise of the Warrants immediately after such adjustment. Such adjustments shall be made successively whenever any such Options or Convertible Securities are distributed and shall become effective at the close of business on the record date for such distribution. To the extent that shares of Common Stock are not delivered at or prior to the expiration of such Options or Convertible Securities, (i) the number of Warrant Shares issuable for each Warrant shall be readjusted to be the number of Warrant Shares issuable for each Warrant that would then be in effect had the adjustment with respect to the issuance of such Options or Convertible Securities been made on the basis of delivery of only the number of Warrant Shares actually delivered and (ii) the Exercise Price shall be readjusted accordingly. In the event that such Options or Convertible Securities are not so issued, (x) the number of Warrant Shares issuable for each Warrant shall be readjusted to be the number of Warrant Shares issuable for each Warrant that would then be in effect if such record date had not occurred and (y) the Exercise Price shall be readjusted accordingly. For purposes of this Section 6(c), in determining whether any Options or Convertible Securities entitle the Holders to subscribe for or purchase shares of Common Stock at less than such Fair Market Value of one share of Common Stock as of the announcement date of such issuance, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received by the Company for such Options or Convertible Securities and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board.

$$Ua = Ub \times \frac{Ob + X}{Ob + Y}$$

Where:

Ub = The number of Warrant Shares issuable for each Warrant before the adjustment

Ua = The number of Warrant Shares issuable for each Warrant after the adjustment

Ob = Number of Warrant Shares outstanding immediately before the transaction in question on a Fully Diluted Basis

X = Number of shares of Common Stock issuable pursuant to such Options or Convertible Securities

Y = Number of shares of Common Stock equal to the aggregate offering price of the shares of Common Stock issuable pursuant to such Options or Convertible Securities, *divided by* the Fair Market Value of one share of Common Stock as of earlier of (a) the announcement date of the issuance of such Options or Convertible Securities and (b) the date of issuance of such Options or Convertible Securities

22

4811-0606-4572.8
#93247308v10

(d)    <u>Certain Other Dividends and Distributions</u>. If after the date hereof the Company shall dividend or distribute to all holders of its shares of Common Stock any of its securities, evidences of its indebtedness, other assets or property of the Company (excluding cash) or rights, options or warrants to acquire any of its securities (including any such distribution made in connection with a merger or consolidation in which the Company is the resulting or surviving Person and shares of Common Stock are not changed or exchanged, but excluding any dividend or other distribution payable for which adjustment is made under <u>Section 6(a)</u>, <u>Section 6(b)</u> or <u>Section 6(c)</u>), then in each such case the Exercise Price shall be decreased, effective on the date immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, by the Fair Market Value of the dividend or distribution made per share of Common Stock as of such record date (determined for such purpose on the basis of the aggregate property distributed with respect to one share of Common Stock).

(e)    <u>Reorganization; Reclassification; Merger</u>.  Subject to <u>Section 6(g)</u>, in the event of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of any event described in <u>Section 6(b)</u>), (iii) consolidation or merger of the Company with or into another Person, (iv) sale of all or substantially all of the Company's assets to another Person or (v) other similar transaction, in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) stock, securities or assets with respect to or in exchange for Common Stock, each Warrant shall, immediately after such reorganization, reclassification, consolidation, merger, sale or similar transaction, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Warrant Shares then issuable upon exercise or conversion of any Warrant, be exercisable for the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Holder would have been entitled upon such reorganization, reclassification, consolidation, merger, sale or similar transaction if the Holder had exercised or converted such Warrant in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale or similar transaction and acquired the applicable number of Warrant Shares then issuable hereunder as a result of such exercise or conversion (without taking into account any limitations or restrictions on the exercisability of the Warrants); and, in such case, appropriate adjustment (as determined in good faith by the Board) shall be made with respect to the Holders' rights under the Warrants to insure that the provisions of this <u>Section 6</u> shall thereafter be applicable, as nearly as possible, to the Warrants in relation to any shares of stock, securities or assets thereafter acquirable upon exercise of the Warrants. The provisions of this <u>Section 6(e)</u> shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or similar transactions. The Company shall not effect any such reorganization, reclassification, consolidation, merger, sale or similar transaction unless, prior to the consummation thereof, the successor Person (if other than the Company) resulting from such reorganization, reclassification, consolidation, merger, sale or similar transaction, shall assume, by written instrument substantially similar in form and substance to the Warrants, the obligation to deliver to any Holder such shares of stock, securities or assets which, in accordance with the foregoing provisions, such Holder shall be entitled to receive upon exercise or conversion of any Warrants.

(f)    <u>Above Market Repurchases</u>. If a repurchase of the Common Stock shall be consummated (whether by tender offer, exchange offer or otherwise), to the extent that the

23

4811-0606-4572.8
#93247308v10

aggregate Fair Market Value of all consideration included in the payment per share of Common Stock exceeds the Fair Market Value of one share of Common Stock as of the Business Day immediately prior to the earliest of (i) the date of such repurchase, (ii) the commencement of an offer to repurchase or (iii) public announcement of such repurchase or offer (the "Reference Date"), then the number of shares of Common Stock issuable for each Warrant shall be adjusted pursuant to the formula below; *provided* that the number of shares of Common Stock issuable for each Warrant shall not be decreased as a result of this Section 6(f). Such increase shall be determined as of the Reference Date, but shall become effective as of the date on which such repurchase is consummated. In the event of an adjustment to the number of Warrant Shares pursuant to this Section 6(f), the Exercise Price shall be adjusted, effective as of the same time as such adjustment to the number of Warrant Shares, so that the Exercise Price immediately after such adjustment shall be equal to (A) the Exercise Price immediately prior to such adjustment, multiplied by (B) a fraction, (1) the numerator of which is the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment, and (2) the denominator of which is the number of Warrant Shares issuable upon exercise of the Warrants immediately after such adjustment.

$$Ua = Ub \ \text{x} \ \frac{(Oa \ \text{x} \ M) + E}{Ob \ \text{x} \ M}$$

Where:

$Ub$ = The number of Warrant Shares issuable for each Warrant before the adjustment

$Ua$ = The number of Warrant Shares issuable for each Warrant after the adjustment

$M$ = The Fair Market Value of one share of Common Stock as of the Reference Date.

$E$ = The aggregate Fair Market Value of any consideration paid or payable for shares of Common Stock purchased in such repurchase.

$Ob$ = The number of shares of Common Stock outstanding on a Fully Diluted Basis as of the Reference Date.

$Oa$ = The number of shares of Common Stock outstanding on a Fully Diluted Basis immediately after the repurchase is consummated.

(g)    Cash Sales and Liquidations. Notwithstanding anything in this Agreement to the contrary, in the event of a Cash Sale or a Company Liquidation Event, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised or unconverted Warrant outstanding immediately prior to the consummation of such Cash Sale or a Company Liquidation Event (the "Cash Closing"), cash in the amount equal to (x) the number of Warrant Shares underlying such Warrant immediately prior to the Cash Closing multiplied by (y) the excess, if

24

4811-0606-4572.8
#93247308v10

any, of the cash consideration being paid for each share of Common Stock in such Cash Sale or a Company Liquidation Event minus the Exercise Price (such product, the "Warrant Spread"); provided, however, that no Holder shall be entitled to any payment hereunder with respect to any portion of such consideration that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of the Common Stock. Upon the occurrence of a Cash Closing, all unexercised or unconverted Warrants outstanding immediately prior to the Cash Sale or a Company Liquidation Event shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants except as to the requirement to pay the Warrant Spread (subject to the limitations described in the prior sentence). For the avoidance of doubt, the Holders shall not be entitled to any payment with respect to any Cash Sale or a Company Liquidation Event in which the Exercise Price is greater than the consideration payable with respect to each share of Common Stock. Notwithstanding anything to the contrary in the foregoing, if the Company engages in a reclassification in which the Common Stock is reclassified into a combination of Common Stock and any other security, such reclassification will be treated as a reclassification subject to Section 6(e) with respect to the Common Stock portion thereof and a distribution subject to Section 6(c) or 6(d), as applicable, with respect to the other security portion thereof.

(h)     Other Changes. If, at any time or from time to time after the issuance of the Warrants but prior to the exercise or conversion in full thereof, the Company shall take any action which (i) affects the Common Stock and (ii) is similar to, or has an effect similar to, any of the actions described in any of Sections 6(a) through (g) (but not including any action described in any such Section) then, and in each such case, (x) with respect to actions similar to Sections 6(a) through (f), the number of Warrant Shares issuable upon exercise or conversion of each Warrant or the Exercise Price, as applicable, shall be adjusted, and (y) with respect to actions similar to Section 6(g), payment of the Warrant Spread shall be made to each Holder based on the amount that such holders of Common Stock are entitled to receive under the Organizational Documents, which adjustment pursuant to clause (x) or payment pursuant to clause (y) shall be made in such manner and at such time and on such terms as the Board determines would be equitable under such circumstances such that the economic benefits of such action that would accrue to the holders of Common Stock of the Company would as nearly as practicable also accrue to the Holders, which determination shall be evidenced in a resolution of the Board, a copy of which shall be mailed by the Warrant Agent (upon the written instruction of the Company) to each of the relevant Holders.

(i)     Notice of Adjustment. Whenever the Warrant Shares issuable, the Exercise Price or the rights of the Holder shall be adjusted or proposed to be adjusted as provided in this Section 6, the Company shall forthwith file with the Warrant Agent a statement, signed by an Appropriate Officer, stating in detail the facts requiring such adjustment, the impact of such adjustment on the price, number and kind of securities issuable upon exercise or conversion of the Warrants, the record date with respect to any such action, if applicable, and the approximate date on which such action is to take place. In the case of any action which would require the fixing of a record date, such notice shall be given at least 10 days prior to the date so fixed, and in case of all other action, such notice shall be given at least 20 days prior to the taking of such proposed action. Until such notices or statements are received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that no such adjustment has occurred. The Company shall also cause a notice setting forth the same information as set forth above to be sent by mail, first class, postage prepaid, to each registered Holder at its address appearing on the Warrant Register. The Company

25

shall, within five (5) days following the event requiring any such adjustment, deliver to the Warrant Agent a certificate, signed by an Appropriate Officer, which (a) sets forth in reasonable detail (i) the event requiring such adjustment and (ii) the method by which such adjustment was calculated and (b) specifies any adjustments to the Warrants in effect following such event. The Warrant Agent shall be fully protected in relying on any such certificate and on any adjustment or statement therein contained and shall have no duty or liability with respect to, and shall not be deemed to have knowledge of any such adjustment or any such event unless and until it shall have received such certificate.

(j)      No Change in Warrant Terms on Adjustment. Irrespective of any adjustments in the Exercise Price or the number of Warrant Shares issuable upon exercise or conversion, Warrants theretofore or thereafter issued may continue to express the same prices and number of Warrant Shares as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the Exercise Price and the number of Warrant Shares issuable upon exercise or conversion specified thereon shall be deemed to have been so adjusted.

(k)      Treasury Shares. Shares of Common Stock at any time owned by the Company shall not be deemed to be outstanding for the purposes of any computation under this Section 6.

(l)      Exclusion of Certain Adjustments. No adjustment need be made for a change in the par value of the shares of Common Stock, *provided*, that the Exercise Price shall remain at least equal to the par value of the shares of Common Stock. All calculations under this Section 6 shall be made to the nearest one one-thousandth (1/1,000) of a share.

(m)      Proceedings Prior to Any Action Requiring Adjustment. As a condition precedent to the taking of any action which would require an adjustment pursuant to this Section 6, the Company shall promptly take (and shall be permitted by the Holders to take) any action which may be necessary, including obtaining any stockholder approvals or exemptions, in order that the Company may thereafter validly and legally issue as fully paid and nonassessable all Warrant Shares that a Holder is entitled to receive upon exercise of a Warrant pursuant to this Section 6.

SECTION 7.      Cancellation of Warrants. The Warrant Agent shall cancel all Warrant Certificates surrendered for exercise, conversion, exchange, substitution or transfer in whole or in part. Such cancelled Warrant Certificates shall thereafter be disposed of by the Warrant Agent upon written instructions from the Company reasonably satisfactory to the Warrant Agent and such Direct Registration Warrants shall be canceled by appropriate notation on the Warrant Register.

SECTION 8.      Mutilated or Missing Warrant Certificates. Upon receipt by the Company and the Warrant Agent from any Holder of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of such Holder's Warrant Certificate and a surety bond or indemnity reasonably satisfactory to them and holding the Warrant Agent and Company harmless, and in case of mutilation upon surrender and cancellation thereof, and absent notice to Warrant Agent that such Warrant Certificates have been acquired by a bona fide purchaser, the Company will execute and the Warrant Agent will countersign and deliver in lieu thereof a new Warrant Certificate of like tenor and representing an equal number of Warrants to such Holder; *provided*, that in the case of mutilation, no bond or indemnity shall be required if

26

such Warrant Certificate in identifiable form is surrendered to the Company or the Warrant Agent for cancellation. Upon the issuance of any new Warrant Certificate under this Section 8, the Company may require the payment of a sum sufficient to cover any stamp tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Warrant Agent) in connection therewith. Every new Warrant Certificate executed and delivered pursuant to this Section 8 in lieu of any lost, stolen, destroyed or mutilated Warrant Certificate shall be entitled to the same benefits of this Agreement equally and proportionately with any and all other Warrant Certificates, whether or not the allegedly lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone. The provisions of this Section 8 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of lost, stolen, destroyed or mutilated Warrant Certificates.

SECTION 9.   Reservation of Shares. The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, solely for issuance and delivery upon exercise or conversion of Warrants, the full number of Warrant Shares from time to time issuable upon the exercise or conversion of all Warrants and any other outstanding warrants, options or similar rights, from time to time outstanding. All Warrant Shares shall be duly authorized and, when issued upon such exercise or conversion of the Warrants, shall be duly and validly issued, and (if applicable) fully paid and nonassessable, free from all taxes, liens, charges, security interests, encumbrances and other restrictions created by or through the Company and issued without violation (i) of any preemptive or similar rights of any stockholder of the Company and (ii) by the Company of any Applicable Law or governmental regulation.

SECTION 10. Legends. The Warrants are issued in reliance upon the exemption from the registration requirements of Section 5 of the Securities Act provided by section 1145 of the Bankruptcy Code for so long as the Securityholders Agreement remains in effect, Warrant Certificates shall be stamped or otherwise imprinted with a legend, and the Warrant Statements shall include a restrictive notation with respect to such Warrants, in substantially the following form:

"THE WARRANTS REPRESENTED BY THIS CERTIFICATE (AND THE SHARES ISSUABLE PURSUANT THERETO) ARE SUBJECT TO A SECURITYHOLDERS AGREEMENT AMONG HORNBECK OFFSHORE SERVICES, INC. AND THE HOLDERS PARTY THERETO, A COPY OF WHICH IS ON FILE WITH THE CORPORATE SECRETARY OF HORNBECK OFFSHORE SERVICES, INC. THE SECURITYHOLDERS AGREEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN PROVISIONS RELATING TO THE TRANSFER OF THE WARRANTS AND THE SHARES ISSUABLE PURSUANT THERETO, INCLUDING RESTRICTIONS ON TRANSFER TO AND OWNERSHIP BY PERSONS WHO ARE NOT U.S. CITIZENS AS DEFINED IN 46 U.S.C. SECTION 50501 QUALIFIED TO OWN AND OPERATE VESSELS ENGAGED IN THE UNITED STATES COASTWISE TRADE, AS IN EFFECT ON THE DATE IN QUESTION, OR ANY SUCCESSOR STATUTE OR REGULATION, AS INTERPRETED BY THE U.S. COAST GUARD IN APPLICABLE PRECEDENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF

27

THE WARRANTS REPRESENTED BY THIS CERTIFICATE (OR THE SHARES ISSUABLE PURSUANT THERETO) MAY, DIRECTLY OR INDIRECTLY, BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT."

Any legend or restrictive notation referenced in this Section 10 shall be removed from the Warrant Certificates or Warrant Statements at any time after the restrictions described in such legend or restrictive notation cease to be applicable; provided that the Company may request from any Holder opinions, certificates or other evidence that such restrictions have ceased to be applicable before removing such legend or restrictive notation.

SECTION 11. Notification of Certain Events; Corporate Action.

(a)     In the event of:

(i)     any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any shares of stock of any class, any other securities or any property, or to receive any other right or interest of any kind, or any other event referred to in Sections 6(a) through (g); or

(ii)     (A) any reclassification of the capital stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a subdivision or combination), (B) the consolidation or merger of the Company with or into any other Person (other than a consolidation or merger in which the Company is the continuing Person and which does not result in any change in the shares of Common Stock), (C) the sale or transfer of the properties and assets of the Company as, or substantially as, an entirety to another Person, or (D) a tender or exchange offer for Common Stock; or

(iii)     the voluntary or involuntary dissolution, liquidation, or winding up of the Company;

the Company shall cause to be filed with the Warrant Agent and delivered to each Holder a notice specifying (x) the date or expected date on which any such record is to be taken for the purpose of such dividend, distribution or right, and the amount and character of any such dividend, distribution or right, or if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution, or right are to be determined, and the amount and character of such dividend, distribution or right, or (y) the date or expected date on which any such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up is expected to become effective, and the time, if any such time is to be fixed, as of which holders of record of Common Stock shall be entitled to exchange their shares of Common Stock for the securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up. Such notice shall be delivered not less than ten (10) calendar days prior

28

to such date therein specified, in the case of any such date referred to in clause (x) of the preceding sentence, and not less than twenty (20) calendar days prior to such date therein specified, in the case of any such date referred to in clause (y) of the preceding sentence.

(b)     Failure to give the notice contemplated by Section 11(a) hereof within the time provided or any defect therein shall not affect the legality or validity of any such action.

(c)     The Company agrees that, for so long as any Warrants are outstanding, it shall not increase the par value of the Common Stock or amend or modify its Charter or by-laws in a manner that would prevent the Company from issuing the Warrant Shares issuable upon exercise of the Warrants. The Company shall not, and shall not permit or cause any of its subsidiaries to, take any action to avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, including through any amendment of its Charter and by-laws (and any equivalent organizational documents of its subsidiaries) or any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities.

SECTION 12. Warrant Agent. The Warrant Agent undertakes the duties and obligations expressly imposed by this Agreement upon the terms and conditions set forth in this Section 12.

(a)     Limitation on Liability. The Warrant Agent shall not by countersigning Warrant Certificates or by any other act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants or the Warrant Certificates (except as to its countersignature thereon), as to the validity, authorization or value (or kind or amount) of any Warrant Shares or other property delivered or deliverable upon exercise or conversion of any Warrant, or as to the purchase price of such Warrant Shares or other property. The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Warrant Certificates or for any action taken, suffered or omitted by the Warrant Agent in the belief that any Warrant Certificate or any other document or any signature is genuine or properly authorized unless such action or omission was taken or omitted to be taken in bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction), (ii) be responsible for determining (x) compliance by any Person with the provisions set forth in Section 5(m) or (y) whether any facts exist that may require any adjustment of the number of Warrant Shares, or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Warrant Shares or property upon the surrender of any Warrant for the purpose of exercise or conversion or to comply with any other of the Company's covenants and obligations contained in this Agreement or in the Warrant Certificates or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction) for which the Warrant Agent shall be liable. Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action. Notwithstanding anything to the contrary stated herein, any liability of the Warrant Agent under this Agreement shall be

4811-0606-4572.8
#93247308v10

limited to the lesser of (i) amount of fees, but not including reimbursable expenses, paid by the Company to the Warrant Agent during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought, and (ii) $50,000.

(b)     Instructions. The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such officer for advice or instructions. The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received by any such officer. The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such officer.

(c)     Agents. The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the Company resulting from such neglect or misconduct, *provided* that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof. The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary in the performance of its duties hereunder. The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

(d)     Cooperation. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e)     Agent Only. The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any Holders. The Warrant Agent shall not be liable except for the performance of such duties as are expressly set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)     Right to Counsel. The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by the Warrant Agent in the absence of bad faith in accordance with the opinion or advice of such counsel.

(g)     Compensation. The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder in accordance with a  mutually agreed upon fee schedule and to reimburse the Warrant Agent for its reasonable expenses incurred by the Warrant Agent hereunder (including reasonable counsel fees and expenses) in connection with the

30

acceptance, negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of the Agreement and the exercise and performance of its duties hereunder.

(h)     Accounting and Payment. The Warrant Agent shall account to the Company with respect to Warrants exercised or converted and pay to the Company all moneys received by the Warrant Agent on behalf of the Company on the purchase of Warrant Shares through the exercise of Warrants pursuant to the procedures set forth in Section 5(f)(v). [The Warrant Agent shall advise the Company by electronic transmission at the end of each day the number of Warrant Exercise Notices received, and, if known, the identity of the Holder(s) of the Warrant(s) exercised or converted.]

(i)     No Conflict. Subject to Applicable Law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities (including, for the avoidance of doubt, bonds, notes and warrants) of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Subject to Applicable Law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person including, without limitation, acting as trustee under an indenture.

(j)     Resignation; Termination. The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising prior to resignation as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction)) after giving thirty (30) calendar days' prior written notice to the Company. In the event the transfer agency relationship in effect between the Company and Warrant Agent terminates, the Warrant Agent shall be deemed to have resigned automatically and be discharged from its duties under this Agreement as of the effective date of such termination. The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction) prior to its removal. The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be. Upon such resignation or removal the Company shall promptly appoint in writing a new warrant agent. If the Company shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new warrant agent. Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company. Any successor warrant agent, whether appointed by the Company or by such a court, shall be a Person, formed under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by a federal or state authority, and have a combined capital and

31

surplus of not less than $50,000,000 as set forth in its most recent published annual report of condition; or in the case of such capital and surplus requirement, a controlled affiliate of such a Person meeting such capital and surplus requirement. After acceptance in writing of such appointment by the new Warrant Agent, such successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities under this Agreement as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. Not later than the effective date of any such appointment, the Company shall send notice thereof to the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company. Failure to give any notice provided for in this Section 12(j), or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(k)     Merger, Consolidation or Change of Name of Warrant Agent. Any Person into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the agency business of the Warrant Agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, *provided* that such Person would be eligible for appointment as a successor Warrant Agent under the provisions of Section 12(j). If at the time such successor to the Warrant Agent shall succeed under this Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force and effect provided in the Warrant Certificates and in this Agreement. If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrants shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrants shall not have been countersigned, the Warrant Agent may countersign such Warrants either in its prior name or in its changed name; and in all such cases such Warrants shall have the full force and effect provided in the Warrants and in this Agreement.

(l)     Indemnity. The Company agrees to indemnify the Warrant Agent, and to hold it harmless against, any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including reasonable counsel fees and expenses) incurred without the bad faith, gross negligence or willful misconduct on the part of the Warrant Agent (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction), for any action taken, suffered or omitted by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of liability arising therefrom, directly or indirectly. The Warrant

32

Agent shall not be obligated to expend or risk its own funds to take any action which it believes would expose it to expense or liability or to a risk of incurring expense of liability, unless it has been furnished with assurance of repayment or indemnity reasonably satisfactory to it.

(m)    Exclusions. The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment, or to determine when any calculation or adjustment required under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant to be issued pursuant to this Agreement or as to whether any Warrant Shares will, when issued, be valid and (if applicable) fully paid and nonassessable.

(n)    No Liability for Interest. The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(o)    No Implied Obligations. The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent. The Warrant Agent shall not be under any obligation to take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it. The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issuance and sale, or exercise or conversion, of the Warrants or Warrant Shares. The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in any Warrant Certificate or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

(p)    Force Majeure. In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, pandemics, epidemics, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(q)    Bank Accounts. All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services (the "Funds") shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company. Until

33

paid pursuant to the terms of this Agreement, Computershare will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party. The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits. The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Company, any Holder or any other party.

(r)      Notice. The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Company, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in Section 15, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

(s)      Signature Guarantee. The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon (i) any Signature Guarantee or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, such Signature Guarantee; or (ii) related applicable law, act, regulation or any interpretation of the same.

(t)      Survival. The provisions under this Section 12 shall survive the expiration of the Warrants, and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company.

SECTION 13. Severability. In the event that any one or more of the provisions contained herein or in the Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable (including as a result of applicable statutes and the related regulations issued by the U.S. Coast Guard or the Maritime Administration), the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; *provided*, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately. Furthermore, subject to the preceding sentence, in lieu of any such invalid, illegal or unenforceable provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms and commercial effect to such invalid, illegal or unenforceable provision as may be possible and be valid and enforceable which a reasonable person in the position of the Company, acting in good faith, would make, always keeping in mind the intent and purposes of this Agreement and the Warrants issued pursuant thereto by the Persons party hereto as of the date hereof.

SECTION 14. Holder Not Deemed a Stockholder. Prior to the exercise or conversion of any Warrants, no Holder thereof, as such, shall be entitled hereunder to any rights of a stockholder of the Company whether by the issuance of this Warrant, including, but not limited to, the right to

34

vote, to receive dividends or other distributions, to exercise any preemptive right or, to receive notice as stockholders in respect of the meetings of stockholders or for the election of directors of the Company or any other matter and a Warrant shall not constitute a right to receive dividends or give rise to a fiduciary obligation on the part of the Company to pay dividends.

SECTION 15. <u>Notices to Company and Warrant Agent</u>. All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company to be effective shall be in writing (including by e-mail), and shall be deemed to have been duly given or made when delivered by hand or e-mail, or one (1) Business Day if sent by overnight courier service (with next day delivery specified), or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two (2) Business Days or less to the destination such notice), or five (5) Business Days after being deposited in the mail, or, in the case of email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

> Hornbeck Offshore Services, Inc.
> 103 Northpark Blvd., Suite 300
> Covington, LA 70433
> Attention:     James O. Harp, Jr., Executive Vice President and Chief Financial Officer
> Samuel A. Giberga, Executive Vice President, General Counsel and Chief Compliance Officer
> Email:     james.harp@hornbeckoffshore.com
> samuel.giberga @hornbeckoffshore.com

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by overnight courier service or first-class mail, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> Computershare, Inc.
> Computershare Trust Company, N.A.
> 150 Royall Street
> Canton, MA 02021
> Attention:     Client Services

Unless the Warrant is represented by a Global Warrant Certificate, any notice or communication mailed to a Holder shall be mailed to the Holder at the Holder's address as it appears on the Warrant Register and shall be sufficiently given if so mailed within the time prescribed. Any notice to the owners of a beneficial interest in a Warrant represented by a Global Warrant Certificate shall be distributed through the Depository in accordance with the procedures of the Depository. Communications to such Holder shall be deemed to be effective at the time of dispatch to the Depository. Failure to provide a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

4811-0606-4572.8
#93247308v10

SECTION 16. <u>Supplements and Amendments</u>. The Company and the Warrant Agent may from time to time supplement, amend, waive or otherwise modify this Agreement (a) without the approval of any Holders to implement any changes required in order for the Company to comply with the limitations imposed by the Jones Act or other applicable law on ownership and control of the Common Stock of the Company by Non-U.S. Citizens (*provided* that to the extent the Company makes any changes pursuant to this clause (a), the Company shall make only such changes which a reasonable person in the position of the Company, acting in good faith, would determine are necessary in order to implement such written requirements, always keeping in mind the intent and purposes of this Agreement and the Warrants issued pursuant thereto by the Persons party hereto as of the date hereof), or (b) with the prior written consent of (i) Holders that hold Warrants representing at least seventy-five percent (75%) of the outstanding Warrants, which must include each of Ares and Whitebox, but only for so long as such Person (together with its respective Affiliates that hold Warrants) holds at least [●] percent ([●]%) of the outstanding Warrants and (ii) if any such amendment or supplement is disproportionately and materially adverse to any Holder(s) (each, an "<u>Affected Holder</u>"), Affected Holders that hold Warrants representing a majority of the outstanding Warrants held by the Affected Holders; *provided*, that the Warrant Agent shall not be required to execute any amendment, supplement, waiver or other modification to this Agreement that the Warrant Agent has determined would adversely affect its own rights, duties, obligations or immunities under this Agreement. As a condition precedent to the Warrant Agent's execution of any amendment, supplement, waiver or other modification to this Agreement, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment, supplement, waiver or other modification is in compliance with the terms of this <u>Section 16</u>. No supplement, modification, amendment or waiver to this Agreement shall be effective unless duly executed by the Warrant Agent. Upon execution and delivery of any supplement, amendment, waiver or other modification pursuant to this <u>Section 16</u>, such amendment, supplement, waiver or other modification shall be considered a part of this Agreement for all purposes and every Holder of a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

SECTION 17. <u>Termination</u>. This Agreement shall terminate on the Expiration Date or, if later, upon settlement of all Warrants (i) validly exercised or converted prior to the Expiration Date and, (ii) if exercised or converted pursuant to <u>Section 5(c)(i)</u> hereof, for which the Exercise Price was timely paid. Notwithstanding the foregoing, this Agreement will terminate on any earlier date when all Warrants have been exercised, converted, or cancelled; *provided*, *however*, that the provisions of <u>Sections 12</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u> and <u>23</u> shall survive such termination.

SECTION 18. <u>Governing Law and Consent to Forum</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and to be performed within the State of Delaware. Each of the Company and the Warrant Agent hereby irrevocably submits to the jurisdiction of the Delaware Chancery Court; provided that if such court does not have jurisdiction, then the United States District Court for the District of Delaware, with respect to any suit, action or proceeding arising out of or relating to this Agreement, and each irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Nothing herein shall affect the right of any Person to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

36

SECTION 19. <u>Waiver of Jury Trial</u>. Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 19</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

SECTION 20. <u>Benefits of this Agreement</u>. Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered Holders and beneficial owners (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders and beneficial owners.

SECTION 21. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 22. <u>Headings</u>. The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

SECTION 23. <u>Confidentiality</u>. The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services of the Warrant Agent shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by applicable law, rule or regulation, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions). Each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law; *provided* that such disclosing party shall (a) direct such officers, affiliates, agents, subcontractors and employees to treat such information confidentially and (b) be responsible for any breach of this <u>Section 23</u> by such officers, affiliates, agents, subcontractors and employees who receive such information.

4811-0606-4572.8
#93247308v10

SECTION 24. <u>Representations</u>. Each party hereto (other than the Warrant Agent) represents and warrants that such party has been duly organized and is validly existing under the laws of the jurisdiction of its incorporation, and that this Agreement has been duly authorized, executed and delivered by such party and is enforceable against such party in accordance with its terms, except as may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar laws affecting the enforcement of creditors' rights generally.

SECTION 25. <u>Entire Agreement.</u> This Agreement, the Warrants and the Securityholders Agreement and any other agreements referenced herein or therein constitute the entire agreement with respect to the subject matter of this Agreement, and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

SECTION 26. <u>No Suspension</u>. The right to exercise any Warrants shall not be suspended during any period.

SECTION 27. <u>Withholding; Adjustments Relating to Withholding</u>.

(a)   <u>Withholding</u>. Notwithstanding any provision in this Agreement to the contrary, and subject to Section 26(b), the Company is authorized to take any actions that may be necessary to comply with all applicable tax withholding and reporting requirements imposed by any governmental authority, including in connection with all distributions, deemed distributions or other situations requiring withholding under applicable law, which may include (i) applying a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (ii) liquidating a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes and (iii) requiring reimbursement from any Holder to the extent any withholding is required in the absence of any distribution.  The Company is authorized to require Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) that are necessary to enable compliance with this Section 26.

(b)   <u>Adjustments Related to Withholding</u>. Notwithstanding any adjustments provided for in this Agreement, the number of Warrant Shares issuable on exchange and/or exercise of any Warrant shall be decreased in the event any withholding or deduction with respect to taxes would be required under applicable law in connection with any adjustment described under Section 6 with respect to such Warrant; provided, that the holder of such Warrant shall be entitled to fund any such withholding tax in cash in lieu of such adjustment being made. The dollar value of any such decrease in the number of Warrant Shares issuable on exchange and/or exercise of such Warrant (based on the distribution to which the adjustment under Section 6 related) or the cash paid by the holder of such Warrant to fund the withholding tax, as applicable shall be remitted in cash to the appropriate taxing authority or authorities in accordance with applicable law.

*[Signature pages follow]*

4811-0606-4572.8
#93247308v10

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

Hornbeck Offshore Services, Inc.

By:_____
Name:   [●]
Title:    [●]

[Signature Page to Creditor Warrant Agreement]

#93247308v10

Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent

By: _____

Name: _____

Title: _____

[Signature Page to Creditor Warrant Agreement]

#93247308v10

**EXHIBIT A**
**WARRANT ALLOCATION SCHEDULE**

[To come.]

A-1

4811-0606-4572.8
#93247308v10

**EXHIBIT B-1**
**FORM OF FACE OF GLOBAL CREDITOR WARRANT CERTIFICATE**

This Global Warrant Certificate is deposited with or on behalf of The Depository Trust Company (the "Depository") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 4(f) of the Warrant Agreement and (ii) this Global Warrant Certificate may be transferred pursuant to Section 4(e) of the Warrant Agreement and as set forth below.

**UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TO THE COMPANY OR THE WARRANT AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO. OR SUCH OTHER ENTITY, HAS AN INTEREST HEREIN.**

**TRANSFERS OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE OR AS OTHERWISE PERMITTED IN THE WARRANT AGREEMENT, AND TRANSFERS OF BENEFICIAL INTERESTS IN THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE WARRANT AGREEMENT.**

**NO AFFILIATE OF HORNBECK OFFSHORE SERVICES, INC. THAT OWNS THIS SECURITY (OR ANY INTEREST HEREIN) MAY SELL THIS SECURITY (OR ANY INTEREST HEREIN) IF UPON SUCH RESALE THIS SECURITY (OR SUCH INTEREST) WOULD CONSTITUTE A "RESTRICTED SECURITY" WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT OF 1933, AS AMENDED.**

No registration or transfer of the securities issuable pursuant to the exercise or conversion of the Warrant will be recorded on the books of the Company until such provisions have been complied with.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

B-1-1

4811-0606-4572.8
#93247308v10

CUSIP No. [●]

ISIN No. [●]

Initially [●] WARRANTS TO PURCHASE

WARRANT SHARES

HORNBECK OFFSHORE SERVICES, INC.

GLOBAL WARRANT TO PURCHASE WARRANT SHARES

VOID AFTER 5:00 P.M., New York City Time, [●], 2027

This Global Warrant Certificate ("Warrant Certificate") certifies that Cede & Co., or its registered assigns is the registered holder of warrants (the "Warrants") of Hornbeck Offshore Services, Inc., a Delaware corporation (the "Company"), to purchase (i) the number of shares of Common Stock, par value $0.00001 per share (the "Common Stock"), of the Company or (ii) Warrants (as defined in the Jones Act Warrant Agreement), as determined in accordance with the Warrant Agreement, set forth above. The Warrants expire at 5:00 p.m., New York City time, on the date that is the seventh (7th) anniversary of the Effective Date (such date, the "Expiration Date"), and each Warrant entitles the holder to purchase from the Company (i) one fully paid and non-assessable share of Common Stock or (ii) a number of Warrants (as defined in the Jones Act Warrant Agreement) exercisable or convertible into one share of Common Stock, as determined in accordance with the Warrant Agreement, at the exercise price per share (the "Exercise Price"), payable, unless the holder has elected a Cashless Conversion, to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the business day immediately prior to the settlement date, which settlement date is three Business Days after a Warrant Exercise Notice is delivered (the "Settlement Date"). The initial Exercise Price shall be $[●] (subject to adjustment as provided in the Warrant Agreement).

The Warrants are subject to exercise and conversion, in whole or in part, as and to the extent provided in the Warrant Agreement.

The number of Warrant Shares purchasable upon exercise or conversion of the Warrants are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised or converted prior to the date of the Warrant Agreement or after the Expiration Date.

*Holder Not Deemed a Stockholder*. Prior to the exercise or conversion of any Warrant, no holder thereof, as such, shall be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or to receive notice as stockholders in respect of the meetings of stockholders or for the

B-1-2

4811-0606-4572.8
#93247308v10

election of directors of the Company or any other matter (provided that, for the avoidance of doubt, nothing herein shall limit the rights of the Holders under the Charter, the Securityholders Agreement or any other agreement).

*Jones Act Limitations on Warrant Exercise*. The issuance of Warrant Shares upon exercise or conversion of Warrants is subject to the limitations on ownership and control of the Common Stock by Non-U.S. Citizens set forth in the Warrant Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

*[signature page follows]*

B-1-3

4811-0606-4572.8
#93247308v10

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____, 2020

Hornbeck Offshore Services, Inc.

By: _____
Name:  [●]
Title:   [●]

By:_____

Name:_____

Title:_____

Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent

By:_____

Name:_____

Title:_____

B-1-4

4811-0606-4572.8
#93247308v10

FORM OF REVERSE OF GLOBAL WARRANT CERTIFICATE
HORNBECK OFFSHORE SERVICES, INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase Warrant Shares issued pursuant to that certain Creditor Warrant Agreement, dated as of [●], 2020 (the "Warrant Agreement"), duly executed and delivered by the Company and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent's office designated for such purpose and is available upon written request addressed to the Company. All capitalized terms used in this Warrant Certificate but not defined herein and are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised or converted to purchase Warrant Shares from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement. Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrants evidenced by this Warrant Certificate may exercise such Warrants as set forth in the Warrant Agreement. The Warrants are also subject to conversion, in whole or in part, at the sole discretion of the Holder, as and to the extent provided in the Warrant Agreement.

In the event that upon any exercise or conversion of the Warrants evidenced hereby the number of Warrant Shares actually purchased shall be less than the total number of Warrant Shares purchasable upon exercise or conversion of the Warrants evidenced hereby, there shall be issued to the holder hereof, or such holder's assignee, a new Warrant Certificate evidencing Warrants to purchase the Warrant Shares not so purchased or appropriate adjustment shall be made in the "Schedule of Increases or Decreases in Global Warrant Certificate" annexed hereto. After 5:00 p.m., New York City time on the Expiration Date, unexercised or unconverted Warrants shall become wholly void and of no value.

Warrant Certificates, when surrendered by book-entry delivery through the facilities of the Depository, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of Warrant Shares.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise or conversion hereof and for all other purposes.

B-1-5

4811-0606-4572.8
#93247308v10

[Balance of page intentionally remains blank]

4811-0606-4572.8
#93247308v10

[TO BE ATTACHED TO GLOBAL WARRANT CERTIFICATE FOR THE WARRANTS]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL WARRANT CERTIFICATE

The following increases or decreases in this Global Warrant Certificate have been made:

| Date | Amount of decrease in the number of Warrants represented by this Global Warrant Certificate | Amount of increase in number of Warrants represented by this Global Warrant Certificate | Number of Warrants represented by this Global Warrant Certificate following such decrease or increase | Signature of authorized officer of the Warrant Agent |
|------|------|------|------|------|
| | | | | |

B-1-7

4811-0606-4572.8
#93247308v10

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING WARRANTS
THROUGH THE DEPOSITORY TRUST COMPANY

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Warrant Shares

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase (i) shares of Common Stock of Hornbeck Offshore Services, Inc. (the "Company") or (ii) Warrants (as defined in the Jones Act Warrant Agreement), as determined in accordance with the Warrant Agreement, held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depository"), to exercise _____ Warrants for the purchase of _____ newly issued Warrant Shares at the Exercise Price of $[●] per share (as such Exercise Price may be adjusted pursuant to the Warrant Agreement).

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐ Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects a Cashless Conversion.

If the undersigned will be receiving the Warrant Shares issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the Warrant Shares issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

B-1-8

4811-0606-4572.8
#93247308v10

☐ Please check if such designee is a Non-U.S. Citizen.

The undersigned requests that the Warrant Shares purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, *provided* that if the Warrant Shares are evidenced by global securities, the Warrant Shares shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITORY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF DIRECT PARTICIPANT IN THE DEPOSITORY: _____
(PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

ADDRESS: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

ACCOUNT FROM WHICH THE WARRANTS ARE BEING DELIVERED:

_____

DEPOSITORY ACCOUNT NO.: _____

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE".

WARRANT HOLDER EXERCISING THE WARRANTS, IF OTHER THAN THE DIRECT DTC PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____

B-1-9

(PLEASE PRINT)

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

ACCOUNT TO WHICH WARRANT SHARES ARE TO BE CREDITED:

_____

DEPOSITORY ACCOUNT NO.: _____

FILL IN FOR DELIVERY OF THE WARRANT SHARES IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
    (PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

NUMBER WARRANTS BEING EXERCISED: _____

NUMBER OF WARRANT SHARES FOR WHICH THE WARRANTS ARE BEING EXERCISED: _____

Signature: _____

Name: _____

Capacity in which signing: _____

Signature Guaranteed

BY: _____

B-1-10

4811-0606-4572.8
#93247308v10

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

B-1-11

**EXHIBIT B-2**
**FORM OF FACE OF INDIVIDUAL WARRANT CERTIFICATE**

VOID AFTER 5:00 P.M., New York City Time, [●], 2027

**"THE SHARES OF COMMON STOCK OF THE COMPANY (THE "SHARES') WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT ARE SUBJECT TO A SECURITYHOLDERS AGREEMENT AMONG HORNBECK OFFSHORE SERVICES, INC. AND THE HOLDERS PARTY THERETO, A COPY OF WHICH IS ON FILE WITH THE CORPORATE SECRETARY OF HORNBECK OFFSHORE SERVICES, INC. THE SECURITYHOLDERS AGREEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN PROVISIONS RELATING TO THE TRANSFER OF THE WARRANTS AND THE SHARES ISSUABLE PURSUANT THERETO, INCLUDING RESTRICTIONS ON TRANSFER TO AND OWNERSHIP BY PERSONS WHO ARE NOT U.S. CITIZENS AS DEFINED IN 46 U.S.C. SECTION 50501 QUALIFIED TO OWN AND OPERATE VESSELS ENGAGED IN THE UNITED STATES COASTWISE TRADE, AS IN EFFECT ON THE DATE IN QUESTION, OR ANY SUCCESSOR STATUTE OR REGULATION, AS INTERPRETED BY THE U.S. COAST GUARD IN APPLICABLE PRECEDENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE WARRANTS REPRESENTED BY THIS CERTIFICATE (OR THE SHARES ISSUABLE PURSUANT THERETO) MAY, DIRECTLY OR INDIRECTLY, BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT."**

4811-0606-4572.8
#93247308v10

[●]

WARRANTS TO PURCHASE

WARRANT SHARES

HORNBECK OFFSHORE SERVICES, INC.

INDIVIDUAL WARRANT TO PURCHASE WARRANT SHARES

VOID AFTER 5:00 P.M., New York City Time, [●], 2027

This Individual Warrant Certificate ("Warrant Certificate") certifies that Cede & Co., or its registered assigns is the registered holder of warrants (the "Warrants") of Hornbeck Offshore Services, Inc., a Delaware corporation (the "Company"), to purchase (i) the number of shares of Common Stock, par value $0.00001 per share (the "Common Stock"), of the Company or (ii) Warrants (as defined in the Jones Act Warrant Agreement), as determined in accordance with the Warrant Agreement, set forth above. The Warrants expire at 5:00 p.m., New York City time, on the date that is the seventh (7th) anniversary of the Effective Date (such date, the "Expiration Date"), and each Warrant entitles the holder to purchase from the Company (i) one fully paid and non-assessable share of Common Stock or (ii) a number of Warrants (as defined in the Jones Act Warrant Agreement) exercisable or convertible into one share of Common Stock, as determined in accordance with the Warrant Agreement, at the exercise price per share (the "Exercise Price"), payable, unless the holder has elected a Cashless Conversion, to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the settlement date, which settlement date is three Business Days after a Warrant Exercise Notice is delivered (the "Settlement Date"). The initial Exercise Price shall be $[●] (subject to adjustment as provided in the Warrant Agreement).

The Warrants are also subject to conversion, in whole or in part, at the sole discretion of the Company, as and to the extent provided in the Warrant Agreement.

The number of Warrant Shares purchasable upon exercise or conversion of the Warrants are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised or converted prior to the date of the Warrant Agreement or after the Expiration Date.

Holder Not Deemed a Stockholder. Prior to the exercise or conversion of any Warrant, no holder thereof, as such, shall be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive

B-2-2

right or to receive notice as stockholders in respect of the meetings of stockholders or for the election of directors of the Company or any other matter (provided that, for the avoidance of doubt, nothing herein shall limit the rights of the Holders under the Charter, the Securityholders Agreement or any other agreement).

Jones Act Limitations on Warrant Exercise. The right to exercise or convert Warrants is subject to the limitations on ownership and control of the Common Stock by Non-U.S. Citizens set forth in the Warrant Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

*[signature page follows]*

B-2-3

4811-0606-4572.8
#93247308v10

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____, 2020


Hornbeck Offshore Services, Inc.


By: _____

Name:  [●]

Title:    [●]



By: _____

Name: _____

Title: _____



Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent


By: _____

Name: _____

Title: _____

B-2-4

4811-0606-4572.8
#93247308v10

FORM OF REVERSE OF INDIVIDUAL WARRANT CERTIFICATE
HORNBECK OFFSHORE SERVICES, INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase Warrant Shares issued pursuant to that certain Creditor Warrant Agreement, dated as of [●], 2020 (the "Warrant Agreement"), duly executed and delivered by the Company and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent's office designated for such purpose and is available upon written request addressed to the Company. All capitalized terms used in this Warrant Certificate but not defined herein and are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised or converted to purchase Warrant Shares from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement. Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrants evidenced by this Warrant Certificate may exercise such Warrants as set forth in the Warrant Agreement.

The Warrants are also subject to conversion, in whole or in part, at the sole discretion of the Holder, as and to the extent provided in the Warrant Agreement.

In the event that upon any exercise or conversion of the Warrants evidenced hereby the number of Warrant Shares actually purchased shall be less than the total number of Warrant Shares purchasable upon exercise or conversion of the Warrants evidenced hereby, there shall be issued to the holder hereof, or such holder's assignee, a new Warrant Certificate evidencing Warrants to purchase the Warrant Shares not so purchased. After 5:00 p.m., New York City time on the Expiration Date, unexercised or unconverted Warrants shall become wholly void and of no value.

Warrant Certificates, when surrendered to the Company, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of Warrant Shares.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise or conversion hereof and for all other purposes.

B-2-5

[Balance of page intentionally remains blank]

B-2-6

4811-0606-4572.8
#93247308v10

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING INDIVIDUAL WARRANT CERTIFICATES

TO BE COMPLETED BY REGISTERED HOLDER

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Warrant Shares

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase (i) shares of Common Stock of Hornbeck Offshore Services, Inc. (the "Company") or (ii) Warrants (as defined in the Jones Act Warrant Agreement), as determined in accordance with the Warrant Agreement, to purchase newly issued Warrant Shares at the Exercise Price of $[●] per share (as such Exercise Price may be adjusted pursuant to the Warrant Agreement).

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐ Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects a Cashless Conversion.

If the undersigned will be receiving the Warrant Shares issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the Warrant Shares issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

☐ Please check if such designee is a Non-U.S. Citizen.

B-2-7

4811-0606-4572.8
#93247308v10

The undersigned requests that the Warrant Shares purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, *provided* that if the Warrant Shares are evidenced by global securities, the Warrant Shares shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF REGISTERED HOLDER: _____
(PLEASE PRINT)

ADDRESS: _____

_____

DELIVERY ADDRESS (IF DIFFERENT): _____

_____

ACCOUNT TO WHICH THE WARRANT SHARES ARE TO BE CREDITED:

_____

FILL IN FOR DELIVERY OF THE WARRANT SHARES IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____

ADDRESS: _____

_____

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

B-2-8

4811-0606-4572.8
#93247308v10

NUMBER WARRANTS BEING EXERCISED:_____

NUMBER OF WARRANT SHARES FOR WHICH THE WARRANTS ARE BEING EXERCISED:_____


Signature:_____

Note: If the Warrant Shares are to be registered in a name other than that in which the Warrants represented by Individual Warrant Certificate(s) are registered, the signature of the holder hereof must be guaranteed.

Signature Guaranteed

BY:_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

4811-0606-4572.8
#93247308v10

**EXHIBIT B-3**
**FORM OF ELECTION TO EXERCISE WARRANT FOR**
**HOLDERS OF DIRECT REGISTRATION WARRANTS**

TO BE COMPLETED BY REGISTERED HOLDER

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Warrant Shares

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase (i) shares of Common Stock of Hornbeck Offshore Services, Inc. (the "Company") or (ii) Warrants (as defined in the Jones Act Warrant Agreement), as determined in accordance with the Warrant Agreement, to purchase newly issued Warrant Shares at the Exercise Price of $[●] per share (as such Exercise Price may be adjusted pursuant to the Warrant Agreement).

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐ Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects a Cashless Conversion.

If the undersigned will be receiving the Warrant Shares issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the Warrant Shares issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

☐ Please check if such designee is a Non-U.S. Citizen.

B-3-1

4811-0606-4572.8
#93247308v10

The undersigned requests that the Warrant Shares purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, *provided* that if the Warrant Shares are evidenced by global securities, the Warrant Shares shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF REGISTERED HOLDER: _____

(PLEASE PRINT)

ADDRESS: _____

_____

CONTACT NAME: _____

ADDRESS: _____

_____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

ACCOUNT FROM WHICH THE WARRANTS ARE BEING DELIVERED:

_____

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE". WARRANT HOLDER DELIVERING THE WARRANTS:

ACCOUNT TO WHICH THE WARRANT SHARES ARE TO BE CREDITED:

_____

DEPOSITORY ACCOUNT NO.: _____

FILL IN FOR DELIVERY OF THE WARRANT SHARES IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

B-3-2

4811-0606-4572.8
#93247308v10

NAME:

     (PLEASE PRINT)

ADDRESS:

CONTACT NAME:

TELEPHONE (INCLUDING INTERNATIONAL CODE):

E-MAIL:

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

NUMBER WARRANTS BEING EXERCISED:

NUMBER OF WARRANT SHARES FOR WHICH THE WARRANTS ARE BEING EXERCISED:

Signature:

Name:

Capacity in which signing:

Signature Guaranteed

BY:

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

B-3-3

**EXHIBIT C**
**FORM OF ASSIGNMENT**

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

FOR VALUE RECEIVED, the undersigned registered holder hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

Warrants to purchase _____ Warrant Shares held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

_____

Signature

_____

Date

_____

Social Security or Other Taxpayer Identification Number of Assignee

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

C-1

4811-0606-4572.8
#93247308v10

**EXHIBIT D**
**WARRANT SUMMARY**

NUMBER OF WARRANTS: Initially, [●] Warrants, subject to adjustment as described in the Creditor Warrant Agreement dated as of [●], 2020 between Hornbeck Offshore Services, Inc. (the "Company") and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent") (as supplemented or amended, the "Warrant Agreement"), each of which is exercisable or convertible for (i) one share of Common Stock or (ii) a number of Warrants (as defined in the Jones Act Warrant Agreement) exercisable or convertible into one share of Common Stock, as determined in accordance with the Warrant Agreement. This summary is not complete and reference is made to the Warrant Agreement for the terms of the Warrants. In the event of any conflict, the terms of the Warrant Agreement shall control.

EXERCISE PRICE: $[●] per Warrant Share (subject to adjustment as provided in the Warrant Agreement).

HOLDER NOT DEEMED A STOCKHOLDER: Prior to the exercise or conversion of any Warrant, no holder thereof, as such, shall be entitled to any rights of a stockholder of the Company.

JONES ACT AND U.S. MARITIME LAWS LIMITATIONS ON EXERCISE OR CONVERSION: The right to exercise or convert Warrants is subject to the limitations on ownership and control of the Common Stock by Non-U.S. Citizens set forth in the Warrant Agreement.

FORM OF SETTLEMENT:

Full Settlement: If full physical settlement is elected, the Company shall deliver, against payment of the Exercise Price, a number of Warrant Shares equal to the number of Warrants exercised or converted, as such number may be adjusted pursuant to the terms of the Warrant Agreement.

Cashless Conversion: If Cashless Conversion is elected, the Company will withhold from issuance a number of Warrant Shares as provided in the Warrant Agreement.

DATES OF EXERCISE OR CONVERSION: At any time, and from time to time, prior to the close of business on the Expiration Date.

EXPIRATION DATE: The seventh (7th) anniversary of the Effective Date.

D-1

4811-0606-4572.8
#93247308v10

**Exhibit C(ii)**

**Jones Act Warrants**

*Exhibit C(ii)*

JONES ACT WARRANT AGREEMENT

Between

Hornbeck Offshore Services, Inc.,

AS ISSUER,

And

Computershare, Inc. and

Computershare Trust Company, N.A.,

collectively, AS WARRANT AGENT

[●], 2020

4824-2560-8892.12
#93237973v11

**TABLE OF CONTENTS**

SECTION 1.    CERTAIN DEFINED TERMS. ................................................................1

SECTION 2.    APPOINTMENT OF WARRANT AGENT. .........................................6

SECTION 3.    ISSUANCE OF WARRANTS; FORM, EXECUTION AND DELIVERY. ..........6

SECTION 4.    TRANSFER OR EXCHANGE. .............................................................8

SECTION 5.    DURATION AND EXERCISE OF WARRANTS. ...............................13

SECTION 6.    ADJUSTMENT OF NUMBER OF SHARES PURCHASABLE OR NUMBER OF WARRANTS; ANTI-DILUTION WARRANTS. ........................19

SECTION 7.    CANCELLATION OF WARRANTS. ..................................................26

SECTION 8.    MUTILATED OR MISSING WARRANT CERTIFICATES. ............26

SECTION 9.    RESERVATION OF SHARES. ...........................................................26

SECTION 10.   LEGENDS ...........................................................................................27

SECTION 11.   NOTIFICATION OF CERTAIN EVENTS; CORPORATE ACTION.................28

SECTION 12.   WARRANT AGENT. ..........................................................................29

SECTION 13.   SEVERABILITY. ................................................................................34

SECTION 14.   HOLDER NOT DEEMED A STOCKHOLDER. .................................34

SECTION 15.   NOTICES TO COMPANY AND WARRANT AGENT. .....................34

SECTION 16.   SUPPLEMENTS AND AMENDMENTS.............................................35

SECTION 17.   TERMINATION....................................................................................35

SECTION 18.   GOVERNING LAW AND CONSENT TO FORUM. ...........................36

SECTION 19.   WAIVER OF JURY TRIAL..................................................................36

SECTION 20.   BENEFITS OF THIS AGREEMENT. .................................................36

SECTION 21.   COUNTERPARTS. ..............................................................................36

SECTION 22.   HEADINGS. .........................................................................................36

SECTION 23.   CONFIDENTIALITY...........................................................................37

i

SECTION 24. REPRESENTATIONS. ...................................................................................37

SECTION 25. NO SUSPENSION. .......................................................................................37

SECTION 26. TAX TREATMENT. .....................................................................................37

Exhibit A   Warrant Allocation Schedule
Exhibit B-1   Form of Face of Global Jones Act Common Stock Warrant Certificate
Exhibit B-2   Form of Face of Individual Warrant Certificate
Exhibit B-3   Form of Election to Exercise Warrant for Holders of Direct Registration Warrants
Exhibit C   Form of Assignment
Exhibit D   Warrant Summary
Exhibit E   Form of Jones Act Anti-Dilution Warrant
Exhibit F   Form of Demand Note

ii

4824-2560-8892.12
#93237973v11

This JONES ACT WARRANT AGREEMENT (this "Agreement") is dated as of [●], 2020, between Hornbeck Offshore Services, Inc., a Delaware corporation, as issuer (the "Company"), and Computershare, Inc., a Delaware corporation, and its wholly owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company (collectively, including any successors thereto, the "Warrant Agent").

W I T N E S S E T H

WHEREAS, in connection with the financial restructuring of the Company and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Plan") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*, the Company has agreed to issue to certain creditors of the Company as of immediately prior to the consummation of the restructuring contemplated by the Plan warrants which are exercisable or convertible to purchase shares of the Company's common stock, par value $0.00001 per share ("Common Stock"), subject to adjustment as provided herein (the "Warrants"), in each case to the extent each such creditor cannot establish to the Company's reasonable satisfaction (during the time period provided under the Plan) that it is or will continue to be a U.S. Citizen (as defined below) for purposes of the Company's compliance with the Jones Act (as defined below) and to the extent that the issuance of such shares of Common Stock under the Plan to such creditor would result in Excess Shares (as defined below) if they were issued;

WHEREAS, pursuant to the Company's Charter, the Company may issue additional Warrants from time to time following the date hereof;

WHEREAS, the Company desires to engage the Warrant Agent to act on behalf of the Company in connection with the issuance, registration, transfer, exchange, replacement, exercise, conversion and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, transfer, exchange, replacement, exercise and conversion of the Warrants as provided herein; and

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the Holders thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.   Certain Defined Terms. Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section 1. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Securityholders Agreement (as defined below).

"Act of Bankruptcy" means, with respect to any Person, the occurrence of any of the following events, conditions or circumstances: (a) such Person files a voluntary petition in bankruptcy or files any petition or consent seeking any reorganization, arrangement, composition,

1

4824-2560-8892.12
#93237973v11

readjustment, liquidation, dissolution or similar relief for itself under the Bankruptcy Code or any present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, or seeks or consents to, or acquiesces in, the appointment of any trustee, receiver, conservator or liquidator of such Person or of all or any substantial part of its properties (the term "acquiesce," as used in this definition, includes the failure to file a petition or motion to vacate or discharge any order, judgment or decree within twenty (20) days, after entry of such order, judgment or decree); or (b) such Person makes a general assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Affected Holder" has the meaning specified in Section 16 hereof.

"Affiliate" means, with respect to any Person, any Person who, directly or indirectly, Controls, is Controlled by or is under common Control with that Person; *provided*, *however*, that for the avoidance of doubt no Holder shall be deemed an affiliate of any other Holder solely on account of ownership of Equity Securities of the Company or being party to the Securityholders Agreement, and no Holder shall be deemed an affiliate of the Company solely on account of being party to the Securityholders Agreement.

"Agreement" has the meaning specified in the preamble hereof.

"Anti-Dilution Amount" means the amount determined in accordance with the following formula:

$$X - Y$$

Where:

$X$ = if the Jones Act Anti-Dilution Warrant is issued to the Holder in respect of a dividend on the Common Stock in accordance with Section 6(h) of this Agreement, the amount equal to the product of (i) such dividend per share of Common Stock, multiplied by (ii) the number of shares of Common Stock underlying such Holder's Warrant;

$Y$ = the amount of withholding taxes paid or payable by the Company on behalf of such Holder in connection with the issuance of the Jones Act Anti-Dilution Warrant based on the amount computed for $X$ without regard to this $Y$ (other than any such withholding taxes paid from other amounts payable to such Holder).

"Applicable Law" means all applicable provisions of (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority, including the Jones Act; (ii) any consents or approvals of any Governmental Authority; and (iii) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Appropriate Officer" has the meaning specified in Section 3(c) hereof.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ § 101 et seq.

2

"Board" means the board of directors (or other applicable governing body) of the Company.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which state or federally chartered banking institutions in New York City, New York are not required to be opened.

"Cash Closing" has the meaning specified in Section 6(g) hereof.

"Cash Sale" means any merger, consolidation or other similar transaction to which the Company is a party and in which holders of Common Stock as of immediately prior to the consummation of such transaction (other than with respect to treasury shares and any shares of Common Stock held by the purchasing party(ies) in such transaction) are entitled to receive consideration consisting solely of cash upon cancellation of such Common Stock in such transaction.

"Cashless Conversion" has the meaning specified in Section 5(c)(ii) hereof.

"Charter" means, with respect to any Person, such Person's certificate or articles of incorporation, certificate of formation, articles of association or similar organizational document, in each case as may be amended from time to time.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" has the meaning specified in the recitals hereof.

"Company Liquidation Event" means any liquidation, dissolution or winding-up of the affairs of the Company, the termination of the legal existence of the Company or any Act of Bankruptcy or any other similar event or proceeding with respect to the Company, whether voluntary or involuntary, pursuant to which the holders of Common Stock are (subject to the liquidation preferences set forth in the Company's Charter) entitled to receive consideration consisting solely of cash.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract (including proxy) or otherwise. The terms "Controlled", "Controlled by" or "under common Control with" shall have correlative meanings.

"Convertible Securities" means any securities (directly or indirectly) convertible into or exchangeable or exercisable for Common Stock, but excluding Options.

"Definitive Warrants" has the meaning specified in Section 4(h)(i) hereof.

"Demand Note" means a non-interest bearing demand note issuable by the Company in the form attached as Exhibit F in connection with the exercise of a Jones Act Anti-Dilution Warrant.

"Depository" has the meaning specified in Section 3(b) hereof.

3

"Direct Registration Warrant" has the meaning specified in Section 3(a) hereof.

"Effective Date" means [●], 2020.

"Excess Shares" has the meaning specified in the Company's Charter.

"Exchange Act" has the meaning specified in Section 4(h)(i) hereof.

"Exercise Price" means the initial exercise price for the Warrants as set forth in Section 5(b) hereof.

"Expiration Date" has the meaning specified in Section 5(a) hereof.

"Fair Market Value" shall mean (i) with respect to Common Stock, at any time the Common Stock is listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the arithmetic average of the daily VWAP of a share of Common Stock for the ten (10) consecutive trading days on which shares of Common Stock traded immediately preceding the date of measurement; or (ii) otherwise, the value of an asset as reasonably determined in good faith by the Board assuming such asset was sold in an arm's-length transaction between a willing buyer and a willing seller occurring on the date of valuation, taking into account all relevant factors determinative of value (and giving effect to any transfer taxes payable in connection with such sale).  For all purposes hereunder, the determination of the Fair Market Value by the Board (or compensation committee or similar committee of the Board) shall be deemed conclusive, final and binding (and shall not be subject to collateral attack for any reason).

"Fully Diluted Basis" means the aggregate number of issued and outstanding shares of Common Stock after giving effect to a hypothetical conversion, or exercise, as applicable, of all of the issued and outstanding Warrants into shares of Common Stock, without regard to whether such Warrants are then convertible or exercisable in accordance with their terms or the terms of the Company's Charter (but disregarding and without giving effect to the issuance, conversion or exercise, as applicable, of any Common Stock, Common Stock Equivalent or other Equity Security of the Company issued or issuable pursuant to the MIP).

"Funds" has the meaning specified in Section 12(q) hereof.

"Global Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, including the U.S. Coast Guard and the U.S. Maritime Administration, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Holder" means the beneficial or registered holder or holders of Warrants, unless the context otherwise requires.

4

"Individual Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Jones Act" shall mean, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d), and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering and interpreting such laws, statutes, rules and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. Coastwise Trade.

"Jones Act Anti-Dilution Warrant" means a warrant to purchase a Demand Note issued to a Holder in the form attached as Exhibit E.

"MIP" has the meaning specified in the Securityholders Agreement.

"Non-U.S. Citizen" means any Person who is not a U.S. Citizen.

"Options" means any warrants, including additional Warrants, or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"Permitted Percentage" has the meaning set forth in the Company's Charter.

"Person" means any individual, corporation, general partnership, limited partnership, limited liability partnership, joint venture, association, joint-stock company, trust, limited liability company, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" has the meaning specified in the recitals hereof.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"Securityholders Agreement" means that certain Securityholders Agreement, dated as of [●], 2020, by and between the Company and the holders of Common Stock and/or Warrants party thereto from time to time, and the other parties thereto, as may be amended from time to time.

"Settlement Date" means the date that is the third Business Day after a Warrant Exercise Notice is delivered.

"Signature Guarantee" has the meaning specified in Section 4(c)(ii).

"U.S. Citizen" shall mean a citizen of the United States within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. Coastwise Trade.

"U.S. Coastwise Trade" shall mean the carriage or transport of merchandise or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 and any successor statutes thereto, as amended or supplemented from time to time.

4824-2560-8892.12
#93237973v11

"VWAP" means, for any trading day, the price for shares of Common Stock determined by the daily volume weighted average price per share of Common Stock for such trading day on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market or the NASDAQ Capital Market, as the case may be, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session), or if shares of Common Stock are not listed or quoted on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market or the NASDAQ Capital Market, as reported by the principal U.S. national or regional securities exchange on which shares of Common Stock are then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such trading day.

"Warrant Agent" has the meaning specified in the preamble hereof.

"Warrant Agent Office" has the meaning specified in Section 4(g)(iv) hereof.

"Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Warrant Exercise Notice" has the meaning specified in Section 5(c)(i) hereof.

"Warrant Register" has the meaning specified in Section 3(d) hereof.

"Warrant Shares" has the meaning specified in Section 3(a) hereof.

"Warrant Spread" has the meaning specified in Section 6(g) hereof.

"Warrant Statement" has the meaning specified in Section 3(b) hereof.

"Warrant Summary" has the meaning specified in Section 3(b) hereof.

"Warrants" has the meaning specified in the recitals hereof.

SECTION 2.   Appointment of Warrant Agent. The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the express terms and conditions set forth in this Agreement (and no implied terms and conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

SECTION 3.   Issuance of Warrants; Form, Execution and Delivery.

(a)      Issuance of Warrants. On the Effective Date, the Warrants shall be issued by the Company in the amounts and to the recipients specified in the Warrant Allocation Schedule attached hereto as Exhibit A. In accordance with Section 4 hereof and the Plan, the Company shall initially cause the Warrants to be issued in the form of Individual Warrant Certificates or by book-entry registration on the books and records of the Warrant Agent ("Direct Registration Warrants"). Thereafter, at the Company's option, the Company may, in its sole discretion, cause to be issued to the Depository one or more Global Warrant Certificates evidencing the Warrants and, in such event, the Company shall cause to be issued to the applicable registered Holders Warrants in the

6

form of Global Warrant Certificates through the facilities of the Depository. Each Direct Registration Warrant and each Warrant evidenced by a Global Warrant Certificate or Individual Warrant Certificate shall entitle the Holder, upon proper exercise and payment or conversion of such Warrant, to receive from the Company, as adjusted as provided herein and subject to the Jones Act limitations on ownership of shares of Common Stock by Non-U.S. Citizens set forth in Section 5(m) and Section 5(n) hereof, if applicable, one share of Common Stock. The shares of Common Stock (as provided pursuant to Section 6 hereof) deliverable upon proper exercise or conversion of the Warrants are referred to herein as "Warrant Shares".

(b)     Form of Warrant. Subject to Section 4 of this Agreement, each of the Warrants shall be issued (i) in certificated form in the form of one or more individual certificates (the "Individual Warrant Certificates") in substantially the form of Exhibit B-2 attached hereto, with the form of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibit C attached hereto, and/or (ii) in the form of Direct Registration Warrants reflected on statements issued by the Warrant Agent from time to time to the Holders thereof reflecting such book-entry position (the "Warrant Statements"); provided, that following the Effective Date, the Company may, in its sole discretion, issue, and allow the Warrants to be exchanged for, beneficial interests in one or more global certificates (the "Global Warrant Certificates") in substantially the form of Exhibit B-1 attached hereto, with the form of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibit C attached hereto.  Upon the issuance of the Global Warrant Certificates, any Individual Warrant Certificates or Direct Registration Warrants that are not subject to any transfer restrictions under applicable securities laws may be exchanged at any time for Global Warrant Certificates representing a corresponding number of Warrants, in accordance with Section 4(d) and the applicable procedures of the Depository and the Warrant Agent. The Warrant Statements representing Warrants shall include as an attachment thereto the "Warrant Summary" as set forth in Exhibit D attached hereto. The Global Warrant Certificates and Individual Warrant Certificates (collectively, the "Warrant Certificates") and Warrant Statements may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the rules and regulations of The Depository Trust Company or any successor thereof (the "Depository") in the case of the Global Warrant Certificates, with any law or with any rules made pursuant thereto or with any rules of any securities exchange or as may be determined, consistently herewith and reasonably acceptable to the Warrant Agent and provided, in each case, that they do not affect the rights, duties, obligations, responsibilities, liabilities or indemnities of the Warrant Agent, by (i) in the case of Warrant Certificates, the Appropriate Officers executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates and (ii) in the case of Warrant Statements, any Appropriate Officer. The Global Warrant Certificates shall be deposited as and when appropriate with the Warrant Agent and registered in the name of Cede & Co. or any successor thereof, as the Depository's nominee. Each Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(c)     Execution of Warrants. Warrant Certificates shall be signed on behalf of the Company by its Chief Executive Officer, its President, its Chief Financial Officer, its General

7

Counsel, its Treasurer or any Executive or Senior Vice President of the Company (each, an "Appropriate Officer"), and by the Corporate Secretary or any Assistant Corporate Secretary of the Company. Each such signature upon the Warrant Certificates may be in the form of an electronic signature of any such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the electronic signature of any Appropriate Officer, the Corporate Secretary or any Assistant Corporate Secretary who shall have been serving as an Appropriate Officer, the Corporate Secretary, or an Assistant Corporate Secretary at the time of entering into this Agreement or issuing such Warrant Certificate. If any Appropriate Officer, the Corporate Secretary or any Assistant Corporate Secretary who shall have signed any of the Warrant Certificates shall cease to be such Appropriate Officer, the Corporate Secretary or an Assistant Corporate Secretary before the Warrant Certificates so signed shall have been countersigned by the Warrant Agent or disposed of by the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of as though such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary had not ceased to be such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary, and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary, although at the date of the execution of this Agreement any such person was not such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary. Warrant Certificates shall be dated the date of countersignature by the Warrant Agent and shall represent one or more whole Warrants.

(d)     Countersignature. Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to countersign and accompanied by Warrant Certificates duly executed on behalf of the Company, the Warrant Agent shall countersign (in manual, facsimile or electronic form) one or more Warrant Certificates evidencing the Warrants and shall deliver such Warrant Certificates to or upon such written order of the Company. Such written order of the Company shall specifically state the number of Warrants that are to be represented by such Warrant Certificate and the Warrant Agent may rely conclusively on such order. Each Warrant shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or converted or shall have expired or been canceled in accordance with the terms hereof. Each Holder shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Corporate Secretary of the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same. No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable or convertible, until such Warrant Certificate has been countersigned by the manual, facsimile or electronic signature of the Warrant Agent. Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder. The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register any Warrant Certificates or Direct Registration Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent. The Company or the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other

8

governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made. Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, the Warrant Agent and the Company may deem and treat the Person in whose name any Warrant is registered as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing made in a Warrant Certificate by anyone), for the purpose of any exercise or conversion thereof, any distribution to the Holder thereof and for all other purposes.

(e)     Additional Warrants.  The Company may, without the consent of the Holders and notwithstanding anything to the contrary herein, reopen this Agreement and issue additional Warrants hereunder with the same terms as the Warrants initially issued hereunder (other than differences in the issue date) if the Company issues additional warrants, including if (i) the Company is required to issue such additional Warrants pursuant to its Charter, or (ii) the Company is issuing such additional Warrants to Holders in the manner and on the terms described in the Securityholders Agreement.  Prior to the issuance of any such additional Warrants, the Company shall deliver to the Warrant Agent such legal opinions and certificates as the Warrant Agent shall reasonably request.

SECTION 4.   Transfer or Exchange.

(a)     Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein. The transfer and exchange of Global Warrant Certificates or beneficial interests therein shall be effected through the Depository, in accordance with the terms of this Agreement and the Warrant Certificates and the procedures of the Depository.

(b)     Exchange of a Beneficial Interest in a Global Warrant Certificate for an Individual Warrant Certificate or Direct Registration Warrant.

(i)     Any Holder of a beneficial interest represented by a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Direct Registration Warrant or a Warrant represented by an Individual Warrant Certificate. A transferor of a beneficial interest represented by a Global Warrant Certificate (or the Depository or its nominee on behalf of such transferor) shall, but only to the extent required by the procedures of the Depository and the Warrant Agent in connection with such transfer or exchange, deliver to the Warrant Agent (I) written instructions or such other form of instructions as is customary for the Depository on behalf of any Person having a beneficial interest in a Global Warrant Certificate, and all other reasonably necessary information, and (II) an instruction of transfer in form reasonably satisfactory to the Warrant Agent which, with respect to a transfer of a Global Warrant Certificate only, shall be properly completed, duly authorized in writing and duly executed by the Holder thereof or by such Holder's attorney. Upon satisfaction of the conditions in this Section 4(b)(i), the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be reduced by the number of Warrants to be represented by an Individual Warrant Certificate or Direct Registration Warrant, as the case may be, to be issued in exchange for the beneficial interest of such Person in the Global Warrant Certificate and, following such reduction,

9

(A) in the case of an exchange for an Individual Warrant Certificate (x) the Company shall issue and the Warrant Agent shall either manually, facsimile or electronically countersign an Individual Warrant Certificate representing the appropriate number of Warrants and (y) the Warrant Agent shall deliver such Individual Warrant Certificate to the registered Holder thereof, or (B) in the case of an exchange for a Direct Registration Warrant, the Warrant Agent shall register such Direct Registration Warrants in accordance with such written instructions from the Depository and deliver to such Holder a Warrant Statement.

(ii)     Warrants represented by an Individual Warrant Certificate issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this Section 4(b) shall be issued in such names as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver Individual Warrant Certificates evidencing such issuance to the Persons in whose names such Individual Warrant Certificates are so issued. Direct Registration Warrants issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this Section 4(b) shall be registered in such names as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.

(c)     Transfer and Exchange of Individual Warrant Certificates or Direct Registration Warrants. When the registered Holder of an Individual Warrant Certificate or Direct Registration Warrant has presented to the Warrant Agent a written request:

(i)     to register the transfer of any Individual Warrant Certificate or Direct Registration Warrant; or

(ii)     to exchange any Individual Warrant Certificate or Direct Registration Warrant for a Direct Registration Warrant or an Individual Warrant Certificate, respectively, representing an equal number of Warrants of authorized denominations,

the Warrant Agent shall register the transfer or make the exchange as requested if (x) its customary requirements for such transactions are met and (y) such transfer or exchange otherwise satisfies the provisions of this Agreement; *provided*, *however*, that the Warrant Agent has received a written instruction of transfer or exchange, as applicable, in form reasonably satisfactory to the Warrant Agent, properly completed and duly executed by the Holder thereof or by his attorney, accompanied by a signature guarantee ("Signature Guarantee") from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, duly authorized in writing and a written order of the Company signed by an Appropriate Officer authorizing such exchange. A party requesting transfer of Warrants must provide any evidence of authority that may be reasonably required by the Warrant Agent.

(d)     Restrictions on Transfer and Exchange of Individual Warrant Certificates or Direct Registration Warrants for a Beneficial Interest in a Global Warrant Certificate. Neither an Individual Warrant Certificate nor a Direct Registration Warrant may be exchanged for a beneficial interest in a Global Warrant Certificate pursuant to this Agreement except, following the issuance of a Global Warrant Certificate by the Company, upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of the Company's written approval and appropriate instruments of transfer, accompanied by a Signature Guarantee, with respect to an Individual

10

Warrant Certificate or Direct Registration Warrant that is not subject to transfer restrictions under applicable securities laws, in form reasonably satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depository to make, an endorsement on the applicable Global Warrant Certificate to reflect an increase in the number of Warrants represented by such Global Warrant Certificate equal to the number of Warrants represented by such Individual Warrant Certificate or Direct Registration Warrant, and all other necessary information, then the Warrant Agent shall cancel such Individual Warrant Certificate or Direct Registration Warrant on the Warrant Register and cause, or direct the Depository to cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by such Global Warrant Certificate to be increased accordingly. Any such transfer shall be subject to the Company's prior written approval.

(e)    <u>Restrictions on Transfer and Exchange of Global Warrant Certificates</u>. Notwithstanding any other provisions of this Agreement (other than the provision set forth in <u>Section 4(f)</u>), a Global Warrant Certificate may not be transferred as a whole except by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

(f)    <u>Cancellation of Warrant Certificate</u>.

(i)    At such time as all beneficial interests in Warrant Certificates and Direct Registration Warrants have been exchanged for Warrant Shares in accordance herewith, redeemed, repurchased or cancelled, all Warrant Certificates shall be returned to, or cancelled and retained pursuant to Applicable Law by, the Warrant Agent, upon written instructions from the Company reasonably satisfactory to the Warrant Agent.

(ii)    If at any time the Depository for the Global Warrant Certificates notifies the Company that the Depository is unwilling or unable to continue as Depository for the Global Warrant Certificates and a successor Depository for the Global Warrant Certificates is not appointed by the Company within ninety (90) days after delivery of such notice, then the Warrant Agent, upon written instructions signed by an Appropriate Officer of the Company, shall register Individual Warrants Certificates and Direct Registration Warrants, in an aggregate number equal to the number of Warrants represented by the Global Warrant Certificates, in exchange for such Global Warrant Certificates.

(g)    <u>Obligations with Respect to Transfers and Exchanges of Warrants</u>.

(i)    To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent is hereby authorized to countersign, either by manual, facsimile or electronic signature, in accordance with the provisions of this <u>Section 4</u>, Warrant Certificates, as required pursuant to the provisions of this <u>Section 4</u>.

(ii)    All Warrant Certificates or Direct Registration Warrants issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Warrant Certificates or Direct Registration Warrants surrendered upon such registration of transfer or exchange.

11

(iii)     So long as the Depository, or its nominee, is the registered owner of a Global Warrant Certificate, the Depository or such nominee, as the case may be, will be considered the sole owner or Holder represented by such Global Warrant Certificate for all purposes under this Agreement, including, without limitation, for the purposes of (a) giving notices with respect to such Warrants and (b) registering transfers with respect to such Warrants. Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(iv)     The Warrant Agent shall register the transfer of any outstanding Warrants in the Warrant Register at the Warrant Agent office designated for such purpose (the "Warrant Agent Office") upon (a) receipt of all information required to be delivered hereunder, (b) if applicable, surrender of duly endorsed Warrant Certificates representing such Warrants, and (c) receipt of a completed form of assignment duly authorized in writing substantially in the form attached as Exhibit C hereto, as the case may be, duly signed by the Holder thereof or by the duly appointed legal representative thereof or by such Holder's attorney, accompanied by a Signature Guarantee. Upon any such registration of transfer, a new Warrant Certificate or Warrant Statement, as the case may be, shall be issued to the transferee.

(v)     The Warrant Agent shall not undertake the duties and obligations of a stock transfer agent under this Agreement, or otherwise, including, without limitation, the duty to receive, issue or transfer Warrant Shares.

(h)     Definitive Warrants.

(i)     Beneficial interests represented by a Global Warrant Certificate deposited with the Depository or with the Warrant Agent pursuant to Section 3(b) shall be transferred to each beneficial owner thereof in the form of Warrant Certificates in a definitive form that is not deposited with the Depository or with the Warrant Agent as custodian for the Depository ("Definitive Warrants") evidencing a number of Warrants equivalent to such owner's beneficial interest in such Global Warrant Certificate, in exchange for such Global Warrant Certificate, only if such transfer complies with Section 4(a) and (i) the Depository notifies the Company in writing that it is unwilling or unable to continue as Depository for such beneficial interests represented by such Global Warrant Certificate or if at any time the Depository ceases to be a "clearing agency" registered under the Securities and Exchange Act of 1934, as amended, or the rules promulgated thereunder (the "Exchange Act"), and, in each such case, a successor Depository is not appointed by the Company within ninety (90) days of such notice or (ii) upon the request of any Holder or beneficial owner, if the Company shall be adjudged bankrupt or insolvent or makes an assignment for the benefit of its creditors or institutes proceedings to be adjudicated bankrupt or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization under federal bankruptcy laws or any other similar applicable federal or state law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or custodian of all or any substantial part of its property, or shall admit in writing its inability to pay or meet its debts as they mature, or if a receiver or custodian of it or all or any substantial part of its property shall be appointed, or if a public officer shall have taken charge or

12

control of the Company or of its property or affairs, for the purpose of rehabilitation, conservation or liquidation.

(ii)      Any beneficial interests represented by a Global Warrant Certificate that are transferable to the beneficial owners thereof in the form of Definitive Warrants pursuant to this Section 4(h) shall be surrendered by the Depository to the Warrant Agent, to be so transferred, in whole or from time to time in part, without charge, and the Warrant Agent shall if directed by an Appropriate Officer of the Company countersign, by either manual, facsimile or electronic signature, and deliver to each beneficial owner in the name of such beneficial owner, upon such transfer of each portion of such beneficial interests represented by a Global Warrant Certificate, Definitive Warrants evidencing a number of Warrants equivalent to such beneficial owner's beneficial interest in the Global Warrant Certificate. The Warrant Agent shall register such transfer in the Warrant Register, and upon such transfer the surrendered Global Warrant Certificate shall be cancelled by the Warrant Agent.

(iii)     All Definitive Warrants issued upon registration of transfer pursuant to this Section 4(h) shall be valid obligations of the Company, evidencing the same obligations of the Company and entitled to the same benefits under this Agreement and the Global Warrant Certificate surrendered for registration of such transfer.

(iv)     Subject to the provisions of Section 4(h)(ii), the registered Holder of a Global Warrant Certificate may grant proxies and otherwise authorize any Person to take any action that such Holder is entitled to take under this Agreement or the Warrants.

(v)      In the event of the occurrence of any of the events specified in Section 4(h)(i), the Company will promptly make available to the Warrant Agent a reasonable supply of Definitive Warrants necessary to comply with this Agreement in definitive, fully registered form.

(vi)     Neither the Company nor the Warrant Agent shall be liable or responsible for any registration or transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

(i)      Securityholders Agreement.  Notwithstanding anything herein to the contrary, no Person may Transfer any Warrant except in compliance with the provisions of the Securityholders Agreement, if the Securityholders Agreement is then in effect, and the Company's Charter.

SECTION 5.   Duration and Exercise of Warrants.

(a)      Expiration Date. The Warrants may be exercised only during the period commencing on the Effective Date and expiring on the date on which no Warrants remain outstanding (the "Expiration Date"). After 5:00 p.m. New York City time on the Expiration Date, the Warrants will become void and without further legal effect, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

(b)      Exercise Price. The Exercise Price for the Warrants shall be $0.00001 per share of Common Stock (equal to the par value $0.00001 per share of Common Stock).

13

(c)    Manner of Exercise.

(i)    Cash Payment. Subject to the provisions of this Agreement, including the Jones Act limitations on ownership and control of capital stock of the Company by Non-U.S. Citizens, including those set forth in Section 5(m) and Section 5(n) hereof and the adjustments contained in Section 6 hereof, each Warrant shall entitle the Holder thereof to purchase from the Company one fully paid and nonassessable Warrant Share at the Exercise Price. All or any of the Warrants represented by a Warrant Certificate or in the form of Direct Registration Warrants may be exercised by the registered Holder thereof during normal business hours on any Business Day, by delivering (A) written notice of such election (a "Warrant Exercise Notice") to exercise Warrants to the Company (at the address set forth in Section 15 hereof) and the Warrant Agent at the Warrant Agent Office, no later than 5:00 p.m., New York City time, on the Expiration Date, which Warrant Exercise Notice shall be (i) substantially in the "Form of Election" set forth in Exhibit B-1, in the case of Warrants represented by a Global Warrant Certificate or otherwise in accordance with applicable procedures of the Depository, (ii) substantially in the "Form of Election" set forth in Exhibit B-2, in the case of Warrants represented by Individual Warrant Certificates and (iii) substantially in the form set forth in Exhibit B-3, in the case of Direct Registration Warrants; and (B) by no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date, such Warrants to the Warrant Agent (by book-entry transfer through the facilities of the Depository, if such Warrants are represented by a Global Warrant Certificate), accompanied by a Signature Guarantee and payment in full in respect of each Warrant that is exercised (which shall be made by delivery of a certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer to an account specified in writing by the Company or the Warrant Agent in immediately available funds or, in respect of any Global Warrant Certificate, otherwise in accordance with applicable procedures of the Depository). Such payment shall be in an amount equal to the product of the number of Warrant Shares designated in such Warrant Exercise Notice multiplied by the Exercise Price for the Warrants being exercised, in each case as adjusted herein. Upon such surrender and payment, such Holder shall thereupon be entitled to receive the number of duly authorized, validly issued, fully paid and nonassessable Warrant Shares as set forth in Section 5(d), Section 5(h) and Section 5(i).

(ii)    Cashless Conversion. Subject to the provisions of this Agreement, the Holder shall have the right, in lieu of paying the Exercise Price of Warrants in cash, to instruct the Company in writing to reduce the number of Warrant Shares issuable pursuant to the conversion of such Warrants (the "Cashless Conversion") in accordance with the following formula:

$$X = (Y \times (A - B)) \div A$$

Where:

X =    the number of Warrant Shares to be issued to the Holder upon conversion of the Warrants

Y =    the total number of Warrant Shares for which the Holder has elected to exercise the applicable Warrants as of the day the Warrant Exercise Notice is delivered to the Warrant Agent

14

4824-2560-8892.12
#93237973v11

A = the Fair Market Value of one Warrant Share determined as of the day the Warrant Exercise Notice is delivered to the Warrant Agent

B = the exercise price which would otherwise be payable in cash for one Warrant Share determined as of the day the Warrant Exercise Notice is delivered to the Warrant Agent

If the Exercise Price of the aggregate number of Warrants being converted exceeds the Fair Market Value at the time of such conversion of the aggregate number of Warrant Shares issuable upon such conversion, then no Warrant Shares will be issuable pursuant to the Cashless Conversion. The Holder shall effect a Cashless Conversion by indicating on a duly executed Warrant Exercise Notice that the Holder wishes to effect a Cashless Conversion. Upon receipt of such election to effect a Cashless Conversion, the Warrant Agent will promptly request the Company to confirm the number of Warrant Shares issuable in connection with the Cashless Conversion. The Company shall calculate and transmit to the Warrant Agent in a written notice the number of Warrant Shares issuable in connection with any Cashless Conversion.

(d)     The number of Warrant Shares to be issued on such exercise or conversion will be determined by the Company (with written notice thereof to the Warrant Agent) in accordance with Section 5(c). The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the number of Warrant Shares to be issued on such exercise or conversion is accurate or correct, nor shall the Warrant Agent have any duty or obligation to take any action with regard to such Warrant exercise or conversion prior to being notified by the Company of the relevant number of Warrant Shares to be issued.

(e)     Except as otherwise provided herein, any exercise or conversion of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(f)     Upon receipt of a Warrant Exercise Notice pursuant to Section 5(c), the Warrant Agent shall:

(i)     examine such Warrant Exercise Notice and all other documents delivered to it by or on behalf of the Holder as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notice and any such other documents have been executed and completed in accordance with their terms;

(ii)     endeavor to inform the Company of and cooperate with and assist the Company in resolving any inconsistencies between the Warrant Exercise Notice received and delivery of Warrants to the Warrant Agent's account;

(iii)     advise the Company, no later than the Business Day after receipt of such Warrant Exercise Notice, of (a) the receipt of such Warrant Exercise Notice and, subject to Company's approval, the number of Warrants to be exercised or converted in accordance with the terms of this Agreement, (b) the instructions with respect to delivery of the Warrant Shares

15

deliverable upon such exercise or conversion, subject to the timely receipt from the Depository of the necessary information, and (c) such other information as the Company shall reasonably require;

(iv)     in the case of Warrants represented by a Global Warrant Certificate, liaise with the Depository and effect such delivery to the relevant accounts at the Depository in accordance with its requirements, if requested by the Company with the delivery of the Warrant Shares and all other necessary information by or on behalf of the Company for delivery to the Depository; and

(v)     notify the Company each month of the amount of any funds received by the Warrant Agent for payment of the aggregate Exercise Price in a given month and forward all such funds by the fifth (5th) Business Day of the following month by wire transfer to an account designated by the Company, *provided* that the Company shall pay wire transfer fees to the Warrant Agent for each such wire pursuant to the mutually agreed upon fee schedule referenced in Section 12(g).

(g)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise or conversion shall be determined by the Company in its sole discretion in good faith, which determination shall be final and binding. The Company reserves the right to reject any and all Warrant Exercise Notices that it determines are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful or in violation of the Jones Act Restriction as determined in good faith. Such determination by the Company shall be final and binding on the Holders absent manifest error. Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise or conversion of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise or conversion of Warrants. Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise or conversion of Warrants, nor shall they incur any liability for the failure to give such notice.

(h)     As soon as reasonably practicable after the exercise or conversion of any Warrant (and in any event not later than five (5) Business Days thereafter), the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the Holder, either: (A) if such Holder holds the Warrants being exercised or converted through the Depository's book-entry transfer facilities, by same-day or next-day credit to the Depository for the account of such Holder or for the account of a participant in the Depository the number of Warrant Shares to which such Holder is entitled, in each case registered in such name and delivered to such account as directed in the Warrant Exercise Notice by such Holder or by the direct participant in the Depository through which such Holder is acting (or, if the Common Stock may not then be held in book-entry form through the facilities of the Depository, as set forth in <u>clause (B)</u>); (B) if such Holder holds the Warrants being exercised or converted in the form of Individual Warrant Certificates, a book-entry interest in the number of Warrant Shares to which such Holder is entitled on the books of the Company's transfer agent or, at the Company's option, by delivery to the address designated by such Holder in its Warrant Exercise Notice of a physical certificate or certificates representing the number of Warrant Shares to which such Holder is entitled, in fully registered form, registered in such name or names as may be directed by such Holder (or, if Common Stock at the time of such exercise is held through the facilities of the Depository, as set forth in the foregoing <u>clause (A)</u>); or (C) if such Holder holds the Warrants being exercised or converted in the form of Direct

16

Registration Warrants, a book-entry interest in the number of Warrant Shares to which such Holder is entitled on the books and records of the Company's transfer agent (or, if Common Stock at the time of such exercise is held through the facilities of the Depository, as set forth in the foregoing clause (A)).

If fewer than all of the Warrants evidenced by a Global Warrant Certificate surrendered upon the exercise or conversion of Warrants are exercised or converted at any time prior to the Expiration Date, the Warrant Agent shall cause a notation to be made to the records maintained by the Depository. Subject to Section 5(g), the Person in whose name any certificate or certificates, or any Warrant Exercise Notice, for the Warrant Shares are to be issued (or such Warrant Shares are to be registered, in the case of a book-entry transfer) upon exercise or conversion of a Warrant shall be deemed to have become the Holder of record of such Warrant Shares on the date such Warrant Exercise Notice is delivered.

(i)       No fractional Warrant Shares or scrip representing fractional Warrant Shares shall be issued upon any exercise or conversion of Warrants. In lieu of any fractional Warrant Share to which a Holder would otherwise be entitled upon an exercise of Warrants, such Holder shall be entitled to receive a cash payment equal to the value of such fractional Warrant Share based on the Fair Market Value of the Common Stock as of the applicable date of delivery of a Warrant Exercise Notice. The number of full Warrant Shares that shall be issuable upon an exercise of Warrants by a Holder at any time shall be computed on the basis of the aggregate number of Warrant Shares which may be issuable pursuant to the Warrants being exercised by that Holder at that time. The beneficial owners of the Warrants and the Holders, by their acceptance hereof, expressly agree to receive cash in lieu of any fractional Warrant Share in accordance with this Section 5(i) and hereby waive their right to receive a physical certificate representing such fractional Warrant Share upon exercise of any Warrant. Whenever a payment for fractional Warrant Shares is to be made by the Warrant Agent under any section of this Agreement, the Company shall (1) provide to the Warrant Agent in reasonable detail the facts related to such payments and the prices and/or formulas utilized in calculating such payments, and (2) provide sufficient monies to the Warrant Agent in the form of fully collected funds to make such payments. The Warrant Agent shall be fully protected in relying upon such a certificate and shall have no duty with respect to, and shall not be deemed to have knowledge of, any payment for fractional Warrant Shares or fractional shares under any section of this Agreement relating to the payment of fractional Warrant Shares or fractional shares unless and until the Warrant Agent shall have received such a certificate and sufficient monies.

(j)       If all of the Warrants evidenced by a Warrant Certificate have been exercised or converted, such Warrant Certificate shall be cancelled by the Warrant Agent. Such cancelled Warrant Certificate shall then be disposed of by or at the direction of the Company in accordance with Applicable Law. The Warrant Agent shall confirm such information to the Company in writing as promptly as practicable.

(k)       The Company shall pay all expenses in connection with, and all transfer taxes and similar governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise or conversion of Warrants (including any conversion under Section 5(n) below). The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

17

(l)      The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period beginning on the date of this Agreement and ending no earlier than the first (1st) anniversary of the Expiration Date.

(m)      Jones Act Limitations on Warrant Exercise. Notwithstanding any of the other provisions of this Agreement, in order to facilitate the Company's compliance with the Jones Act and the Jones Act Restriction concerning the ownership and control of the capital stock of the Company by Non-U.S. Citizens with regard to its continuing ability to operate its vessels in the coastwise trade of the United States and to comply with obligations of the Company under contracts that it may enter into from time to time with United States Governmental Authorities:

(i)      At the time of exercise or conversion of any Warrant, its Holder shall advise the Company whether or not it (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of such Warrant) is a U.S. Citizen. The Company may require a Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of such Warrant) to provide it with such documents and other information as it may request as reasonable to confirm that the Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of such Warrant) is a U.S. Citizen.

(ii)      Any Holder that cannot establish to the Company's reasonable satisfaction that it (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of any Warrant) is a U.S. Citizen may not exercise or convert any Warrant to the extent the Warrant Shares deliverable upon exercise or conversion of such Warrant would constitute Excess Shares if they were issued, which shall be determined by the Company in its sole discretion at the time of any proposed exercise or conversion of such Warrant. In such an event, the Company shall advise the Holder that its Warrant Exercise Notice will be processed at such time as the Warrant Shares deliverable upon exercise or conversion of such Warrant would not constitute Excess Shares if they were issued, which shall be determined by the Company in its sole discretion. Subject to Section 5(n) herein, any Warrant Exercise Notice which is delayed for processing because of Jones Act limitations and which subsequently becomes eligible for processing will be processed in the order that it is received by the Warrant Agent (provided that, if two or more Warrant Exercise Notices are submitted on the same day and the exercise or conversion of the full amount of the Warrants set forth in all such Warrant Exercise Notices will not be issued as a result of the application of this Section 5(m), then such Warrant Exercise Notices shall be processed pro-rata), provided that such Warrant Exercise Notice has been submitted in proper form and in full compliance with this Agreement and has not been withdrawn.

(iii)      Any sale, transfer or other disposition of any Warrant by any Holder that is a Non-U.S. Citizen to a Person who is a U.S. Citizen must be a complete transfer of such Holder's interests in such Warrant and the Warrant Shares issuable upon its exercise or conversion to such Person with the transferor retaining no ownership of the Warrant or underlying Warrant Shares nor any ability to direct or control such Person. The foregoing restriction shall also apply to any Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of any Warrant.

18

(iv)     Notwithstanding anything herein to the contrary, in the event that either (A) the Jones Act and other applicable laws are repealed or amended so that the ownership and control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way or (B) the Company's Charter is amended so that the ownership and control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way, the provisions of this Section 5(m) shall no longer apply to any Holder or Warrant.

(n)     Automatic Exercise of Warrants held by Non-U.S. Citizens. The Company shall review its books and records and third party publicly available information, including the records of the Warrant Agent, at least quarterly to determine whether, in its sole discretion, some or all of the outstanding Warrants held by Non-U.S. Citizens may be converted into shares of Common Stock without exceeding the Permitted Percentage or resulting in the existence of Excess Shares.

(i)     If, after making such review, the Company determines, in its sole discretion, that conversion of some or all of the outstanding Warrants covered by a previously submitted Warrant Exercise Notice that has not been withdrawn, will not result in (and would not reasonably be expected to result in) ownership and control by Non-U.S. Citizens in the aggregate in excess of the Permitted Percentage, the Company shall effect the automatic conversion of (and any applicable Holder shall be deemed to have elected under Section 5(c)(ii) to convert) such amount of outstanding Warrants covered by a previously submitted Warrant Exercise Notice (without any further action required by any such Non-U.S. Citizen after its prior submission of a Warrant Exercise Notice, to the extent that such Holder has not withdrawn its Warrant Exercise Notice) into the total number of shares of Common Stock that the Company has so determined, in its sole discretion, may be issued at such time without causing the Permitted Percentage to be exceeded or Excess Shares being issued; *provided*, *however*, that any such conversion shall be subject to the terms herein, including without limitation the restrictions on the issuance of fractional Warrant Shares. Warrants shall be selected for conversion *pro rata* on a Fully Diluted Basis. Any such conversion shall be effected in a manner substantially the same as a Cashless Conversion hereunder. Following such conversion, the number of shares issuable pursuant to Warrants held by each such Holder shall be reduced automatically by the number of Warrant Shares actually issued to each such Holder pursuant to such conversion (or applied as part of the Cashless Conversion), and such Warrants so converted shall no longer be deemed outstanding.

(ii)     In the event of any conversion pursuant to this Section 5(n), the Company shall as promptly as practicable cause to be filed with the Warrant Agent and mailed to each Holder of Warrants subject to such conversion a notice specifying: (A) the date of such conversion which shall be considered the date of delivery of a Warrant Exercise Notice for purposes of determining the number of Warrant Shares issuable and settlement and ownership thereof; (B) the number of such Holder's Warrants converted and the number of Warrant Shares to be issued to such Holder in respect of such Warrants; and (C) the place or places where any Warrant Certificates for such Warrants are to be surrendered and any other applicable procedures required by the Depository and the Warrant Agent to effect such conversion. The Warrant Agent shall be fully protected and authorized in relying upon such notice and shall not be liable for any action taken, suffered or omitted by it in accordance therewith.

(iii)     Notwithstanding anything herein to the contrary, all Warrant Shares issued pursuant to this Section 5(n) shall in all events be subject to all of the restrictions and remedies set

19

forth in the Company's Charter, including, without limitation, in the event that Excess Shares are in fact issued upon the conversion of Warrants pursuant to this Section 5(n), regardless of any determination made by the Board under Section 5(n)(i); *provided*, that, in the event that either (A) the Jones Act and other applicable laws are repealed or amended so that the ownership and control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way or (B) the Company's Charter is amended so that the ownership and control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way, the provisions of this Section 5(n) shall no longer apply to any Holder or Warrant.

(o)     Cost Basis Information.

(i)     In the event of a cash exercise of Warrants, the Company hereby instructs the Warrant Agent to record cost basis for newly issued Warrant Shares as reasonably determined by the Company prior to processing.

(ii)     In the event of a Cashless Conversion of Warrants, the Company shall provide the cost basis for Warrant Shares issued pursuant to such Cashless Conversion at the time the Company confirms the number of Warrant Shares issuable in connection with such Cashless Conversion to the Warrant Agent pursuant to Section 5 hereof.

(p)     Securityholders Agreement.  Each (i) Holder and (ii) Person that acquires any Warrants after the date hereof in accordance with the terms of this Agreement and the Securityholders Agreement, in each case, that is not already a party to the Securityholders Agreement, shall become a party to the Securityholders Agreement, if the Secuirtyholders Agreement is then in effect. Notwithstanding anything herein to the contrary, no Person shall receive any Warrant Shares upon exercise or conversion of any Warrant unless such Person is or becomes a party to the Securityholders Agreement by executing a joinder thereto, if the Securityholders Agreement is then in effect.

SECTION 6.   Adjustment of Number of Shares Purchasable or Number of Warrants; Anti-Dilution Warrants.

(a)     Below Market Issuances.

(i)     If the Company at any time or from time to time after the date hereof shall grant, issue or sell (whether directly or by assumption in a merger or otherwise) any additional shares of Common Stock, Options or Convertible Securities or shall fix a record date for the determination of holders of any Equity Securities to receive any additional shares of Common Stock, Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon such event, including upon the exercise of such Options or, in the case of Convertible Securities, the conversion or exchange of such Convertible Securities, shall be deemed to be additional Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of 5:00 PM (New York City time) on such record date; *provided*, that additional Common Stock shall not be deemed to have been issued unless the consideration per share of such additional Common Stock would be less

20

4824-2560-8892.12
#93237973v11

than the Fair Market Value of each such share of Common Stock as of such date and immediately prior to such issuance, or such record date, as the case may be; provided, further, that, in any such case in which additional Common Stock is deemed to be issued, no further adjustments shall be made upon the subsequent issue of Convertible Securities or Common Stock upon the exercise of Options or the conversion or exchange of Convertible Securities.

(ii)    If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment pursuant to the terms of this Section 6(a), are revised (either automatically, pursuant to the provisions contained therein, or as a result of an amendment to such terms) to provide for either (i) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (ii) any increase or decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then, effective upon such increase or decrease becoming effective, the number of Warrant Shares issuable upon exercise or conversion of any Warrant computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such number of Warrant Shares issuable upon exercise or conversion of any Warrant as would have been obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security.

(iii)    If the terms of any Option or Convertible Security, the issuance of which did not result in an adjustment to the number of Warrant Shares issuable upon exercise or conversion of any Warrant pursuant to the terms of this Section 6(a) (either because the consideration per additional Common Stock subject thereto was equal to or greater than the-then Fair Market Value of each such share of Common Stock), are revised after the date hereof (either automatically, pursuant to the provisions contained therein, or as a result of an amendment to such terms) to provide for either (i) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (ii) any increase or decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended, and the additional Common Stock subject thereto shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(iv)    Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the number of Warrant Shares issuable upon exercise or conversion of any Warrant pursuant to the terms of this Section 6(a), the number of Warrant Shares issuable upon exercise or conversion of any Warrant shall be readjusted to such number of Warrant Shares issuable upon exercise or conversion of any Warrant as would have been obtained had such Option or Convertible Security never been issued.

(v)    Except as provided in Section 6(a)(vi) and except in the case of any event described in Section 6(b), Section 6(c), Section 6(d) or Section 6(e), in the event the Company shall at any time after the date hereof grant, sell or issue additional Common Stock (including additional Common Stock deemed to be issued pursuant to Section 6(a)(i)) without consideration or for consideration per share of Common Stock less than the Fair Market Value of each such share of Common Stock, then the number of Warrant Shares issuable upon exercise or conversion of any Warrant shall be increased pursuant to the formula below:

21

$$Ua = Ub \times \frac{Oa}{Ob + Y}$$

Where:

$Ub$ = The number of Warrant Shares issuable for each Warrant before the adjustment

$Ua$ = The number of Warrant Shares issuable for each Warrant after the adjustment

$Oa$ = Number of shares of Common Stock outstanding immediately after the transaction in question on a Fully Diluted Basis

$Ob$ = Number of shares of Common Stock outstanding immediately before the transaction in question on a Fully Diluted Basis

$Y$ = Number of shares of Common Stock equal to the aggregate offering price of the shares of Common Stock being issued, *divided by* the Fair Market Value of one share of Common Stock as of the earlier of (a) the announcement date of the issuance of such Common Stock and (b) the date of issuance of such Common Stock

(vi)     Notwithstanding anything in this Section 6 to the contrary, none of the grant, sale or issuance of (A) any Common Stock, Common Stock Equivalent or other Equity Security of the Company (including the grant, sale or issuance of any Common Stock, other Equity Security of the Company or Common Stock Equivalent upon conversion, exchange or exercise thereof) pursuant to the MIP, (B) the Warrants issued pursuant to this Agreement and the Company's Charter (including the grant, sale or issuance of any Common Stock, other Equity Security of the Company or Common Stock Equivalent upon the exercise thereof), (C) the New Creditor Warrants (as defined in the Plan) (including the grant, sale or issuance of any Common Stock, other Equity Security of the Company or Common Stock Equivalent upon the exercise thereof), (D) shares of Common Stock or Convertible Securities actually issued upon the exercise of Options or shares of Common Stock actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security and such issuance has already resulted in an adjustment in accordance with this Section 6, or (E) shares of Common Stock in an offering for cash for the account of the Company that is underwritten on a firm commitment basis and is registered under the Securities Act, shall be deemed to be a grant, sale or issuance of additional Common Stock for purposes of this Section 6.

(b)     Stock Dividends, Subdivisions and Combinations of Shares. If after the date hereof the number of outstanding shares of Common Stock is increased by a share dividend or share distribution to all holders of Common Stock, in each case payable in shares of Common Stock, or a split, subdivision or combination of shares of Common Stock occurs, then, in any such event, the number of Warrant Shares issuable for each Warrant will be adjusted as follows: the number of Warrant Shares issuable pursuant to a valid exercise or conversion of Warrants immediately

22

4824-2560-8892.12
#93237973v11

prior to such event shall be adjusted so that each Holder shall be entitled to receive upon the exercise or conversion of its Warrant the number of Warrant Shares that such Holder would have owned or would have been entitled to receive upon or by reason of such event had such Warrant been exercised or converted immediately prior to the occurrence of such event (without taking into account any limitations or restrictions on the exercisability of the Warrants). Any adjustment made pursuant to this Section 6(b) shall become effective (i) in the case of any such dividend or distribution, at the close of business on the record date for the determination of holders of shares of Common Stock entitled to receive such dividend or distribution or (ii) in the case of any such split, subdivision or combination, at the open of business on the date on which such corporate action becomes effective.

(c)     Distributions of Certain Rights, Options and Warrants. If after the date hereof the Company distributes to holders of the Common Stock any Options or Convertible Securities entitling them to subscribe for or purchase shares of Common Stock at a price per share that is less than the Fair Market Value of one share of Common Stock as of the announcement date of such issuance, the number of Warrant Shares issuable for each Warrant will be increased pursuant to the formula below. Such increases shall be made successively whenever any such Options or Convertible Securities are distributed and shall become effective at the close of business on the record date for such distribution. To the extent that shares of Common Stock are not delivered at or prior to the expiration of such Options or Convertible Securities, the number of Warrant Shares issuable for each Warrant shall be readjusted to be the number of Warrant Shares issuable for each Warrant that would then be in effect had the adjustment with respect to the issuance of such Options or Convertible Securities been made on the basis of delivery of only the number of Warrant Shares actually delivered. In the event that such Options or Convertible Securities are not so issued, the number of Warrant Shares issuable for each Warrant shall be readjusted to be the number of Warrant Shares issuable for each Warrant that would then be in effect if such record date had not occurred. For purposes of this Section 6(c), in determining whether any Options or Convertible Securities entitle the Holders to subscribe for or purchase shares of Common Stock at less than such Fair Market Value of one share of Common Stock as of the announcement date of such issuance, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received by the Company for such Options or Convertible Securities and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board.

$$Ua = \quad Ub \ \times \ \frac{Ob + X}{Ob + Y}$$

Where:

Ub = The number of Warrant Shares issuable for each Warrant before the adjustment

Ua = The number of Warrant Shares issuable for each Warrant after the adjustment

23

4824-2560-8892.12
#93237973v11

Ob = Number of Warrant Shares outstanding immediately before the transaction in question on a Fully Diluted Basis

X = Number of shares of Common Stock issuable pursuant to such Options or Convertible Securities

Y = Number of shares of Common Stock equal to the aggregate offering price of the shares of Common Stock issuable pursuant to such Options or Convertible Securities, *divided by* the Fair Market Value of one share of Common Stock as of earlier of (a) the announcement date of the issuance of such Options or Convertible Securities and (b) the date of issuance of such Options or Convertible Securities

(d)     Certain Other Dividends and Distributions. If after the date hereof the Company shall dividend or distribute to all holders of its shares of Common Stock any of its securities, evidences of its indebtedness, other assets or property of the Company (excluding cash) or rights, options or warrants to acquire any of its securities (including any such distribution made in connection with a merger or consolidation in which the Company is the resulting or surviving Person and shares of Common Stock are not changed or exchanged, but excluding any dividend or other distribution payable for which adjustment is made under Section 6(a), Section 6(b) or Section 6(c)), then in each such case the Warrant Shares issuable upon exercise or conversion of each Warrant outstanding immediately following the close of business on the record date for such distribution shall be increased to an amount determined pursuant to the formula below. Such increase shall become effective at the close of business on the record for such dividend or distribution. In the event that such dividend or distribution is not so paid or made, the number of Warrant Shares issuable upon exercise or conversion of each Warrant shall be readjusted, effective as of the date when the Board determines not to make such dividend or distribution, as the case may be, to be the number of Warrant Shares issuable upon exercise or conversion of each Warrant that would be in effect if such dividend or distribution had not been declared.

$$ Ua = Ub \times \frac{M}{M - D} $$

Where:

Ub = The number of Warrant Shares issuable for each Warrant before the adjustment

Ua = The number of Warrant Shares issuable for each Warrant after the adjustment

M = Fair Market Value of one share of Common Stock immediately preceding the record date for such dividend or distribution

24

4824-2560-8892.12
#93237973v11

D = Fair Market Value of the dividend or distribution made per share of Common Stock as of such record date (determined for such purpose on the basis of the aggregate property distributed with respect to one share of Common Stock)

(e) <u>Reorganization; Reclassification; Merger</u>.  Subject to <u>Section 6(g)</u>, in the event of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of any event described in <u>Section 6(b)</u>), (iii) consolidation or merger of the Company with or into another Person, (iv) sale of all or substantially all of the Company's assets to another Person or (v) other similar transaction, in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) stock, securities or assets with respect to or in exchange for Common Stock, each Warrant shall, immediately after such reorganization, reclassification, consolidation, merger, sale or similar transaction, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Warrant Shares then issuable upon exercise or conversion of any Warrant, be exercisable for the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Holder would have been entitled upon such reorganization, reclassification, consolidation, merger, sale or similar transaction if the Holder had exercised or converted such Warrant in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale or similar transaction and acquired the applicable number of Warrant Shares then issuable hereunder as a result of such exercise or conversion (without taking into account any limitations or restrictions on the exercisability of the Warrants); and, in such case, appropriate adjustment (as determined in good faith by the Board) shall be made with respect to the Holders' rights under the Warrants to insure that the provisions of this <u>Section 6</u> shall thereafter be applicable, as nearly as possible, to the Warrants in relation to any shares of stock, securities or assets thereafter acquirable upon exercise of the Warrants. The provisions of this <u>Section 6(e)</u> shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or similar transactions. The Company shall not effect any such reorganization, reclassification, consolidation, merger, sale or similar transaction unless, prior to the consummation thereof, the successor Person (if other than the Company) resulting from such reorganization, reclassification, consolidation, merger, sale or similar transaction, shall assume, by written instrument substantially similar in form and substance to the Warrants, the obligation to deliver to any Holder such shares of stock, securities or assets which, in accordance with the foregoing provisions, such Holder shall be entitled to receive upon exercise or conversion of any Warrants.

(f) [Reserved]

(g) <u>Cash Sales and Liquidations</u>. Notwithstanding anything in this Agreement to the contrary, in the event of a Cash Sale or a Company Liquidation Event, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised or unconverted Warrant outstanding immediately prior to the consummation of such Cash Sale or a Company Liquidation Event (the "<u>Cash Closing</u>"), cash in the amount equal to (x) the number of Warrant Shares underlying such Warrant immediately prior to the Cash Closing multiplied by (y) the excess, if any, of the cash consideration being paid for each share of Common Stock in such Cash Sale or a Company Liquidation Event minus the Exercise Price (such product, the "<u>Warrant Spread</u>"); provided, however, that no Holder shall be entitled to any payment hereunder with respect to any

25

portion of such consideration that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of the Common Stock. Upon the occurrence of a Cash Closing, all unexercised or unconverted Warrants outstanding immediately prior to the Cash Sale or a Company Liquidation Event shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants except as to the requirement to pay the Warrant Spread (subject to the limitations described in the prior sentence). For the avoidance of doubt, the Holders shall not be entitled to any payment with respect to any Cash Sale or a Company Liquidation Event in which the Exercise Price is greater than the consideration payable with respect to each share of Common Stock. Notwithstanding anything to the contrary in the foregoing, if the Company engages in a reclassification in which the Common Stock is reclassified into a combination of Common Stock and any other security, such reclassification will be treated as a reclassification subject to Section 6(e) with respect to the Common Stock portion thereof and a distribution subject to Section 6(c) or 6(d), as applicable, with respect to the other security portion thereof.

(h)     Cash Dividends on Common Stock.  If after the date hereof the Company declares at any time or from time to time any cash dividends on the shares of Common Stock, then in each such case the Company shall issue to each Holder a Jones Act Anti-Dilution Warrant.  Each such Jones Act Anti-Dilution Warrant will have an exercise price of $0.00 per share and shall be exercisable by U.S. Citizens only for a Demand Note that has an aggregate principal amount equal to the applicable Anti-Dilution Amount.

(i)     Other Changes. If, at any time or from time to time after the issuance of the Warrants but prior to the exercise or conversion in full thereof, the Company shall take any action which (i) affects the Common Stock and (ii) is similar to, or has an effect similar to, any of the actions described in any of Sections 6(a) through (h) (but not including any action described in any such Section) then, and in each such case, (x) with respect to actions similar to Sections 6(a) through (e), the number of Warrant Shares issuable upon exercise or conversion of each Warrant shall be adjusted, (y) with respect to actions similar to Section 6(g), payment of the Warrant Spread shall be made to each Holder based on the amount that such holders of Common Stock are entitled to receive under the Organizational Documents and (z) with respect to actions similar to Section 6(h), Jones Act Anti-Dilution Warrants shall be issued, which adjustment pursuant to clause (x), payment pursuant to clause (y) or issuance pursuant to clause (z) shall be made in such manner and at such time and on such terms as the Board determines would be equitable under such circumstances such that the economic benefits of such action that would accrue to the holders of Common Stock of the Company would as nearly as practicable also accrue to the Holders, which determination shall be evidenced in a resolution of the Board, a copy of which shall be mailed by the Warrant Agent (upon the written instruction of the Company) to each of the relevant Holders.

(j)     Notice of Adjustment. Whenever the Warrant Shares issuable or the rights of the Holder shall be adjusted or proposed to be adjusted as provided in this Section 6, the Company shall forthwith file with the Warrant Agent a statement, signed by an Appropriate Officer, stating in detail the facts requiring such adjustment, the impact of such adjustment on the number and kind of securities issuable upon exercise or conversion of the Warrants, the record date with respect to any such action, if applicable, and the approximate date on which such action is to take place. In the case of any action which would require the fixing of a record date, such notice shall be given at least 10 days prior to the date so fixed, and in case of all other action, such notice shall be given

26

at least 20 days prior to the taking of such proposed action. Until such notices or statements are received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that no such adjustment has occurred. The Company shall also cause a notice setting forth the same information as set forth above to be sent by mail, first class, postage prepaid, to each registered Holder at its address appearing on the Warrant Register. The Company shall, within five (5) days following the event requiring any such adjustment, deliver to the Warrant Agent a certificate, signed by an Appropriate Officer, which (a) sets forth in reasonable detail (i) the event requiring such adjustment and (ii) the method by which such adjustment was calculated and (b) specifies any adjustments to the Warrants in effect following such event. The Warrant Agent shall be fully protected in relying on any such certificate and on any adjustment or statement therein contained and shall have no duty or liability with respect to, and shall not be deemed to have knowledge of any such adjustment or any such event unless and until it shall have received such certificate.

(k)     No Change in Warrant Terms on Adjustment. Irrespective of any adjustments in the number of Warrant Shares issuable upon exercise or conversion, Warrants theretofore or thereafter issued may continue to express the same prices and number of Warrant Shares as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the number of Warrant Shares issuable upon exercise or conversion specified thereon shall be deemed to have been so adjusted (including for purposes of Section 5(n) hereof).

(l)     Treasury Shares. Shares of Common Stock at any time owned by the Company shall not be deemed to be outstanding for the purposes of any computation under this Section 6.

(m)     Exclusion of Certain Adjustments. No adjustment need be made for a change in the par value of the shares of Common Stock, *provided*, that the Exercise Price shall remain at $0.00001. All calculations under this Section 6 shall be made to the nearest one one-thousandth (1/1,000) of a share.

(n)     Proceedings Prior to Any Action Requiring Adjustment. As a condition precedent to the taking of any action which would require an adjustment pursuant to this Section 6, the Company shall promptly take (and shall be permitted by the Holders to take) any action which may be necessary, including obtaining any stockholder approvals or exemptions, in order that the Company may thereafter validly and legally issue as fully paid and nonassessable all Warrant Shares that a Holder is entitled to receive upon exercise of a Warrant pursuant to this Section 6.

(o)     Redemptions. In the event the Board determines to return capital or any other amounts to the holders of Company Securities, the Company shall do so by offering to redeem or otherwise repurchase shares of Common Stock and Warrants on a pro rata basis (determined by reference to the relative ownership of the then outstanding shares of Common Stock and Warrants on a Fully Diluted Basis as of the date of such redemption or repurchase).

SECTION 7.   Cancellation of Warrants. The Warrant Agent shall cancel all Warrant Certificates surrendered for exercise, conversion, exchange, substitution or transfer in whole or in part. Such cancelled Warrant Certificates shall thereafter be disposed of by the Warrant Agent upon written instructions from the Company reasonably satisfactory to the Warrant Agent and such Direct Registration Warrants shall be canceled by appropriate notation on the Warrant Register.

27

4824-2560-8892.12
#93237973v11

SECTION 8.   Mutilated or Missing Warrant Certificates. Upon receipt by the Company and the Warrant Agent from any Holder of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of such Holder's Warrant Certificate and a surety bond or indemnity reasonably satisfactory to them and holding the Warrant Agent and Company harmless, and in case of mutilation upon surrender and cancellation thereof, and absent notice to Warrant Agent that such Warrant Certificates have been acquired by a bona fide purchaser, the Company will execute and the Warrant Agent will countersign and deliver in lieu thereof a new Warrant Certificate of like tenor and representing an equal number of Warrants to such Holder; *provided*, that in the case of mutilation, no bond or indemnity shall be required if such Warrant Certificate in identifiable form is surrendered to the Company or the Warrant Agent for cancellation. Upon the issuance of any new Warrant Certificate under this Section 8, the Company may require the payment of a sum sufficient to cover any stamp tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Warrant Agent) in connection therewith. Every new Warrant Certificate executed and delivered pursuant to this Section 8 in lieu of any lost, stolen, destroyed or mutilated Warrant Certificate shall be entitled to the same benefits of this Agreement equally and proportionately with any and all other Warrant Certificates, whether or not the allegedly lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone. The provisions of this Section 8 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of lost, stolen, destroyed or mutilated Warrant Certificates.

SECTION 9.   Reservation of Shares. The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, solely for issuance and delivery upon exercise or conversion of Warrants, the full number of Warrant Shares from time to time issuable upon the exercise or conversion of all Warrants and any other outstanding warrants, options or similar rights, from time to time outstanding. All Warrant Shares shall be duly authorized and, when issued upon such exercise or conversion of the Warrants, shall be duly and validly issued, and (if applicable) fully paid and nonassessable, free from all taxes, liens, charges, security interests, encumbrances and other restrictions created by or through the Company and issued without violation (i) of any preemptive or similar rights of any stockholder of the Company and (ii) by the Company of any Applicable Law or governmental regulation.

SECTION 10. Legends. The Warrants are issued in reliance upon the exemption from the registration requirements of Section 5 of the Securities Act provided by either (a) section 1145 of the Bankruptcy Code or (B) section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. To the extent the Company determines that the exemption from registration provided under section 1145 of the Bankruptcy Code is not available with respect to any issuance or transfer of Warrants, the Warrant Certificates representing such Warrants shall be stamped or otherwise imprinted with a legend, and the Warrant Statements shall include a restrictive notation with respect to such Warrants, in substantially the following form:

> "THE WARRANTS REPRESENTED BY THIS CERTIFICATE (AND THE SHARES ISSUABLE PURSUANT THERETO) HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THEY HAVE BEEN REGISTERED UNDER THAT ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE."

28

In addition, for so long as the Securityholders Agreement remains in effect, Warrant Certificates shall be stamped or otherwise imprinted with a legend, and the Warrant Statements shall include a restrictive notation with respect to such Warrants, in substantially the following form:

"THE WARRANTS REPRESENTED BY THIS CERTIFICATE (AND THE SHARES ISSUABLE PURSUANT THERETO) ARE SUBJECT TO A SECURITYHOLDERS AGREEMENT AMONG HORNBECK OFFSHORE SERVICES, INC. AND THE HOLDERS PARTY THERETO, A COPY OF WHICH IS ON FILE WITH THE CORPORATE SECRETARY OF HORNBECK OFFSHORE SERVICES, INC. THE SECURITYHOLDERS AGREEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN PROVISIONS RELATING TO THE TRANSFER OF THE WARRANTS AND THE SHARES ISSUABLE PURSUANT THERETO, INCLUDING RESTRICTIONS ON TRANSFER TO AND OWNERSHIP BY PERSONS WHO ARE NOT U.S. CITIZENS AS DEFINED IN 46 U.S.C. SECTION 50501 QUALIFIED TO OWN AND OPERATE VESSELS ENGAGED IN THE UNITED STATES COASTWISE TRADE, AS IN EFFECT ON THE DATE IN QUESTION, OR ANY SUCCESSOR STATUTE OR REGULATION, AS INTERPRETED BY THE U.S. COAST GUARD IN APPLICABLE PRECEDENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE WARRANTS REPRESENTED BY THIS CERTIFICATE (OR THE SHARES ISSUABLE PURSUANT THERETO) MAY, DIRECTLY OR INDIRECTLY, BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT."

Any legend or restrictive notation referenced in this Section 10 shall be removed from the Warrant Certificates or Warrant Statements at any time after the restrictions described in such legend or restrictive notation cease to be applicable; provided that the Company may request from any Holder opinions, certificates or other evidence that such restrictions have ceased to be applicable before removing such legend or restrictive notation.

SECTION 11.   Notification of Certain Events; Corporate Action.

(a)      In the event of:

(i)      any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any shares of stock of any class, any other securities or any property, or to receive any other right or interest of any kind, or any other event referred to in Sections 6(a) through (h); or

(ii)      (A) any reclassification of the capital stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a

29

4824-2560-8892.12
#93237973v11

result of a subdivision or combination), (B) the consolidation or merger of the Company with or into any other Person (other than a consolidation or merger in which the Company is the continuing Person and which does not result in any change in the shares of Common Stock), (C) the sale or transfer of the properties and assets of the Company as, or substantially as, an entirety to another Person, or (D) a tender or exchange offer for Common Stock; or

(iii)    the voluntary or involuntary dissolution, liquidation, or winding up of the Company;

the Company shall cause to be filed with the Warrant Agent and delivered to each Holder a notice specifying (x) the date or expected date on which any such record is to be taken for the purpose of such dividend, distribution or right, and the amount and character of any such dividend, distribution or right, or if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution, or right are to be determined, and the amount and character of such dividend, distribution or right, or (y) the date or expected date on which any such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up is expected to become effective, and the time, if any such time is to be fixed, as of which holders of record of Common Stock shall be entitled to exchange their shares of Common Stock for the securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up. Such notice shall be delivered not less than ten (10) calendar days prior to such date therein specified, in the case of any such date referred to in clause (x) of the preceding sentence, and not less than twenty (20) calendar days prior to such date therein specified, in the case of any such date referred to in clause (y) of the preceding sentence.

(b)    Failure to give the notice contemplated by Section 11(a) hereof within the time provided or any defect therein shall not affect the legality or validity of any such action.

(c)    The Company agrees that, for so long as any Warrants are outstanding, it shall not increase the par value of the Common Stock or amend or modify its Charter or by-laws in a manner that would prevent the Company from issuing the Common Stock issuable upon exercise of the Warrants. The Company shall not, and shall not permit or cause any of its subsidiaries to, take any action to avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, including through any amendment of its Charter and by-laws (and any equivalent organizational documents of its subsidiaries) or any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities.

SECTION 12. Warrant Agent. The Warrant Agent undertakes the duties and obligations expressly imposed by this Agreement upon the terms and conditions set forth in this Section 12.

(a)    Limitation on Liability. The Warrant Agent shall not by countersigning Warrant Certificates or by any other act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants or the Warrant Certificates (except as to its countersignature thereon), as to the validity, authorization or value (or kind or amount) of any Warrant Shares or other property delivered or deliverable upon exercise or conversion of any Warrant, or as to the purchase price of such Warrant Shares or other property. The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in

30

4824-2560-8892.12
#93237973v11

the Warrant Certificates or for any action taken, suffered or omitted by the Warrant Agent in the belief that any Warrant Certificate or any other document or any signature is genuine or properly authorized unless such action or omission was taken or omitted to be taken in bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction), (ii) be responsible for determining (x) compliance by any Person with the provisions set forth in Section 5(m) or (y) whether any facts exist that may require any adjustment of the number of Warrant Shares, or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Warrant Shares or property upon the surrender of any Warrant for the purpose of exercise or conversion or to comply with any other of the Company's covenants and obligations contained in this Agreement or in the Warrant Certificates or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction) for which the Warrant Agent shall be liable. Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action. Notwithstanding anything to the contrary stated herein, any liability of the Warrant Agent under this Agreement shall be limited to the lesser of (i) amount of fees, but not including reimbursable expenses, paid by the Company to the Warrant Agent during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought, and (ii) $50,000.

(b)      Instructions. The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such officer for advice or instructions. The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received by any such officer. The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such officer.

(c)      Agents. The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the Company resulting from such neglect or misconduct, *provided* that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof. The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary in the performance of its duties hereunder. The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

31

(d)     Cooperation. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e)     Agent Only. The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any Holders. The Warrant Agent shall not be liable except for the performance of such duties as are expressly set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)     Right to Counsel. The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by the Warrant Agent in the absence of bad faith in accordance with the opinion or advice of such counsel.

(g)     Compensation. The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder in accordance with a mutually agreed upon fee schedule and to reimburse the Warrant Agent for its reasonable expenses incurred by the Warrant Agent hereunder (including reasonable counsel fees and expenses) in connection with the acceptance, negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of the Agreement and the exercise and performance of its duties hereunder.

(h)     Accounting and Payment. The Warrant Agent shall account to the Company with respect to Warrants exercised or converted and pay to the Company all moneys received by the Warrant Agent on behalf of the Company on the purchase of Warrant Shares through the exercise of Warrants pursuant to the procedures set forth in Section 5(f)(v). [The Warrant Agent shall advise the Company by electronic transmission at the end of each day the number of Warrant Exercise Notices received, and, if known, the identity of the Holder(s) of the Warrant(s) exercised or converted.]

(i)     No Conflict. Subject to Applicable Law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities (including, for the avoidance of doubt, bonds, notes and warrants) of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Subject to Applicable Law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person including, without limitation, acting as trustee under an indenture.

(j)     Resignation; Termination. The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising prior to resignation as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-

32

appealable judgment of a court of competent jurisdiction)) after giving thirty (30) calendar days' prior written notice to the Company. In the event the transfer agency relationship in effect between the Company and Warrant Agent terminates, the Warrant Agent shall be deemed to have resigned automatically and be discharged from its duties under this Agreement as of the effective date of such termination. The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction) prior to its removal. The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be. Upon such resignation or removal the Company shall promptly appoint in writing a new warrant agent. If the Company shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new warrant agent. Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company. Any successor warrant agent, whether appointed by the Company or by such a court, shall be a Person, formed under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by a federal or state authority, and have a combined capital and surplus of not less than $50,000,000 as set forth in its most recent published annual report of condition; or in the case of such capital and surplus requirement, a controlled affiliate of such a Person meeting such capital and surplus requirement. After acceptance in writing of such appointment by the new Warrant Agent, such successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities under this Agreement as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. Not later than the effective date of any such appointment, the Company shall send notice thereof to the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company. Failure to give any notice provided for in this <u>Section 12(j)</u>, or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(k)     <u>Merger, Consolidation or Change of Name of Warrant Agent</u>. Any Person into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the agency business of the Warrant Agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, *provided* that such Person would be eligible for appointment as a successor Warrant Agent under the provisions of <u>Section 12(j)</u>. If at the time such successor to the Warrant Agent shall succeed under this

33

4824-2560-8892.12
#93237973v11

Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force and effect provided in the Warrant Certificates and in this Agreement. If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrants shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrants shall not have been countersigned, the Warrant Agent may countersign such Warrants either in its prior name or in its changed name; and in all such cases such Warrants shall have the full force and effect provided in the Warrants and in this Agreement.

(l)     Indemnity. The Company agrees to indemnify the Warrant Agent, and to hold it harmless against, any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including reasonable counsel fees and expenses) incurred without the bad faith, gross negligence or willful misconduct on the part of the Warrant Agent (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction), for any action taken, suffered or omitted by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of liability arising therefrom, directly or indirectly. The Warrant Agent shall not be obligated to expend or risk its own funds to take any action which it believes would expose it to expense or liability or to a risk of incurring expense of liability, unless it has been furnished with assurance of repayment or indemnity reasonably satisfactory to it.

(m)     Exclusions. The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment, or to determine when any calculation or adjustment required under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant to be issued pursuant to this Agreement or as to whether any Warrant Shares will, when issued, be valid and fully paid and nonassessable.

(n)     No Liability for Interest. The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(o)     No Implied Obligations. The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent. The Warrant Agent shall not be under any obligation to

34

take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it. The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issuance and sale, or exercise or conversion, of the Warrants or Warrant Shares. The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in any Warrant Certificate or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

(p)    Force Majeure. In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, pandemics, epidemics, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(q)    Bank Accounts. All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services (the "Funds") shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company. Until paid pursuant to the terms of this Agreement, Computershare will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party. The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits. The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Company, any Holder or any other party.

(r)    Notice. The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Company, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in Section 15, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

(s)    Signature Guarantee. The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon (i) any Signature Guarantee or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, such Signature Guarantee; or (ii) related applicable law, act, regulation or any interpretation of the same.

35

(t)      Survival. The provisions under this Section 12 shall survive the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company.

SECTION 13. Severability. In the event that any one or more of the provisions contained herein or in the Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable (including as a result of applicable statutes and the related regulations issued by the U.S. Coast Guard or the Maritime Administration), the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; *provided*, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately. Furthermore, subject to the preceding sentence, in lieu of any such invalid, illegal or unenforceable provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms and commercial effect to such invalid, illegal or unenforceable provision as may be possible and be valid and enforceable which a reasonable person in the position of the Company, acting in good faith, would make, always keeping in mind the intent and purposes of this Agreement and the Warrants issued pursuant thereto by the Persons party hereto as of the date hereof.

SECTION 14. Holder Not Deemed a Stockholder. Prior to the exercise or conversion of any Warrants, no Holder thereof, as such, shall be entitled hereunder to any rights of a stockholder of the Company whether by the issuance of this Warrant or any Jones Act Anti-Dilution Warrant, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or, to receive notice as stockholders in respect of the meetings of stockholders or for the election of directors of the Company or any other matter and the Jones Act Anti-Dilution Warrant shall not constitute a right to receive dividends or give rise to a fiduciary obligation on the part of the Company to pay dividends.

SECTION 15. Notices to Company and Warrant Agent. All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company to be effective shall be in writing (including by e-mail), and shall be deemed to have been duly given or made when delivered by hand or e-mail, or one (1) Business Day if sent by overnight courier service (with next day delivery specified), or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two (2) Business Days or less to the destination such notice), or five (5) Business Days after being deposited in the mail, or, in the case of email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

Hornbeck Offshore Services, Inc.
103 Northpark Blvd., Suite 300
Covington, LA 70433
Attention:      James O. Harp, Jr., Executive Vice President and Chief Financial Officer
                Samuel A. Giberga, Executive Vice President, General Counsel and Chief Compliance Officer
Email:          james.harp@hornbeckoffshore.com

36

4824-2560-8892.12
#93237973v11

samuel.giberga @hornbeckoffshore.com

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by overnight courier service or first-class mail, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> Computershare, Inc.
> Computershare Trust Company, N.A.
> 150 Royall Street
> Canton, MA 02021
> Attention:      Client Services

Unless the Warrant is represented by a Global Warrant Certificate, any notice or communication mailed to a Holder shall be mailed to the Holder at the Holder's address as it appears on the Warrant Register and shall be sufficiently given if so mailed within the time prescribed. Any notice to the owners of a beneficial interest in a Warrant represented by a Global Warrant Certificate shall be distributed through the Depository in accordance with the procedures of the Depository. Communications to such Holder shall be deemed to be effective at the time of dispatch to the Depository. Failure to provide a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

SECTION 16. Supplements and Amendments. The Company and the Warrant Agent may from time to time supplement, amend, waive or otherwise modify this Agreement (a) without the approval of any Holders to implement any changes required in order for the Company to comply with the limitations imposed by the Jones Act or other applicable law on ownership and control of the Common Stock of the Company by Non-U.S. Citizens (provided that to the extent the Company makes any changes pursuant to this clause (a), the Company shall make only such changes which a reasonable person in the position of the Company, acting in good faith, would determine are necessary in order to implement such written requirements, always keeping in mind the intent and purposes of this Agreement and the Warrants issued pursuant thereto by the Persons party hereto as of the date hereof), or (b) with the prior written consent of (i) Holders that hold Warrants representing at least seventy-five percent (75%) of the outstanding Warrants, which must include each of Ares, Whitebox and Highbridge, but only for so long as such Person (together with its respective Affiliates that hold Warrants) holds at least [●] percent ([●]%) of the outstanding Warrants and (ii) if any such amendment or supplement is disproportionately and materially adverse to any Holder(s) (each, an "Affected Holder"), Affected Holders that hold Warrants representing a majority of the outstanding Warrants held by the Affected Holders; provided, that the Warrant Agent shall not be required to execute any amendment, supplement, waiver or other modification to this Agreement that the Warrant Agent has determined would adversely affect its own rights, duties, obligations or immunities under this Agreement. As a condition precedent to the Warrant Agent's execution of any amendment, supplement, waiver or other modification to this Agreement, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment, supplement, waiver or other modification is in compliance with the terms of this Section 16. No supplement, modification, amendment or waiver

37

4824-2560-8892.12
#93237973v11

to this Agreement shall be effective unless duly executed by the Warrant Agent. Upon execution and delivery of any supplement, amendment, waiver or other modification pursuant to this Section 16, such amendment, supplement, waiver or other modification shall be considered a part of this Agreement for all purposes and every Holder of a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

SECTION 17. Termination. This Agreement shall terminate on the Expiration Date or, if later, upon settlement of all Warrants (i) validly exercised or converted prior to the Expiration Date and, (ii) if exercised or converted pursuant to Section 5(c)(i) hereof, for which the Exercise Price was timely paid. Notwithstanding the foregoing, this Agreement will terminate on any earlier date when all Warrants have been exercised, converted, or cancelled; *provided*, *however*, that the provisions of Sections 12, 13, 14, 15, 16, 17, 18, 19, 20 and 23 shall survive such termination.

SECTION 18. Governing Law and Consent to Forum. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and to be performed within the State of Delaware. Each of the Company and the Warrant Agent hereby irrevocably submits to the jurisdiction of the Delaware Chancery Court; provided that if such court does not have jurisdiction, then the United States District Court for the District of Delaware, with respect to any suit, action or proceeding arising out of or relating to this Agreement, and each irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Nothing herein shall affect the right of any Person to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

SECTION 19. Waiver of Jury Trial. Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 19 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

SECTION 20. Benefits of this Agreement. Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered Holders and beneficial owners (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders and beneficial owners.

4824-2560-8892.12
#93237973v11

SECTION 21. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 22. <u>Headings</u>. The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

SECTION 23. <u>Confidentiality</u>. The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services of the Warrant Agent shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by applicable law, rule or regulation, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions). Each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law; provided that such disclosing party shall (a) direct such officers, affiliates, agents, subcontractors and employees to treat such information confidentially and (b) be responsible for any breach of this <u>Section 23</u> by such officers, affiliates, agents, subcontractors and employees who receive such information.

SECTION 24. <u>Representations</u>. Each party hereto (other than the Warrant Agent) represents and warrants that such party has been duly organized and is validly existing under the laws of the jurisdiction of its incorporation, and that this Agreement has been duly authorized, executed and delivered by such party and is enforceable against such party in accordance with its terms, except as may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar laws affecting the enforcement of creditors' rights generally.

SECTION 25. Entire Agreement. This Agreement, the Warrants and the Securityholders Agreement and any other agreements referenced herein or therein constitute the entire agreement with respect to the subject matter of this Agreement, and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

SECTION 26. <u>No Suspension</u>. The right to exercise any Warrants shall not be suspended during any period.

SECTION 27. <u>Tax Treatment</u>. The Company intends to treat the Warrants as stock for U.S. federal income tax purposes unless otherwise required pursuant to applicable law.

*[Signature pages follow]*

39

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

Hornbeck Offshore Services, Inc.

By:_____
Name:  [●]
Title:   [●]

[Signature Page to Jones Act Warrant Agreement]

4824-2560-8892.12
#93237973v11

Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent


By: _____

Name: _____

Title: _____

[Signature Page to Jones Act Warrant Agreement]

4824-2560-8892.12
#93237973v11

# EXHIBIT A
# WARRANT ALLOCATION SCHEDULE

[To come.]

A-1

**EXHIBIT B-1**
**FORM OF FACE OF GLOBAL JONES ACT WARRANT CERTIFICATE**

This Global Warrant Certificate is deposited with or on behalf of The Depository Trust Company (the "Depository") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 4(f) of the Warrant Agreement and (ii) this Global Warrant Certificate may be transferred pursuant to Section 4(e) of the Warrant Agreement and as set forth below.

**UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TO THE COMPANY OR THE WARRANT AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO. OR SUCH OTHER ENTITY, HAS AN INTEREST HEREIN.**

**TRANSFERS OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE OR AS OTHERWISE PERMITTED IN THE WARRANT AGREEMENT, AND TRANSFERS OF BENEFICIAL INTERESTS IN THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE WARRANT AGREEMENT.**

**NO AFFILIATE OF HORNBECK OFFSHORE SERVICES, INC. THAT OWNS THIS SECURITY (OR ANY INTEREST HEREIN) MAY SELL THIS SECURITY (OR ANY INTEREST HEREIN) IF UPON SUCH RESALE THIS SECURITY (OR SUCH INTEREST) WOULD CONSTITUTE A "RESTRICTED SECURITY" WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT OF 1933, AS AMENDED.**

No registration or transfer of the securities issuable pursuant to the exercise or conversion of the Warrant will be recorded on the books of the Company until such provisions have been complied with.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

B-1-1

4824-2560-8892.12
#93237973v11

CUSIP No. [●]

ISIN No. [●]

Initially [●] WARRANTS TO PURCHASE

SHARES OF COMMON STOCK

HORNBECK OFFSHORE SERVICES, INC.

GLOBAL WARRANT TO PURCHASE COMMON STOCK

VOID AFTER 5:00 P.M., New York City Time, [●]

This Global Warrant Certificate ("Warrant Certificate") certifies that Cede & Co., or its registered assigns is the registered holder of warrants (the "Warrants") of Hornbeck Offshore Services, Inc., a Delaware corporation (the "Company"), to purchase the number of shares of Common Stock, par value $0.00001 per share (the "Common Stock"), of the Company set forth above. The Warrants expire at 5:00 p.m., New York City time, on the date on which no Warrants remain outstanding (such date, the "Expiration Date"), and each Warrant entitles the holder to purchase from the Company one fully paid and non-assessable share of Common Stock at the exercise price per share (the "Exercise Price"), payable, unless the holder has elected a Cashless Conversion, to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the settlement date, which settlement date is three Business Days after a Warrant Exercise Notice is delivered (the "Settlement Date"). The initial Exercise Price shall be $0.00001 per share (equal to the par value $0.00001 per share of Common Stock) (subject to adjustment as provided in the Warrant Agreement).

The Warrants are subject to exercise and conversion, in whole or in part, as and to the extent provided in the Warrant Agreement.

The number of shares of Common Stock purchasable upon exercise or conversion of the Warrants are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised or converted prior to the date of the Warrant Agreement or after the Expiration Date.

*Holder Not Deemed a Stockholder*. Prior to the exercise or conversion of any Warrant, no holder thereof, as such, shall be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or to receive notice as stockholders in respect of the meetings of stockholders or for the election of directors of the Company or any other matter (provided that, for the avoidance of doubt,

B-1-2

4824-2560-8892.12
#93237973v11

nothing herein shall limit the rights of the Holders under the Charter, the Securityholders Agreement or any other agreement).

*Jones Act Limitations on Warrant Exercise*. The right to exercise or convert Warrants is subject to the limitations on ownership and control of the Common Stock by Non-U.S. Citizens set forth in the Warrant Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

*[signature page follows]*

B-1-3

4824-2560-8892.12
#93237973v11

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____, 2020


Hornbeck Offshore Services, Inc.


By: _____
Name:  [●]
Title:   [●]



By:_____

Name:_____

Title:_____



Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent


By:_____

Name:_____

Title:_____

B-1-4

FORM OF REVERSE OF GLOBAL WARRANT CERTIFICATE
HORNBECK OFFSHORE SERVICES, INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase shares of Common Stock issued pursuant to that certain Jones Act Warrant Agreement, dated as of [●], 2020 (the "Warrant Agreement"), duly executed and delivered by the Company and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent's office designated for such purpose and is available upon written request addressed to the Company. All capitalized terms used in this Warrant Certificate but not defined herein and are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised or converted to purchase Warrant Shares from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement. Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrants evidenced by this Warrant Certificate may exercise such Warrants as set forth in the Warrant Agreement. The Warrants are also subject to conversion, in whole or in part, at the discretion of the Company or the holder, as applicable, as and to the extent provided in the Warrant Agreement.

In the event that upon any exercise or conversion of the Warrants evidenced hereby the number of shares of Common Stock actually purchased shall be less than the total number of shares of Common Stock purchasable upon exercise or conversion of the Warrants evidenced hereby, there shall be issued to the holder hereof, or such holder's assignee, a new Warrant Certificate evidencing Warrants to purchase the shares of Common Stock not so purchased or appropriate adjustment shall be made in the "Schedule of Increases or Decreases in Global Warrant Certificate" annexed hereto. After 5:00 p.m., New York City time on the Expiration Date, unexercised or unconverted Warrants shall become wholly void and of no value.

Warrant Certificates, when surrendered by book-entry delivery through the facilities of the Depository, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of shares of Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing

B-1-5

4824-2560-8892.12
#93237973v11

hereon made by anyone) for the purpose of any exercise or conversion hereof and for all other purposes.

[Balance of page intentionally remains blank]

B-1-6

4824-2560-8892.12
#93237973v11

[TO BE ATTACHED TO GLOBAL WARRANT CERTIFICATE FOR THE WARRANTS]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL WARRANT CERTIFICATE

The following increases or decreases in this Global Warrant Certificate have been made:

| Date | Amount of decrease in the number of Warrants represented by this Global Warrant Certificate | Amount of increase in number of Warrants represented by this Global Warrant Certificate | Number of Warrants represented by this Global Warrant Certificate following such decrease or increase | Signature of authorized officer of the Warrant Agent |
|---|---|---|---|---|
| | | | | |

B-1-7

4824-2560-8892.12
#93237973v11

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING WARRANTS
THROUGH THE DEPOSITORY TRUST COMPANY

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Shares of Common Stock

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase shares of Common Stock of Hornbeck Offshore Services, Inc. (the "Company") held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depository"), to exercise _____ Warrants for the purchase of _____ newly issued shares of Common Stock of the Company at the Exercise Price of $0.00001 per share (as such Exercise Price may be adjusted pursuant to the Warrant Agreement).

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐ Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects a Cashless Conversion.

If the undersigned will be receiving the shares of Common Stock issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the shares of Common Stock issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

B-1-8

4824-2560-8892.12
#93237973v11

☐ Please check if such designee is a Non-U.S. Citizen.

The undersigned requests that the shares of Common Stock purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, *provided* that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITORY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF DIRECT PARTICIPANT IN THE DEPOSITORY: _____
(PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

ADDRESS:_____

TELEPHONE (INCLUDING INTERNATIONAL CODE):_____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):_____

ACCOUNT FROM WHICH THE WARRANTS ARE BEING DELIVERED:

_____

DEPOSITORY ACCOUNT NO.:_____

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE".

WARRANT HOLDER EXERCISING THE WARRANTS, IF OTHER THAN THE DIRECT DTC PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

B-1-9

NAME:_____
      (PLEASE PRINT)

CONTACT NAME:_____

TELEPHONE (INCLUDING INTERNATIONAL CODE):_____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):_____

ACCOUNT TO WHICH SHARES OF COMMON STOCK ARE TO BE CREDITED:

_____

DEPOSITORY ACCOUNT NO.:_____

FILL IN FOR DELIVERY OF THE COMMON STOCK IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME:_____
      (PLEASE PRINT)

ADDRESS:_____

CONTACT NAME:_____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL   SECURITY   OR   OTHER   TAXPAYER   IDENTIFICATION   NUMBER   (IF APPLICABLE): _____

NUMBER WARRANTS BEING EXERCISED:_____

NUMBER OF SHARES OF COMMON STOCK FOR WHICH THE WARRANTS ARE BEING EXERCISED:_____

Signature: _____

Name: _____

Capacity in which signing:_____

Signature Guaranteed

BY:_____

4824-2560-8892.12
#93237973v11

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

4824-2560-8892.12
#93237973v11

**EXHIBIT B-2**
**FORM OF FACE OF INDIVIDUAL WARRANT CERTIFICATE**

VOID AFTER 5:00 P.M., New York City Time, [●]

 "THIS WARRANT, AND THE SHARES OF COMMON STOCK OF THE COMPANY WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THEY HAVE BEEN REGISTERED UNDER THAT ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

THE SHARES OF COMMON STOCK OF THE COMPANY (THE "SHARES') WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT ARE SUBJECT TO A SECURITYHOLDERS AGREEMENT AMONG HORNBECK OFFSHORE SERVICES, INC. AND THE HOLDERS PARTY THERETO, A COPY OF WHICH IS ON FILE WITH THE CORPORATE SECRETARY OF HORNBECK OFFSHORE SERVICES, INC. THE SECURITYHOLDERS AGREEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN PROVISIONS RELATING TO THE TRANSFER OF THE WARRANTS AND THE SHARES ISSUABLE PURSUANT THERETO, INCLUDING RESTRICTIONS ON TRANSFER TO AND OWNERSHIP BY PERSONS WHO ARE NOT U.S. CITIZENS AS DEFINED IN 46 U.S.C. SECTION 50501 QUALIFIED TO OWN AND OPERATE VESSELS ENGAGED IN THE UNITED STATES COASTWISE TRADE, AS IN EFFECT ON THE DATE IN QUESTION, OR ANY SUCCESSOR STATUTE OR REGULATION, AS INTERPRETED BY THE U.S. COAST GUARD IN APPLICABLE PRECEDENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE WARRANTS REPRESENTED BY THIS CERTIFICATE (OR THE SHARES ISSUABLE PURSUANT THERETO) MAY, DIRECTLY OR INDIRECTLY, BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH SECURITYHOLDERS AGREEMENT."

B-2-1

[●]

WARRANTS TO PURCHASE

SHARES OF COMMON STOCK

HORNBECK OFFSHORE SERVICES, INC.

INDIVIDUAL WARRANT TO PURCHASE COMMON STOCK

VOID AFTER 5:00 P.M., New York City Time, [●]

This Individual Warrant Certificate ("Warrant Certificate") certifies that_____, or its registered assigns is the registered holder of Warrants (the "Warrants") of Hornbeck Offshore Services, Inc., a Delaware corporation (the "Company"), to purchase the number of shares of Common Stock par value $0.00001 per share (the "Common Stock"), of the Company set forth above. The Warrants expire at 5:00 p.m., New York City time, on the date on which no Warrants remain outstanding (such date, the "Expiration Date"), and each Warrant entitles the holder to purchase from the Company one fully paid and non-assessable Share at the exercise price (the "Exercise Price"), payable, unless the holder has elected a Cashless Conversion, to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the business day immediately prior to the settlement date, which settlement date is three Business Days after a Warrant Exercise Notice is delivered (the "Settlement Date"). The initial Exercise Price shall be $0.00001 per share (equal to the par value $0.00001 per share of Common Stock) (subject to adjustment as provided in the Warrant Agreement).

The Warrants are also subject to conversion, in whole or in part, at the sole discretion of the Company, as and to the extent provided in the Warrant Agreement.

The number of shares of Common Stock purchasable upon exercise or conversion of the Warrants are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised or converted prior to the date of the Warrant Agreement or after the Expiration Date.

Holder Not Deemed a Stockholder. Prior to the exercise or conversion of any Warrant, no holder thereof, as such, shall be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or to receive notice as stockholders in respect of the meetings of stockholders or for the election of directors of the Company or any other matter (provided that, for the avoidance of doubt,

B-2-2

4824-2560-8892.12
#93237973v11

nothing herein shall limit the rights of the Holders under the Charter, the Securityholders Agreement or any other agreement).

Jones Act Limitations on Warrant Exercise. The right to exercise or convert Warrants is subject to the limitations on ownership and control of the Common Stock by Non-U.S. Citizens set forth in the Warrant Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT

CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

*[signature page follows]*

B-2-3

4824-2560-8892.12
#93237973v11

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____, 2020

Hornbeck Offshore Services, Inc.
By: _____
Name:  [•]
Title:   [•]

By:_____

Name:_____

Title:_____

Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent

By:_____

Name:_____

Title:_____

B-2-4

4824-2560-8892.12
#93237973v11

FORM OF REVERSE OF INDIVIDUAL WARRANT CERTIFICATE
HORNBECK OFFSHORE SERVICES, INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase shares of Common Stock issued pursuant to that certain Jones Act Warrant Agreement, dated as of [●], 2020 (the "Warrant Agreement"), duly executed and delivered by the Company and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent's office designated for such purpose and is available upon written request addressed to the Company. All capitalized terms used in this Warrant Certificate but not defined herein and are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised or converted to purchase Warrant Shares from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement. Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrants evidenced by this Warrant Certificate may exercise such Warrants as set forth in the Warrant Agreement.

The Warrants are also subject to conversion, in whole or in part, at the discretion of the Company or the holder, as applicable, as and to the extent provided in the Warrant Agreement.

In the event that upon any exercise or conversion of the Warrants evidenced hereby the number of shares of Common Stock actually purchased shall be less than the total number of shares of Common Stock purchasable upon exercise or conversion of the Warrants evidenced hereby, there shall be issued to the holder hereof, or such holder's assignee, a new Warrant Certificate evidencing Warrants to purchase the shares of Common Stock not so purchased. After 5:00 p.m., New York City time on the Expiration Date, unexercised or unconverted Warrants shall become wholly void and of no value.

Warrant Certificates, when surrendered to the Company, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of shares of Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise or conversion hereof and for all other purposes.

B-2-5

[Balance of page intentionally remains blank]

B-2-6

4824-2560-8892.12
#93237973v11

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING INDIVIDUAL WARRANT CERTIFICATES

TO BE COMPLETED BY REGISTERED HOLDER

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Shares of Common Stock

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by _____ Warrants to purchase _____ shares of Common Stock of Hornbeck Offshore Services, Inc. (the "Company"), to purchase _____ newly issued shares of Common Stock of the Company at the Exercise Price of $0.00001 per share (as such Exercise Price may be adjusted pursuant to the Warrant Agreement).

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐ Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects a Cashless Conversion.

If the undersigned will be receiving the shares of Common Stock issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the shares of Common Stock issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

☐ Please check if such designee is a Non-U.S. Citizen.

B-2-7

4824-2560-8892.12
#93237973v11

The undersigned requests that the shares of Common Stock purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, *provided* that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF REGISTERED HOLDER:_____
(PLEASE PRINT)

ADDRESS:_____

_____

DELIVERY ADDRESS (IF DIFFERENT):_____

_____

ACCOUNT TO WHICH THE SHARES OF COMMON STOCK ARE TO BE CREDITED:____

_____

FILL IN FOR DELIVERY OF THE COMMON STOCK IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME:_____

ADDRESS:_____

_____

CONTACT NAME:_____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):_____

B-2-8

4824-2560-8892.12
#93237973v11

NUMBER WARRANTS BEING EXERCISED:_____

NUMBER OF SHARES OF COMMON STOCK FOR WHICH THE WARRANTS ARE BEING EXERCISED:_____

Signature:_____

Note: If the Warrant Shares are to be registered in a name other than that in which the Warrants represented by Individual Warrant Certificate(s) are registered, the signature of the holder hereof must be guaranteed.

Signature Guaranteed

BY:_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

B-2-9

4824-2560-8892.12
#93237973v11

**EXHIBIT B-3**
**FORM OF ELECTION TO EXERCISE WARRANT FOR**
**HOLDERS OF DIRECT REGISTRATION WARRANTS**

TO BE COMPLETED BY REGISTERED HOLDER

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Shares of Common Stock

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by _____ Warrants to purchase _____ shares of Common Stock of Hornbeck Offshore Services, Inc. (the "Company"), to purchase _____ newly issued shares of Common Stock of the Company at the Exercise Price of $0.00001 per share (as such Exercise Price may be adjusted pursuant to the Warrant Agreement).

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐ Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects a Cashless Conversion.

If the undersigned will be receiving the shares of Common Stock issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the shares of Common Stock issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

☐ Please check if such designee is a Non-U.S. Citizen.

B-3-1

4824-2560-8892.12
#93237973v11

The undersigned requests that the shares of Common Stock purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, *provided* that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depository or its nominee.

Dated:_____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF REGISTERED HOLDER:_____
(PLEASE PRINT)

ADDRESS:_____

_____

CONTACT NAME: _____

ADDRESS:_____

_____

TELEPHONE (INCLUDING INTERNATIONAL CODE):_____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):_____

ACCOUNT FROM WHICH THE WARRANTS ARE BEING DELIVERED:

_____

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE". WARRANT HOLDER DELIVERING THE WARRANTS:

ACCOUNT TO WHICH THE SHARES OF COMMON STOCK ARE TO BE CREDITED:

_____

DEPOSITORY ACCOUNT NO.:_____

B-3-2

FILL IN FOR DELIVERY OF THE COMMON STOCK IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME:_____
     (PLEASE PRINT)

ADDRESS:_____

_____

CONTACT NAME:_____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

NUMBER WARRANTS BEING EXERCISED:_____

NUMBER OF SHARES OF COMMON STOCK FOR WHICH THE WARRANTS ARE BEING EXERCISED:_____


Signature: _____

Name: _____

Capacity in which signing:_____


Signature Guaranteed

BY: _____


Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.


B-3-3

**EXHIBIT C**
**FORM OF ASSIGNMENT**

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

FOR VALUE RECEIVED, the undersigned registered holder hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

Warrants to purchase _____ shares of Common Stock held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

_____

Signature

_____

Date

_____

Social Security or Other Taxpayer Identification Number of Assignee

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

C-1

4824-2560-8892.12
#93237973v11

## EXHIBIT D
## WARRANT SUMMARY

NUMBER OF WARRANTS: Initially, [●] Warrants, subject to adjustment as described in the Jones Act Warrant Agreement dated as of [●], 2020 between Hornbeck Offshore Services, Inc. (the "Company") and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent") (as supplemented or amended, the "Warrant Agreement"), each of which is exercisable or convertible for one share of the Company's Common Stock, par value $0.00001 per share. This summary is not complete and reference is made to the Warrant Agreement for the terms of the Warrants. In the event of any conflict, the terms of the Warrant Agreement shall control.

EXERCISE PRICE: $0.00001 per share of Common Stock (subject to adjustment as provided in the Warrant Agreement).

HOLDER NOT DEEMED A STOCKHOLDER: Prior to the exercise or conversion of any Warrant, no holder thereof, as such, shall be entitled to any rights of a stockholder of the Company.

JONES ACT LIMITATIONS ON EXERCISE OR CONVERSION: The right to exercise or convert Warrants is subject to the limitations on ownership and control of the Common Stock by Non-U.S. Citizens set forth in the Warrant Agreement.

FORM OF SETTLEMENT:

Full Settlement: If full physical settlement is elected, the Company shall deliver, against payment of the Exercise Price, a number of shares of Common Stock equal to the number of Warrants exercised or converted, as such number may be adjusted pursuant to the terms of the Warrant Agreement.

Cashless Conversion: If Cashless Conversion is elected, the Company will withhold from issuance a number of shares of Common Stock as provided in the Warrant Agreement.

DATES OF EXERCISE OR CONVERSION: At any time, and from time to time, prior to the close of business on the Expiration Date.

EXPIRATION DATE: The date on which no Warrants remain outstanding.

D-1

# EXHIBIT E
# FORM OF JONES ACT ANTI-DILUTION WARRANT

**Attached.**

4824-2560-8892.12
#93237973v11

**EXHIBIT F**
**FORM OF DEMAND NOTE**

**Attached.**

G-1

4824-2560-8892.12
#93237973v11

**Exhibit C(iii)**

**Jones Act Anti-Dilution Warrants**

*Exhibit C(iii)*

JONES ACT ANTI-DILUTION WARRANT AGREEMENT

Between

Hornbeck Offshore Services, Inc.,

AS ISSUER,

And

Computershare, Inc. and

Computershare Trust Company, N.A.,

collectively, AS WARRANT AGENT

[●], 2020

4826-3625-2092.10
#93237976v12

# TABLE OF CONTENTS[1]

SECTION 1.  CERTAIN DEFINED TERMS. ...................................................................1

SECTION 2.  APPOINTMENT OF WARRANT AGENT. ...........................................4

SECTION 3.  ISSUANCE OF WARRANTS; FORM, EXECUTION AND DELIVERY. ..........4

SECTION 4.  TRANSFER OR EXCHANGE. .............................................................7

SECTION 5.  DURATION AND EXERCISE OF WARRANTS. ...............................11

SECTION 6.  CANCELLATION OF WARRANTS. ..................................................16

SECTION 7.  MUTILATED OR MISSING WARRANT CERTIFICATES. .............16

SECTION 8.  FUNDAMENTAL TRANSACTIONS ................................................16

SECTION 9.  MERGER, CONSOLIDATION, ETC. .................................................16

SECTION 10. LEGENDS ...........................................................................................16

SECTION 11. CORPORATE ACTION. .....................................................................17

SECTION 12. WARRANT AGENT. ...........................................................................17

SECTION 13. SEVERABILITY. .................................................................................22

SECTION 14. NOTICES TO COMPANY AND WARRANT AGENT. .....................22

SECTION 15. SUPPLEMENTS AND AMENDMENTS. ..........................................23

SECTION 16. TERMINATION. ..................................................................................24

SECTION 17. GOVERNING LAW AND CONSENT TO FORUM. ..........................24

SECTION 18. WAIVER OF JURY TRIAL. ................................................................24

SECTION 19. BENEFITS OF THIS AGREEMENT. .................................................24

SECTION 20. COUNTERPARTS. ..............................................................................25

SECTION 21. HEADINGS. .........................................................................................25

---

[1]      NTD: To update Table of Contents.

i

4826-3625-2092.10
#93237976v12

SECTION 22. CONFIDENTIALITY. ...........................................................................................25

SECTION 23. REPRESENTATIONS. ...........................................................................................25

SECTION 24. NO SUSPENSION. ...............................................................................................26

| | |
|---|---|
| Exhibit A-1 | Form of Face of Global Jones Act Anti-Dilution Warrant Certificate |
| Exhibit A-2 | Form of Face of Individual Warrant Certificate |
| Exhibit A-3 | Form of Election to Exercise Warrant for Holders of Direct Registration Warrants |
| Exhibit B | Form of Assignment |
| Exhibit C | Warrant Summary |
| Exhibit D | Form of Demand Note |

4826-3625-2092.10
#93237976v12

This JONES ACT ANTI-DILUTION WARRANT AGREEMENT (this "Agreement") is dated as of [●], 2020, between Hornbeck Offshore Services, Inc., a Delaware corporation, as issuer (the "Company"), and Computershare, Inc., a Delaware corporation, and its wholly owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company (collectively, including any successors thereto, the "Warrant Agent").

W I T N E S S E T H

WHEREAS, in connection with the financial restructuring of the Company and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Plan") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*, the Company has agreed to issue to certain creditors of the Company as of immediately prior to the consummation of the restructuring contemplated by the Plan warrants which are exercisable or convertible to purchase shares of the Company's common stock, par value $0.00001 per share ("Common Stock"), subject to adjustment as provided herein (the "Jones Act Common Stock Warrants"), in each case to the extent each such creditor cannot establish to the Company's reasonable satisfaction (during the time period provided under the Plan) that it is or will continue to be a U.S. Citizen (as defined below) for purposes of the Company's compliance with the Jones Act (as defined below) and to the extent that the issuance of such shares of Common Stock under the Plan to such creditor would result in Excess Shares (as defined below) if they were issued;

WHEREAS, in accordance with the terms of the Jones Act Common Stock Warrants, in the event that cash dividends are paid on the Common Stock, then the holders of the Jones Act Common Stock Warrants will each be issued warrants to purchase Demand Notes (as defined below) as further set forth in this Agreement (the "Warrants");

WHEREAS, the Company desires to engage the Warrant Agent to act on behalf of the Company in connection with the issuance, registration, transfer, exchange, replacement, exercise, conversion and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, transfer, exchange, replacement, exercise and conversion of the Warrants as provided herein; and

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the Holders thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.   Certain Defined Terms. Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section 1.  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Securityholders Agreement (as defined below).

1

"Act of Bankruptcy" means, with respect to any Person, the occurrence of any of the following events, conditions or circumstances: (a) such Person files a voluntary petition in bankruptcy or files any petition or consent seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under the Bankruptcy Code or any present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, or seeks or consents to, or acquiesces in, the appointment of any trustee, receiver, conservator or liquidator of such Person or of all or any substantial part of its properties (the term "acquiesce," as used in this definition, includes the failure to file a petition or motion to vacate or discharge any order, judgment or decree within twenty (20) days, after entry of such order, judgment or decree); or (b) such Person makes a general assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Affected Holder" has the meaning specified in Section 14 hereof.

"Agreement" has the meaning specified in the preamble hereof.

"Anti-Dilution Amount" means the principal amount of a Demand Note as determined in accordance with the Jones Act Warrant Agreement.

"Applicable Law" means all applicable provisions of (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority, including the Jones Act; (ii) any consents or approvals of any Governmental Authority; and (iii) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Appropriate Officer" has the meaning specified in Section 3(c) hereof.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ § 101 et seq.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which state or federally chartered banking institutions in New York City, New York are not required to be opened.

"Cash Closing" has the meaning specified in Section 8 hereof.

"Cash Sale" means any merger, consolidation or other similar transaction to which the Company is a party and in which holders of Common Stock as of immediately prior to the consummation of such transaction (other than with respect to treasury shares and any shares of Common Stock held by the purchasing party(ies) in such transaction) are entitled to receive consideration consisting solely of cash upon cancellation of such Common Stock in such transaction.

"Charter" means, with respect to any Person, such Person's certificate or articles of incorporation, certificate of formation, articles of association or similar organizational document, in each case as may be amended from time to time.

2

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" has the meaning specified in the recitals hereof.

"Company Liquidation Event" means any liquidation, dissolution or winding-up of the affairs of the Company, the termination of the legal existence of the Company or any Act of Bankruptcy or any other similar event or proceeding with respect to the Company, whether voluntary or involuntary, pursuant to which the holders of Common Stock are (subject to the liquidation preferences set forth in the Company's Charter) entitled to receive consideration consisting solely of cash.

"Company Conversion Notice" has the meaning specified in Section 5(n)(ii) hereof.

"Definitive Warrants" has the meaning specified in Section 4(i)(i) hereof.

"Demand Note" means a non-interest bearing demand note issuable by the Company in the form attached as Exhibit D in connection with the exercise of a Warrant.

"Depository" has the meaning specified in Section 3(b) hereof.

"Direct Registration Warrant" has the meaning specified in Section 3(a) hereof.

"Excess Shares" has the meaning specified in the Company's Charter.

"Exercise Price" means the exercise price for the Warrants as set forth in Section 5(b) hereof.

"Expiration Date" has the meaning specified in Section 5(a) hereof.

"Funds" has the meaning specified in Section 11(q) hereof.

"Global Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, including the U.S. Coast Guard and the U.S. Maritime Administration, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Holder" means the beneficial or registered holder or holders of Warrants, unless the context otherwise requires.

"Individual Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Jones Act" shall mean, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any

3

successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering and interpreting such laws, statutes, rules and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. Coastwise Trade.

"Jones Act Common Stock Warrants" has the meaning specified in the recitals hereof.

"Jones Act Warrant Agreement" means that certain Jones Act Warrant Agreement, dated as of [●], 2020, by and between the Company and the Warrant Agent, as may be amended from time to time.

"Non-U.S. Citizen" means any Person who is not a U.S. Citizen.

"Person" means any individual, corporation, general partnership, limited partnership, limited liability partnership, joint venture, association, joint-stock company, trust, limited liability company, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" has the meaning specified in the recitals hereof.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"Securityholders Agreement" means that certain Securityholders Agreement, dated as of [●], 2020, by and between the Company and the holders of Common Stock and/or Warrants party thereto from time to time, and the other parties thereto, as may be amended from time to time.

"Settlement Date" means the date that is the third Business Day after a Warrant Exercise Notice is delivered.

"Signature Guarantee" has the meaning specified in Section 4(d)(ii).

"U.S. Citizen" shall mean a citizen of the United States within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. Coastwise Trade.

"U.S. Coastwise Trade" shall mean the carriage or transport of merchandise or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 and any successor statutes thereto, as amended or supplemented from time to time.

"Warrant Agent" has the meaning specified in the preamble hereof.

"Warrant Agent Office" has the meaning specified in Section 4(h)(iv) hereof.

"Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Warrant Exercise Notice" has the meaning specified in Section 5(c) hereof.

4

"Warrant Register" has the meaning specified in Section 3(d) hereof.

"Warrant Statement" has the meaning specified in Section 3(b) hereof.

"Warrant Summary" has the meaning specified in Section 3(b) hereof.

"Warrants" has the meaning specified in the recitals hereof.

SECTION 2.   Appointment of Warrant Agent. The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the express terms and conditions set forth in this Agreement (and no implied terms and conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

SECTION 3.   Issuance of Warrants; Form, Execution and Delivery.

(a)      Issuance of Warrants. From time to time, the Warrants shall be issued by the Company with such underlying principal amount of Demand Notes as determined in accordance with the Jones Act Warrant Agreement and this Agreement. In accordance with Section 4 hereof, the Company shall, at its option, cause to be issued to the Depository one or more Global Warrant Certificates evidencing the Warrants, issue the Warrants in the form of Individual Warrant Certificates or reflect the issuance of the Warrants by book-entry registration on the books and records of the Warrant Agent ("Direct Registration Warrants"). To the extent the Warrants are issued in the form of Global Warrant Certificates, the Company shall cause to be issued to the recipients thereof Warrants in the form of Global Warrant Certificates through the facilities of the Depository. Each Direct Registration Warrant and each Warrant evidenced by a Global Warrant Certificate or Individual Warrant Certificate shall entitle the Holder, upon proper exercise and payment or conversion of such Warrant, to receive from the Company, as adjusted as provided herein and subject to the Jones Act limitations on exercise by Non-U.S. Citizens set forth in Section 5(l) hereof, if applicable, a Demand Note with an aggregate principal amount equal to the applicable Anti-Dilution Amount.

(b)      Form of Warrant. Subject to Section 4 of this Agreement, each of the Warrants shall be issued, at the Company's option (i) in the form of one or more global certificates (the "Global Warrant Certificates") in substantially the form of Exhibit A-1 attached hereto, with the form of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibit B attached hereto, (ii) in certificated form in the form of one or more individual certificates (the "Individual Warrant Certificates") in substantially the form of Exhibit A-2 attached hereto, with the form of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibit B attached hereto, and/or (iii) in the form of Direct Registration Warrants reflected on statements issued by the Warrant Agent from time to time to the Holders thereof reflecting such book-entry position (the "Warrant Statements"). Upon the issuance of Global Warrant Certificates, any Individual Warrant Certificates or Direct Registration Warrants that are not subject to any transfer restrictions under applicable securities laws may be exchanged at any time for Global Warrant Certificates representing a corresponding number of Warrants, in accordance with Section 4(e) and the applicable procedures of the Depository and the Warrant Agent. The Warrant

5

4826-3625-2092.10
#93237976v12

Statements representing Warrants shall include as an attachment thereto the "Warrant Summary" as set forth in Exhibit C attached hereto. The Global Warrant Certificates and Individual Warrant Certificates (collectively, the "Warrant Certificates") and Warrant Statements may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the rules and regulations of The Depository Trust Company or any successor thereof (the "Depository") in the case of the Global Warrant Certificates, with any law or with any rules made pursuant thereto or with any rules of any securities exchange or as may be determined, consistently herewith and reasonably acceptable to the Warrant Agent and provided, in each case, that they do not affect the rights, duties, obligations, responsibilities, liabilities or indemnities of the Warrant Agent, by (i) in the case of Warrant Certificates, the Appropriate Officers executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates and (ii) in the case of Warrant Statements, any Appropriate Officer. The Global Warrant Certificates shall be deposited as and when appropriate with the Warrant Agent and registered in the name of Cede & Co. or any successor thereof, as the Depository's nominee. Each Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(c) Execution of Warrants. Warrant Certificates shall be signed on behalf of the Company by its Chief Executive Officer, its President, its Chief Financial Officer, its General Counsel, its Treasurer or any Executive or Senior Vice President of the Company (each, an "Appropriate Officer"), and by the Corporate Secretary or any Assistant Corporate Secretary of the Company. Each such signature upon the Warrant Certificates may be in the form of an electronic signature of any such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the electronic signature of any Appropriate Officer, the Corporate Secretary or any Assistant Corporate Secretary who shall have been serving as an Appropriate Officer, the Corporate Secretary, or an Assistant Corporate Secretary at the time of entering into this Agreement or issuing such Warrant Certificate. If any Appropriate Officer, the Corporate Secretary or any Assistant Corporate Secretary who shall have signed any of the Warrant Certificates shall cease to be such Appropriate Officer, the Corporate Secretary or an Assistant Corporate Secretary before the Warrant Certificates so signed shall have been countersigned by the Warrant Agent or disposed of by the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of as though such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary had not ceased to be such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary, and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary, although at the date of the execution of this Agreement any such person was not such Appropriate Officer, Corporate Secretary or Assistant Corporate Secretary. Warrant Certificates shall be dated the date of countersignature by the Warrant Agent and shall represent one or more whole Warrants.

6

(d)      Countersignature. Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to countersign and accompanied by Warrant Certificates duly executed on behalf of the Company, the Warrant Agent shall countersign (in manual, facsimile or electronic form) one or more Warrant Certificates evidencing the Warrants and shall deliver such Warrant Certificates to or upon such written order of the Company. Such written order of the Company shall specifically state the number of Warrants that are to be represented by such Warrant Certificate and the Warrant Agent may rely conclusively on such order. Each Warrant shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or converted or shall have expired or been canceled in accordance with the terms hereof. Each Holder shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Corporate Secretary of the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same. No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable or convertible, until such Warrant Certificate has been countersigned by the manual, facsimile or electronic signature of the Warrant Agent. Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder. The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register any Warrant Certificates or Direct Registration Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent. The Company or the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made. Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, the Warrant Agent and the Company may deem and treat the Person in whose name any Warrant is registered as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing made in a Warrant Certificate by anyone), for the purpose of any exercise or conversion thereof, any distribution to the Holder thereof and for all other purposes.

SECTION 4.   Transfer or Exchange.

(a)      Transfers Generally.  Notwithstanding anything herein to the contrary, the Warrants shall be fully transferrable (subject to applicable securities laws) and severable from the Jones Act Common Stock Warrants.

(b)      Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein. The transfer and exchange of Global Warrant Certificates or beneficial interests therein shall be effected through the Depository, in accordance with the terms of this Agreement and the Warrant Certificates and the procedures of the Depository.

7

(c)    Exchange of a Beneficial Interest in a Global Warrant Certificate for an Individual Warrant Certificate or Direct Registration Warrant.

(i)    Any Holder of a beneficial interest represented by a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Direct Registration Warrant or a Warrant represented by an Individual Warrant Certificate. A transferor of a beneficial interest represented by a Global Warrant Certificate (or the Depository or its nominee on behalf of such transferor) shall, but only to the extent required by the procedures of the Depository and the Warrant Agent in connection with such transfer or exchange, deliver to the Warrant Agent (I) written instructions or such other form of instructions as is customary for the Depository on behalf of any Person having a beneficial interest in a Global Warrant Certificate, and all other reasonably necessary information, and (II) an instruction of transfer in form reasonably satisfactory to the Warrant Agent which, with respect to a transfer of a Global Warrant Certificate only, shall be properly completed, duly authorized in writing and duly executed by the Holder thereof or by such Holder's attorney. Upon satisfaction of the conditions in this Section 4(c)(i), the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be reduced by the number of Warrants to be represented by an Individual Warrant Certificate or Direct Registration Warrant, as the case may be, to be issued in exchange for the beneficial interest of such Person in the Global Warrant Certificate and, following such reduction, (A) in the case of an exchange for an Individual Warrant Certificate (x) the Company shall issue and the Warrant Agent shall either manually, facsimile or electronically countersign an Individual Warrant Certificate representing the appropriate number of Warrants and (y) the Warrant Agent shall deliver such Individual Warrant Certificate to the registered Holder thereof, or (B) in the case of an exchange for a Direct Registration Warrant, the Warrant Agent shall register such Direct Registration Warrants in accordance with such written instructions from the Depository and deliver to such Holder a Warrant Statement.

(ii)    Warrants represented by an Individual Warrant Certificate issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this Section 4(c) shall be issued in such names as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver Individual Warrant Certificates evidencing such issuance to the Persons in whose names such Individual Warrant Certificates are so issued. Direct Registration Warrants issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this Section 4(c) shall be registered in such names as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.

(d)    Transfer and Exchange of Individual Warrant Certificates or Direct Registration Warrants. When the registered Holder of an Individual Warrant Certificate or Direct Registration Warrant has presented to the Warrant Agent a written request:

(i)    to register the transfer of any Individual Warrant Certificate or Direct Registration Warrant; or

8

(ii)    to exchange any Individual Warrant Certificate or Direct Registration Warrant for a Direct Registration Warrant or an Individual Warrant Certificate, respectively, representing an equal number of Warrants of authorized denominations,

the Warrant Agent shall register the transfer or make the exchange as requested if (x) its customary requirements for such transactions are met and (y) such transfer or exchange otherwise satisfies the provisions of this Agreement; *provided*, *however*, that the Warrant Agent has received a written instruction of transfer or exchange, as applicable, in form reasonably satisfactory to the Warrant Agent, properly completed and duly executed by the Holder thereof or by his attorney, accompanied by a signature guarantee ("Signature Guarantee") from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, duly authorized in writing and a written order of the Company signed by an Appropriate Officer authorizing such exchange. A party requesting transfer of Warrants must provide any evidence of authority that may be reasonably required by the Warrant Agent.

(e)    Restrictions on Transfer and Exchange of Individual Warrant Certificates or Direct Registration Warrants for a Beneficial Interest in a Global Warrant Certificate. Neither an Individual Warrant Certificate nor a Direct Registration Warrant may be exchanged for a beneficial interest in a Global Warrant Certificate pursuant to this Agreement except, following the issuance of a Global Warrant Certificate by the Company, upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of the Company's written approval and appropriate instruments of transfer, accompanied by a Signature Guarantee, with respect to an Individual Warrant Certificate or Direct Registration Warrant that is not subject to transfer restrictions under applicable securities laws, in form reasonably satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depository to make, an endorsement on the applicable Global Warrant Certificate to reflect an increase in the number of Warrants represented by such Global Warrant Certificate equal to the number of Warrants represented by such Individual Warrant Certificate or Direct Registration Warrant, and all other necessary information, then the Warrant Agent shall cancel such Individual Warrant Certificate or Direct Registration Warrant on the Warrant Register and cause, or direct the Depository to cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by such Global Warrant Certificate to be increased accordingly. Any such transfer shall be subject to the Company's prior written approval.

(f)    Restrictions on Transfer and Exchange of Global Warrant Certificates. Notwithstanding any other provisions of this Agreement (other than the provision set forth in Section 4(g)), a Global Warrant Certificate may not be transferred as a whole except by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

(g)    Cancellation of Warrant Certificate.

(i)    At such time as all beneficial interests in Warrant Certificates and Direct Registration Warrants have been exchanged for Demand Notes in accordance herewith, redeemed, repurchased or cancelled, all Warrant Certificates shall be returned to, or cancelled and retained

9

pursuant to Applicable Law by, the Warrant Agent, upon written instructions from the Company reasonably satisfactory to the Warrant Agent.

(ii)     If at any time the Depository for the Global Warrant Certificates notifies the Company that the Depository is unwilling or unable to continue as Depository for the Global Warrant Certificates and a successor Depository for the Global Warrant Certificates is not appointed by the Company within ninety (90) days after delivery of such notice, then the Warrant Agent, upon written instructions signed by an Appropriate Officer of the Company, shall register Individual Warrants Certificates and Direct Registration Warrants, in an aggregate number equal to the number of Warrants represented by the Global Warrant Certificates, in exchange for such Global Warrant Certificates.

(h)     Obligations with Respect to Transfers and Exchanges of Warrants.

(i)     To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent is hereby authorized to countersign, either by manual, facsimile or electronic signature, in accordance with the provisions of this Section 4, Warrant Certificates, as required pursuant to the provisions of this Section 4.

(ii)     All Warrant Certificates or Direct Registration Warrants issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Warrant Certificates or Direct Registration Warrants surrendered upon such registration of transfer or exchange.

(iii)     So long as the Depository, or its nominee, is the registered owner of a Global Warrant Certificate, the Depository or such nominee, as the case may be, will be considered the sole owner or Holder represented by such Global Warrant Certificate for all purposes under this Agreement, including, without limitation, for the purposes of (a) giving notices with respect to such Warrants and (b) registering transfers with respect to such Warrants. Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(iv)     The Warrant Agent shall register the transfer of any outstanding Warrants in the Warrant Register at the Warrant Agent office designated for such purpose (the "Warrant Agent Office") upon (a) receipt of all information required to be delivered hereunder, (b) if applicable, surrender of duly endorsed Warrant Certificates representing such Warrants, and (c) receipt of a completed form of assignment duly authorized in writing substantially in the form attached as Exhibit C hereto, as the case may be, duly signed by the Holder thereof or by the duly appointed legal representative thereof or by such Holder's attorney, accompanied by a Signature Guarantee. Upon any such registration of transfer, a new Warrant Certificate or Warrant Statement, as the case may be, shall be issued to the transferee.

10

4826-3625-2092.10
#93237976v12

(v)     The Warrant Agent shall not undertake the duties and obligations of a stock transfer agent under this Agreement, or otherwise, including, without limitation, the duty to receive, issue or transfer Demand Notes.

(i)     <u>Definitive Warrants</u>.

(i)     Beneficial interests represented by a Global Warrant Certificate deposited with the Depository or with the Warrant Agent pursuant to <u>Section 3(b)</u> shall be transferred to each beneficial owner thereof in the form of Warrant Certificates in a definitive form that is not deposited with the Depository or with the Warrant Agent as custodian for the Depository ("<u>Definitive Warrants</u>") evidencing a number of Warrants equivalent to such owner's beneficial interest in such Global Warrant Certificate, in exchange for such Global Warrant Certificate, only if such transfer complies with <u>Section 4(a)</u> and (i) the Depository notifies the Company in writing that it is unwilling or unable to continue as Depository for such beneficial interests represented by such Global Warrant Certificate or if at any time the Depository ceases to be a "clearing agency" registered under the Securities and Exchange Act of 1934, as amended, or the rules promulgated thereunder, and, in each such case, a successor Depository is not appointed by the Company within ninety (90) days of such notice or (ii) upon the request of any Holder or beneficial owner, if the Company shall be adjudged bankrupt or insolvent or makes an assignment for the benefit of its creditors or institutes proceedings to be adjudicated bankrupt or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization under federal bankruptcy laws or any other similar applicable federal or state law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or custodian of all or any substantial part of its property, or shall admit in writing its inability to pay or meet its debts as they mature, or if a receiver or custodian of it or all or any substantial part of its property shall be appointed, or if a public officer shall have taken charge or control of the Company or of its property or affairs, for the purpose of rehabilitation, conservation or liquidation.

(ii)     Any beneficial interests represented by a Global Warrant Certificate that are transferable to the beneficial owners thereof in the form of Definitive Warrants pursuant to this <u>Section 4(i)</u> shall be surrendered by the Depository to the Warrant Agent, to be so transferred, in whole or from time to time in part, without charge, and the Warrant Agent shall if directed by an Appropriate Officer of the Company countersign, by either manual, facsimile or electronic signature, and deliver to each beneficial owner in the name of such beneficial owner, upon such transfer of each portion of such beneficial interests represented by a Global Warrant Certificate, Definitive Warrants evidencing a number of Warrants equivalent to such beneficial owner's beneficial interest in the Global Warrant Certificate. The Warrant Agent shall register such transfer in the Warrant Register, and upon such transfer the surrendered Global Warrant Certificate shall be cancelled by the Warrant Agent.

(iii)     All Definitive Warrants issued upon registration of transfer pursuant to this <u>Section 4(i)</u> shall be valid obligations of the Company, evidencing the same obligations of the Company and entitled to the same benefits under this Agreement and the Global Warrant Certificate surrendered for registration of such transfer.

4826-3625-2092.10
#93237976v12

(iv)     Subject to the provisions of <u>Section 4(i)(ii)</u>, the registered Holder of a Global Warrant Certificate may grant proxies and otherwise authorize any Person to take any action that such Holder is entitled to take under this Agreement or the Warrants.

(v)     In the event of the occurrence of any of the events specified in <u>Section 4(i)(i)</u>, the Company will promptly make available to the Warrant Agent a reasonable supply of Definitive Warrants necessary to comply with this Agreement in definitive, fully registered form.

(vi)     Neither the Company nor the Warrant Agent shall be liable or responsible for any registration or transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

(j)     <u>Securityholders Agreement</u>. Notwithstanding anything herein to the contrary, no Person may Transfer any Warrant except in compliance with the provisions of the Securityholders Agreement, if the Securityholders Agreement is then in effect, and the Company's Charter.

SECTION 5.   <u>Duration and Exercise of Warrants</u>.

(a)     <u>Duration</u>. The Warrants may be exercised only during the period commencing on the date of issuance of the Warrant and expiring on the date on which no Warrants remain outstanding (the "<u>Expiration Date</u>"). After 5:00 p.m. New York City time on the Expiration Date, the Warrants will become void and without further legal effect, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

(b)     <u>Exercise Price</u>. The Exercise Price for the Warrants shall be $0.00.

(c)     <u>Manner of Exercise</u>.  Subject to the provisions of this Agreement, including the Jones Act limitations on ownership and control of capital stock of the Company by Non-U.S. Citizens, including those set forth in <u>Section 5(l)</u> hereof, each Warrant shall entitle the Holder thereof to purchase from the Company a Demand Note at the Exercise Price. Each Demand Note will bear a principal amount equal to the applicable Anti-Dilution Amount. All or any of the Warrants represented by a Warrant Certificate or in the form of Direct Registration Warrants may be exercised by the registered Holder thereof during normal business hours on any Business Day, by delivering (A) written notice of such election (a "<u>Warrant Exercise Notice</u>") to exercise Warrants to the Company (at the address set forth in <u>Section 13</u>) and the Warrant Agent at the Warrant Agent Office, no later than 5:00 p.m., New York City time, on the Expiration Date, which Warrant Exercise Notice shall be (i) substantially in the "Form of Election" set forth in <u>Exhibit A-1</u>, in the case of Warrants represented by a Global Warrant Certificate or otherwise in accordance with applicable procedures of the Depository, (ii) substantially in the "Form of Election" set forth in <u>Exhibit A-2</u>, in the case of Warrants represented by Individual Warrant Certificates and (iii) substantially in the form set forth in <u>Exhibit A-3</u>, in the case of Direct Registration Warrants; and (B) by no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date, such Warrants to the Warrant Agent (by book-entry transfer through the facilities of the Depository, if such Warrants are represented by a Global Warrant Certificate), accompanied by a Signature Guarantee and payment in full in respect of each Warrant that is exercised (which shall be made by delivery of a certified or official bank or bank cashier's check payable to the

12

order of the Company, or by wire transfer to an account specified in writing by the Company or the Warrant Agent in immediately available funds or, in respect of any Global Warrant Certificate, otherwise in accordance with applicable procedures of the Depository). Such payment shall be in an amount equal to the product of the number of Demand Notes designated in such Warrant Exercise Notice multiplied by the Exercise Price for the Warrants being exercised. Upon such surrender and payment, such Holder shall thereupon be entitled to receive the number of duly authorized Demand Notes in the principal amounts as set forth in Section 5(d) and Section 5(h).

(d)     The principal amount of the Demand Notes to be issued on such exercise or conversion will be determined by the Company (with written notice thereof to the Warrant Agent) in accordance with Section 5(c). The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the principal amount of the Demand Notes to be issued on such exercise or conversion is accurate or correct, nor shall the Warrant Agent have any duty or obligation to take any action with regard to such Warrant exercise or conversion prior to being notified by the Company of the relevant principal amount of the Demand Notes to be issued.

(e)     Except as otherwise provided herein, any exercise or conversion of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(f)     Upon receipt of a Warrant Exercise Notice pursuant to Section 5(c), the Warrant Agent shall:

(i)     examine such Warrant Exercise Notice and all other documents delivered to it by or on behalf of the Holder as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notice and any such other documents have been executed and completed in accordance with their terms;

(ii)     endeavor to inform the Company of and cooperate with and assist the Company in resolving any inconsistencies between the Warrant Exercise Notice received and delivery of Warrants to the Warrant Agent's account;

(iii)     advise the Company, no later than the Business Day after receipt of such Warrant Exercise Notice, of (a) the receipt of such Warrant Exercise Notice and, subject to Company's approval, the number of Warrants to be exercised or converted in accordance with the terms of this Agreement, (b) the instructions with respect to delivery of the Demand Notes deliverable upon such exercise or conversion, subject to the timely receipt from the Depository of the necessary information, and (c) such other information as the Company shall reasonably require; and

(iv)     in the case of Warrants represented by a Global Warrant Certificate, liaise with the Depository and effect such delivery to the relevant accounts at the Depository in accordance with its requirements, if requested by the Company with the delivery of the Demand Notes and all other necessary information by or on behalf of the Company for delivery to the Depository.

4826-3625-2092.10
#93237976v12

(g)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise or conversion shall be determined by the Company in its sole discretion in good faith, which determination shall be final and binding. The Company reserves the right to reject any and all Warrant Exercise Notices that it determines are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful as determined in good faith. Such determination by the Company shall be final and binding on the Holders absent manifest error. Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise or conversion of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise or conversion of Warrants. Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise or conversion of Warrants, nor shall they incur any liability for the failure to give such notice.

(h)     As soon as reasonably practicable after the exercise or conversion of any Warrant (and in any event not later than five (5) Business Days thereafter), the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the Holder, either: (A) if such Holder holds the Warrants being exercised or converted through the Depository's book-entry transfer facilities, by same-day or next-day credit to the Depository for the account of such Holder or for the account of a participant in the Depository the Demand Notes to which such Holder is entitled, in each case registered in such name and delivered to such account as directed in the Warrant Exercise Notice by such Holder or by the direct participant in the Depository through which such Holder is acting (or, if the Demand Notes may not then be held in book-entry form through the facilities of the Depository, as set forth in clause (B)); (B) if such Holder holds the Warrants being exercised or converted in the form of Individual Warrant Certificates, a book-entry interest in the Demand Notes to which such Holder is entitled on the books of the Company's transfer agent or, at the Company's option, by delivery to the address designated by such Holder in its Warrant Exercise Notice of a physical certificate or certificates representing the Demand Notes to which such Holder is entitled, in fully registered form, registered in such name or names as may be directed by such Holder (or, if the Warrants at the time of such exercise are held through the facilities of the Depository, as set forth in the foregoing clause (A)); or (C) if such Holder holds the Warrants being exercised or converted in the form of Direct Registration Warrants, a book-entry interest in the Demand Notes to which such Holder is entitled on the books and records of the Company's transfer agent (or, if the Warrants at the time of such exercise are held through the facilities of the Depository, as set forth in the foregoing clause (A)).

If fewer than all of the Warrants evidenced by a Global Warrant Certificate surrendered upon the exercise or conversion of Warrants are exercised or converted at any time prior to the Expiration Date, the Warrant Agent shall cause a notation to be made to the records maintained by the Depository. The Person in whose name any certificate or certificates, or any Warrant Exercise Notice, for the Demand Notes are to be issued (or such Demand Notes are to be registered, in the case of a book-entry transfer) upon exercise or conversion of a Warrant shall be deemed to have become the Holder of record of such Demand Notes on the date such Warrant Exercise Notice is delivered.

(i)     If all of the Warrants evidenced by a Warrant Certificate have been exercised or converted, such Warrant Certificate shall be cancelled by the Warrant Agent. Such cancelled

14

4826-3625-2092.10
#93237976v12

Warrant Certificate shall then be disposed of by or at the direction of the Company in accordance with Applicable Law. The Warrant Agent shall confirm such information to the Company in writing as promptly as practicable.

(j)        The Company shall pay all expenses in connection with, and all transfer taxes and similar governmental charges that may be imposed with respect to, the issuance or delivery of the Demand Notes upon exercise or conversion of Warrants. The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

(k)        The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period beginning on the date of this Agreement and ending no earlier than the first (1st) anniversary of such date on which there are no outstanding Jones Act Common Stock Warrants or Warrants.

(l)        <u>Jones Act Limitations on Warrant Exercise</u>. Notwithstanding any of the other provisions of this Agreement, in order to facilitate the Company's compliance with the Jones Act and the Jones Act Restriction concerning the ownership and control of the capital stock of the Company by Non-U.S. Citizens with regard to its continuing ability to operate its vessels in the coastwise trade of the United States and to comply with obligations of the Company under contracts that it may enter into from time to time with United States Governmental Authorities:

(i)        At the time of exercise or conversion of any Warrant, its Holder shall advise the Company whether or not it (or, if not the Holder, the Person that the Holder has designated to receive the Demand Notes issuable upon exercise or conversion of such Warrant) is a U.S. Citizen. The Company may require a Holder (or, if not the Holder, the Person that the Holder has designated to receive the Demand Notes issuable upon exercise or conversion of such Warrant) to provide it with such documents and other information as it may request as reasonable to confirm that the Holder (or, if not the Holder, the Person that the Holder has designated to receive the Demand Notes issuable upon exercise or conversion of such Warrant) is a U.S. Citizen.

(ii)       Any Holder that cannot establish to the Company's reasonable satisfaction that it (or, if not the Holder, the Person that the Holder has designated to receive the Demand Notes issuable upon exercise or conversion of any Warrant) is a U.S. Citizen may not exercise or convert any Warrant.

(iii)      Any sale, transfer or other disposition of any Warrant by any Holder that is a Non-U.S. Citizen to a Person who is a U.S. Citizen must be a complete transfer of such Holder's interests in such Warrant and the Demand Note issuable upon its exercise or conversion to such Person with the transferor retaining no ownership of the Warrant or underlying Demand Note nor any ability to direct or control such Person. The foregoing restriction shall also apply to any Person that the Holder has designated to receive any Demand Note issuable upon exercise or conversion of any Warrant.

(iv)      Notwithstanding anything (iv) herein to the contrary, in the event that either (A) the Jones Act and other applicable laws are repealed or amended so that the ownership and

15

control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way or (B) the Company's Charter is amended so that the ownership and control of the Common Stock by Non-U.S. Citizens is no longer restricted in any way, the provisions of this Section 5(l) shall no longer apply to any Holder or Warrant.

(m)    Cost Basis Information.

(i)    In the event of a cash exercise of Warrants, the Company hereby instructs the Warrant Agent to record cost basis for the Demand Notes as reasonably determined by the Company prior to processing.

(ii)    In the event of a conversion of Warrants, the Company shall provide the cost basis for Demand Notes issued pursuant to such conversion at the time the Company confirms the principal amount of the Demand Notes issuable in connection with such conversion to the Warrant Agent pursuant to Section 5 hereof.

(n)    Optional Company Conversion.

(i)    Right to Convert.  If any Warrants become held by any Holder who is a U.S. Citizen (including by transfer of such Warrants to any Holder that is a U.S. Citizen), the Company shall have the right to convert any such Warrants into Demand Notes bearing a principal balance equal to the applicable Anti-Dilution Amounts, at the Company's sole discretion.  In order for the Company to determine whether any Holder is a U.S. Citizen (in its sole discretion), the Company may require a Holder to provide it with such documents and other information as it may request as reasonable to confirm that the Holder is a U.S. Citizen.

(ii)    Mechanics of Conversion.  In order for the Company to convert Warrants into Demand Notes pursuant to this Section 5(n), the Company shall deliver a written notice to each applicable Holder (such notice, a "Company Conversion Notice") stating such Holder's name and the principal amount of each Demand Note to be received by the Holder upon the conversion of such Holder's Warrants. If required by the Company, such Holder shall surrender any Individual Warrant Certificates, if applicable, at the office of the Warrant Agent for the Warrants, and any Individual Warrant Certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form reasonably satisfactory to the Company, duly executed by the Holder of record or his, her or its attorney duly authorized in writing.

(iii)    Within five (5) Business Days of delivery of the Company Conversion Notice, the Company shall issue and deliver to the Holders of the Warrants that are being converted the Demand Notes.

(iv)    The Company shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of any Demand Note upon conversion of Warrants pursuant to this Section 5(n). The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any Demand Note in a name other than that in which the Warrants so converted were registered, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid

16

4826-3625-2092.10
#93237976v12

to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

(o)     On each Warrant's Expiration Date, such Warrant shall be deemed to be exercised in full by the Holder (without delivery of a Warrant Exercise Notice or any action by the Holder) to the extent that the Holder is a U.S. Citizen.

SECTION 6.   Cancellation of Warrants. The Warrant Agent shall cancel all Warrant Certificates surrendered for exchange, substitution or transfer in whole or in part. Such cancelled Warrant Certificates shall thereafter be disposed of by the Warrant Agent upon written instructions from the Company reasonably satisfactory to the Warrant Agent and such Direct Registration Warrants shall be canceled by appropriate notation on the Warrant Register.

SECTION 7.   Mutilated or Missing Warrant Certificates. Upon receipt by the Company and the Warrant Agent from any Holder of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of such Holder's Warrant Certificate and a surety bond or indemnity reasonably satisfactory to them and holding the Warrant Agent and Company harmless, and in case of mutilation upon surrender and cancellation thereof, and absent notice to Warrant Agent that such Warrant Certificates have been acquired by a bona fide purchaser, the Company will execute and the Warrant Agent will countersign and deliver in lieu thereof a new Warrant Certificate of like tenor and representing an identical interest in Warrants to such Holder; *provided*, that in the case of mutilation, no bond or indemnity shall be required if such Warrant Certificate in identifiable form is surrendered to the Company or the Warrant Agent for cancellation. Upon the issuance of any new Warrant Certificate under this Section 7, the Company may require the payment of a sum sufficient to cover any stamp tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Warrant Agent) in connection therewith. Every new Warrant Certificate executed and delivered pursuant to this Section 7 in lieu of any lost, stolen, destroyed or mutilated Warrant Certificate shall be entitled to the same benefits of this Agreement equally and proportionately with any and all other Warrant Certificates, whether or not the allegedly lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone. The provisions of this Section 7 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of lost, stolen, destroyed or mutilated Warrant Certificates.

SECTION 8.   Cash Sales and Liquidations. In the event of a Cash Sale or a Company Liquidation Event, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised or unconverted Warrant outstanding immediately prior to the consummation of such Cash Sale or a Company Liquidation Event (the "Cash Closing"), cash in the amount equal to the aggregate principal amount of the underlying Demand Notes that such Holder is entitled to receive upon exercise of their Warrants (without regard to any limitations on exercise contained in this Agreement); provided, however, that no Holder shall be entitled to any payment hereunder with respect to any portion of such consideration that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of the Common Stock. Upon the occurrence of a Cash Closing, all unexercised or unconverted Warrants outstanding immediately prior to the Cash Sale or a Company Liquidation Event shall automatically be terminated and cancelled and

17

the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants except as to the requirement to pay the aggregate principal amount of the underlying Demand Notes (subject to the limitations described in the prior sentence).

SECTION 9.   Legends. To the extent subject to restrictions on transfer under applicable securities laws, Warrant Certificates, if any, shall be stamped or otherwise imprinted with a legend, and the Warrant Statements shall include a restrictive notation with respect to such Warrants, in substantially the following form:

"THE WARRANTS REPRESENTED BY THIS CERTIFICATE (AND THE DEMAND NOTES ISSUABLE PURSUANT THERETO) HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THEY HAVE BEEN REGISTERED UNDER THAT ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE."

Any legend or restrictive notation referenced in this Section 9 shall be removed from the Warrant Certificates or Warrant Statements at any time after the restrictions described in such legend or restrictive notation cease to be applicable; provided that the Company may request from any Holder opinions, certificates or other evidence that such restrictions have ceased to be applicable before removing such legend or restrictive notation.

SECTION 10. Corporate Action.  The Company shall not, and shall not permit or cause any of its subsidiaries to, take any action to avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, including through any amendment of its Charter and by-laws (and any equivalent organizational documents of its subsidiaries) or any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities.

SECTION 11. Warrant Agent. The Warrant Agent undertakes the duties and obligations expressly imposed by this Agreement upon the terms and conditions set forth in this Section 11.

(a)      Limitation on Liability. The Warrant Agent shall not by countersigning Warrant Certificates or by any other act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants or the Warrant Certificates (except as to its countersignature thereon), as to the validity, authorization or value (or kind or amount) of any Demand Notes or other property delivered or deliverable upon exercise or conversion of any Warrant. The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Warrant Certificates or for any action taken, suffered or omitted by the Warrant Agent in the belief that any Warrant Certificate or any other document or any signature is genuine or properly authorized unless such action or omission was taken or omitted to be taken in bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction), (ii) be responsible for determining compliance by any Person with the provisions set forth in Section 5(l), (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Demand Notes or property upon the surrender of any Warrant for

18

4826-3625-2092.10
#93237976v12

the purpose of exercise or conversion or to comply with any other of the Company's covenants and obligations contained in this Agreement or in the Warrant Certificates or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction) for which the Warrant Agent shall be liable. Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action. Notwithstanding anything to the contrary stated herein, any liability of the Warrant Agent under this Agreement shall be limited to the amount of fees, but not including reimbursable expenses, paid by the Company to the Warrant Agent during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought.

(b) <u>Instructions</u>. The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such officer for advice or instructions. The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received by any such officer. The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such officer.

(c) <u>Agents</u>. The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the Company resulting from such neglect or misconduct, *provided* that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof. The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary in the performance of its duties hereunder. The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

(d) <u>Cooperation</u>. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e) <u>Agent Only</u>. The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any Holders. The Warrant Agent shall not be liable except for the performance of such duties as are expressly set forth herein, and no implied covenants or

19

obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)      Right to Counsel. The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by the Warrant Agent in the absence of bad faith in accordance with the opinion or advice of such counsel.

(g)      Compensation. The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder in accordance with a mutually agreed upon fee schedule and to reimburse the Warrant Agent for its reasonable expenses incurred by the Warrant Agent hereunder (including reasonable counsel fees and expenses) in connection with the acceptance, negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of the Agreement and the exercise and performance of its duties hereunder.

(h)      Accounting and Payment. The Warrant Agent shall account to the Company with respect to Warrants exercised or converted. [The Warrant Agent shall advise the Company by electronic transmission at the end of each day the number of Warrant Exercise Notices received, and, if known, the identity of the Holder(s) of the Warrant(s) exercised or converted.]

(i)      No Conflict. Subject to Applicable Law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities (including, for the avoidance of doubt, bonds, notes and warrants) of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Subject to Applicable Law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person including, without limitation, acting as trustee under an indenture.

(j)      Resignation; Termination. The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising prior to resignation as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction)) after giving thirty (30) calendar days' prior written notice to the Company. In the event the transfer agency relationship in effect between the Company and Warrant Agent terminates, the Warrant Agent shall be deemed to have resigned automatically and be discharged from its duties under this Agreement as of the effective date of such termination. The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction) prior to its removal. The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company,

20

at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be. Upon such resignation or removal the Company shall promptly appoint in writing a new warrant agent. If the Company shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new warrant agent. Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company. Any successor warrant agent, whether appointed by the Company or by such a court, shall be a Person, formed under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by a federal or state authority, and have a combined capital and surplus of not less than $50,000,000 as set forth in its most recent published annual report of condition; or in the case of such capital and surplus requirement, a controlled affiliate of such a Person meeting such capital and surplus requirement. After acceptance in writing of such appointment by the new Warrant Agent, such successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities under this Agreement as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. Not later than the effective date of any such appointment, the Company shall send notice thereof to the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company. Failure to give any notice provided for in this <u>Section 11(j)</u>, or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(k)    <u>Merger, Consolidation or Change of Name of Warrant Agent</u>. Any Person into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the agency business of the Warrant Agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, *provided* that such Person would be eligible for appointment as a successor Warrant Agent under the provisions of <u>Section 11(j)</u>. If at the time such successor to the Warrant Agent shall succeed under this Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force and effect provided in the Warrant Certificates and in this Agreement. If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrants shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrants shall not have been countersigned, the Warrant Agent may countersign such

21

Warrants either in its prior name or in its changed name; and in all such cases such Warrants shall have the full force and effect provided in the Warrants and in this Agreement.

(l)     Indemnity. The Company agrees to indemnify the Warrant Agent, and to hold it harmless against, any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including reasonable counsel fees and expenses) incurred without the bad faith, gross negligence or willful misconduct on the part of the Warrant Agent (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction), for any action taken, suffered or omitted by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of liability arising therefrom, directly or indirectly. The Warrant Agent shall not be obligated to expend or risk its own funds to take any action which it believes would expose it to expense or liability or to a risk of incurring expense of liability, unless it has been furnished with assurance of repayment or indemnity reasonably satisfactory to it.

(m)     Exclusions. The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment, or to determine when any calculation or adjustment required under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment.

(n)     No Liability for Interest. The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(o)     No Implied Obligations. The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent. The Warrant Agent shall not be under any obligation to take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it. The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issuance and sale, or exercise or conversion, of the Warrants or Demand Notes. The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in any Warrant Certificate or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

22

(p)      Force Majeure. In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, pandemics, epidemics, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(q)      Bank Accounts. All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services (the "Funds") shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company. Until paid pursuant to the terms of this Agreement, Computershare will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party. The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits. The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Company, any Holder or any other party.

(r)      Notice. The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Company, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in Section 15, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

(s)      Signature Guarantee. The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon (i) any Signature Guarantee or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, such Signature Guarantee; or (ii) related applicable law, act, regulation or any interpretation of the same.

(t)      Survival. The provisions under this Section 11 shall survive the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company.

SECTION 12. Severability. In the event that any one or more of the provisions contained herein or in the Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable (including as a result of applicable statutes and the related regulations issued by the U.S. Coast Guard or the Maritime Administration), the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; *provided*, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately.

23

4826-3625-2092.10
#93237976v12

Furthermore, subject to the preceding sentence, in lieu of any such invalid, illegal or unenforceable provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms and commercial effect to such invalid, illegal or unenforceable provision as may be possible and be valid and enforceable which a reasonable person in the position of the Company, acting in good faith, would make, always keeping in mind the intent and purposes of this Agreement and the Warrants issued pursuant thereto by the Persons party hereto as of the date hereof.

SECTION 13. <u>Notices to Company and Warrant Agent</u>. All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company to be effective shall be in writing (including by e-mail), and shall be deemed to have been duly given or made when delivered by hand or e-mail, or one (1) Business Day if sent by overnight courier service (with next day delivery specified), or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two (2) Business Days or less to the destination such notice), or five (5) Business Days after being deposited in the mail, or, in the case of email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

> Hornbeck Offshore Services, Inc.
> 103 Northpark Blvd., Suite 300
> Covington, LA 70433
> Attention: James O. Harp, Jr., Executive Vice President and Chief Financial Officer
> Samuel A. Giberga, Executive Vice President, General Counsel and Chief Compliance Officer
> Email: james.harp@hornbeckoffshore.com
> samuel.giberga @hornbeckoffshore.com

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by overnight courier service or first-class mail, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> Computershare, Inc.
> Computershare Trust Company, N.A.
> 150 Royall Street
> Canton, MA 02021
> Attention: Client Services

Unless the Warrant is represented by a Global Warrant Certificate, any notice or communication mailed to a Holder shall be mailed to the Holder at the Holder's address as it appears on the Warrant Register and shall be sufficiently given if so mailed within the time prescribed. Any notice to the owners of a beneficial interest in a Warrant represented by a Global Warrant Certificate shall be distributed through the Depository in accordance with the procedures of the Depository. Communications to such Holder shall be deemed to be effective at the time of dispatch to the

4826-3625-2092.10
#93237976v12

Depository. Failure to provide a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

SECTION 14. <u>Supplements and Amendments</u>. The Company and the Warrant Agent may from time to time supplement, amend, waive or otherwise modify this Agreement (a) without the approval of any Holders to implement any changes required in order for the Company to comply with the limitations imposed by the Jones Act or other applicable law on ownership and control of the capital stock of the Company by Non-U.S. Citizens (*provided* that to the extent the Company makes any changes pursuant to this clause (a), the Company shall make only such changes which a reasonable person in the position of the Company, acting in good faith, would determine are necessary in order to implement such written requirements, always keeping in mind the intent and purposes of this Agreement and the Warrants issued pursuant thereto by the Persons party hereto as of the date hereof), or (b) with the prior written consent of (i) (A) Holders that hold Warrants representing at least seventy-five percent (75%) of the principal amount of the Demand Notes issuable pursuant to all outstanding Warrants and (B) Holders (as defined in the Jones Act Warrant Agreement) that hold Jones Act Common Stock Warrants representing at least seventy-five percent (75%) of the outstanding Jones Act Common Stock Warrants, which must include each of Ares, Whitebox and Highbridge, but only for so long as such Person (together with its respective Affiliates that hold Jones Act Common Stock Warrants) holds at least [●] percent ([●]%) of the outstanding Jones Act Common Stock Warrants and (ii) if any such amendment or supplement is disproportionately and materially adverse to any Holder(s) (each, an "<u>Affected Holder</u>"), Affected Holders that hold Warrants representing a majority of the principal amount of the Demand Notes issuable pursuant to all outstanding Warrants held by the Affected Holders; *provided*, that the Warrant Agent shall not be required to execute any amendment, supplement, waiver or other modification to this Agreement that the Warrant Agent has determined would adversely affect its own rights, duties, obligations or immunities under this Agreement. As a condition precedent to the Warrant Agent's execution of any amendment, supplement, waiver or other modification to this Agreement, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment, supplement, waiver or other modification is in compliance with the terms of this <u>Section 16</u>. No supplement, modification, amendment or waiver to this Agreement shall be effective unless duly executed by the Warrant Agent. Upon execution and delivery of any supplement, amendment, waiver or other modification pursuant to this <u>Section 16</u>, such amendment, supplement, waiver or other modification shall be considered a part of this Agreement for all purposes and every Holder of a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

SECTION 15. <u>Termination</u>. This Agreement shall terminate on the date on which there are no outstanding Jones Act Common Stock Warrants or Warrants; *provided*, *however*, that the provisions of <u>Sections 11</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u> and <u>21</u> shall survive such termination.

SECTION 16. <u>Governing Law and Consent to Forum</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and to be performed within the State of Delaware. Each of the Company and the Warrant Agent hereby irrevocably submits to the jurisdiction of the Delaware Chancery Court; provided that if such court does not have jurisdiction, then the United States District Court for the District of Delaware, with respect to any suit, action or proceeding arising out of or relating to this Agreement,

25

and each irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Nothing herein shall affect the right of any Person to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

SECTION 17. Waiver of Jury Trial. Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

SECTION 18. Benefits of this Agreement. Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered Holders and beneficial owners (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders and beneficial owners.

SECTION 19. Counterparts. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 20. Headings. The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

SECTION 21. Confidentiality. The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services of the Warrant Agent shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by applicable law, rule or regulation, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions). Each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its

26

duties and obligations under this Agreement and such disclosure is not prohibited by applicable law; *provided* that such disclosing party shall (a) direct such officers, affiliates, agents, subcontractors and employees to treat such information confidentially and (b) be responsible for any breach of this Section 21 by such officers, affiliates, agents, subcontractors and employees who receive such information.

SECTION 22. Representations. Each party hereto (other than the Warrant Agent) represents and warrants that such party has been duly organized and is validly existing under the laws of the jurisdiction of its incorporation, and that this Agreement has been duly authorized, executed and delivered by such party and is enforceable against such party in accordance with its terms, except as may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar laws affecting the enforcement of creditors' rights generally.

SECTION 24. No Suspension. The right to exercise any Warrants shall not be suspended during any period.

SECTION 25. Entire Agreement. This Agreement, the Warrants and the Securityholders Agreement and any other agreements referenced herein or therein constitute the entire agreement with respect to the subject matter of this Agreement, and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

SECTION 26. Tax Treatment. The Company intends to treat the Warrants as Demand Notes for U.S. federal income tax purposes unless otherwise required pursuant to applicable law.

*[Signature pages follow]*

27

4826-3625-2092.10
#93237976v12

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

Hornbeck Offshore Services, Inc.


By:_____
Name:  [●]
Title:   [●]


[Signature Page to Jones Act Anti-Dilution Warrant Agreement]

4826-3625-2092.10
#93237976v12

Computershare, Inc. and
Computershare Trust Company, N.A.,

collectively, as Warrant Agent


By: _____

Name: _____

Title: _____

[Signature Page to Jones Act Anti-Dilution Warrant Agreement]

**EXHIBIT A-1**
**FORM OF FACE OF GLOBAL JONES ACT ANTI-DILUTION WARRANT CERTIFICATE**

This Global Warrant Certificate is deposited with or on behalf of The Depository Trust Company (the "Depository") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 4(g) of the Warrant Agreement and (ii) this Global Warrant Certificate may be transferred pursuant to Section 4(f) of the Warrant Agreement and as set forth below.

**UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TO THE COMPANY OR THE WARRANT AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO. OR SUCH OTHER ENTITY, HAS AN INTEREST HEREIN.**

**TRANSFERS OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE OR AS OTHERWISE PERMITTED IN THE WARRANT AGREEMENT, AND TRANSFERS OF BENEFICIAL INTERESTS IN THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE WARRANT AGREEMENT.**

**NO AFFILIATE OF HORNBECK OFFSHORE SERVICES, INC. THAT OWNS THIS SECURITY (OR ANY INTEREST HEREIN) MAY SELL THIS SECURITY (OR ANY INTEREST HEREIN) IF UPON SUCH RESALE THIS SECURITY (OR SUCH INTEREST) WOULD CONSTITUTE A "RESTRICTED SECURITY" WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT OF 1933, AS AMENDED.**

No registration or transfer of the Demand Note issuable pursuant to the exercise or conversion of the Warrant will be recorded on the books of the Company until such provisions have been complied with.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

A-1

4826-3625-2092.10
#93237976v12

CUSIP No. [●]

ISIN No. [●]

[●] WARRANTS TO PURCHASE

DEMAND NOTES EACH WITH PRINCIPAL AMOUNT OF $[●]

HORNBECK OFFSHORE SERVICES, INC.

GLOBAL WARRANT TO PURCHASE DEMAND NOTES

VOID AFTER 5:00 P.M., New York City Time, [●]

This Global Warrant Certificate ("Warrant Certificate") certifies that Cede & Co., or its registered assigns is the registered holder of warrants (the "Warrants") of Hornbeck Offshore Services, Inc., a Delaware corporation (the "Company"), to purchase a number of Demand Notes each in the principal amount of $[●] as set forth above (the "Demand Notes"). The Warrants expire at 5:00 p.m., New York City time, on the date on which no Warrants remain outstanding (such date, the "Expiration Date"), and each Warrant entitles the holder to purchase from the Company one Demand Note at the exercise price per Demand Note (the "Exercise Price") in the principal amount set forth above, payable to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the business day immediately prior to the settlement date, which settlement date is three Business Days after a Warrant Exercise Notice is delivered (the "Settlement Date"). The Exercise Price shall be determined in accordance with Section 5(b) of the Warrant Agreement.

The Warrants are subject to exercise and conversion, in whole or in part, as and to the extent provided in the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised or converted prior to the date of the Warrant Agreement or after the Expiration Date.

*Jones Act Limitations on Warrant Exercise*. The right to exercise or convert Warrants is subject to the limitations on ownership and control of the capital stock of the Company by Non-U.S. Citizens set forth in the Warrant Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

A-2

4826-3625-2092.10
#93237976v12

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

*[signature page follows]*

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____, 2020

Hornbeck Offshore Services, Inc.

By: _____
Name:  [●]
Title:   [●]

By: _____

Name: _____

Title: _____

Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent

By: _____

Name: _____

Title: _____

A-3

4826-3625-2092.10
#93237976v12

FORM OF REVERSE OF GLOBAL WARRANT CERTIFICATE
HORNBECK OFFSHORE SERVICES, INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase Demand Notes issued pursuant to that certain Jones Act Anti-Dilution Warrant Agreement, dated as of [●], 2020 (the "Warrant Agreement"), duly executed and delivered by the Company and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent's office designated for such purpose and is available upon written request addressed to the Company. All capitalized terms used in this Warrant Certificate but not defined herein and are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised to purchase the Demand Notes from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement. Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrants evidenced by this Warrant Certificate may exercise such Warrants as set forth in the Warrant Agreement. The Warrants are also subject to conversion, in whole or in part, at the sole discretion of the Company, as and to the extent provided in the Warrant Agreement. After 5:00 p.m., New York City time on the Expiration Date, unexercised or unconverted Warrants shall become wholly void and of no value.

Warrant Certificates, when surrendered by book-entry delivery through the facilities of the Depository, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of Demand Notes.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise or conversion hereof and for all other purposes.

[Balance of page intentionally remains blank]

A-4

[TO BE ATTACHED TO GLOBAL WARRANT CERTIFICATE FOR THE WARRANTS]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL WARRANT CERTIFICATE

The following increases or decreases in this Global Warrant Certificate have been made:

| Date | Amount of decrease in the number of Warrants represented by this Global Warrant Certificate | Amount of increase in number of Warrants represented by this Global Warrant Certificate | Number of Warrants represented by this Global Warrant Certificate following such decrease or increase | Signature of authorized officer of the Warrant Agent |
|---|---|---|---|---|
| | | | | |

A-5

4826-3625-2092.10
#93237976v12

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING WARRANTS
THROUGH THE DEPOSITORY TRUST COMPANY

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Demand Notes each with a principal amount of
$_____

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase Demand Notes of Hornbeck Offshore Services, Inc. (the "Company") held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depository"), to exercise _____ Warrants for the purchase of _____ newly issued Demand Notes each with a principal amount of _____ at the Exercise Price as determined in accordance with Section 5(b) of the Warrant Agreement.

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such Demand Notes $_____by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

If the undersigned will be receiving the Demand Notes issuable upon exercise of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the Demand Notes issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

☐ Please check if such designee is a Non-U.S. Citizen.

A-6

The undersigned requests that the Demand Notes purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITORY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF DIRECT PARTICIPANT IN THE DEPOSITORY: _____
                                                        (PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

ADDRESS: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

ACCOUNT FROM WHICH THE WARRANTS ARE BEING DELIVERED:

_____

DEPOSITORY ACCOUNT NO.: _____

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE".

WARRANT HOLDER EXERCISING THE WARRANTS, IF OTHER THAN THE DIRECT DTC PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
        (PLEASE PRINT)

A-7

4826-3625-2092.10
#93237976v12

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

ACCOUNT TO WHICH DEMAND NOTES ARE TO BE CREDITED:

_____

DEPOSITORY ACCOUNT NO.: _____

FILL IN FOR DELIVERY OF THE DEMAND NOTES IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
      (PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

NUMBER WARRANTS BEING EXERCISED: _____

NUMBER OF DEMAND NOTES FOR WHICH THE WARRANTS ARE BEING EXERCISED:

_____

PRINCIPAL AMOUNT OF EACH DEMAND NOTE BEING EXERCISED _____

Signature: _____

Name: _____

Capacity in which signing: _____

Signature Guaranteed

BY: _____

A-8

4826-3625-2092.10
#93237976v12

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

A-9

4826-3625-2092.10
#93237976v12

**EXHIBIT A-2**
**FORM OF FACE OF INDIVIDUAL WARRANT CERTIFICATE**

VOID AFTER 5:00 P.M., New York City Time, [●]

**THIS WARRANT, AND THE DEMAND NOTES OF THE COMPANY WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THEY HAVE BEEN REGISTERED UNDER THAT ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE."**

A-2-1

[●]

WARRANTS TO PURCHASE

DEMAND NOTES

HORNBECK OFFSHORE SERVICES, INC.

INDIVIDUAL WARRANT TO PURCHASE DEMAND NOTES

VOID AFTER 5:00 P.M., New York City Time, [●]

This Individual Warrant Certificate ("Warrant Certificate") certifies that_____, or its registered assigns is the registered holder of Warrants (the "Warrants") of Hornbeck Offshore Services, Inc., a Delaware corporation (the "Company"), to purchase a number of Demand Notes each in the principal amount of $[●] as set forth above (the "Demand Notes"). The Warrants expire at 5:00 p.m., New York City time, on the date on which no Warrants remain outstanding (such date, the "Expiration Date"), and each Warrant entitles the holder to purchase from the Company one Demand Note at the exercise price (the "Exercise Price"), payable to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the settlement date, which settlement date is three Business Days after a Warrant Exercise Notice is delivered (the "Settlement Date"). The Exercise Price shall be determined in accordance with Section 5(b) of the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised prior to the date of the Warrant Agreement or after the Expiration Date.

Jones Act Limitations on Warrant Exercise. The right to exercise or convert Warrants is subject to the limitations on ownership and control of the capital stock of the Company by Non-U.S. Citizens set forth in the Warrant Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT

CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

*[signature page follows]*

A-2-2

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____, 2020

Hornbeck Offshore Services, Inc.


By: _____
Name:  [●]
Title:   [●]



By:_____

Name:_____

Title:_____



Computershare, Inc. and
Computershare Trust Company, N.A.

collectively, as Warrant Agent


By:_____

Name:_____

Title:_____

A-2-3

4826-3625-2092.10
#93237976v12

FORM OF REVERSE OF INDIVIDUAL WARRANT CERTIFICATE
HORNBECK OFFSHORE SERVICES, INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase Demand Notes issued pursuant to that certain Jones Act Anti-Dilution Warrant Agreement, dated as of [●], 2020 (the "Warrant Agreement"), duly executed and delivered by the Company and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent's office designated for such purpose and is available upon written request addressed to the Company. All capitalized terms used in this Warrant Certificate but not defined herein and are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised to purchase Demand Notes from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof. Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrants evidenced by this Warrant Certificate may exercise such Warrants as set forth in the Warrant Agreement.

The Warrants are also subject to conversion, in whole or in part, at the sole discretion of the Company, as and to the extent provided in the Warrant Agreement.

In the event that upon any exercise of the Warrants evidenced hereby the number of Demand Notes actually purchased shall be less than the total number of Demand Notes purchasable upon exercise or conversion of the Warrants evidenced hereby, there shall be issued to the holder hereof, or such holder's assignee, a new Warrant Certificate evidencing Warrants to purchase Demand Notes not so purchased. After 5:00 p.m., New York City time on the Expiration Date, unexercised or unconverted Warrants shall become wholly void and of no value.

Warrant Certificates, when surrendered to the Company, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of Demand Notes.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise or conversion hereof and for all other purposes.

[Balance of page intentionally remains blank]

A-2-4

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING INDIVIDUAL WARRANT CERTIFICATES

TO BE COMPLETED BY REGISTERED HOLDER

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Demand Notes each with a principal amount of
$_____

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by _____ Warrants to purchase _____ Demand Notes of Hornbeck Offshore Services, Inc. (the "Company"), each with a principal amount of _____ at the Exercise Price as determined in accordance with Section 5(b) of the Warrant Agreement.

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such Demand Notes $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

If the undersigned will be receiving the Demand Notes issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the Demand Notes issuable upon exercise of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

☐ Please check if such designee is a Non-U.S. Citizen.

The undersigned requests that the Demand Notes purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, *provided* that if the Demand Notes are evidenced by global securities, the Demand Notes shall be registered in the name of the Depository or its nominee.

A-2-5

4826-3625-2092.10
#93237976v12

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF REGISTERED HOLDER: _____
(PLEASE PRINT)

ADDRESS: _____

_____

DELIVERY ADDRESS (IF DIFFERENT): _____

_____

ACCOUNT TO WHICH THE DEMAND NOTES ARE TO BE CREDITED: ____

_____

FILL IN FOR DELIVERY OF THE DEMAND NOTES IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____

ADDRESS: _____

_____

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

NUMBER WARRANTS BEING EXERCISED: _____

NUMBER OF DEMAND FOR WHICH THE WARRANTS ARE BEING EXERCISED: _____

PRINCIPAL AMOUNT OF EACH DEMAND NOTE BEING EXERCISED _____

A-2-6

Signature:_____

Note: If the Demand Notes are to be registered in a name other than that in which the Warrants represented by Individual Warrant Certificate(s) are registered, the signature of the holder hereof must be guaranteed.

Signature Guaranteed

BY:_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

A-2-7

**EXHIBIT A-3**
**FORM OF ELECTION TO EXERCISE WARRANT FOR**
**HOLDERS OF DIRECT REGISTRATION WARRANTS**

TO BE COMPLETED BY REGISTERED HOLDER

HORNBECK OFFSHORE SERVICES, INC.

_____ Warrants to Purchase _____ Demand Notes each with a principal amount of $_____

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by _____ Warrants to purchase _____ Demand Notes of Hornbeck Offshore Services, Inc. (the "Company"), each with a principal amount of _____, at the Exercise Price as determined in accordance with Section 5(b) of the Warrant Agreement.

The undersigned represents, warrants and promises that it has the full power and authority to exercise or convert and deliver the Warrants exercised or converted hereby. Unless the undersigned is making an election to convert the Warrants as set forth below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such Demand Notes $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

If the undersigned will be receiving the Demand Notes issuable upon exercise or conversion of Warrants:

☐ Please check if the undersigned is a U.S. Citizen (additional information may be required by the Company to confirm that the undersigned is a U.S. Citizen)

☐ Please check if the undersigned is a Non-U.S. Citizen.

If the undersigned has designated another person (a "designee") to receive the Demand Notes issuable upon exercise or conversion of Warrants:

☐ Please check if such designee is a U.S. Citizen (additional information may be required by the Company to confirm that such designee is a U.S. Citizen)

☐ Please check if such designee is a Non-U.S. Citizen.

The undersigned requests that the Demand Notes purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance

A-3-1

4826-3625-2092.10
#93237976v12

with the instructions set forth below, *provided* that if the Demand Notes are evidenced by global securities, the Demand Notes shall be registered in the name of the Depository or its nominee.

Dated:

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND ELECTRONIC MAILING ADDRESS WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF REGISTERED HOLDER:

(PLEASE PRINT)

ADDRESS:

CONTACT NAME:

ADDRESS:

TELEPHONE (INCLUDING INTERNATIONAL CODE):

E-MAIL:

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

ACCOUNT FROM WHICH THE WARRANTS ARE BEING DELIVERED:

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE". WARRANT HOLDER DELIVERING THE WARRANTS:

ACCOUNT TO WHICH THE DEMAND NOTES ARE TO BE CREDITED:

DEPOSITORY ACCOUNT NO.:

FILL IN FOR DELIVERY OF THE DEMAND NOTES IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME:

A-3-2

4826-3625-2092.10
#93237976v12

(PLEASE PRINT)

ADDRESS: _____

_____

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

E-MAIL: _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

NUMBER WARRANTS BEING EXERCISED: _____

NUMBER OF DEMAND NOTES FOR WHICH THE WARRANTS ARE BEING EXERCISED: _____

PRINCIPAL AMOUNT OF EACH DEMAND NOTE BEING EXERCISED _____

Signature: _____

Name: _____

Capacity in which signing: _____

Signature Guaranteed

BY: _____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

A-3-3

**EXHIBIT B**
**FORM OF ASSIGNMENT**

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

FOR VALUE RECEIVED, the undersigned registered holder hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

Warrants to purchase _____ Demand Notes each with a principal amount of $_____ held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

_____

Signature

_____

Date

_____

Social Security or Other Taxpayer Identification Number of Assignee

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

B-1

4826-3625-2092.10
#93237976v12

**EXHIBIT C**
**WARRANT SUMMARY**

NUMBER OF WARRANTS: [●] Warrants, as described in the Jones Act Anti-Dilution Warrant Agreement dated as of [●], 2020 between Hornbeck Offshore Services, Inc. (the "Company") and Computershare, Inc. and its wholly owned subsidiary, Computershare Trust Company, N.A. (collectively, the "Warrant Agent") (as supplemented or amended, the "Warrant Agreement"), each of which is exercisable for one Demand Note of the Company. This summary is not complete and reference is made to the Warrant Agreement for the terms of the Warrants. In the event of any conflict, the terms of the Warrant Agreement shall control.

EXERCISE PRICE: $0.00 per Demand Note.

PRINCIPAL AMOUNT: $[●] per Demand Note.

JONES ACT LIMITATIONS ON EXERCISE OR CONVERSION: The right to exercise or convert Warrants is subject to the limitations on ownership and control of the capital stock of the Company by Non-U.S. Citizens set forth in the Warrant Agreement.

SETTLEMENT:

Settlement: The Company shall deliver, against payment of the Exercise Price, a number of Demand Notes equal to the number of Warrants exercised.

DATES OF EXERCISE OR CONVERSION: At any time, and from time to time, prior to the close of business on the Expiration Date.

EXPIRATION DATE: The twenty-fifth (25th) anniversary of the date that the Warrants are issued.

C-1

**EXHIBIT D**
**FORM OF DEMAND NOTE**

**Attached.**

D-1

4826-3625-2092.10
#93237976v12

## **Exhibit D**

## **Management Agreements**

This <u>Exhibit D</u> contains the following documents:

- <u>Exhibit D(i)</u>: Management Incentive Plan.

- <u>Exhibit D(ii)</u>: Employment Agreements.

**Exhibit D(i)**

**Management Incentive Plan**

*Exhibit D(i)*

**2020 MANAGEMENT INCENTIVE PLAN**
**OF**
**[REORGANIZED HORNBECK]**

**ARTICLE I.          PURPOSE**

**1.1      Purposes of the Plan**.  This 2020 Management Incentive Plan (as amended from time to time, the "Plan") of [Reorganized Hornbeck, a Delaware corporation] (the "Company"), is designed to provide an incentive to executives, senior management, certain consultants and advisors, and non-employee directors of the Company or any of its Affiliates (collectively, the "Eligible Individuals") and to offer an additional inducement in obtaining the services of such individuals.

**ARTICLE II.          SHARE LIMITATION**

**2.1      Shares Subject to the Plan**.  Subject to the provisions of Article XI, the aggregate number of shares of Common Stock that may be issued or used for reference purposes with respect to which Awards may be granted under the Plan shall be equal to [_____] shares of the Company's Common Stock, with [___] of such shares of Common Stock to be reserved for grant of Awards exclusively to MIP Participants (the "MIP Reserve") and [__] of such shares of Common stock to be reserved for grant of Awards to non-employee directors of the Company or any of its Affiliates.  Such shares of Common Stock may, in the discretion of the Board, consist either in whole or in part of authorized but unissued shares of Common Stock or shares of Common Stock held in the treasury of the Company.  Subject to the provisions of Section 13.6, any share of Common Stock underlying an Award granted under the Plan which for any reason expires, is canceled, is forfeited, or is terminated unexercised, shall again become available for the granting of Awards under the Plan (in each case with respect to any portion of the Award for which no value was received by Participant).  For the avoidance of doubt, the following shares shall not again be made available for delivery to Participants under the Plan: (a) shares used to pay the exercise price or withholding taxes related to an outstanding Award and (b) shares repurchased by the Company.

**2.2      Initial Grants; Future Grants; Automatic Allocation upon Change of Control**.

(a)      Notwithstanding anything to the contrary contained herein, sixty percent (60%) of the MIP Reserve shall be granted in the form of Options and Restricted Stock Units upon the Effective Date, in the amounts and to the individuals listed on Exhibit A (the "Emergence Awards").  The Emergence Awards shall be granted in accordance with the form Emergence Restricted Stock Unit Award Agreement attached hereto on Exhibit B and the form Emergence Option Award Agreement attached hereto on Exhibit C.

(b)      The portion of the MIP Reserve that does not constitute the Emergence Awards, plus any Awards granted pursuant to the MIP Reserve that have been forfeited or cancelled for no value before vesting (collectively, the "Remaining MIP Share Reserve"), will be granted on terms and conditions, and at such times, as are determined by the Board in its discretion following the Effective Date.

(c)     As of immediately prior to a Change of Control, if (i) the Remaining MIP Share Reserve has not been fully granted, and (ii) the TEV in connection with such Change of Control is at least $1 billion, then the Board shall make a special RSU grant to Participants who remain in a Service relationship with the Company or its Affiliates at the time of such Change of Control (such grants, the "Special RSUs").  The Special RSUs shall be fully vested upon grant. The amount of shares subject to the Special RSUs granted shall be the lesser of (A) twenty percent (20%) of the MIP Reserve (*i.e.*, [___] Shares), and (B) one hundred percent (100%) of the Remaining MIP Share Reserve as of the time of the Change of Control.

## ARTICLE III.     ADMINISTRATION

**3.1     Administration of the Plan**.  The Plan shall be administered and interpreted by the Committee.

**3.2     Authority of the Committee**.  The Committee shall have full authority to grant, pursuant to the terms of the Plan and applicable law, to Eligible Individuals:  (i) Options, (ii) Stock Appreciation Rights, (iii) Restricted Stock Units, (iv) Restricted Stock, (v) Performance Awards, (vi) Other Stock-Based Awards, and (vii) Other Cash-Based Awards.  Subject to Section 2.2 and Section 13.6, the Committee shall have the full and final authority, in its good faith discretion, to make all determinations relating to the Plan, including, but not limited to, the right to:

(a)     select the Eligible Individuals to whom Awards may, from time to time, be granted hereunder;

(b)     determine whether and to what extent Awards are to be granted hereunder to one or more Eligible Individuals;

(c)     determine whether the Awards are intended to be exempt from, or comply with, the requirements of Section 409A of the Code;

(d)     determine the number of shares of Common Stock to be subject to each Award granted hereunder, or the amount of cash (if any) to be covered by each Award granted hereunder;

(e)     determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder (including, but not limited to, the exercise or purchase price (if any), the term, any restriction or limitation, any vesting schedule or any forfeiture restrictions or waiver thereof (including, without limitation, providing for the accelerated vesting or lapse of restrictions of any Award at any time, subject, in the discretion of and as determined by the Committee, to any applicable limitations on permitted acceleration under Section 409A of the Code), based on such factors, if any, as the Committee shall determine, in its sole discretion);

(f)     determine whether and under what circumstances an RSU may be settled in cash and/or Common Stock;

(g)     determine whether an Option is an Incentive Stock Option or Non-Qualified Stock Option;

2

(h)      impose a "blackout" period during which Options may not be exercised;

(i)      determine whether shares of Common Stock may be issued upon the exercise of an Option as partly paid and, if so, the dates when future installments of the exercise price shall become due and the amounts of such installments;

(j)      determine whether to restrict the sale or other disposition of the shares of Common Stock acquired upon the exercise or settlement of an Award and, if so, whether and under what conditions to waive any such restriction;

(k)      determine whether and under what conditions to subject all or a portion of the grant or exercise of an Option or the shares of Common Stock purchased or acquired pursuant to the exercise of an Option or the settlement of an RSU to the fulfillment of certain restrictions or contingencies as specified in the Award Agreement, including, without limitation, restrictions or contingencies relating to financial objectives for the Company or any of its Affiliates, a division of any of the foregoing, a product line or other category, and/or to the period of continued Service of a Participant to the Company or any of its Affiliates, and to determine, in each case, whether such limitations, restrictions or contingencies have been met;

(l)      determine the amount, if any, necessary to satisfy the obligation of the Company or any of its Affiliates to withhold taxes or other amounts;

(m)      to construe the respective Award Agreement and the Plan;

(n)      modify, extend, renew, or cancel an Award, provided, that, such modification, extension, renewal, or cancelation is permitted under the Plan on the date of such modification, extension, renewal, or cancelation, and provided, further, that such Award as modified, extended, renewed, or canceled would continue to be exempt from the application of Section 409A of the Code or would comply (or would continue to comply) with all requirements applicable to deferred compensation under Sections 409A(a)(2), (a)(3) and (a)(4) of the Code; and

(o)      prescribe, amend, and rescind rules and regulations relating to the Plan, and to make all other determinations necessary or advisable for administering the Plan.

The good faith determinations of the Committee on the matters referred to in this Section 3.2 shall be conclusive and binding on all parties, including the Company, its Affiliates, Participants, and any Person claiming any rights under the Plan from or through any Participant.  The Committee's determinations under the Plan need not be uniform and may be made selectively among Eligible Individuals who are eligible to receive, or actually receive, Awards.  Without limiting the generality of the foregoing, the Committee shall be entitled to make non-uniform and selective determinations, amendments, and adjustments to Awards awarded under the Plan and to enter into non-uniform and selective Award Agreements.  The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee.  The Committee may delegate to officers, directors, or managers of the Company or any Affiliate of the Company the authority, subject to such terms as the Committee shall determine, to perform such functions as the Committee may determine, to the extent permitted under applicable law.

**3.3**     **Emergence Awards**.  Notwithstanding anything to the contrary in the Plan, the terms, conditions, and allocations of the Emergence Awards are set forth in Exhibit A, Exhibit B, and Exhibit C hereof, and such Emergence Awards shall be made on the Effective Date without any further action of the Company or the Committee required.  This Section 3.3 supersedes any conflicting provision of the Plan.

**3.4**     **Limitation of Liability**.  Each member of the Committee shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer, director, or other employee of the Company or any of its Affiliates, the Company's independent certified public accountants, or any executive compensation consultant, legal counsel, or other professional retained by the Company to assist in the administration of the Plan.  To the fullest extent permitted by applicable law, no member of the Committee, nor any officer, director, or employee of the Company acting on behalf of the Committee, shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and all members of the Committee and any officer, director, or employee of the Company acting on its behalf shall, to the extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

**3.5**     **Decisions Final**.  Any decision, interpretation, or other action made or taken in good faith by or at the direction of the Committee arising out of or in connection with the Plan shall be within the absolute discretion of the Committee and shall be final, binding and conclusive on all Persons, including all employees and Participants and their respective heirs, executors, administrators, successors, and assigns, subject to any dispute rights set forth in an Award Agreement.

**3.6**     **Actions by the Board**.  The Board may, at any time and from time to time, grant Awards and administer the Plan with respect to such Awards.  In any such case, the Board shall have all the authority granted to the Committee under the Plan.

**ARTICLE IV.**     **ELIGIBILITY**

**4.1**     **Eligibility**.  The Committee may, from time to time, in its sole discretion, consistent with the purposes of the Plan, grant Awards to the Eligible Individuals.  Such Awards granted shall cover such number of shares of Common Stock as the Committee may determine, in its sole discretion, as set forth in the applicable Award Agreement.

**ARTICLE V.**     **STOCK OPTIONS**

**5.1**     **Stock Options**. Options may be granted alone or in addition to other Awards granted under the Plan. Each Option granted under the Plan shall be either (a) an Incentive Stock Option or (b) a Non-Qualified Stock Option. The Committee shall have the authority to grant to any Eligible Individual one or more Incentive Stock Options, Non-Qualified Stock Options, or both types of Options, in each case, pursuant to an Award Agreement and subject to the terms and conditions set forth herein and therein.

**5.2**     **Exercise Price**.  The exercise price of the shares of Common Stock subject to an Option shall be equal to or greater than one hundred percent (100%) of the Fair Market Value of the Common Stock on the date of grant.

4

**5.3     Option Term**.  The maximum term of each Option granted pursuant to the Plan shall be equal to ten (10) years from the date of grant thereof; subject, however, to earlier termination as hereinafter provided.

**5.4     Exercisability**.  Options granted under the Plan shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at the time of grant.  If the Committee provides, in its discretion, that any Option is exercisable subject to certain limitations (including, without limitation, that such Option is exercisable only in installments or within certain time periods), the Committee may waive such limitations on the exercisability at any time at or after the time of grant in whole or in part (including, without limitation, waiver of the installment exercise provisions or acceleration of the time at which such Option may be exercised), based on such factors, if any, as the Committee shall determine, in its sole discretion.

**5.5     Method of Exercise**.  Subject to whatever installment exercise and waiting period provisions apply under Section 5.4, to the extent then-vested and exercisable, Options may be exercised, in whole or in part at any time during the Option term, by giving written notice to the Company (or to its agent specifically designated for such purpose), at the address and in the form established by the Committee (which notice may be provided in an electronic form, to the extent acceptable to the Committee and the Company), specifying the number of shares of Common Stock to be purchased.  Such notice shall be accompanied by a certified check or bank draft payable to the order of the Company for an amount equal to the sum of the aggregate exercise price for such shares of Common Stock and any income taxes and employment taxes required to be withheld.  The Committee may, in its sole discretion and subject to applicable law, at the time the Option is granted or at a later date, permit other forms of payment in an Award Agreement or otherwise, including notes, shares of Common Stock, "net exercise", or other contractual obligations of a Participant to make payment on a deferred basis.  Any fractional shares of Common Stock shall be settled in cash.

**5.6     Unvested Options**.  Unless otherwise determined by the Committee in the applicable Award Agreement or otherwise in accordance with the terms of the applicable Award Agreement and the Plan, Options that are not vested or exercisable as of the date of a Participant's termination of Service for any reason shall terminate and expire as of the date of such termination for no consideration.

**5.7     Non-Transferability of Options**.  Except to the extent provided above, no Option granted under the Plan shall be Transferable by a Participant, other than by will or the laws of descent and distribution, and during the lifetime of a Participant, all Options may be exercised only by Participant or Participant's Legal Representatives, and any attempted Transfer shall be null and void ab initio and of no force or effect.  Notwithstanding anything to the contrary herein, Options and shares of Common Stock underlying an Option permitted to be transferred hereunder shall be subject to the transfer restrictions set forth in the Securityholders Agreement applicable to Common Stock.

**5.8     Early Exercise**.  The Committee may provide that an Award Agreement with respect to an Option include a provision whereby a Participant may elect at any time before a Participant's termination of Service with the Company or any of its Affiliates to exercise the

5

Option as to any part or all of the shares of Common Stock subject to the Option prior to full vesting of the Option, and such shares shall be subject to the original vesting schedule applicable to the predecessor Option.  Unvested shares of Common Stock so purchased may be subject to a repurchase option in favor of the Company or to any other restriction the Committee determines to be appropriate, with any such terms to be set forth in the applicable Award Agreement.

**5.9**     **Termination of Service**.  Except as otherwise provided in an Award Agreement, in the event of a Participant's termination of Service with the Company or any of its Affiliates for any reason other than Cause, a Participant may exercise, to the extent exercisable on the date of such termination, any outstanding and vested Options on the date of such termination or at any time within a period of ninety (90) days from the date of such termination, but not thereafter and in no event after the date the Options would otherwise have expired.  If a Participant is terminated for Cause, then all vested and unvested Options shall terminate for no consideration on the day immediately before the date of such termination.

**5.10**     **Incentive Stock Option Limitations**.  In the case of Incentive Stock Options, the terms and conditions of such Awards shall be subject to and comply with such rules as may be prescribed by Section 422 of the Code and any regulations implementing such statute.  All Options when granted under the Plan are intended to be Non-Qualified Stock Options, unless the applicable Award Agreement expressly states that the Option is intended to be an Incentive Stock Option.  If an Option is intended to be an Incentive Stock Option, and if for any reason such Option (or any portion thereof) shall not qualify as an Incentive Stock Option, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a Non-Qualified Stock Option appropriately granted under the Plan; provided, that, such Option (or portion thereof) otherwise complies with the Plan's requirements relating to Non-Qualified Stock Options.

## ARTICLE VI.     STOCK APPRECIATION RIGHTS

**6.1**     **Stock Appreciation Rights**.  The Committee may, from time to time, grant Stock Appreciation Rights to an Eligible Individual pursuant to an Award Agreement.  The Stock Appreciation Rights granted shall take such form as determined in the discretion of the Committee, subject to the terms and conditions herein and therein.

**6.2**     **Base Price**.  To the extent a Stock Appreciation Right is not intended to be a "stock right" exempt from Section 409A of the Code, the base price of the shares of Common Stock subject to a Stock Appreciation Right shall be equal to or greater than one hundred percent (100%) of the Fair Market Value of the Common Stock on the date of grant.

**6.3**     **Stock Appreciation Right Term**.    The maximum term of each Stock Appreciation Right granted pursuant to the Plan shall be equal to ten (10) years from the date of grant thereof; subject, however, to earlier termination as hereinafter provided.

**6.4**     **Exercisability**.  Stock Appreciation Rights granted under the Plan shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at the time of grant.  If the Committee provides, in its discretion, that any Stock Appreciation Right is exercisable subject to certain limitations (including, without

6

limitation, that such Stock Appreciation Right is exercisable only in installments or within certain time periods), the Committee may waive such limitations on the exercisability at any time at or after the time of grant in whole or in part (including, without limitation, waiver of the installment exercise provisions or acceleration of the time at which such Stock Appreciation Right may be exercised), based on such factors, if any, as the Committee shall determine, in its sole discretion.

**6.5    Method of Exercise**.  Subject to whatever installment exercise and waiting period provisions apply under Section 6.4, to the extent then vested and exercisable, Stock Appreciation Rights may be exercised, in whole or in part, at any time during the Stock Appreciation Right term, by giving written notice to the Company (or to its agent specifically designated for such purpose), at the address and in the form established by the Committee (which notice may be provided in an electronic form to the extent acceptable to the Committee and the Company), specifying the number of Stock Appreciation Rights to be exercised.  Such notice shall be accompanied by a certified check or bank draft payable to the order of the Company for an amount equal to any income taxes and employment taxes required to be withheld.  The Committee may, in its sole discretion and subject to applicable law, at the time the Stock Appreciation Right is granted or at a later date, permit other forms of payment in an Award Agreement or otherwise, including notes, shares of Common Stock, or other contractual obligations of a Participant to make payment on a deferred basis.  Any fractional shares of Common Stock shall be settled in cash.

**6.6    Unvested Stock Appreciation Rights**.  Unless otherwise determined by the Committee in the applicable Award Agreement or otherwise in accordance with the terms of the applicable Award Agreement and the Plan, Stock Appreciation Rights that are not vested or exercisable as of the date of a Participant's termination of Service for any reason shall terminate and expire as of the date of such termination for no consideration.

**6.7    Non-Transferability**.  Except to the extent provided above, no Stock Appreciation Right shall be Transferable by a Participant other than by will or the laws of descent and distribution, and during the lifetime of a Participant, all Stock Appreciation Rights may be exercised only by Participant or Participant's Legal Representatives, and any attempted Transfer shall be null and void ab initio and of no force or effect. Notwithstanding anything to the contrary herein, Stock Appreciation Rights and shares of Common Stock underlying Stock Appreciation Rights permitted to be transferred hereunder shall be subject to the transfer restrictions set forth in the Securityholders Agreement applicable to Common Stock.

**6.8    Termination of Service**.  In the event of a Participant's termination with the Company or any of its Affiliates for any reason, a Participant may exercise, to the extent exercisable on the date of such termination, any outstanding and vested Stock Appreciation Rights on the date of such termination or at any time within a period of ninety (90) days from the date of such termination, but not thereafter and in no event after the date the Stock Appreciation Rights would otherwise have expired; provided, that, if a Participant is terminated for Cause, such Stock Appreciation Rights shall terminate for no consideration on the day immediately before the date of such termination.

7

**6.9**   **Form of Payment**.   Upon the exercise of a Stock Appreciation Right, a Participant shall be entitled to receive, for each right exercised, an amount in cash and/or shares of Common Stock equal in value to the excess of the Fair Market Value of one share of Common Stock on the date that the right is exercised over the base price.

**ARTICLE VII.**      **RESTRICTED STOCK UNITS**

**7.1**   **Awards of Restricted Stock Units**.   RSUs may be issued either alone or in addition to other Awards granted under the Plan.  The Committee shall determine the Eligible Individuals, to whom, and the time or times at which, grants of RSUs shall be made, the number of RSUs to be awarded, the price (if any) to be paid by a Participant, the time or times within which such Awards may be subject to forfeiture, the vesting schedule and rights to acceleration thereof, and all other terms and conditions of the Awards.  No shares of Common Stock shall be issued at the time an Award of RSUs is made, and the Company will not be required to set aside a fund for the payment of any such Award.

**7.2**   **Restrictions**.   Delivery of Common Stock or cash, as determined by the Committee but subject to the terms of the applicable Award Agreement, will occur upon expiration of the deferred period specified for RSUs by the Committee.  The Committee may condition an Award of RSUs or the lapse of restrictions with respect to an Award of RSUs, in whole or in part, on the achievement of certain performance goals determined by the Committee in its sole discretion.

**7.3**   **Termination**.   Except as may otherwise be expressly provided in the applicable Award Agreement, in the event of a Participant's termination of Service with the Company or any of its Affiliates for any reason, all RSUs that are not then vested shall be forfeited for no consideration; provided, that, if a Participant is terminated for Cause all RSUs, whether vested or unvested, shall terminate for no consideration on the day immediately before the date of such termination.

**7.4**   **Dividend Equivalents**.   At the discretion of the Committee, each RSU (representing one share of Common Stock) awarded to a Participant may be credited with dividends paid in respect of one share of Common Stock ("Dividend Equivalents").  Dividend Equivalents credited to a Participant's account and attributable to any particular RSU (and earnings thereon, if applicable) shall be distributed to a Participant upon settlement of such RSU and, if such RSU is forfeited, a Participant shall have no right to such Dividend Equivalents.  For the avoidance of doubt, any Dividend Equivalents paid in respect of an RSU shall be subject to the same vesting conditions as apply to the underlying Award.

**7.5**   **Non-Transferability**.   No RSU granted under the Plan shall be Transferable by a Participant other than by will or the laws of descent and distribution, and any attempted Transfer shall be null and void ab initio and of no force or effect.  Notwithstanding anything to the contrary herein, RSUs and shares of Common Stock underlying RSUs permitted to be transferred hereunder shall be subject to the transfer restrictions set forth in the Securityholders Agreement applicable to Common Stock.

**7.6**     **Settlement of RSUs**.  Before the Company issues cash or any shares of Common Stock to a Participant pursuant to the settlement of any RSUs, at a Participant's election, the Company shall permit a Participant to make such provision, or furnish the Company such authorization, necessary or desirable so that the Company may satisfy its obligation under applicable tax laws to withhold for income or other taxes due upon or incident to such settlement.

## ARTICLE VIII.     RESTRICTED STOCK

**8.1**     **Awards of Restricted Stock**.  Shares of Restricted Stock may be issued either alone or in addition to other Awards granted under the Plan.  The Committee shall determine the Eligible Individuals, to whom, and the time or times at which, grants of Restricted Stock shall be made, the number of shares to be awarded, the price (if any) to be paid by a Participant (subject to Section 8.2 hereof), the time or times within which such Awards may be subject to forfeiture, the vesting schedule and rights to acceleration thereof, and all other terms and conditions of the Awards.  The Committee may condition the grant or vesting of Restricted Stock upon the attainment of specified performance targets (including one or more Performance Goals) or such other factor(s) as the Committee may determine, in its sole discretion.

**8.2**     **Awards and Certificates**.  If required by the applicable Award Agreement, Eligible Individuals selected to receive Restricted Stock shall not have any right with respect to such Award, unless and until such Participant has delivered a fully executed copy of the Award Agreement evidencing the Award to the Company, to the extent required by the Committee, and has otherwise complied with the applicable terms and conditions of such Award.  Further, such Award shall be subject to the following conditions:

(a)     Purchase Price.  The purchase price of Restricted Stock shall be fixed by the Committee.  The purchase price for shares of Restricted Stock may be zero, to the extent permitted by applicable law, and, to the extent not so permitted, such purchase price may not be less than par value.

(b)     Acceptance.  Awards of Restricted Stock must be accepted within a period of sixty (60) days (or such shorter period as the Committee may specify at grant) after the grant date, by executing a Restricted Stock Award Agreement and by paying whatever price (if any) the Committee has designated thereunder.

(c)     Legend.  The Company will evidence each Participant's ownership of Restricted Stock pursuant to a designated system, such as book entries by the transfer agent.  If a stock certificate for such shares of Restricted Stock is issued, such certificate shall be registered in the name of such Participant, and shall, in addition to such legends required by applicable securities laws and/or the Securityholders Agreement, bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Award, substantially in the following form:

> "The anticipation, alienation, attachment, sale, transfer, assignment, pledge, encumbrance or charge of the shares of stock represented hereby are subject to the terms and conditions (including forfeiture) of the [Reorganized Hornbeck] (the "Company") 2020 Management Incentive Plan (as it may be amended from time to time, the "Plan") and an

9

Agreement entered into between the registered owner and the Company dated as of [_____]. Copies of such Plan and Agreement are on file at the principal office of the Company."

(d) <u>Custody</u>. If stock certificates are issued in respect of shares of Restricted Stock, the Committee may require that any stock certificates evidencing such shares be held in custody by the Company until the restrictions thereon shall have lapsed, and that, as a condition of any grant of Restricted Stock, Participant shall have delivered a duly signed stock power or other instruments of assignment (including a power of attorney), each endorsed in blank with a guarantee of signature if deemed necessary or appropriate by the Company, which would permit Transfer to the Company of all or a portion of the shares subject to the Restricted Stock Award in the event that such Award is forfeited in whole or part or otherwise transferred to the Company.

**8.3    Restrictions and Conditions**. The shares of Restricted Stock awarded pursuant to the Plan shall be subject to the following restrictions and conditions and such other terms and conditions as may be determined by the Committee in its sole discretion:

(a) <u>Restriction Period</u>. A Participant shall not be permitted to Transfer shares of Restricted Stock awarded under the Plan during the period or periods set by the Committee (the "<u>Restriction Period</u>") commencing on the date of such Award, as set forth in the Award Agreement and such Award Agreement shall set forth a vesting schedule and any event that would accelerate vesting of the shares of Restricted Stock. Within these limits, based on Service, attainment of one or more Performance Goals and/or such other factors or criteria as the Committee may determine in its sole discretion, the Committee may condition the grant or provide for the lapse of such restrictions in installments in whole or in part, or may accelerate the vesting of all or any part of any Restricted Stock Award and/or waive the deferral limitations for all or any part of any Restricted Stock Award.

(b) <u>Rights as a Stockholder</u>. As a condition to receipt, or issuance, of any shares of Restricted Stock, a Participant will execute a joinder to the Securityholders Agreement designated by the Company (in the form attached to such Securityholders Agreement). Except as provided in <u>Section 8.3(a)</u>, this <u>Section 8.3(b)</u> or <u>Section 8.3(e)</u>, or as otherwise determined by the Committee in an Award Agreement, a Participant shall have, with respect to the shares of Restricted Stock, all of the rights of a holder of shares of Common Stock of the Company, including, without limitation, (i) the right to receive dividends, <u>provided</u>, that, the payment of any dividends in respect of such Restricted Stock shall be deferred (without interest) until, and subject to and conditioned upon, (A) the expiration of the applicable Restriction Period, and (B) the lapse of all applicable restrictions thereon (including any vesting conditions of the underlying shares of Restricted Stock), (ii) the right to vote such shares, and (iii) subject to and conditioned upon the full vesting of shares of Restricted Stock, the right to tender such shares.

(c) <u>Termination</u>. Unless otherwise determined by the Committee in the applicable Award Agreement or otherwise in accordance with the terms of the applicable Award Agreement and the Plan, upon a Participant's termination of Service for any reason during the relevant Restriction Period, all Restricted Stock still subject to restriction will be forfeited for no consideration

10

(d)     Lapse of Restrictions.  If and when the Restriction Period expires without a prior forfeiture of the shares of Restricted Stock, such earned shares (and to the extent ownership of such shares is evidenced by stock certificates, the stock certificates for such shares) shall be delivered to Participant.  All legends shall be removed from said certificates at the time of delivery to Participant, except as otherwise required by applicable law or other limitations imposed by the Committee.  Notwithstanding the end of the Restriction Period, earned shares will remain subject to the terms of the Securityholders Agreement.

**ARTICLE IX.        PERFORMANCE AWARDS**

**9.1     Performance Awards**.  The Committee may designate an Award (including any Restricted Stock and any Other Stock-Based Award) at grant as a Performance Award payable upon the attainment of specific Performance Goals.  If the Performance Award is payable in shares of Restricted Stock, such shares shall be transferable to a Participant only upon attainment of the relevant Performance Goal in accordance with this Article IX.  If the Performance Award is denominated in cash, it may be paid upon the attainment of the relevant Performance Goals either in cash, shares of Common Stock, restricted stock units, and/or in shares of Restricted Stock (based on the then current Fair Market Value of such shares), as determined by the Committee, in its sole and absolute discretion. Each Performance Award shall be evidenced by an Award Agreement in such form that is not inconsistent with the Plan and that the Committee may, from time to time, approve.  If required by the Award Agreement, an Eligible Individual selected to receive Performance Awards shall not have any right with respect to such Award, unless and until such Eligible Individual has delivered a fully executed copy of the Award Agreement evidencing the Award to the Company, to the extent required by the Committee, and has otherwise complied with the applicable terms and conditions of such Award.

**9.2     Terms and Conditions**.  Performance Awards awarded pursuant to this Article IX shall be subject to the following terms and conditions and such other terms and conditions as may be determined by the Committee in its sole discretion:

(a)     Earning of Performance Award.  At the expiration of the applicable performance period, the Committee shall determine the extent to which the Performance Goals established pursuant to Section 9.2(c) are achieved and the percentage of each Performance Award that has been earned and certify such results in writing.

(b)     Non-Transferability.  Subject to the applicable provisions of the Award Agreement and the Plan, Performance Awards may not be Transferred during the performance period.  Notwithstanding anything to the contrary herein, Performance Awards and shares of Common Stock underlying Performance Awards permitted to be transferred hereunder shall be subject to the transfer restrictions set forth in the Securityholders Agreement applicable to Common Stock.

(c)     Performance Goals, Formulae, or Standards.  Performance Awards will be subject to the achievement of the performance goals, formulae, or standards determined by the Committee in its sole discretion.

11

(d)  Payment.  Following the Committee's determination in accordance with Section 9.2(a), the Company shall settle Performance Awards, in such form (including, without limitation, in shares of Common Stock, Restricted Stock, RSUs, and/or in cash) as determined by the Committee, in an amount equal to such Participant's earned Performance Awards. Notwithstanding the foregoing, the Committee may, in its sole discretion, award an amount less than the earned Performance Awards and/or subject the payment of all or part of any Performance Award to additional vesting, forfeiture, and deferral conditions as it deems appropriate.

(e)  Termination.  Subject to the applicable provisions of the Award Agreement and the Plan, upon a Participant's termination of Service for any reason during the performance period for a given Performance Award, the Performance Award in question will vest or be forfeited in accordance with the terms and conditions established by the Committee.

## ARTICLE X.  OTHER STOCK-BASED AND CASH-BASED AWARDS

**10.1  Other Stock-Based Awards**.  The Committee is authorized to grant to Eligible Individuals Other Stock-Based Awards that are payable in, valued in whole or in part by reference to, or otherwise based on or related to shares of Common Stock, including, but not limited to, shares of Common Stock awarded purely as a bonus and not subject to restrictions or conditions, shares of Common Stock in payment of the amounts due under an incentive or performance plan sponsored or maintained by the Company or an Affiliate, phantom stock units, stock equivalent units, SARs, RSUs, and Awards valued by reference to book value of shares of Common Stock.  Other Stock-Based Awards may be granted either alone, in addition to, or in tandem with other Awards granted under the Plan.  Other Stock-Based Awards may be payable in cash, shares of Common Stock, or other property valued in whole or in part by reference to shares of Common Stock.

Subject to the provisions of the Plan, the Committee shall have authority to determine the Eligible Individuals, to whom, and the time or times at which, such Awards shall be made, the number of shares of Common Stock to be awarded pursuant to such Awards, and all other conditions of the Awards.  If required by the Award Agreement, an Eligible Individual selected to receive Other Stock-Based Awards shall not have any right with respect to such Award, unless and until such Eligible Individual has delivered a fully executed copy of the Award Agreement evidencing the Award to the Company, to the extent required by the Committee, and has otherwise complied with the applicable terms and conditions of such Award.

**10.2  Terms and Conditions**.  Other Stock-Based Awards made pursuant to this Article X shall be subject to the terms of the Plan, including the following terms and conditions, and such other terms and conditions as may be determined by the Committee in its sole discretion:

(a)  Non-Transferability.  Subject to the applicable provisions of the Award Agreement and the Plan, shares of Common Stock subject to Awards made under this Article X may not be Transferred prior to the date on which the shares are issued, or, if later, the date on which any applicable restriction, performance, or deferral period lapses.  Notwithstanding anything to the contrary herein, Other Stock-Based Awards and shares of Common Stock

12

underlying Other Stock-Based Awards permitted to be transferred hereunder shall be subject to the transfer restrictions set forth in the Securityholders Agreement applicable to Common Stock.

(b)     <u>Vesting</u>.   Any Award under this <u>Article X</u> and any Common Stock covered by any such Award shall vest or be forfeited to the extent so provided in the Award Agreement, as determined by the Committee in its sole discretion.

(c)     <u>Price</u>.   Common Stock issued on a bonus basis under this <u>Article X</u> may be issued for no cash consideration.   Common Stock purchased pursuant to a purchase right awarded under this <u>Article X</u> shall be priced as determined by the Committee in its sole discretion.

**10.3    Other Cash-Based Awards**.  The Committee may from time to time grant Other Cash-Based Awards to Eligible Individuals in such amounts, on such terms and conditions (subject to the terms of the Plan), and for such consideration, including no consideration or such minimum consideration as may be required by applicable law, as it shall determine in its sole discretion.   Other Cash-Based Awards may be granted subject to the satisfaction of vesting conditions or may be awarded purely as a bonus and not subject to restrictions or conditions, and if subject to vesting conditions, the Committee may accelerate the vesting of such Awards at any time in its sole discretion.   The grant of an Other Cash-Based Award shall not require a segregation of any of the Company's assets for satisfaction of the Company's payment obligation thereunder.

**ARTICLE XI.        ADJUSTMENTS UPON CHANGES IN CAPITALIZATION**

**11.1**    The existence of the Plan and the Awards granted hereunder shall not affect in any way the right or power of the Board or the stockholders of the Company to make or authorize (a) any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, (b) any merger or consolidation of the Company or any of its Affiliates, (c) any issuance of bonds, debentures, preferred or prior preference stock ahead of or affecting the Common Stock, (d) the dissolution or liquidation of the Company or any of its Affiliates, (e) any sale or transfer of all or part of the assets or business of the Company or any of its Affiliates, or (f) any other corporate act or proceeding.

**11.2**    Subject to the provisions of <u>Section 11.1</u> hereof:

(a)     In the event any recapitalization, forward or reverse split, reorganization, merger, consolidation, spin-off, combination, repurchase, or exchange of shares of Common Stock or other securities, any stock dividend or other special and nonrecurring dividend or distribution (whether in the form of cash, securities, or other property), liquidation, dissolution, or other similar transactions or events (including a Change of Control), affects the shares of Common Stock such that the Committee (acting reasonably and in good faith) determines that an adjustment is appropriate in order to prevent dilution or enlargement of the rights of Participants under the Plan, then the Committee shall make an equitable or substitution adjustment in (i) the number and kind of shares of Common Stock deemed to be available thereafter for grants of Awards under the Plan, (ii) the number and kind of shares of Common Stock that may be delivered or deliverable in respect of outstanding Awards, and/or (iii) the exercise price of

13

outstanding Options; provided, however, that the manner of any such equitable adjustment shall be determined in the good faith discretion of the Committee.  In addition, the Committee shall have discretion to make the foregoing types of adjustments, as well as any adjustments to any performance goals, targets or measures with respect to any Award, and as to all other matters it deems relevant, as it may determine to be equitable in other types of events, including in the event of an acquisition or disposition of any of the businesses of the Company or its Affiliates occurring after the date of grant of any Award.  Any adjustments made pursuant to this Section 11.2 shall be determined in a manner consistent with Section 409A of the Code, to the extent so required.

(b)     Fractional shares of Common Stock resulting from any adjustment in Awards pursuant to Section 11.1 or this Section 11.2 shall be aggregated until, and eliminated at, the time of exercise or payment by rounding-down for fractions less than one-half (½) and rounding-up for fractions equal to or greater than one-half (½).  No cash settlements shall be required with respect to fractional shares eliminated by rounding.  Notice of any adjustment shall be given by the Committee to each Participant whose Award has been adjusted and such adjustment (whether or not such notice is given) shall be effective and binding for all purposes of the Plan.

## ARTICLE XII.     UNFUNDED STATUS OF PLAN

**12.1**     The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation.  With respect to any payment as to which a Participant has a fixed and vested interest, but which are not yet made to a Participant by the Company, nothing contained herein shall give any such Participant any right that is greater than those of a general unsecured creditor of the Company and the Company shall not be required to establish any fund or make any other segregation of assets to assure satisfaction of the Company's obligations under the Plan.

## ARTICLE XIII.     GENERAL PROVISIONS

### 13.1     Compliance with Securities Laws.

(a)     The Committee may require, in its sole discretion, as a condition to the exercise of any Option hereunder or the settlement in shares of Common Stock of any RSU hereunder, that either (i) the Company shall have obtained a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), with respect to the issuance of the shares of Common Stock to be issued upon such grant, exercise or settlement shall be effective and current at the time of grant, exercise or settlement, or (ii) there is an exemption from registration under the Securities Act for the issuance of the shares of Common Stock upon such grant, exercise or settlement.  Nothing herein shall be construed as requiring the Company to register the issuance of the shares of Common Stock subject to any Award under the Securities Act or to keep any registration statement effective or current.

(b)     The Committee may require, in its sole discretion, as a condition to the receipt of an Award or the exercise or settlement of any Award hereunder, that a Participant execute and deliver to the Company customary representations and warranties, in form, substance and scope reasonably satisfactory to the Committee, which representations and

14

warranties the Committee reasonably determines are necessary in connection with qualifying for an exemption from the registration requirements of the Securities Act, applicable state securities laws or satisfying other legal requirements.

(c)      In addition, if at any time the Committee shall determine, in good faith, that the listing or qualification of the shares of Common Stock subject to any Award on any securities exchange or under any applicable law, or the consent or approval of any governmental agency or regulatory body, is necessary or desirable as a condition to, or in connection with, the granting of an Award or the issuance of shares of Common Stock thereunder, such Award may not be granted and such Award may not be exercised or settled (as applicable) in whole or in part unless such listing, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.

**13.2    Award Agreements**.  Each Award shall be evidenced by an appropriate Award Agreement which shall be duly executed by the Company and a Participant, and which shall contain such terms, provisions, and conditions as may be determined by the Committee.  In the event of a conflict between the terms of the Award Agreement and the Plan, the terms of the Award Agreement shall govern.

**13.3    No Fractional Shares**.  In no case may a fraction of a share of Common Stock be purchased or issued under the Plan.

**13.4    Rights as a Stockholder**.  Except as otherwise determined by the Committee in an Award Agreement, the holder of an Option or other Award shall not be deemed for any purpose, nor have any of the rights or privileges of, a stockholder of the Company in respect of any shares of Common Stock purchasable upon the exercise of any part of an Option or deliverable in respect of such other Award unless, until and to the extent that (a) such holder has signed a joinder to the Securityholders Agreement designated by the Company (in the form attached to such Securityholders Agreement), (b) in the case of an Option, such Option shall have been exercised pursuant to its terms, (c) the Company shall have issued and delivered such shares to such holder, and (d) the holder's name shall have been entered as a stockholder of record with respect to such shares on the books of the Company.  For the avoidance of doubt, no shares of Common Stock will be delivered or issued in respect of an Award unless and until Participant, or Participant's Legal Representative, as applicable, has signed a joinder to the Securityholders Agreement.

**13.5    No Right to Service**.  Neither the Plan nor the grant of any Award hereunder shall confer on any Participant any right with respect to continuance of Service with the Company or any of its Affiliates, or interfere in any way with any right of the Company or any of its Affiliates to terminate a Participant's Service at any time for any reason whatsoever or for no reason, without liability to the Company or any of its Affiliates.

**13.6    Amendments and Termination of the Plan**.  The Committee may, at any time, alter, amend, suspend, discontinue, or terminate this Plan; provided, however, that no such action shall adversely affect the rights of any Participant with respect to Awards previously granted hereunder without such Participant's express written consent.  The power of the Committee to construe and administer any Award granted under the Plan prior to the termination or suspension

15

of the Plan nevertheless shall continue after such termination or during such suspension. The Committee may not, at any time, alter, amend, suspend, discontinue, waive, or terminate Section 2.2(a) or Section 2.2(c), or the terms of any Emergence Award, in a way that adversely affects the rights of any MIP Participant who would otherwise be eligible to benefit from such section, without such Participant's written consent.

**13.7    Legends; Payment of Expenses**.  The Company may endorse such legend or legends upon the certificates for shares of Common Stock issued upon exercise or settlement of an Award under the Plan and may issue such "stop transfer" instructions to its transfer agent in respect of such shares as it determines, in its discretion, to be necessary or appropriate to (a) prevent a violation of, or to qualify for an exemption from, the registration requirements of the Securities Act and any applicable state securities laws, or (b) implement the provisions of the Plan or any agreement between the Company and a Participant with respect to such shares of Common Stock.

**13.8    No Assignment of Benefits**.  No Award or other benefit payable under the Plan shall, except as otherwise specifically provided by law or permitted by the Committee, be Transferable in any manner, and any attempt to Transfer any such benefit shall be void, and any such benefit shall not in any manner be liable for or subject to the debts, contracts, liabilities, engagements, or torts of any Person who shall be entitled to such benefit, nor shall it be subject to attachment or legal process for or against such Person.  Shares received in satisfaction of any Award are subject to the terms and conditions of the Securityholders Agreement.

**13.9    Other Requirements**.  Notwithstanding anything herein to the contrary, as a condition to the receipt of shares of Common Stock pursuant to an Award under the Plan, to the extent required by the Committee, a Participant shall execute and deliver documentation that shall set forth certain restrictions on Transferability of the shares of Common Stock acquired upon exercise, purchase or settlement, and such other terms as the Committee shall from time to time establish.

**13.10   Right to Repurchase**.  The provisions set forth in this Section 13.10 shall apply until the occurrence of an Initial Public Offering.  Except as set forth in an Award Agreement, the following shall apply:

(a)    **Right to Repurchase**.

(i)    In the case of any Participant whose Service terminates for any reason (including, without limitation, death, Disability, retirement, voluntary resignation or termination, or involuntary termination with or without Cause), the Company shall have the right (but not the obligation) to repurchase from a Participant (or any successor in interest by purchase, gift, or other mode of transfer) some or all shares of Common Stock issued (or issuable in respect of vested but unsettled Awards) to a Participant under the Plan for a repurchase price (the "Repurchase Price") equal to the Fair Market Value of the shares of Common Stock on the date of the Repurchase Notice ("Determination Date") by delivering written notice to such Participant (the "Repurchase Notice") as set forth in this Section 13.10; provided, that, the Repurchase Price may be subject to adjustment subject to Section 13.10(c).

16

(ii)    The Company's right to repurchase shall be exercisable by the Company at any time within either (A) the six (6)-month period following the termination of a Participant's Service with the Company or any of its Affiliates for any reason (including, without limitation, death, Disability, retirement, voluntary resignation or termination, or involuntary termination with or without Cause) or (B) the six (6)-month period following any vesting of an Option or portion thereof, in each case, which vests following a Qualifying Termination (such period, the "Repurchase Period").  The Company must (x) deliver the Repurchase Notice to such Participant during the Repurchase Period, and (y) tender payment of the Repurchase Price of such shares of Common Stock to a Participant within thirty (30) days of the delivery of such written notice.

(b)    The closing of the transactions contemplated by this Article XIII will take place on the date designated in the Repurchase Notice, which date will not be more than ninety (90) days after the delivery of such notice.  The Company will pay for the shares of Common Stock to be purchased by delivery of a check payable to the holder of such shares of Common Stock.

(c)    Notwithstanding the foregoing clause (b), if the repurchase would violate the terms of the Company's credit agreements with third parties, the ninety (90) day period described herein shall be tolled until such repurchase would no longer result in violation of any such credit agreement, and the Company shall have thirty (30) days following such date to repurchase the shares of Common Stock subject to the Repurchase Notice, and to account for such delay as contemplated by this Section 13.10(c), the Repurchase Price for such shares of Common Stock shall be the greater of the Fair Market Value of such shares on (i) the Determination Date and (ii) the date of the closing of the transactions contemplated by this Article XIII.  The Company shall make commercially reasonable efforts to ensure that such credit agreements with third parties include sufficient baskets to accommodate the foregoing repurchases.

13.11  **Section 409A of the Code**.  The Plan is intended to comply with the applicable requirements of Section 409A of the Code and shall be limited, construed, and interpreted in accordance with such intent.  To the extent that any Award is subject to Section 409A of the Code, it shall be structured in a manner that will comply with or be exempt from Section 409A of the Code, including proposed, temporary, or final regulations or any other guidance issued by the Secretary of the Treasury and the Internal Revenue Service with respect thereto.  The Company shall have no liability to a Participant, or any other Person, if an Award that is intended to be exempt from, or compliant with, Section 409A of the Code is not so exempt therefrom or compliant therewith or for any action taken by the Committee or the Company and, in the event that any amount or benefit under the Plan becomes subject to penalties under Section 409A of the Code, responsibility for payment of such penalties shall rest solely with the affected Participants and not with the Company. Notwithstanding any contrary provision in the Plan or Award Agreement, any payment(s) of "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) that are otherwise required to be made under the Plan to a "specified employee" (as defined under Section 409A of the Code) as a result of such employee's "separation from service" (as defined under Section 409A of the Code, and excluding any payments that are not subject to Section 409A of the Code) shall be delayed for the first six (6) months following such separation from service (or, if earlier, the date of death of

17

the specified employee) and shall instead be paid (in a manner set forth in the Award Agreement) upon expiration of such six (6)-month delay period.  Furthermore, notwithstanding any contrary provision of the Plan or Award Agreement, any payment of "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) under the Plan that may be made in installment shall be treated as a right to receive a series of separate and distinct payments.

**13.12  Governing Law; Construction**.   The Plan, any Award Agreement and the actions taken in connection therewith, and all related matters shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to conflict of law provisions.  Neither the Plan nor any Award Agreement shall be construed or interpreted with any presumption against the Company by reason of the Company causing the Plan or any Award Agreement to be drafted.  Whenever from the context it appears appropriate, any term stated in either the singular or plural shall include the singular and plural, and any term stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.

**13.13  Jurisdiction; Waiver of Jury Trial**.  Any suit, action, or proceeding with respect to the Plan or any Award Agreement, or any judgment entered by any court of competent jurisdiction in respect of any thereof, shall be resolved only in the courts of the State of Delaware or the United States District Court for the District of Delaware and the appellate courts having jurisdiction of appeals in such courts.  In that context, and without limiting the generality of the foregoing, the Company and each Participant shall irrevocably and unconditionally (a) submit in any proceeding relating to the Plan or any Award Agreement, or for the recognition and enforcement of any judgment in respect thereof (a "Proceeding"), to the exclusive jurisdiction of the courts of the State of Delaware, the court of the United States of America for the District of Delaware, and appellate courts having jurisdiction of appeals from any of the foregoing, and agree that all claims in respect of any such Proceeding shall be heard and determined in such Delaware State court or, to the extent permitted by law, in such federal court, (b) consent that any such Proceeding may and shall be brought in such courts and waives any objection that the Company and each Participant may now or thereafter have to the venue or jurisdiction of any such Proceeding in any such court or that such Proceeding was brought in an inconvenient court and agree not to plead or claim the same, (c) waive all right to trial by jury in any Proceeding (whether based on contract, tort or otherwise) arising out of or relating to the Plan or any Award Agreement, (d) agree that service of process in any such Proceeding may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party, in the case of a Participant, at Participant's address shown in the books and records of the Company or, in the case of the Company, at the Company's principal offices, attention General Counsel, and (e) agree that nothing in the Plan shall affect the right to effect service of process in any other manner permitted by the laws of the State of Delaware.

**13.14  Severability of Provisions**.  The invalidity, illegality, or unenforceability of any provision in the Plan, any Award, or Award Agreement shall not affect the validity, legality, or enforceability of any other provision, all of which shall be valid, legal, and enforceable to the fullest extent permitted by applicable law.

**13.15  Modification for Grants Outside the United States**.   The Board or the Committee may, without amending the Plan, determine the terms and conditions applicable to

18

grants to individuals who are foreign nationals or employed outside the United States in a manner otherwise inconsistent with the Plan if the Board or the Committee deems such terms and conditions necessary in order to recognize differences in local law or regulations, tax policies, or customs.

**13.16   Successors and Assigns**.  The Plan and any applicable Award Agreement(s) shall be binding on all successors and permitted assigns of a Participant, including, without limitation, the estate of such Participant and the executor, administrator, or trustee of such estate.

**13.17   Headings and Captions**.  The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be employed in the construction of the Plan.

**13.18   Effective Date and Term of Plan**.  The Plan shall become effective on the effective date of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Effective Date").  No awards shall be granted under the Plan after the tenth (10th) anniversary of the Effective Date, but all outstanding Awards granted on or prior to such date will continue in effect thereafter subject to the terms thereof and of the Plan.

**13.19   Withholding**. A Participant may be required to pay to the Company or any Affiliate, and, subject to Section 409A of the Code, the Company or any Affiliate shall have the right and is hereby authorized to withhold, from any Award, from any payment due or transfer made under any Award or under the Plan or from any compensation or other amount owing to a Participant, the amount (in cash, shares, other securities, other Awards, or other property), any applicable withholding taxes in respect of an Award, its exercise, or any payment or transfer under an Award or under the Plan, and to take such other action(s) as may be reasonably necessary in the opinion of the Company to satisfy all obligations for the payment of such taxes.

## ARTICLE XIV.      DEFINITIONS

**14.1     Definitions**.  For purposes of the Plan, the following terms shall be defined as set forth below:

(a)      "**Affiliate**" of any specified Person means (i) each other Person who, directly or indirectly, controls, is controlled by, or is under common control with such specified Person and (ii) each Affiliated Fund of such specified Person.  The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting or other securities, by contract or otherwise; provided, that, in any event, any business in which the Company has any direct or indirect ownership interest shall be treated as an Affiliate of the Company.

(b)      "**Affiliated Fund**" of any Permitted Holder means a fund, pooled investment vehicle, managed account (including separately managed accounts), or other entity now or hereafter existing that is (i) directly or indirectly controlled by one or more general partners or managing members, or any Affiliates of such general partners or managing members,

19

of such Permitted Holder, or (ii) otherwise, directly or indirectly, managed or advised by such Permitted Holder or the entity that manages or advises such Permitted Holder.

(c)      "**Ares**" means ASOF HOS GP LLC, on behalf of certain investment vehicles.

(d)      "**Award**" means any Option, Stock Appreciation Right, Restricted Stock Unit, Restricted Stock, Performance Award, Other Stock-Based Award, or Other Cash-Based Award granted under the Plan.

(e)      "**Award Agreement**" means the written or electronic agreement setting forth the terms and conditions applicable to an Award.

(f)      "**Board**" or "**Board of Directors**" means the Board of Directors of the Company.

(g)      "**Cause**" shall have the meaning ascribed to such term in any employment agreement between a Participant and the Company or any of its Affiliates, if applicable, or in the absence of any such employment (or similar) agreement, "Cause" means a Participant has (i) refused to carry out any reasonable and lawful direction from the Board or from such Participant's supervisor (other than a failure resulting from Participant's inability to carry out directions due to physical or mental illness), (ii) materially breached any restrictive covenants by which such Participant is bound, (iii) demonstrated gross negligence or misconduct in the execution of a Participant's assigned duties, (iv) been indicted for, convicted of, or entered a plea of guilty or nolo contendere to (A) any felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty, or fraud, (v) failed to cooperate with a bona fide internal investigation or an investigation by regulatory or law enforcement authorities, after being instructed by the Company to cooperate, (vi) committed an act of embezzlement, fraud, or any other act of material dishonesty relating to a Participant's Service with the Company, or (vii) willfully destroyed or failed to preserve documents or other materials known to be relevant to such investigation or the induced others to fail to cooperate or to produce documents or other materials in connection with such investigation. Any determination of Cause by the Committee will not be made until a Participant has been given written notice detailing the specific event constituting such Cause and a period of fifteen (15) days following receipt of such notice to cure such event (if susceptible to cure).

(h)      "**Change of Control**" means the occurrence of one (1) or more of the following events following the Effective Date: (i) any "person," as such term is used in Sections 13(d) of the Exchange Act (other than the Company, any of its Affiliates, a Permitted Holder, or any trustee or other fiduciary holding securities under any employee benefit plan of the Company), becoming the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), by way of merger, consolidation, recapitalization, reorganization, or otherwise, directly or indirectly, of securities of the Company representing sixty-five percent (65%) or more of the combined voting power of the Company's then outstanding securities (on a fully-diluted basis, assuming exercise of all Jones Act Warrants, (ii) the sale or other disposition by the Company of all or substantially all of its assets in one or more transactions other than (A) to an Affiliate of the Company or a Permitted Holder or (B) in connection with a spinoff or similar corporate

20

transaction involving an Affiliate of the Company, Permitted Holder or then current shareholder(s), or (iii) a transaction or series of transactions following which the Permitted Holder(s) collectively, in the aggregate, cease to own thirty-five percent (35%) or more of the securities in the Company; provided, that, a Change of Control shall not be deemed to have occurred so long as a Permitted Holder continues to own at least thirty-five percent (35%) of securities of the Company.  For the avoidance of doubt, the Permitted Holders' sell-down of their securities in the Company following an Initial Public Offering, to the extent it meets the threshold set forth in the foregoing clause (iii), can trigger a Change of Control thereunder. Notwithstanding the foregoing, with respect to any Award that is characterized as "nonqualified deferred compensation" within the meaning of Section 409A of the Code, an event shall not be considered to be a Change of Control under the Plan for purposes of payment of such Award unless such event is also a "change in ownership," a "change in effective control" or a "change in the ownership of a substantial portion of the assets" of the Company within the meaning of Section 409A of the Code; for the avoidance of doubt, whether a transaction constitutes a Change of Control for purposes of triggering the grant of Special RSUs under Section 2.2(c) shall be determined without regard to the foregoing Section 409A of the Code limitation.

(i)　　"**Code**" means the Internal Revenue Code of 1986, as amended, and any successor thereto.

(j)　　"**Committee**" means (i) the Compensation Committee of the Board, or such other committee as may be appointed by the Compensation Committee or the Board or (ii) in the absence of any such committee, the Board.

(k)　　"**Common Stock**" means the common stock, par value $0.00001 per share, of the Company, and any shares or capital stock for or into such common stock hereafter is exchanged, converted, reclassified or recapitalized by the Company.

(l)　　"**Debtors**" means Hornbeck Offshore Services, Inc., a Delaware Corporation, and certain of its subsidiaries.

(m)　　"**Disability**" shall have the meaning ascribed to such term in any employment agreement between a Participant and the Company or any of its Affiliates, if applicable, or in the absence of any such employment (or similar) agreement, "Disability" means a permanent and total disability within the meaning of Section 22(e)(3) of the Code, provided, that, such condition is also a "disability" within the meaning of Section 409A(a)(2)(C) of the Code.

(n)　　"**Eligible Individual**" shall have the meaning set forth in Section 1.1 hereof.

(o)　　"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

(p)　　"**Fair Market Value**" means, as of any applicable date, the fair market value of one share of Common Stock (or other such security, as applicable) as determined by the Board in good faith; provided, that, any determination of the Fair Market Value of the Common Stock (or other such security, as applicable) by the Board pursuant to the Plan shall be based on

21

the proportionate share of the aggregate equity value of the Company (as a whole) attributable to all securities of the Company that are of the same class as such security; provided, further, that for purposes of Section 13.10, the "Fair Market Value" shall exclude any discounts for lack of liquidity, marketability, minority interest, or any related discounts; provided, further, that if shares of Common Stock are readily tradable on a national securities exchange or other market system, "Fair Market Value" means the volume-weighted average trading price of the shares during the trailing ten (10) trading days immediately preceding the date of grant or the date of calculation, as the case may be, on the stock exchange or over the counter market on which the shares are principally trading during such trailing ten (10)-day period.

(q)     "**Good Reason**" shall have the meaning ascribed to such term in any employment agreement between a Participant and the Company or any of its Affiliates, if applicable, or in the absence of any such employment (or similar) agreement, "Good Reason" means, without a Participant's express written consent, the occurrence of any of the following events:

(i)     a reduction by the Company of a Participant's base salary; or

(ii)     any relocation by the Company of a Participant's principal place of Service by more than fifty (50) miles from such Participant's principal place of Service immediately before such relocation.

Notwithstanding the foregoing, no termination will constitute a resignation for Good Reason unless, (A) Participant notifies the Company in writing detailing the specific circumstances alleged to constitute Good Reason within thirty (30) days of the first occurrence of such circumstances, (B) Participant cooperates in good faith with the Company's efforts to remedy the alleged circumstances for a period not less than thirty (30) days following such notice (the "Cure Period"), (C) the Company fails to cure such events in all material respects during the Cure Period, and (D) Participant terminates his or her Service with the Company within thirty (30) days following the end of the Cure Period.

(r)     "**Highbridge**" means Highbridge Capital Management, LLC on behalf of certain of the funds it manages.

(s)     "**Initial Public Offering**" means an initial underwritten public offering the Common Stock of the Company (or any successor thereto formed for the purpose of pursuing an initial public offering) pursuant to an effective registration statement filed with the United States Securities and Exchange Commission (or any successor form).

(t)     "**Jones Act Warrants**" means Warrants, as defined in that certain Jones Act Warrant Agreement, dated as of [_____], 2020, by and between Hornbeck Offshore Services, Inc. and American Stock Transfer & Trust Company.

(u)     "**Legal Representative**" means the executor, administrator, or other Person who at the time is entitled by law to exercise the rights of a deceased or incapacitated Participant with respect to an Award granted under the Plan.

22

(v)  "**MIP Participant**" means executives, senior management, and certain consultants and advisors (excluding non-employee directors) of the Company or any of its Affiliates.

(w)  "**Non-Qualified Stock Option**" means any Option other than an incentive stock option as defined in Section 422 of the Code and any successor thereto.

(x)  "**Option**" means any stock option to purchase shares of Common Stock granted to Eligible Individuals pursuant to Article V of the Plan.

(y)  "**Other Cash-Based Award**" means an Award granted pursuant to Section 10.3 hereof and payable and/or denominated in cash at such time or times and subject to such terms and conditions as determined by the Committee in its sole discretion.

(z)  "**Other Stock-Based Award**" means an Award granted pursuant to Article X of the Plan that is valued in whole or in part by reference to, or is payable in or otherwise based on or denominated in, Common Stock at such time or times and subject to such terms and conditions as determined by the Committee in its sole discretion.

(aa)  "**Parent**" shall have the same meaning as "parent corporation" as defined in Section 424(e) of the Code.

(bb)  "**Participant**" means an Eligible Individual who has been selected by the Committee to participate in the Plan and to whom an Award has been granted pursuant to the Plan.

(cc)  "**Performance Award**" means an Award granted to a Participant pursuant to Article IX of the Plan contingent upon achieving certain Performance Goals.

(dd)  "**Performance Goals**" means goals established by the Committee as contingencies for Awards to vest and/or become exercisable or distributable.

(ee)  "**Permitted Holder**" means any of Ares, Whitebox, and Highbridge, their respective Affiliates, and their respective funds, managed accounts, and related entities managed by any of them or their respective Affiliates, or wholly-owned Subsidiaries of the foregoing.

(ff)  "**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency, or political subdivision thereof, or any other entity or organization.

(gg)  "**Plan**" shall have the meaning ascribed to such term in Section 1.1.

(hh)  "**Qualifying Termination**" means a Participant's termination of Service by the Company without Cause or by a Participant for Good Reason.

(ii)  "**Restricted Stock**" means an Award of shares of Common Stock under the Plan that is subject to restrictions under Article VIII of the Plan.

23

(jj)     "**Restricted Stock Unit**" or "**RSU**" means a right granted to an Eligible Individual pursuant to Article VII of the Plan to receive Common Stock or cash, as determined by the Committee, at the end of a specified period, which right may also be conditioned, in whole or in part, on the satisfaction of specified performance or other criteria.

(kk)     "**Section 409A of the Code**" means, collectively, Section 409A of the Code, as amended, and the regulations and guidance promulgated thereunder.

(ll)     "**Service**" means a Participant's service as an employee, director, or consultant of the Company or any of its Affiliates, as applicable.

(mm)     "**Stock Appreciation Right**" or "**SAR**" means a right to receive an amount of cash and/or shares equal to the excess of (i) the Fair Market Value of a share of Common Stock on the date such right is exercised over (ii) the aggregate base price of such right, as provided in Article VI hereof.

(nn)     "**Securityholders Agreement**" means that certain Securityholders Agreement, dated as of [___], by and among the Company and the holders of the Company's outstanding Common Stock and warrants to purchase Common Stock, as the same may thereafter be amended from time to time in accordance with its terms.

(oo)     "**Subsidiary**" means any company (whether a corporation, partnership, joint venture, or other form of entity) in which the Company has a direct or indirect "controlling interest," within the meaning of Treas. Reg. Section 1.409A-1(b)(5)(ii)(E)(1).

(pp)     "**TEV**" means total enterprise value, which shall be reasonably determined by the Board in good faith as the sum of (i) the Fair Market Value of a share of Common Stock, multiplied by the number of shares of Common Stock then-outstanding, calculated on a fully-diluted basis (but excluding for this purpose, any Options or warrants (including Jones Act Warrants) with an exercise price less than the Fair Market Value of a share of Common Stock on the date of the applicable transaction), plus (ii) an amount equal to the then-principal amount of all the Company's then-outstanding interest-bearing debt, minus the then-total balance sheet cash or cash equivalents, plus (iii) the Fair Market Value of all preferred stock of the Company, calculated on a fully-diluted basis, plus (iv) the aggregate amount of cash dividends or distributions made to, or redemptions from, the Company's equityholders with respect to their equity holdings in the Company before the effective date of the Change of Control.

(qq)     "**Transfer**" means:  (i) when used as a noun, any direct or indirect transfer, sale, assignment, pledge, hypothecation, encumbrance or other disposition (including the issuance of equity in any entity), whether for value or no value and whether voluntary or involuntary (including by operation of law), and (ii) when used as a verb, to directly or indirectly transfer, sell, assign, pledge, encumber, charge, hypothecate or otherwise dispose of (including the issuance of equity in any entity) whether for value or for no value and whether voluntarily or involuntarily (including by operation of law).  "Transferred" and "Transferable" shall have a correlative meaning.

(rr)     "**Whitebox**" means Whitebox Advisors LLC, on behalf of certain managed funds.

24

**Exhibit D(ii)**

**Employment Agreement**

*Exhibit D(ii)*

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This **AMENDED AND RESTATED EMPLOYMENT AGREEMENT** (this "Agreement") is entered into as of [Date], by and between [Hornbeck Offshore Operators, LLC, a Delaware limited liability company] (the "Company"), and [Executive's Full Name], an individual (the "Executive"). This Agreement shall become effective on the effective date of the Company's Plan of Reorganization (such date, the "Effective Date"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in Section 22.

**WHEREAS**, the Executive and the Company are party to that certain [insert name of existing contract] (as amended from time to time, the "Original Agreement"), which this Agreement will replace and supersede in its entirety, effective as of the Effective Date;

**WHEREAS**, the Executive is currently employed as the [Titles] of the Company; and

**WHEREAS**, the Company and the Executive desire to enter into this Agreement to set out the terms and conditions for the continued employment relationship of the Executive with the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1.      **Term**. The Company agrees to continue to employ the Executive pursuant to the terms of this Agreement, and the Executive agrees to continue to be so employed, commencing as of the Effective Date and ending on the fourth (4th) anniversary of the Effective Date (the "Initial Term"). On the last day of the Initial Term and on each one (1)-year anniversary thereof, the term of this Agreement shall be automatically extended for an additional one (1)-year period, unless either party hereto elects not to extend this Agreement by giving written notice to the other party at least ninety (90) days prior to any such renewal date. Notwithstanding the foregoing, the Executive's employment hereunder may be earlier terminated in accordance with Section 4 hereof. The period of time between the Effective Date and the termination of the Executive's employment hereunder is referred to herein as the "Term." Upon any termination of the Executive's employment with the Company, the Executive shall be deemed to have resigned from all positions with the Company and all of its Subsidiaries.

2.      **Positions and Duties**.

(a)      During the Term, the Executive shall serve as the [Titles] of the Company. In these capacities, the Executive shall have the duties, authorities and responsibilities generally commensurate with the duties, authorities and responsibilities of persons serving in similar capacities in similarly sized and situated companies, and such other duties, authorities and responsibilities as the [Chief Executive Officer ("CEO") of the Company or the] [Board of Directors of the Company (the "Board")] shall designate from time to time that are not inconsistent with the Executive's positions. [For so long as the Executive serves as the Chief Executive Officer of the Company, the Executive will have the right to proffer the first name nominated for consideration and vote by the Board with respect to the chairman of any committees of the Board (other than the Compensation Committee); provided, however, that if the Executive does not do

so within fifteen (15) days after being given the opportunity in writing, such nominations may be proffered by any other director, in accordance with the terms set forth in Section 2.1(d)(iii) of the Company's Securityholders Agreement; provided further that any breach of this provision will not constitute Good Reason for purposes of this Agreement.]  The Executive shall report directly to the [CEO] [Board].

(b)      The Executive shall devote substantially all of the Executive's business time to the performance of the Executive's duties hereunder and the advancement of the business and affairs of the Company; provided, that, the Executive shall be entitled to: (i) serve as a member of the board of directors (or equivalent governing body) of, or advisor to, (A) the entities listed on Exhibit A attached hereto and (B) such other entities that are not Competitive Enterprises, subject to the Executive providing prior written notice to the [Board of Directors of the Company (the "Board")][Board], (ii) serve on civic, charitable, educational, religious, public interest or public service boards, and (iii) manage the Executive's personal and family investments, in each case, to the extent such activities do not interfere, individually or in the aggregate, with the performance of the Executive's duties and responsibilities hereunder or create a business or fiduciary conflict[; and provided, further, that, the Company acknowledges and agrees that the Executive's roles and responsibilities with respect to both (I) the Third Amended and Restated Trade Name and Trademark License Agreement, dated as of the Effective Date, and entered into by and between HFR, LLC, a Texas limited liability company ("HFR"), and the Company (the "Trademark License Agreement"), and (II) the Amended and Restated Facilities Use Agreement, dated as of the Effective Date, by and between Larry D. Hornbeck and Hornbeck Offshore Services, Inc., a Delaware corporation (the "Facilities Use Agreement"), shall not, under any circumstances, be deemed to create a potential business or fiduciary conflict].

(c)      The Executive's principal place of employment will continue to be in Covington, Louisiana; provided, that, the Executive may be required to travel from time to time for business purposes.

3.      **Compensation and Benefits**.

(a)      Base Salary.  During the Term, the Company shall pay to the Executive a base salary at an annual rate of not less than $[●], in substantially equal installments in accordance with the regular payroll practices of the Company, but not less frequently than monthly.  The Executive's base salary shall be subject to annual review by the Compensation Committee of the Board (the "Committee") and may be increased, but not decreased, from time to time by the Committee.  The base salary as determined herein and adjusted from time to time shall constitute "Base Salary" for purposes of this Agreement.

(b)      Annual Bonus.  During each fiscal year during the Term, the Executive shall be eligible to participate in the Company's annual bonus plan, as established by the Committee and in effect from time to time for its senior executives, and will be paid a cash annual bonus under such plan (the "Annual Bonus"), to the extent earned based on performance against reasonably obtainable objective performance criteria.  The performance criteria for each fiscal year shall be determined by the Committee, after consultation with the CEO, no later than ninety (90) days following the commencement of the applicable fiscal year.  The Executive's target Annual Bonus opportunity for each fiscal year shall equal 100% of the Executive's annualized Base Salary for that fiscal year (the "Target Bonus").  The Executive's actual Annual Bonus for each fiscal year

2

will equal a percentage of the Target Bonus, determined as follows: (i) 100% of the Target Bonus, if target levels of performance for that fiscal year are achieved; (ii) 50% of the Target Bonus, if threshold levels of performance for that fiscal year are achieved; (iii) 200% of the Target Bonus, if maximum levels of performance for that fiscal year are achieved; and (iv) a percentage of the Target Bonus determined in accordance with the plan, if performance for that fiscal year is in between threshold, target and maximum levels of performance.  Unless otherwise determined by the Committee, the Executive will not earn an Annual Bonus if threshold levels of performance are not achieved.  The Executive's Annual Bonus for each fiscal year shall be determined by the Committee after the end of the applicable fiscal year and shall be paid to the Executive when bonuses for such fiscal year are paid to other senior executives of the Company generally, but in no event later than seventy-four (74) days following the end of such fiscal year, subject to the Executive's continued employment with the Company through the end of the fiscal year with respect to which such Annual Bonus was earned.  In carrying out its functions under this Section 3(b), the Committee shall at all times act reasonably and in good faith.

(c) <u>Benefit Plans</u>.  During the Term, the Executive shall be entitled to participate in any employee benefit plan that the Company has adopted or may adopt, maintain or contribute to for the benefit of its employees generally and/or for the benefit of its senior executives as in effect from time to time, subject to satisfying the applicable eligibility requirements, except to the extent such plans are duplicative of the benefits otherwise provided hereunder; <u>provided</u>, <u>however</u>, that the Company shall make commercially reasonable efforts to ensure that any health insurance benefit plan will not provide for a preexisting condition limitation.  The Executive's participation will be subject to the terms of the applicable plan documents and generally applicable Company policies.  Notwithstanding the foregoing, the Company may modify or terminate any employee benefit plan at any time.

(d) <u>Business Expenses</u>.  The Executive is authorized to incur reasonable business expenses in carrying out the Executive's duties and responsibilities under this Agreement.  The Executive shall be promptly reimbursed for all reasonable out-of-pocket business expenses incurred and paid by the Executive during the Term, subject to and in accordance with the Company's expense reimbursement policy as in effect from time to time.

(e) <u>Automobile</u>.  During the Term, the Company shall continue to provide the Executive with an automobile and pay for such automobile's auto insurance, maintenance, and fuel; <u>provided</u>, that, the Executive shall pay all taxes related to the Executive's personal use of the automobile.

4. **Termination of Employment; Severance**.

(a) <u>General</u>.  The Executive's employment and the Term shall terminate upon the earliest to occur of (i) the Executive's death, (ii) a termination by the Company due to the Executive's Disability, (iii) a termination by the Company with or without Cause, (iv) a termination by the Executive with or without Good Reason, and (v) the expiration of the Term (the date of such termination, the "<u>Termination Date</u>").  On the Termination Date, the Executive's role as (A) an officer of any member of the Company Group, (B) a member of the Board or similar body of any member of the Company Group and (C) a fiduciary of any Company Group benefit plan shall be deemed to have terminated, in each case, to the extent applicable and the Executive shall confirm the foregoing by submitting to the Company a written confirmation of such

3

resignations upon request by the Board; provided, that, the foregoing shall not modify or diminish in any way the rights and/or remedies otherwise available to the Executive in connection with such termination.

(b)     Termination Due to the Executive's Death or Disability.  The Executive's employment and the Term shall terminate automatically upon the Executive's death. The Company may terminate the Executive's employment and the Term upon a final determination as to the occurrence of the Executive's Disability (with such determination made, for the avoidance of doubt, in accordance with the definition of Disability set forth below), with such termination to be effective ten (10) days following the date on which the Company provides written notice to the Executive of such determination in accordance with this Agreement and of such termination.  Upon a termination of the Executive's employment and the Term due to the Executive's death or Disability, the Executive's estate or the Executive, as applicable, shall be entitled to the following:

(i)     payment of any earned but unpaid Base Salary through the Termination Date, no later than sixty (60) days following the Termination Date (or such earlier date as may be required by applicable law);

(ii)     payment of any earned but unpaid Annual Bonus for the fiscal year preceding the fiscal year in which the Termination Date occurs, to be paid in accordance with Section 3(b) (the "Prior Year Bonus");

(iii)     payment in lieu of any earned but unused vacation time in accordance with Company policy as in effect from time to time;

(iv)     all other payments, benefits, or fringe benefits to which the Executive shall be entitled under the terms of any applicable compensation arrangement or benefit, equity or fringe benefit plan or program or grant or this Agreement, payable in accordance therewith;

(v)     reimbursement for any unreimbursed business expenses incurred through the Termination Date, in accordance with Section 3(d) (with the payments and benefits described in subparagraphs (i), (ii), (iii), (iv) and (v) hereof, collectively, the "Accrued Benefits");

(vi)     a pro-rata portion of the Annual Bonus for the fiscal year in which the Termination Date occurs, determined by multiplying (A) the Annual Bonus that the Executive would have received for such fiscal year, based on actual performance (provided, that, any subjective performance goals will be deemed satisfied at target levels), by (B) a fraction, (I) the numerator of which is the number of calendar days that the Executive was employed with the Company during the fiscal year in which the Termination Date occurs, and (II) the denominator of which is the total number of calendar days in the fiscal year in which the Termination Date occurs, which amount shall be paid in accordance with Section 3(b); provided, however, that, for the avoidance of doubt, the requirement in Section 3(b) that payment of the Annual Bonus be subject to the Executive's continued employment with the Company through the end of the fiscal year with respect to which such Annual Bonus was earned shall not apply (the "Pro-Rata Bonus"); and

4

(vii)    subject to the Executive timely electing to continue the Executive's coverage, reimbursement for the employer portion of the monthly cost of maintaining medical, dental and/or vision benefits for the Executive under a group health plan of the Company for purposes of the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "COBRA"), based on the premium rate in effect on the Termination Date (the "Benefit Payment"), until the earlier to occur of (A) twelve (12) months following the Termination Date and (B) the date the Executive ceases to be eligible for such COBRA coverage under applicable law or plan terms.  The first installment of the Benefit Payment shall be paid on the sixtieth (60th) day following the Termination Date and shall include all amounts that would otherwise have been paid prior thereto absent the delay.

For the avoidance of doubt, any equity awards outstanding as of the Termination Date will receive the treatment set forth in the applicable award agreement.  Following a termination of the Executive's employment due to death or Disability, except as set forth in this Section 4(b), the Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(c)    Termination by the Company for Cause.  The Company may terminate the Executive's employment at any time for Cause, effective upon delivery to the Executive of written notice of such termination.  If the Executive's employment is terminated by the Company for Cause, the Executive shall be entitled only to the Accrued Benefits, exclusive, for the avoidance of doubt, of the Prior Year Bonus (if any), which shall be forfeited upon a termination for Cause.

Following the termination of the Executive's employment by the Company for Cause, except as set forth in this Section 4(c), the Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(d)    Termination by the Company Without Cause, Termination by the Executive for Good Reason or Termination Due to the Company's Non-Renewal of the Term.  The Company may terminate the Executive's employment at any time without Cause, effective upon delivery to the Executive of written notice of such termination.  The Executive may terminate the Executive's employment for Good Reason by providing the Company written notice in the manner set forth below.  In the event that the Executive's employment is terminated by the Company without Cause (other than due to the Executive's death or Disability), by the Executive for Good Reason or due to the Company's non-renewal of the Term (each, a "Qualifying Termination"), in each case, subject to Section 4(g) below, the Executive shall be entitled to:

(i)    the Accrued Benefits;

(ii)    if the Qualifying Termination occurs at least halfway through the applicable fiscal year, the Pro-Rata Bonus;

(iii)    an amount equal to [●] (the "Severance Multiple") times the sum of the Executive's (A) Base Salary, at the rate in effect as of the Termination Date, and (B) Target Bonus, at the rate in effect as of the Effective Date (provided, that, if the Qualifying Termination is due to the Executive's termination of employment for Good Reason caused, in whole or in part, by a reduction in the Executive's Base Salary and/or Target Bonus, or if the Executive would have had grounds to terminate the Executive's employment for Good Reason on such basis at the time of a Qualifying Termination, each such amount

5

shall be included in the foregoing calculation at the rate in effect prior to any decrease thereof) (the "Cash Severance"), which amount shall be payable in equal monthly installments over the twenty-four (24) month period following the Termination Date, provided, that, the first installment shall be paid on the sixtieth (60th) day following the Termination Date and shall include all amounts that would otherwise have been paid prior thereto absent the delay; and

(iv)    the Benefit Payment[, which shall be an aggregate amount equal to thirty (30) months of Benefit Payments, payable over the twenty-four (24)-month period following the Termination Date][ for the twenty-four (24)-month period following the Termination Date], or, if earlier, until the date on which the Executive ceases to be eligible for such COBRA coverage under applicable law or plan terms (with the payments described in subparagraphs (ii), (iii), and (iv) hereof, collectively, the "Severance Benefits").

For the avoidance of doubt, any equity awards outstanding as of the Termination Date will receive the treatment set forth in the applicable award agreement.  Payments and benefits provided in this Section 4(d) shall be in lieu of any termination or severance payments or benefits for which the Executive may be eligible under any of the plans, policies or programs of the Company or under the Worker Adjustment Retraining Notification Act of 1988 or any similar state statute or regulation.

Following the termination of the Executive's employment due to a Qualifying Termination, except as set forth in this Section 4(d), the Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(e)    Change of Control Qualifying Termination.  This Section 4(e) shall apply if (i) the Executive's Qualifying Termination occurs during the two (2)-year period immediately following a Change of Control, or (ii) the Executive is terminated by the Company without Cause within the six (6)-month period immediately prior to a Change of Control (each, a "Change of Control Qualifying Termination").  To the extent a Change of Control Qualifying Termination occurs and the Executive is already receiving the benefits described in Section 4(d) in accordance with the terms thereof, the Executive shall no longer be eligible for the benefits described in Section 4(d) and instead shall be entitled exclusively to all of the benefits provided in this Section 4(e); provided, that, the benefits set forth under this Section 4(e) shall be reduced by any payments and benefits that the Executive already received in accordance with the terms of Section 4(d).  For the avoidance of doubt, there shall be no duplication of the benefits under Section 4(d). If any such Change of Control Qualifying Termination occurs, the Executive (or the Executive's estate, if the Executive dies after such termination and execution of the Release (as defined in Section 4(g)) but before receiving such amount) shall receive the benefits set forth in Section 4(d), except that (A) the Severance Multiple shall be (I) [●], if such Change of Control occurs, or the Company enters into a definitive agreement that would result in a Change of Control if consummated, in each case, on or prior to the first anniversary of the Effective Date, and a Change of Control Qualifying Termination occurs in connection therewith; (II) [●], if such Change of Control occurs, or the Company enters into a definitive agreement that would result in a Change of Control if consummated, in each case, after the first anniversary, but on or prior to the second anniversary, of the Effective Date, and a Change of Control Qualifying Termination occurs in connection therewith; and (III) as set forth in Section 4(d)(iii), if such Change of Control occurs,

6

or the Company enters into a definitive agreement that would result in a Change of Control if consummated, in each case, after the second anniversary of the Effective Date, and a Change of Control Qualifying Termination occurs in connection therewith; (B) the Pro-Rata Bonus set forth in Section 4(d)(ii) shall be payable regardless of when in the applicable fiscal year the Termination Date occurs (*i.e.*, the Pro-Rata Bonus shall be payable even if the Termination Date occurs prior to the midpoint of the applicable fiscal year), and the amount of such Pro-Rata Bonus shall be determined based on deemed achievement of all performance criteria at target levels; and (C) the Pro-Rata Bonus, Cash Severance and Benefit Payment will be payable in a lump sum.  For the avoidance of doubt, the Company's reorganization as of the Effective Date will not constitute a Change of Control.

(f)    Termination by the Executive Without Good Reason or Due to the Executive's Non-Renewal of the Term.  The Executive may terminate the Executive's employment without Good Reason by providing sixty (60) days' prior written notice to the Company or by electing not to renew the Term in accordance with Section 1 hereof.  Upon receipt of such notice, the Company may, in its sole discretion, remove the Executive's title and require that the Executive not attend the workplace, perform any duties or contact any clients, suppliers or employees of the Company or any associated persons through the Termination Date ("the Garden Leave Period"); provided, that, for the avoidance of doubt, the foregoing restriction shall not prohibit the Executive from contacting employees for logistical or human resources purposes, in each case relating to the transition of the Executive's duties and/or termination of his employment, attending the workplace for purposes of removing the Executive's personal effects from the workplace (as reasonably permitted by the Company), or performing other ministerial tasks as required by the Company; and provided, further, that, during the Garden Leave Period, the Company shall continue to (i) pay to the Executive the Base Salary and (ii) provide to the Executive the existing benefits in accordance with the terms of the applicable plans.  Upon the Executive's voluntary termination of employment without Good Reason, the Executive shall be entitled only to the Accrued Benefits. For the avoidance of doubt, any equity awards outstanding as of the Termination Date will receive the treatment set forth in the applicable award agreement.  Following any such termination of the Executive's employment, except as set forth in this Section 4(f), the Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(g)    Release of Claims, Continued Compliance.  Notwithstanding any provision herein to the contrary, the payment and provision of the Severance Benefits pursuant to Section 4(d) or Section 4(e) shall be conditioned upon the Executive's execution, delivery to the Company and non-revocation of the general release of claims substantially in the form attached hereto as Exhibit B (the "Release") (and the expiration of any revocation period contained in such Release) within sixty (60) days following the Termination Date, as well as the Executive's acknowledgement of, and the Executive's material compliance with, the Executive's obligations under Section 6, as further outlined in this paragraph below.  If the Executive fails to execute the Release in such a timely manner so as to permit any revocation period to expire prior to the end of such sixty (60)-day period, or timely revokes such release following its execution, the Executive shall not be entitled to any of the Severance Benefits.  If the period of time during which the Executive may consider the Release begins in one calendar year and ends in the next calendar year, any amounts payable under this Section 4 that are contingent upon the execution and non-revocation of the Release shall be paid as soon as practicable in the second calendar year (provided, that, the Release has become effective and non-revocable), even if the Release first became effective and non-revocable in the first calendar year.  Notwithstanding any provision in this

7

Agreement to the contrary, if the Executive materially breaches any of the covenants contained in Section 6 while receiving the Severance Benefits under Section 4(d), the Company shall have the right, but not the obligation, to cease providing such Severance Benefits under Section 4(d); provided, that [such material breach has a substantial detrimental impact on the Company or could reasonably be expected to have a substantial detrimental impact on the Company as determined by the Board in good faith; provided, further, that] a material breach of Section 6 can only occur for purposes of this Section 4(g) (and otherwise, without limiting any other remedies with respect thereto) if (i) the Company provides the Executive with written notice of the circumstances constituting the alleged material breach of such covenants within ninety (90) days after becoming aware of such circumstances and (ii) the alleged breach, if curable (which includes any commercial relationship resulting from such prohibited conduct), has not been cured within fifteen (15) days after receipt of the written notice described in clause (i) above.

(h)    No Offset.  In the event of termination of the Executive's employment for any reason, the Executive shall be under no obligation to seek other employment, and there shall be no offset against amounts due to the Executive on account of any remuneration or benefits provided by any subsequent employment the Executive may obtain.  The Company's obligation to make any payment pursuant to, and otherwise to perform its obligations under, this Agreement shall not be affected by any offset, counterclaim or other right that the Company or any other member of the Company Group may have against the Executive for any reason.

5.    **Section 280G of the Code**.

(a)    Shareholder Approval Exemption.  If the Company is eligible for the shareholder vote exemption at the time of a Change of Control, the Company will subject the Executive's payments to a shareholder vote in accordance with Treasury Regulation Section 1.280G-1 and recommend approval thereof; provided, that, the Executive cooperates with all reasonable and customary requests in connection with such vote, including execution of any required documentation in connection therewith.

(b)    Best-Net Cutback.  Notwithstanding any other provision of this Agreement or any other plan, arrangement, or agreement to the contrary, if any of the payments or benefits provided or to be provided by the Company Group to the Executive or for the Executive's benefit pursuant to the terms of this Agreement or otherwise ("Covered Payments") constitute parachute payments within the meaning of Section 280G of the Internal Revenue of Code of 1986, as amended (the "Code"), and would, but for this Section 5, be subject to the excise tax imposed under Section 4999 of the Code (or any successor provision thereto) or any similar tax imposed by state or local law or any interest or penalties with respect to such taxes (collectively, the "Excise Tax"), then prior to making the Covered Payments, a calculation shall be made comparing (i) the Net Benefit (as defined below) to the Executive of the Covered Payments after payment of the Excise Tax to (ii) the Net Benefit to the Executive if the Covered Payments are limited to the extent necessary to avoid being subject to the Excise Tax.  Only if the amount calculated under subparagraph (i) above is less than the amount under subparagraph (ii) above will the Covered Payments be reduced to the minimum extent necessary to ensure that no portion of the Covered Payments is subject to the Excise Tax.  "Net Benefit" shall mean the present value of the Covered Payments net of all federal, state, local, and foreign income, employment, and excise taxes.

8

(c) <u>Method of Reduction</u>. The Covered Payments shall be reduced in a manner that maximizes the Executive's economic position. In applying this principle, the reduction shall be made in a manner consistent with the requirements of Section 409A of the Code; <u>provided</u>, that, (i) cash payments shall be reduced before non-cash payments; and (ii) payments to be made on a later payment date shall be reduced before payments to be made on an earlier payment date.

(d) <u>Determination</u>. Any determination required under this <u>Section 5</u>, including whether any payments or benefits are parachute payments, shall be made in the sole discretion of a nationally recognized, independent accounting or consulting firm selected and paid for by the Company using reasonable assumptions on the Executive's tax rates (as determined by such firm). The Executive shall provide the Company with such information and documents as the Company and such accounting firm may reasonably request in order to make a determination under this <u>Section 5</u>. The parties shall cooperate to the extent necessary to reduce the Excise Tax, including determining "reasonable compensation" under Sections 280G and 4999 of the Code (which may involve the valuation of the Executive's non-compete obligations). The firm's determination shall be final and binding on the Executive and the Company absent manifest error.

6. **Restrictive Covenants**. The Company and the Executive acknowledge and agree that during the Executive's employment with the Company, the Executive will have access to and may assist in developing Confidential Information and will occupy a position of trust and confidence with respect to the affairs and business of the Company Group. The Executive further acknowledges that (I) the Executive performs services of a unique nature for the Company that are irreplaceable, and that the Executive's performance of such services to a competing business will result in irreparable harm to the Company Group; (II) the Executive has had and will continue to have access to Confidential Information which, if disclosed, would unfairly and inappropriately assist in competition against the Company Group; (III) in the course of the Executive's employment by a competitor, the Executive inevitably would use or disclose such Confidential Information; (IV) members of the Company Group have substantial relationships with their customers, and the Executive has had and will continue to have access to these customers; and (V) the Executive has received and will receive specialized training from the Company and other members of the Company Group. Accordingly, the Executive agrees that the following obligations are necessary to preserve the confidential and proprietary nature of Confidential Information and to protect the Company Group against harmful solicitation of employees and customers, harmful competition and other actions by the Executive that would result in serious adverse consequences for the Company Group:

(a) <u>Confidentiality</u>. During the Executive's employment and at all times thereafter, the Executive shall not, directly or indirectly, use, make available, sell, copy, disseminate, transfer, communicate or otherwise disclose any Confidential Information, other than as authorized in writing by the Company or within the scope of the Executive's duties with the Company as determined reasonably and in good faith by the Executive. Anything herein to the contrary notwithstanding, the term "Confidential Information" shall not include, and the provisions of this <u>Section 6(a)</u> shall not apply to, information that (i) was known to the public prior to its disclosure to the Executive; (ii) becomes generally known to the public subsequent to disclosure to the Executive through no wrongful act of the Executive or any representative of the Executive; (iii) the Executive is required to disclose by applicable law, regulation or legal process (<u>provided</u>, that, to the extent permissible, the Executive provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective

9

order or other appropriate protection of such information)[; or (iv) was owned by the Executive and/or any of the Executive's Affiliates and used by the Company (x) pursuant to the Trademark License Agreement or the Facilities Use Agreement [or (y) as listed on Schedule 1 hereto]].

(b)    Materials.  The Executive will use Confidential Information only for normal and customary use in the Company's business, as determined reasonably and in good faith by the Company.  The Executive will return to the Company all Confidential Information and copies thereof and all other property of the Company or any other member of the Company Group at any time upon the request of the Company and in any event immediately after termination of the Executive's employment.  The Executive agrees to identify and return to the Company any copies of any Confidential Information after the Executive ceases to be employed by the Company. Anything to the contrary notwithstanding, nothing in this Section 6 shall prevent the Executive from retaining a home computer (provided all Confidential Information has been removed), papers and other materials of a personal nature, including diaries, calendars and contact lists (excluding customer lists), information relating to the Executive's compensation or relating to reimbursement of expenses, [information obtained in the Executive's capacity as an investor in the Company or any of its Affiliates or in his separate capacity in any other commercial relationship,] information that may be needed for tax purposes, and copies of plans, programs and agreements relating to the Executive's employment.

(c)    Non-Competition; Non-Solicitation.

(i)    During the Restricted Period, the Executive shall not, directly or indirectly: (A) solicit, service, or assist any other individual, person, firm, or other entity in soliciting or servicing, any Customer for the purpose of providing and/or selling any products that are provided and/or sold by any member of the Company Group, or performing any services that are performed by any member of the Company Group, or performing any services or providing and/or selling any products that any member of the Company Group proposed to initiate performing, selling or providing during the twelve (12)-month period immediately preceding the Termination Date, based on active discussions with the Board that occurred during such twelve (12)-month period, as evidenced by existing memoranda, Board minutes or other written correspondence, and only to the extent the Company Group was capable of pursuing such proposals as a business and financial matter; (B) interfere with or damage any relationship and/or agreement between any member of the Company Group and any Customer; or (C) associate (including, but not limited to, association as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, contractor, director or otherwise) with any Competitive Enterprise; provided, however, that [(x)] the Executive may own, as a passive investor, securities of any such entity that has outstanding publicly traded securities, so long as the Executive's direct holdings in any such entity shall not in the aggregate constitute more than 5% of the voting power of such entity[, and (y) the exercise of any rights or remedies of the Executive or any of his Affiliates under any other agreements with the Company or any of its Affiliates, including, without limitation, the Trademark License Agreement and the Facilities Use Agreement, will not be deemed to be a breach of this Section 6(c)].  The Executive acknowledges that this covenant has a unique, very substantial, and immeasurable value to the Company, that the Executive has sufficient assets and skills to provide a livelihood for the Executive while such covenant remains in force, and that, as a result of the foregoing, in the event that the

10

Executive breaches such covenant, monetary damages would be an insufficient remedy for the Company and equitable enforcement of the covenant would be proper.

(ii)     During the Restricted Period, the Executive shall not solicit, entice, persuade, or induce any individual who is employed or engaged by any member of the Company Group (or who was so employed or engaged within six (6) months immediately preceding the Executive's Termination Date) to terminate or refrain from continuing such employment or engagement or to become employed by or enter into contractual relations with any other individual or entity other than a member of the Company Group, and the Executive shall not hire, directly or indirectly, on the Executive's behalf or on behalf of any other person, as an employee, consultant, or otherwise, any such person.

(d)     Mutual Non-Disparagement.  The Executive agrees not to, at any time, make negative comments about or otherwise disparage any member of the Company Group or any officer, director, employee, shareholder, agent or product of any member of the Company Group, other than to officers, employees, or directors of the Company Group in the good faith performance of the Executive's duties to the Company while the Executive is employed by the Company.  The Company agrees that it will direct the senior officers of the Company and its Subsidiaries as of the Termination Date and the members of the Board as of the Termination Date to refrain from making negative comments about the Executive or otherwise disparaging the Executive in any manner, including by making or issuing any official public statements or press releases disparaging the Executive.  The foregoing shall not be violated by truthful statements in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, depositions in connection with such proceedings).

(e)     Inventions.

(i)     The Executive acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, works of authorship, and other work product, whether patentable or unpatentable, (A) that are reduced to practice, created, invented, designed, developed, contributed to or improved with the use of any Company resources and/or within the scope of the Executive's work with the Company, or that relate to the business, operations or actual or demonstrably anticipated research or development of the Company, and that are made or conceived by the Executive, solely or jointly with others, during the Term, or (B) suggested by any work that the Executive performs in connection with the Company, either while performing the Executive's duties with the Company or on the Executive's own time, shall belong exclusively to the Company (or its designee), whether or not patent or other applications for intellectual property protection are filed thereon (the "Inventions").  The Executive will keep full and complete written records (the "Records"), in the manner prescribed by the Company, of all Inventions and will promptly disclose all Inventions completely and in writing to the Company.  The Records shall be the sole and exclusive property of the Company, and the Executive will surrender them upon the termination of the Term, or upon the Company's earlier written request.  The Executive irrevocably conveys, transfers and assigns to the Company the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the Term, together with the right to file, in the Executive's name or in the name of the Company (or its designee), applications for patents and equivalent

11

rights (the "Applications").  The Executive will, at any time during and subsequent to the Term, make such applications, sign such papers, take all rightful oaths and perform all other acts as may be requested from time to time by the Company to perfect, record, enforce, protect, patent or register the Company's rights in the Inventions, all without additional compensation to the Executive from the Company.  The Executive will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to the Executive from the Company, but entirely at the Company's expense.

(ii)  In addition, the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Company, and the Executive agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to the Executive.  If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Company, the Executive hereby irrevocably conveys, transfers and assigns to the Company all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of the Executive's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom.  In addition, the Executive hereby waives any so-called "moral rights" with respect to the Inventions.  To the extent that the Executive has any rights in the results and proceeds of the Executive's service to the Company that cannot be assigned in the manner described herein, the Executive agrees to unconditionally waive the enforcement of such rights.  The Executive hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to the Executive's benefit by virtue of the Executive being an employee of or other service provider to the Company.

(iii)  18 U.S.C. Section 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. Section 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. Section 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law.

12

The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(iv)     [The term "intellectual property," as used in this Section 6(e), expressly includes all intellectual property, except for any trade names and trademarks owned by HFR and licensed to the Company pursuant to the Trademark License Agreement.]

(f)     Conflicting Obligations and Rights.  The Executive agrees to inform the Company of any apparent conflicts between the Executive's work for the Company and any obligations the Executive may have to preserve the confidentiality of another's proprietary information or related materials before using the same on the Company's behalf.  The Company shall receive such disclosures in confidence and consistent with the objectives of avoiding any conflict of obligations and rights or the appearance of any conflict of interest.

(g)     Reasonableness of Restrictive Covenants.  In signing this Agreement, the Executive gives the Company assurance that the Executive has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under this Section 6 hereof.  The Executive agrees that these restraints are necessary for the reasonable and proper protection of the Company and the other members of the Company Group and their Confidential Information, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent the Executive from obtaining other suitable employment during the period in which the Executive is bound by the restraints.   The Executive acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company and the other members of the Company Group, and that the Executive has sufficient assets and skills to provide a livelihood while such covenants remain in force.  The Executive further covenants that the Executive will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 6.  It is also agreed that each member of the Company Group will have the right to enforce all of the Executive's obligations to any other member of the Company Group under this Agreement, including, without limitation, pursuant to this Section 6.

(h)     Reformation.  If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 6 is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state.

(i)     Enforcement.  The Executive acknowledges that, in the event of any breach or threatened breach of this Section 6, the business interests of the Company and the other members of the Company Group might be irreparably injured, the full extent of the damages to the Company and the other members of the Company Group might be impossible to ascertain, monetary damages might not be an adequate remedy for the Company and the other members of the Company Group, and the Company will be entitled to seek to enforce this Agreement by a temporary, preliminary and/or permanent injunction or other equitable relief.  The Executive understands that the Company may waive some of the requirements expressed in this Agreement, but that such a waiver to be effective must be made in writing and should not in any way be deemed

13

a waiver of the Company's right to enforce any other requirements or provisions of this Agreement. The Executive agrees that each of the Executive's obligations specified in this Agreement is a separate and independent covenant and that the unenforceability of any of them shall not preclude the enforcement of any other covenants in this Agreement.

7.    **Cooperation**.  Upon the receipt of reasonable notice from the Company (including through outside counsel), the Executive agrees that, while employed by the Company and thereafter, the Executive will respond and provide information with regard to matters in which the Executive has knowledge as a result of the Executive's employment with the Company, and will provide reasonable assistance to the Company, other members of the Company Group and their respective representatives, in defense of any claims that may be made against the Company or any other member of the Company Group, and will assist the Company and other members of the Company Group in the prosecution of any claims that may be made by the Company or any other member of the Company Group, to the extent that such claims are based on facts occurring during the Executive's employment with the Company (collectively, the "Claims").  During the pendency of any litigation or other proceeding involving Claims, the Executive shall not communicate with anyone (other than the Executive's attorneys and tax and/or financial advisors**,** and except to the extent that the Executive determines in good faith is necessary in connection with the performance of the Executive's duties hereunder) with respect to the facts or subject matter of any pending or potential litigation or regulatory or administrative proceeding involving the Company or any other member of the Company Group without, to the extent legally permitted to do so, giving prior written notice to the Company or the Company's counsel.  Upon presentation of appropriate documentation, the Company shall pay or reimburse the Executive for all reasonable out-of-pocket travel, duplicating or telephonic expenses incurred by the Executive in complying with this Section 7.  The Company shall cooperate with the Executive on the timing and location of the Executive's cooperation and use its good faith efforts to limit any travel or interference with the Executive's other professional commitments.  In addition, following the Executive's termination of employment, to the extent the Executive is not receiving any Severance Benefits in respect of such post-termination period, the Executive shall be compensated for the time spent for such cooperation at an hourly rate determined based on the Executive's Base Salary at the rate in effect as of the Termination Date.

8.    **Whistleblower Protection; Protected Activity**.

(a)    Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede the Executive (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including, but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation.  The Executive does not need the prior authorization of the Company to make any such reports or disclosures, and the Executive shall not be required to notify the Company that such reports or disclosures have been made.

(b)    The Executive hereby acknowledges and agrees that nothing in this Agreement shall in any way limit or prohibit the Executive from engaging for a lawful purpose in any Protected Activity.  For purposes of this Agreement, "Protected Activity" shall mean (i) filing a charge, complaint or report with, or otherwise communicating with, cooperating with or participating in any investigation or proceeding that may be conducted by, any federal, state or

local government agency or commission, including the Equal Employment Opportunity Commission, the Department of Labor, the Occupational Safety and Health Administration, and the National Labor Relations Board (the "Government Agencies"); or (ii) any rights the Executive may have under Section 7 of the National Labor Relations Act or equivalent state law to engage in concerted protected activity or to discuss the terms of employment or working conditions with or on behalf of coworkers, or to bring such issues to the attention of the Board at any time.  The Executive understands that, in connection with such Protected Activity, the Executive is permitted to disclose documents or other information as permitted by law, and without giving notice to, or receiving authorization from, the Company.  Notwithstanding the foregoing, the Executive agrees to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Confidential Information to any parties other than the relevant Government Agencies.  The Executive further understands that Protected Activity does not include the disclosure of any Company attorney-client privileged communications, and that any such disclosure without the Company's written consent shall constitute a material breach of this Agreement.

9.      **Notices**.  All notices, demands, requests or other communications, which may be or are required to be given or made by any party to any other party pursuant to this Agreement, shall be in writing and shall be hand delivered, mailed by first-class registered or certified mail, return receipt requested, postage prepaid, delivered by overnight air courier, or transmitted by e-mail or facsimile transmission, addressed as follows:

(a)      If to the Company:

[HORNBECK OFFSHORE OPERATORS, LLC]
[ADDRESS]
Attention: [INSERT NAME AND TITLE]
E-Mail: [INSERT]

with copies (which shall not constitute notice) to:

[                    ]

(b)      If to the Executive:

Address last shown on the Company's books and records

Each party may designate by notice in writing a new address to which any notice, demand, request or communication may thereafter be so given, served or sent.  Each notice, demand, request or communication that shall be given or made in the manner described above shall be deemed sufficiently given or made for all purposes at such time as it is delivered to the addressee (with the return receipt, the delivery receipt, confirmation of facsimile transmission or the affidavit of messenger being deemed conclusive but not exclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

10.     **Severability**.  The provisions of this Agreement shall be deemed severable.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction,

15

it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by applicable law. If any term or provision of this Agreement is found to be invalid or unenforceable by a final determination of a court of competent jurisdiction, the invalid or unenforceable term or provision hereof shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision hereof.

11.     **Survival**.  It is the express intention and agreement of the parties hereto that the provisions of Sections 5 through 22 shall survive the termination of employment of the Executive. In addition, all obligations of the Company to make payments hereunder shall survive any termination of this Agreement on the terms and conditions set forth herein.

12.     **No Assignments**.  The rights and obligations of the parties to this Agreement shall not be assignable or delegable, except that (a) in the event of the Executive's death, the personal representative or legatees or distributees of the Executive's estate, as the case may be, shall have the right to receive any amount owing and unpaid to the Executive hereunder; and (b) the rights and obligations of the Company hereunder shall be assignable and delegable to an Affiliate or in connection with any subsequent merger, consolidation, sale of all or substantially all of the assets or equity interests of the Company, or similar transaction involving the Company or a successor corporation.  The Company shall require any successor to the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

13.     **Binding Effect**.  Subject to any provisions hereof restricting assignment, this Agreement shall be binding upon the parties hereto and shall inure to the benefit of the parties and their respective heirs, devisees, executors, administrators, legal representatives, successors and assigns.

14.     **Amendments; Modifications; Waivers**.  No provision of this Agreement may be amended, modified, waived or discharged, unless such amendment, modification, waiver or discharge is agreed to in writing and signed by the Executive and such officer or director of the Company as may be designated by the Board.  No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time unless such waiver specifically states that it is to be construed as a continuing waiver.

15.     **Section Headings; Inconsistency**.  Section and subsection headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.  In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall govern and control, unless otherwise expressly provided.

16.     **Governing Law**.  This Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the State of Louisiana (but not including any choice of law rule that would cause the laws of another jurisdiction to apply).

16

17.    **Dispute Resolution**.  Each of the parties hereto irrevocably and unconditionally (a) WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING RELATING TO THIS AGREEMENT OR THE EXECUTIVE'S EMPLOYMENT BY THE COMPANY OR ANY OTHER MEMBER OF THE COMPANY GROUP, or for the recognition and enforcement of any judgment in respect thereof (a "Proceeding"), whether such Proceeding is based on contract, tort or otherwise; (b) agrees that service of process in any such Proceeding may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at the Executive's or its address as provided in Section 9; and (c) agrees that nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by applicable law.

18.    **Entire Agreement; Advice of Counsel**.  This Agreement constitutes the entire agreement between the parties respecting the employment of the Executive, there being no representations, warranties or commitments except as set forth herein, and supersedes and replaces all other agreements related to the subject matter hereof of, including, without limitation, the Original Agreement.  The Executive acknowledges that, in connection with the Executive's entry into this Agreement, the Executive was advised, or had the opportunity to be advised, by an attorney of the Executive's choice on the terms and conditions of this Agreement, including, without limitation, on the application of Section 409A of the Code on the payments and benefits payable or to be paid to the Executive hereunder.

19.    **Counterparts**.  This Agreement may be executed (including by email with scan attachment) in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

20.    **Withholding**.  The Company may withhold from any and all amounts payable under this Agreement or otherwise such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

21.    **Section 409A of the Code**.

(a)    The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Code and the regulations and guidance promulgated thereunder (collectively, "Section 409A of the Code"), and accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.  If the Executive notifies the Company (with specificity as to the reason therefor) that the Executive believes that any provision of this Agreement (or of any award of compensation, including equity compensation or benefits) would cause the Executive to incur any additional tax or interest under Section 409A of the Code and the Company concurs with such belief or the Company (without any obligation whatsoever to do so) independently makes such determination, the Company shall, after consulting with the Executive, reform such provision to attempt to comply with Section 409A of the Code through good faith modifications to the minimum extent reasonably appropriate to conform with Section 409A of the Code.  To the extent that any provision hereof is modified in order to comply with Section 409A of the Code, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to the Executive and the Company of the applicable provision without violating the provisions of Section 409A of the Code.  For the sake of clarity, the Company shall have no obligation to indemnify the Executive for liabilities incurred as a result of Section 409A of the Code.

17

(b)     A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code, and for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service."   If the Executive is deemed on the Termination Date to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then with regard to any payment or the provision of any benefit that is considered deferred compensation under Section 409A of the Code payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6) month period measured from the date of such "separation from service" of the Executive, and (ii) the date of the Executive's death, to the extent required under Section 409A of the Code.   Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 22(b) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Executive in a lump sum with interest at the prime rate as published in *The Wall Street Journal* on the first business day following the date of the "separation from service," and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(c)     To the extent that reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Section 409A of the Code, (i) all expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by the Executive; (ii) any right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit; and (iii) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

(d)     For purposes of Section 409A of the Code, the Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

(e)     Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Code be subject to offset by any other amount unless otherwise permitted by Section 409A of the Code.

22.     **Definitions**.

(a)     "Affiliate" means any entity controlled by, in control of, or under common control with, the Company.

(b)     "Cause" shall be limited to the following events: (i) the Executive's conviction of either (A) a felony involving moral turpitude or (B) any crime in connection with the Executive's employment that causes the Company Group a substantial detriment (in each case,

18

excluding traffic offenses); (ii) actions or inactions by the Executive that clearly are contrary to the best interests of the Company Group and the express directives of the Board; provided, that such actions or inactions by the Executive cause the Company Group a substantial detriment or could reasonably be expected to cause a substantial detriment to the Company Group as determined by the Board in good faith; (iii) the Executive's willful failure to take actions permitted by law and necessary to implement policies of the Board that the Board has communicated to him in writing; provided, that, such policies that are reflected in minutes of a Board meeting attended in its entirety by the Executive shall be deemed communicated to the Executive to the extent the Executive received a copy of such minutes from the Secretary or the General Counsel of the Company promptly following approval by the Board; (iv) the Executive's continued failure to attend to his material duties as an executive officer of the Company Group following the Executive's receipt of written notice from the Board of such failure; provided, that such failure by the Executive causes the Company Group a substantial detriment or could reasonably be expected to cause a substantial detriment to the Company Group as determined by the Board in good faith; (v) the Executive's commission of an act of fraud or material act of dishonesty or misappropriation involving the Company Group; (vi) the Executive's willful violation of law or gross negligence that is substantially detrimental to the Company; (vii) the material breach or material violation by the Executive of this Agreement or any other written agreement with a member of the Company Group, or any material violation of any written policy of the Company Group; provided, that such material breach or material violation by the Executive causes the Company Group a substantial detriment or could reasonably be expected to cause a substantial detriment to the Company Group as determined by the Board in good faith; or (viii) the Executive's habitual use of illicit drugs or habitual abuse of alcohol that, in the reasonable good faith opinion of the Board, renders the Executive unfit to serve as an officer of the Company Group.  If any determination of habitual use or substantial dependence under clause (viii) is disputed by the Executive, the parties hereto agree to abide by the decision of a panel of three (3) physicians appointed in the manner specified in Section 22(h) of the Agreement.  For purposes of this "Cause" definition, no action or inaction will be considered "willful" or will constitute "gross negligence", if the Executive had a reasonable, good faith belief that such action or inaction was in the best interests of the Company Group.  Anything herein to the contrary notwithstanding, the Executive shall not be terminated for "Cause" hereunder, unless (A) written notice stating the basis for the termination is provided to the Executive, and (B) with the exception of clause (i) of this paragraph, the Executive is given ten (10) business days to cure the neglect or conduct that is the basis of such claim, to the extent curable.

(c)    "Change of Control" has the meaning set forth in the [2020 Management Incentive Plan of [Reorganized Hornbeck]].

(d)    "Company Group" means the Company and each of its Subsidiaries and Affiliates.

(e)    "Competitive Enterprise" means the offshore transportation of refined and unrefined petroleum products, offshore towing, offshore supply vessel services, anchor handling and towing services, well stimulation vessel services, well-test services, offshore pipeline remediation services, ROV support services, offshore construction services, and other services required in the offshore construction, energy exploration and production industry and in specialty services in coastal waters in the Restricted Area.

19

(f)      "Confidential Information" means all non-public information concerning trade secrets, know-how, software, developments, inventions, processes, technology, designs, financial data, strategic business plans or any proprietary or confidential information, documents or materials in any form or media, including any of the foregoing relating to research, operations, finances, current and proposed products and services, vendors, customers, advertising and marketing, and other non-public, proprietary and confidential information of the Company Group. Notwithstanding anything to the contrary contained herein, the general skills, knowledge and experience gained during the Executive's employment with the Company, information publicly available or generally known within the industry or trade in which the Company competes, and information or knowledge possessed by the Executive prior to the Executive's employment by the Company shall not be considered Confidential Information.

(g)      "Customer" means any person, firm, corporation or other entity whatsoever to whom the Company or its Subsidiaries provided or actively sought to provide services or sold or actively sought to sell any products within a twelve (12)-month period on, before, or after the Executive's Termination Date.

(h)      "Disability" means that the Executive is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of at least three (3) months under any long term disability plan maintained by the Company that covers the Executive.  In the absence of such a long term disability plan, "Disability" means the inability of the Executive, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, to perform the duties required of him under this Agreement for a period of at least ninety (90) days in any one (1)-year period.  Upon such determination, the Board may terminate the Executive's employment under this Agreement, subject to providing ten (10) days' prior written notice.  The Executive agrees, in the event of any dispute hereunder as to whether a Disability exists, the parties hereto agree to abide by the decision of a panel of three (3) physicians.  The Executive and the Board shall each appoint one member to the panel, and the third member of the panel shall be appointed by the other two members.  The Executive agrees to make himself available for, and submit to examinations by, such physicians as may be directed by the Board.  Failure to submit to any such examination shall constitute a breach of a material part of this Agreement.  This Section 22(h) shall be interpreted and applied so as to comply with the provisions of the Americans with Disabilities Act and any applicable state or local laws.

(i)      "Good Reason" means, unless otherwise agreed to in writing by the Executive, (i) any material diminution in the Executive's titles, duties, responsibilities, status or authorities with the Company or any of its material operating Subsidiaries; (ii) a material reduction in the Executive's Base Salary or Target Bonus; (iii) a relocation of the Executive's primary place of employment to a location more than thirty-five (35) miles farther from the Executive's primary residence than the current location of the Company's offices in Louisiana as of the Effective Date; or (iv) a material breach by the Company of this Agreement or any other agreement between the Company and the Executive.  In order to invoke a termination for Good Reason, (A) the Executive must provide written notice within forty-five (45) days of the Executive becoming aware of the occurrence of any event of "Good Reason," (B) the Company must fail to cure such event within

20

thirty (30) days of the giving of such notice, and (C) the Executive must terminate employment within forty-five (45) days following the expiration of the Company's cure period.

(j)      "Restricted Area" means (i) the United States or (ii) any other country in which the Company Group conducts or takes concrete, active steps to conduct the Competitive Enterprise during the Executive's employment or service with the Company Group during the Restricted Period, as evidenced by existing memoranda, Board minutes or other written correspondence.

(k)      "Restricted Period" means the period commencing on the Effective Date and ending twenty-four (24) months following the Executive's Termination Date.

(l)      "Subsidiary" means any subsidiary corporation of the Company within the meaning of Section 424(f) of the Code.

[*Remainder of Page Intentionally Left Blank*]

21

IN WITNESS WHEREOF, the undersigned have duly executed and delivered this Agreement or have caused this Agreement to be duly executed and delivered on their behalf.

**[HORNBECK OFFSHORE OPERATORS, LLC]**

By:_____

Name: _____

Title: _____

**[EXECUTIVE]**

_____

[**NAME**]

## **EXHIBIT A**
## **OUTSIDE BOARD MEMBERSHIP**

[To come].

**EXHIBIT B**
**GENERAL RELEASE**

I, [**Full Name**], in consideration of payment by **[Hornbeck Offshore Operators, LLC]** (together with its Subsidiaries, the "Company") of the amounts set forth in Section 4[(d)][(e)] of the Employment Agreement, dated as of **[●]**, 2020 (the "Agreement"), do hereby release and forever discharge, as of the date hereof, the Company and its Affiliates and all of their respective present, former and future managers, directors, officers, employees, successors and assigns of the Company and its Affiliates and direct or indirect owners [, (which, for the avoidance of doubt, shall include the Permitted Holders (as defined in the 2020 Management Incentive Plan of [Reorganized Hornbeck))]] (collectively, the "Released Parties") to the extent provided below (this "General Release"). The Released Parties are intended to be third-party beneficiaries of this General Release, and this General Release may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such Released Parties hereunder. Terms used herein but not otherwise defined shall have the meanings given to them in the Agreement.

1.  My employment with the Company terminated as of [Date], and I hereby resign from any position as an officer, member of the board of managers or directors (as applicable) or fiduciary of the Company or any other member of the Company Group (or reaffirm any such resignation that may have already occurred). I understand that any payments or benefits paid or granted to me under Section 4 of the Agreement represent, in part, consideration for signing this General Release and are not salary, wages or benefits to which I was already entitled. I understand and agree that I will not receive certain of the payments and benefits specified in Section 4 of the Agreement, unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter. I understand and agree that such payments and benefits are subject to my continued material compliance with Section 6 of the Agreement (as more fully set forth in the Agreement) during the period in which I am paid the Severance Benefits pursuant to Section 4[(d)][(e)] of the Agreement, which (as noted below) expressly survive my termination of employment and the execution of this General Release. Such payments and benefits will not be considered compensation for purposes of any employee benefit plan, program, policy, or arrangement maintained or hereafter established by the Company or its Affiliates.

2.  Except as provided in paragraphs 4 and 5 below and except for the provisions of the Agreement which expressly survive the termination of my employment with the Company, I knowingly and voluntarily (for myself and my heirs, executors, administrators and assigns) release and forever discharge the Company and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date on which I execute this General Release) and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties, which I, my spouse, or any of my heirs, executors, administrators or assigns may have, which arise out of or are connected with my employment with, or my separation or termination from, the Company (including, but not limited to, any allegation, claim, or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act

of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; Sections 23:301 to 23:369 of the Louisiana Revised Statutes; Article 2315 of the Louisiana Civil Code; the Louisiana Workers' Compensation Act; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, or defamation; or any claim for costs, fees, or other expenses, including attorneys' fees, incurred in these matters) (all of the foregoing collectively referred to herein as the "Claims").

3.  I represent that I have made no assignment or transfer of any right, claim, demand, cause of action or other matter covered by paragraph 2 above.

4.  I agree that this General Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967 which arise after the date I execute this General Release. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of the Agreement shall not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

5.  I agree that I hereby waive all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever in respect of any Claim, including, without limitation, reinstatement, back pay, front pay and any form of injunctive relief. Notwithstanding the above, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding; provided, however, that I disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding. Additionally, I am not waiving (a) any right to the Accrued Benefits or any Severance Benefits to which I am entitled under Section 4[(d)][(e)] of the Agreement, (b) any rights I have under Section 4(e) of the Agreement in the event a Qualifying Termination becomes a Change of Control Qualifying Termination, (c) any claim relating to directors' and officers' liability insurance coverage or any right of indemnification under the Company's organizational documents or otherwise, or (d) my rights as an equity or security holder in the Company or its Affiliates.

6.  In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. I expressly consent that this General Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state or local statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver the Company would not have agreed to the terms of the Agreement. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my

A-2

behalf, this General Release shall serve as a complete defense to such Claims to the maximum extent permitted by law.  I further agree that I am not aware of any pending claim of the type described in paragraph 2 above as of the execution of this General Release.

7. I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

8. I agree that I will forfeit all amounts payable by the Company pursuant to the Agreement if I challenge the validity of this General Release. I also agree that if I violate this General Release by suing the Company or the other Released Parties, I will pay all costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees, and return all payments received by me pursuant to the Agreement on or after the termination of my employment.

9. I agree that this General Release and the Agreement are confidential and agree not to disclose any information regarding the terms of this General Release or the Agreement, except to my immediate family and any tax, legal or other counsel I have consulted regarding the meaning or effect hereof or as required by law, and I will instruct each of the foregoing not to disclose the same to anyone.  The Company agrees to disclose any such information only to any tax, legal, or other counsel of the Company as required by law.

10. Any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the National Association of Securities Dealers, Inc. (NASD), any other self-regulatory organization or governmental entity.

11. I hereby acknowledge that Sections 5 through 22 of the Agreement shall survive my execution of this General Release.

12. I represent that I am not aware of any claim by me other than the claims that are released by this General Release.  I acknowledge that I may hereafter discover claims or facts in addition to or different than those which I now know or believe to exist with respect to the subject matter of the release set forth in paragraph 2 above and which, if known or suspected at the time of entering into this General Release, may have materially affected this General Release and my decision to enter into it, but I nonetheless shall continue to be bound by this General Release in all respects.

13. Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach by the Company or by any Released Party of the Agreement after the date hereof.

14. Whenever possible, each provision of this General Release shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed, and

A-3

enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

(i)    I HAVE READ IT CAREFULLY;

(ii)   I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING, BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED; TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963; THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

(iii)  I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

(iv)   I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

(v)    I HAVE HAD AT LEAST [**TWENTY-ONE (21)**][**FORTY-FIVE (45)**] DAYS FROM THE DATE OF MY RECEIPT OF THIS GENERAL RELEASE TO CONSIDER IT AND THE CHANGES MADE SINCE MY RECEIPT OF THIS GENERAL RELEASE ARE NOT MATERIAL OR WERE MADE AT MY REQUEST AND WILL NOT RESTART THE REQUIRED [TWENTY-ONE (21)][FORTY-FIVE (45)]-DAY PERIOD;

(vi)   I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS GENERAL RELEASE TO REVOKE IT AND THAT THIS GENERAL RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(vii)  I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(viii) I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

SIGNED:_____     DATED:_____

A-4